```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   UNITED STATES OF AMERICA        .  CR. NO. H-12-691-2
                                     .  HOUSTON, TEXAS
 4   VS.                             .
                                     .  APRIL 21, 2014
 5   DAVID MORSE BARRY               .  9:00 A.M. to 5:00 P.M.

 6

 7                         DAY 1 of 5
                      TRANSCRIPT of BENCH TRIAL
 8            BEFORE THE HONORABLE LEE H. ROSENTHAL
                   UNITED STATES DISTRICT JUDGE
 9


10   APPEARANCES:

11
     FOR THE GOVERNMENT:            MS. SHERRI L. ZACK
12                                  U.S. Attorney's Office
                                    1000 Louisiana
13                                  Suite 2300
                                    Houston, Texas   77002
14


15
     FOR THE DEFENDANT:             MR. ROBERT T. JARVIS
16                                  Robert T. Jarvis Law
                                      Firm, P.C.
17                                  123 W Houston
                                    Sherman, Texas   75090
18
                                    MS. KIMBERLY F. MINICK
19                                  Minick Law Firm, P.C.
                                    3340 Camp Bowie Blvd.
20                                  Suite 100
                                    Fort Worth, Texas   76107
21
     THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
22   CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
     COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
23   ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
     COPY AT THE OFFICIAL RATE.   General Order 94-15, United States
24   District Court, Southern District of Texas.

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

1                          <u>APPEARANCES CONTINUED</u>

2
ALSO PRESENT:                      MR. JEFFERY G. CHAPPELL
3

4
OFFICIAL COURT REPORTER:           MS. KATHY L. METZGER
5                                  U.S. Courthouse
                                   515 Rusk
6                                  Room 8004
                                   Houston, Texas   77002
7                                  713-250-5208

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2                                                              PAGE

3    OPENING STATEMENTS

4    By Ms. Zack                                              10
     By Mr. Jarvis                                            13
5

6
     GOVERNMENT'S WITNESS
7
     Jeffery G. Chappell
8       Direct Examination by Ms. Zack                        19
        Cross-examination by Mr. Jarvis                       142
9

10

11

12                            *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2        (Open Court, Defendant present.)
 3             THE COURT:  Good morning.  Please be seated, after you
 4    state your appearances.
 5             MS. ZACK:  Sherri Zack and Bob Stabe on behalf of the
 6    United States, Your Honor.
 7             THE COURT:  And who is with you at counsel table?
 8             MS. ZACK:  Lolita Pouncy, a paralegal in our office,
 9    and Special Agent Jeffery Chappell from HSI, Your Honor.
10             THE COURT:  All right.  Thank you.
11             MR. JARVIS:  Good morning, Judge.  Bob Jarvis and Kim
12    Minick for the defense, David Barry.
13             THE COURT:  All right.  Thank you.
14                  We have a number of documents.  Are there any
15    issues relating to those that we can take up at this time?
16             MS. ZACK:  Your Honor, we have provided the Court with
17    a copy of the exhibit notebook.  We have provided the same copy
18    to the defense.  And we have also provided the most updated
19    version of the exhibit list to everybody.  There are -- the
20    only additions to that list, Your Honor, are the things from
21    the stipulation that occurred last week, and that would be 28a
22    and b, which are the interviews of XXXXXXX Barry from 6-7-13
23    and 6-14-13.
24             THE COURT:  28a and b?
25             MS. ZACK:  Yes, Your Honor, the CDs.
```

1          THE COURT:  Yes.  All right.

2          MS. ZACK:  Yeah, these are DVDs of the interviews.

3   They were part of the trial stipulations that the Defendant

4   signed off on last week.

5          THE COURT:  How are the numbers on the current exhibit

6   list?  Are they the -- are the numbers that were on the -- of

7   the exhibits that were previously listed carried over so there

8   are no changes?

9          MS. ZACK:  That's my understanding, yes, Your Honor.

10         THE COURT:  All right.  Good.

11             Any objection to admitting 28a and b?

12         MR. JARVIS:  Judge, we don't have a copy of the

13   newest --

14         MS. ZACK:  It's inside your notebook.

15         MR. JARVIS:  Oh, okay.

16         MS. MINICK:  Are you removing --

17         MR. JARVIS:  So, just for clarification, so the only

18   change is 28, you changed that to a forensic video?

19         MS. ZACK:  We added that.

20         MS. MINICK:  Well, your previous one had 28 and 29,

21   which were the birth certificates.

22         MS. ZACK:  Right.  We took those off, since the

23   stipulation as to -- the first stipulation gives both their

24   dates of birth.

25         THE COURT:  So, 27 is now -- that's the adoption

 1  certificate.  I assume that --

 2          MS. ZACK:  Correct, that's still the same.

 3          THE COURT:  All right.

 4          MR. JARVIS:  They changed the birth certificate to the

 5  interview.  Okay.

 6          MS. ZACK:  Right.

 7          MR. JARVIS:  So you --

 8          MS. ZACK:  Correct.

 9          THE COURT:  All right.  So, 28 and 29 are withdrawn.

10  28a and 28b, are those to be admitted without objection?

11          MR. JARVIS:  No, ma'am.  We had a previous objection

12  about those, you have already ruled on.  Subject to our

13  previous objection, yes, ma'am.

14          THE COURT:  No, these are the interviews.  I thought

15  that the stipulation covered these.  What am I

16  misunderstanding?

17          MR. JARVIS:  No, we stipulated that if he was to be

18  called, that's what he would say.

19          THE COURT:  All right.

20          MR. JARVIS:  But we still had our objection that you

21  earlier overruled, and we just want to make sure that --

22          THE COURT:  Okay.

23          MR. JARVIS:  -- we're not giving up --

24          THE COURT:  So they're admitted subject to your

25  objection.

1          *MR. JARVIS:*  Yes.

2          *THE COURT:*  All right.  That's fine.  Your objection

3    is noted, but these are admitted.

4          *MR. JARVIS:*  Yes, ma'am.

5          *MS. ZACK:*  And that was based on the 414, 404

6    conversation and objections that we went back and forth.  The

7    things that Your Honor had conditionally admitted was 4aa

8    through gg and everything in Exhibit 7.

9          *THE COURT:*  Yes.

10          *MS. ZACK:*  And 17n through t.  Those were all

11    conditionally admitted and Your Honor had asked for

12    supplemental briefing on that, which the Government provided,

13    and so as a matter of housekeeping at this time, Your Honor,

14    are those going to be --

15          *THE COURT:*  Do you have copies of the briefs?

16          *MS. ZACK:*  I have a copy, yes, Your Honor.

17          *THE COURT:*  That would be helpful.

18      *(Judge conferring with law clerk.)*

19          *MS. ZACK:*  No, I have it.  It's here.

20          *THE COURT:*  I'll get them, never mind.  We'll take up

21    the issue when you get to it in the trial.

22          *MS. ZACK:*  Okay.  Here it is, Your Honor, both of

23    them.

24          *THE COURT:*  All right.  Thank you.

25          *MS. ZACK:*  That's the first one.  Here they both are.

1          *THE COURT:*  Thank you.

2          *MS. ZACK:*  So this was the first one that we filed,

3    and then this is the United States' additional notice of

4    intention to use.

5          *THE COURT:*  Thank you.

6          *MS. ZACK:*  Focusing specifically on the case law that

7    was discussed in the courtroom that day.

8          *THE COURT:*  Good.

9          *MS. ZACK:*  The only other housekeeping like matter,

10   Your Honor, is as to the admission of 28a and b, I don't know

11   that -- being that there will be no cross of anybody, that

12   that's a DVD, I don't know at some point, wherever we get to

13   the trial where I want that to come in, is Your Honor just

14   going to view them privately or how are we going to --

15         *THE COURT:*  We'll probably view them in the courtroom,

16   so I can hear any concerns that --

17         *MS. ZACK:*  Okay.

18         *THE COURT:*  -- either side may want to express about

19   them.

20         *MS. ZACK:*  Okay.  Thank you.  And I think that that's

21   it for now.  We have the computer and the screen set up, Your

22   Honor.  Every exhibit that we plan on showing on the screen is

23   in Your Honor's notebook.  The reason we've put it on disk is

24   it's hard sometimes to flip back and forth in the notebook --

25         *THE COURT:*  That's fine.

1          *MS. ZACK:*  -- and I think it will just make for a

2     fluid presentation.  But if there's ever any question of what

3     Your Honor is looking at, if the screen isn't clear or

4     whatever, you do have a printed paper copy in front of you.

5          *THE COURT:*  All right.  Thank you.

6          *MS. ZACK:*  And I don't believe there's -- other than,

7     you know, we've already admitted the stipulated items, I don't

8     think there's anything else at this time from the United

9     States.

10          *THE COURT:*  All right.  Very good.

11               Anything on behalf of the Defendant?

12          *MR. JARVIS:*  No, ma'am.

13          *THE COURT:*  All right.  You have a more up-to-date

14     exhibit list as well, it looks like?

15          *MR. JARVIS:*  Yes, ma'am.

16          *THE COURT:*  Do you want to tend to any of these

17     matters now?  How is it different?

18          *MR. JARVIS:*  All we did was change the description of

19     some of the pictures of David Barry and his family.

20          *THE COURT:*  All right.

21          *MR. JARVIS:*  And those have been provided to the

22     Government.

23          *THE COURT:*  Very good.

24          *MR. JARVIS:*  So there's really no big difference.

25          *THE COURT:*  Very good.  All right.  I think we are

 1    ready then.   Do the parties want to make an opening?

 2              MS. ZACK:  Yes, Your Honor.

 3              THE COURT:  Go ahead then.

 4              MS. ZACK:  Your Honor, this situation -- this case

 5    started based on HSI Dallas sending a lead to Houston, to

 6    Special Agent Chappell who was assigned the task of

 7    investigating an individual that became known to him as Craig

 8    Noonan, William Craig Noonan.  And in the course of executing a

 9    search warrant at that home, he had been provided, Special

10    Agent Chappell, that is, with a picture of who they believed to

11    be Mr. Noonan and two children.

12              At the same time -- that was on February 8th of

13    2011.  And at the same time, the day before, on February 7th of

14    2011, HSI Dallas executed a warrant at the home of Mr. Barry.

15    Computers were taken.  Cameras were taken.  Interviews were

16    had.  And what was found was that there were images of the two

17    children who ultimately were identified as R.B. and O.B. with

18    Mr. Noonan in lewd and lascivious displays.  There were images

19    that contained Mr. Barry and Mr. Noonan naked with these

20    children, these children naked with Mr. Noonan, the children

21    naked themselves, both together and individually, and there

22    were other images that were found on Mr. Barry's computer of

23    unknown -- of an unknown child and an unknown adult.

24              While all of this is happening and things are

25    being forensically analyzed, the children are interviewed.

1   They're removed from the home.  At some point they are

2   returned.  Mr. Barry is then arrested on federal charges based

3   out of Houston, based on bringing these children -- and you

4   will learn that these children came with Mr. Barry several

5   times to the Houston area, twice starting in late May, early

6   June of 2010, and then in December, slash, January of 2010 --

7   2011.

8            They traveled here with Mr. Barry, who is their

9   adopted father, and they stayed in Mr. Noonan's home, as the

10  pictures will demonstrate.  That they were naked a great deal

11  of the time, that they visited with other individuals who

12  got -- also got naked with the children, and that Mr. Barry was

13  fully aware what these pictures were being taken.

14           And we know that for several reasons.  We know

15  that because the pictures were on Mr. Barry's computer.  We

16  know that there were Instant Messenger chats where Mr. Barry

17  sends a naked picture that included his son O.B. prior to his

18  son's circumcision.  We know that there are pictures found on

19  Mr. Barry's camera that were similar in nature to those found

20  on Mr. Noonan's camera, not the exact same pictures, but of a

21  similar kind, lewd and lascivious exhibition of the genitals.

22  There are pictures that Your Honor will see with Mr. Noonan's

23  head in the pelvic, genital region of one of the Barry

24  children.  There are pictures of the Barry children with

25  their heads in Mr. Noonan's genital region.  There are pictures

1  where the children are precariously close to Mr. Noonan's

2  exposed genitals.

3              There are bathroom pictures.  One in particular

4  where one of the Barry children is in the tub where his feet

5  are in such a position that he has raised his pelvis to expose

6  his genitals, which are the focus of the picture.

7              All of this was done, the United States believes

8  we can prove, with the knowledge of Mr. Barry and obviously in

9  accord with the actions of Mr. Noonan.  We believe that the

10 Defendant brought these children here for that purpose.  We can

11 demonstrate through the chats that Mr. Barry is fully aware of

12 what child pornography is.  That he knows it's illegal to send

13 and that he sent it to others, saying it was only for them to

14 look at.

15             The nexus, Your Honor, to the interstate commerce

16 will be demonstrated in the fact that the items that were used

17 to produce these pictures, the cameras, the computers that they

18 were sent on, the things that stored them were all manufactured

19 outside of the Southern District of Texas and outside the State

20 of Texas and, in fact, outside of the United States.

21             And we believe after viewing all of the evidence

22 and applying the law to the facts in this case, that Your Honor

23 will find that in both Counts 1 and 2 the Defendant conspired

24 with Mr. Noonan to produce this child pornography and in Counts

25 6 and 7, that the Defendant did, in fact, produce this child

1    pornography as the parent or guardian of R.B. and O.B.

2                   Thank you, Your Honor.

3          *THE COURT:*  Thank you.

4                   On behalf of the defense?

5          *MR. JARVIS:*  Yes, ma'am.  Thank you.  I think what the

6    Judge -- the Court is going to find is after you hear all of

7    the testimony, you're going to believe that David Barry is

8    probably one of the most naive, trusting souls you've ever met,

9    and that he was duped into believing that Craig Noonan was his

10   friend and somebody who was going to help him and somebody who

11   was going to help him take care of the boys.

12                   When he and his Partner Mark Peterson -- they had

13   been together at this time probably about 18 years.  They

14   decided to foster kids, and they went through all of the

15   training.  They decided to adopt these two boys that CPS

16   brought to them.  They were, I think, 1 and not quite 2 years

17   old yet.  And you'll hear evidence that how David Barry took

18   those boys in and taught them how to speak, taught them how to

19   walk.  Did everything a great parent would want to do to help

20   these developmentally delayed children.

21                   And you'll hear them going to school, taking care

22   of them, soccer practice, the whole 9 yards.  He became

23   concerned, though, of the problems that he believed they were

24   going to face in life, the sons of gay parents, adopted,

25   Hispanic, and developmentally delayed.  He began researching,

1    and he found a study that said if they become nudists that
2    might help them with their self-esteem later on in life.
3              So after the adoption, a couple years later, he
4    decides that he's going to try nudism inside his own home.  And
5    you will hear testimony about how it started out with just
6    hanging around and then working out on the Wii workout stuff.
7    And every once in a while the boys would work out with him
8    naked, too.  And eventually it became more of a lifestyle for
9    them inside their own home.
10             He then -- because Mr. Peterson and he were --
11   started to be estranged.  And Mr. Peterson's mom was sick and
12   in the hospital in Fort Worth and he was working all the time.
13   So, Mr. Barry was basically home alone with the boys or when
14   they were not in school.
15             He decided to go on truenudist.com, which is a
16   Web site for nudists.  He met a person by the name of Craig
17   Noonan out of Houston.  They began chatting and talking and
18   interacting for six or eight months before Mr. Barry decided
19   and Mr. Noonan invited him down to Houston.  So he brings the
20   boys in June of 2010 twice and then once more during -- after
21   Christmas and right around New Year's Eve down to Houston.
22             Now, Mr. Noonan is also a practicing nudist.  So
23   they came down and everybody took off their clothes and they
24   just hung around naked inside that home.  You'll hear testimony
25   and you'll see these pictures and they're going to be Saturday

1   morning pictures laying around the bed with the dog and toys.

2   And you'll see these pictures and you'll be able to tell

3   that -- excuse me -- R.B. took a lot of these pictures, if not

4   the vast majority of them.

5               The ones we want you to concentrate on, Judge, is

6   there are three basic separate groups of these pictures.

7   There's the horsing around pictures, where there's R.B. and

8   O.B. and Mr. Noonan on or in, around the bedroom.  Then there's

9   another smaller group pictures where there's Mr. Barry and

10  Mr. Noonan and the boys all in more of a portrait-type snapshot

11  sitting there naked.  And then there's a third group of

12  pictures of one or two of the boys in a bathtub with bubble

13  bath.

14              So there's three different groups of pictures.

15  And that's important because you'll hear testimony that R.B.

16  took the majority, if not all, or, well, it was taken with a

17  timer, all of those Saturday morning horsing around pictures.

18  With four of them in the picture, there had to be a timer, and

19  the timer took those pictures, the portraits.  And then it's

20  unknown who took the pictures of the boys in the bathtub.  But

21  we know there's going to be at least a timer on the camera, so

22  that the boys could have taken the pictures.

23              One time Mr. Noonan invited Mr. Barry to come to

24  Euless, to visit with another nudist man who has a son, Tim

25  Whittington, and you'll hear his name.  He's the one that was

1 the beginning of all this deal.  And you'll hear that when

2 Mr. Barry and the boys showed up, Noonan was already there or

3 they met there and they all became naked and the boys began

4 wrestling and horse playing again.  And that's when Tim

5 Whittington took pictures without the knowledge of Mr. Barry.

6 He didn't know these pictures were taken.  And you'll see a

7 couple of those pictures inside the evidence.

8                But when you look at these pictures, you're going

9 to see that they're just vacation pictures of nudists.  They're

10 not child pornography.  There's no erect penises.  There's no

11 sexual poses.  There's no coyness or looking at the camera or

12 asking and looking like they want to have some type of sex.

13 And there was never any intent to create child pornography.

14 And there's no evidence that Mr. Barry even knew that those

15 pictures were taken by R.B., except for the portrait pictures

16 where they all were in there together.

17                We're not sure -- at least I'm not sure how those

18 pictures got on Mr. Barry's computer, because they weren't

19 taken by him.  There's no evidence they were.  But they were

20 just pictures of a nudist family at another naked guy's house,

21 which is disgusting, but it's not illegal.  There's no child

22 pornography.

23                So when the Federal Government executed the

24 search warrant in February 2011, they took the boys.  They put

25 them in foster care 17 months.  They had counseling every week

1  by a lady by the name of Julie Porter.  At no time during those

2  17 months did they ever make an outcry about being sexually

3  abused by anybody, Mr. Noonan, Mr. Barry, Mr. Peterson, anybody

4  at all.  They asked them about the cameras.  They hardly

5  remembered anybody taking any pictures, because it wasn't that

6  big deal for the boys.

7           We had a termination jury trial in Wichita Falls

8  in July of 2012, eight days of testimony.  They returned the

9  boys.

10           *MS. ZACK:*  Objection, Your Honor, relevance.

11           *THE COURT:*  It's a bench trial.  I'm going to allow

12  it.

13           *MR. JARVIS:*  The boys were returned without any

14  supervision or restrictions.  And then lo and behold, two

15  months later, Tarrant County decides to indict him for sexual

16  performance of a child.  That's about 19 months after they took

17  the computer and the boys were taken.

18           The boys were then taken away from Mr. Barry and

19  Mr. Peterson again for about 90 days.  Then he gets the boys

20  back, because that's the State statute, after 90 days, you can

21  have your child back if a family law court has made that

22  decision.  Lo and behold about four months later, he gets

23  indicted by the feds in the Southern District, all for the same

24  pictures that were presented to the jury in Wichita Falls.

25           You'll see with these chats, they're not nice

```
 1  chats.  They're not good chats.  But if you look at them
 2  carefully, as far as the elements of the offense, there's not a
 3  chat between Craig Noonan and David Barry saying, "I enjoyed
 4  taking pictures of your boys and it really turned me on to have
 5  them."  There's nothing in there between Mr. Noonan and
 6  Mr. Barry about creating, producing, conspiring to create child
 7  pornography.  And that's what he's charged with.  There's
 8  nothing in those chats.
 9            Mr. Barry's just a -- or was, he's no longer, a
10  gay nudist.  And, frankly, I think that's why we're here today.
11       MS. ZACK:  Objection, Your Honor.
12       THE COURT:  I'm going to sustain that objection.
13       MR. JARVIS:  Yes, ma'am.  But when you look at these
14  pictures, you'll see it's just nakedness, which isn't illegal.
15  Thank you.
16       THE COURT:  Thank you.
17            All right.  Do you want to call your first
18  witness, please?
19       MS. ZACK:  Yes, Your Honor.  At this time the United
20  States would call Special Agent Jeffery Chappell.
21       THE COURT:  Mr. Chappell.
22    (Jeffery G. Chappell, Government's witness, sworn.)
23       THE COURT:  All right.  Thank you.  Please be seated,
24  sir.
25            You may proceed.
```

Chappell - Direct by Ms. Zack

1    *MS. ZACK:*  Thank you, Your Honor.

2    **DIRECT EXAMINATION**

3    BY MS. ZACK:

4    *Q.*  Could you please state your full name?

5    *A.*  Jeffery Glen Chappell.

6    *Q.*  And how are you employed, sir?

7    *A.*  As a special agent with Homeland Security Investigations.

8    *Q.*  And how long have you been so employed?

9    *A.*  Since November of 2000 -- I'm sorry, since January of 2004,

10   10 years.

11   *Q.*  And prior to that, did you have any law enforcement

12   experience?

13   *A.*  Yes, ma'am.  Almost seven years with the U.S. Border Patrol

14   and prior to that almost seven years as a municipal police

15   officer in the city of McAllen, Texas.

16   *Q.*  And when you became a special agent with HSI, did you take

17   on any special responsibilities or get any special training?

18   *A.*  Yes, ma'am.  In November of 2004 I was assigned to the

19   cyber investigations group, which handles -- or investigates

20   child exploitation via the Internet and the use of computers.

21   I received training in that field.  And then in 2009 I received

22   training for -- specifically related to computer forensics.

23   *Q.*  And what type of training was that in 2009?

24   *A.*  In 2009 I received the basic certification through the

25   Treasury Computer Forensics Program, as well as A plus

Chappell - Direct by Ms. Zack

1   certification through TIA.

2   Q.   And have you trained specifically in any computer forensic

3   tools that you use to analyze computers and computer media?

4   A.   Yes.

5   Q.   And what are those?

6   A.   I received my AccessData certified examiner certification,

7   which is certification to use the AccessData toolkit, FTK as

8   it's typically called, as well as the EnCE, which is the EnCase

9   certified examiner through Guidance Software, to use their

10  suite of tools as well.

11  Q.   And do you update that as the companies update that

12  software?

13  A.   Yes.  It's every two years for each.

14  Q.   Okay.  And have you been continuously certified since your

15  first acquiring that type of training?

16  A.   Yes, ma'am.

17  Q.   Now, those tools don't -- do they only relate to child

18  pornography examinations?

19  A.   No, ma'am.

20  Q.   Okay.  Did you get training as far as Internet crimes

21  against children?  Have you attended conferences on that

22  subject and taken classes specifically targeting individuals

23  who have a sexual interest in children?

24  A.   Yes, ma'am.

25  Q.   And is that something that you continuously do as the

Chappell - Direct by Ms. Zack

1   courses and the certifications became available?

2   A.   That's correct.

3   Q.   Now, can you tell Court how you became involved in this

4   particular case?

5   A.   In January of 2011, I received information from our Dallas

6   office regarding an individual who was believed to have resided

7   in the Houston, Texas, area by the name of William Craig

8   Noonan.   This information was based on at that time an ongoing

9   investigation by HSI Dallas to an individual identified as

10  Timothy Whittington.   It involved the production and

11  distribution of child pornography by Mr. Whittington and

12  believed through Mr. Noonan and then one other individual, who

13  I later came to know as David Barry.

14  Q.   Okay.   And in order to investigate this, were you provided

15  with certain information from HSI Dallas?

16  A.   Yes, ma'am.

17  Q.   And did that information include e-mail addresses or IP

18  addresses associated with Mr. Noonan?

19  A.   Yes, ma'am.   The information packet I received had two

20  summonses and related returns.   The first summons was related

21  to the e-mail addresses that were used by Mr. Noonan and Mr.

22  Barry to exchange correspondence with Mr. Whittington.

23  Q.   And what provider was used for that?

24  A.   That was Microsoft Network, MSN.

25  Q.   Okay.   And is that information -- oh, and what was the

Chappell - Direct by Ms. Zack

1   other summons that you got back, from what other provider?

2   A.   The other summons was related to -- was from AT&T, and it

3   related to the IP addresses associated with the log-ins from

4   the e-mail accounts from the other summons.

5   Q.   Okay.  And that information is contained in Government's

6   Exhibits 18 and 19 that's already been admitted; is that

7   correct?

8   A.   That is correct, ma'am.

9   Q.   You've reviewed those exhibits?

10   A.   Yes, ma'am.

11   Q.   And that's the information -- some of the information you

12   used to obtain a search warrant for Mr. Noonan's residence; is

13   that correct?

14   A.   That is correct.

15   Q.   Okay.  And that search warrant was executed when?

16   A.   February 8th of 2011.

17   Q.   And as part of that process, do you photograph the

18   residence?

19   A.   Yes, ma'am.

20   Q.   And are those photographs -- or some of those photographs

21   contained in Government's Exhibit 21?

22   A.   That is correct.

23   Q.   And looking at 21A, is that the home where you executed the

24   search warrant?

25   A.   That is correct.

Chappell - Direct by Ms. Zack

1   *Q.* And to the best of your knowledge, who owns that home?

2   *A.* William Craig Noonan -- or actually his mother, I believe,

3   owns it.

4   *Q.* And he lived there with another individual; is that

5   correct?

6   *A.* Yes, ma'am.

7   *Q.* And the Internet and all of that was in the other

8   individual's name?

9   *A.* The roommate's name, correct.

10  *Q.* And you verified that with the roommate?

11  *A.* Yes, ma'am.

12  *Q.* Okay.  Was the roommate interviewed?

13  *A.* Yes, ma'am.

14  *Q.* And did he indicate that he ever participated in any of the

15  these nudist -- claimed nudist activities or any activities

16  with the children?

17  *A.* No, ma'am, he did not.

18  *Q.* And did he tell you which computers belonged to whom and

19  make all of those explanations at the time the warrant was

20  executed?

21  *A.* Yes, ma'am.

22  *Q.* Based on your investigative knowledge at that time and the

23  interviews, was he cleared of any involvement in any of these

24  charges?

25  *A.* Eventually, yes, ma'am, he was.

Chappell - Direct by Ms. Zack

1  *Q.*  Now, when you searched this residence, I assume that based

2  on your training and experience there are certain things that

3  draw your attention?

4  *A.*  Yes, ma'am.

5  *Q.*  Okay.  And you're looking specifically for computers, for

6  pictures, for cameras, things like that, correct?

7  *A.*  Correct.

8  *Q.*  And had you at this time seen any picture of Mr. Noonan and

9  children naked?

10  *A.*  Yes, ma'am.

11  *Q.*  Okay.  And that image was provided to you from Dallas?

12  *A.*  That is correct.

13  *Q.*  Did you compare that image to Mr. Noonan's driver's license

14  to verify that that was, in fact, the individual whose home you

15  were at?

16  *A.*  Yes, ma'am.

17  *Q.*  Okay.  So you go and you execute this warrant and you take

18  pictures.  And I want to draw your attention to Government's

19  Exhibit 21k.  And what is Government's Exhibit 21k?

20  *A.*  They are children's toys, specifically a Nerf basketball

21  set and another Super Hero Squad toy.

22  *Q.*  And these were found in the home; is that correct?

23  *A.*  Mr. Noonan's residence, correct.

24  *Q.*  Okay.  Prior to executing the warrant, did your research

25  reveal whether or not Mr. Noonan had any children?

Chappell - Direct by Ms. Zack

1   A.  I had found no information stating that Mr. Noonan had any
2   children.
3   Q.  And to this date are you aware of whether or not Mr. Noonan
4   has any children?
5   A.  I do not know of any children Mr. Noonan has, correct.
6   Q.  All right.  Now, did you also investigate the roommate?
7   A.  Yes.
8   Q.  Did he have any children?
9   A.  He had no children as well.
10  Q.  Okay.  And these toys were found in Mr. Noonan's home?
11  A.  Correct.
12  Q.  And what about the items in 21l?
13  A.  Yes.
14  Q.  Is that part of the same --
15  A.  That's the same from the previous picture.
16  Q.  Okay.
17  A.  It's a better shot.
18  Q.  And m, 21m, what was that?
19  A.  That's a kite set that was found in Mr. Noonan's, I
20  believe, bedroom.
21  Q.  And let's talk about 21o.
22  A.  That's a --
23  Q.  What is that?
24  A.  -- a Lego brick set also found in Mr. Noonan's bedroom.
25  Q.  Okay.  Now, let's talk about the computer media.  You

Chappell - Direct by Ms. Zack

1  seized computer media at that residence, did you not?

2  A.  Yes, ma'am.

3  Q.  And I want to draw your attention to Government's Exhibit

4  10, which is the Dell laptop, service tag number H0YJKB1.  Are

5  you familiar with that item?

6  A.  Yes, ma'am.  It would be the one with the University of

7  Texas Longhorn symbol on it.

8  Q.  Okay.  And this is Government's Exhibit 10; is that

9  correct?

10  A.  Yes, ma'am.

11  Q.  Okay.

12       MS. ZACK:  Your Honor, would it be okay to put the

13  physical evidence on the table here?

14       THE COURT:  That would be fine.  Thank you.

15       MS. ZACK:  Okay.  Thank you.

16  BY MS. ZACK:

17  Q.  And where was that item located?

18  A.  Mr. Noonan's residence, in the TV room next to a blue

19  chair.

20  Q.  And Government's Exhibit 11?

21  A.  Is the white computer desktop.

22  Q.  Okay.  And this was located where?

23  A.  That was located in a desk in the -- I guess it would be

24  called more the formal living room, at the front of the house.

25  Q.  Okay.  And those would correspond to the pictures 21i and

Chappell - Direct by Ms. Zack

1   21j of the search photos; is that correct?

2           *MS. ZACK:*  Can we see 21i and j?

3   BY MS. ZACK:

4   Q.  That's the laptop right here, correct?

5   A.  That is correct, yes, ma'am.

6   Q.  And the white box is in 21j?

7   A.  Yes, ma'am.

8   Q.  Okay.  And this was all at Mr. Noonan's residence.

9           Did you also find a camera there?

10  A.  Yes, ma'am.

11  Q.  And that would be Government's Exhibit No. 8?

12          *MS. ZACK:*  Your Honor, may I approach?

13          *THE COURT:*  You may.  You need not ask permission to

14  approach the witness, either side.

15          *MS. ZACK:*  Thank you, Your Honor.

16  BY MS. ZACK:

17  Q.  Is this No. 8?

18  A.  Yes, ma'am.

19  Q.  Okay.  And this was found where, Special Agent Chappell?

20  A.  I believe in Mr. Noonan's bedroom.

21  Q.  Okay.  Now, just so we can get this out of the way, Item

22  No. 10, the laptop, the hard drive in that, where was that

23  manufactured?

24  A.  In Thailand.

25  Q.  And the white box?

Chappell - Direct by Ms. Zack

1    A.  Also in Thailand.

2    Q.  Also in Thailand.   And the camera?

3    A.  In China.

4    Q.  China.   Okay.   Now, can you describe for the Court -- we

5    saw the picture of the front of the house.   This is not a large

6    house; is that correct?

7    A.  No, ma'am.

8    Q.  And how many bedrooms were in the house?

9    A.  Three bedrooms.

10   Q.  And how many were being used as bedrooms?

11   A.  Two.

12   Q.  Okay.   And what was the third bedroom being used as?

13   A.  Storage.

14   Q.  Okay.   No bed in that bedroom?

15   A.  No, ma'am.

16   Q.  Okay.   Let's talk about the other two bedrooms.   You said

17   that Mr. Noonan had a roommate?

18   A.  Yes, ma'am.

19   Q.  And was one of those bedrooms designated as his bedroom?

20   A.  That is correct.

21   Q.  Okay.   And that would leave one other bedroom, and that was

22   Mr. Noonan's bedroom; is that correct?

23   A.  Yes, ma'am.

24   Q.  And that would be contained in the picture 21g?

25   A.  Yes, ma'am.

Chappell - Direct by Ms. Zack

1   Q.   Okay.   And was there -- were there any other sleeping areas

2   in this home?

3   A.   Yes, ma'am.

4   Q.   What was that?

5   A.   In the family room, TV room, there was a bed made up

6   against the wall.

7   Q.   And that's contained in Exhibit 21h?

8   A.   Yes, ma'am.

9   Q.   Okay.   I'm going to direct your attention, Special Agent

10  Chappell, to Government's Exhibit No. 5.   And can

11  you without -- other than using initials, can you identify the

12  individuals in that exhibit?

13  A.   On the far right is Mr. Noonan, and then the two children

14  are O.B. and R.B.   They are identified as Mr. Barry's two

15  children.

16  Q.   Okay.   And that picture is taken where?

17  A.   In Mr. Noonan's bedroom.

18  Q.   And that's based on your comparing the search -- what you

19  saw at the search and the photos of the search to this picture,

20  correct?

21  A.   That is correct.

22  Q.   And where was this picture found, do you know?

23  A.   This was found on Mr. Barry's laptop.

24  Q.   Okay.   And just so we're clear, is Mr. Noonan related in

25  any way to these children, either through adoption,

Chappell - Direct by Ms. Zack

1   biologically, anything?

2   A.  No, ma'am.

3   Q.  And it appears in this picture that Mr. Noonan and at least

4   the child that he has his arm around are shirtless; is that

5   correct?

6   A.  That is correct.

7   Q.  Now, how many -- well, did you analyze the items that have

8   been moved into evidence, Items 10, 11, and 8, forensically?

9   A.  Yes, ma'am.

10  Q.  And did you do that yourself or was there another forensic

11  analyst?

12  A.  Initially I did have assistance from another analyst.  He

13  assisted with acquiring the images of the hard drives.

14  Q.  Okay.  And when you say "acquiring the images of the hard

15  drives," you're talking about Government's Exhibit 12, the

16  forensic images of both?

17  A.  Yes, ma'am.

18  Q.  Okay.  And in order to get those, you essentially copy the

19  hard drives from these items?

20  A.  Yes, ma'am.  It's a form of copying the data off of the

21  hard drives in a manner that allows us to maintain the

22  integrity of the original device.

23  Q.  Okay.  And that would be Government's Exhibit 12 contains

24  both of those, is that correct --

25  A.  From Mr. Noonan's --

Chappell - Direct by Ms. Zack

1  Q.  -- both from the white box and the --

2  A.  Yes, ma'am.

3  Q.  -- UT laptop for --

4  A.  Yes, ma'am.

5  Q.  -- that lack of a better description?  Okay.

6        And this is Government's Exhibit 12 that I'm

7  holding up here, correct?

8  A.  Yes, ma'am.

9  Q.  All right.  So you forensically image them and then you do

10  what?

11  A.  Then I'll take it, and utilizing the FTK and EnCase, both

12  programs, I'll process the data -- or the images.  And it will

13  put it into a format that is easier to look at and to read, and

14  then I analyze that data to see what was contained on the

15  suspect hard drive.

16  Q.  And have you created a DVD with the images that you believe

17  to be child pornography from the Dell laptop of Mr. Noonan?

18  A.  Yes, ma'am.

19  Q.  And those contain the Barry children; is that correct?

20  A.  That is correct.

21  Q.  And that would all be contained in Government's Exhibit 13;

22  is that correct?

23  A.  Yes, ma'am.

24  Q.  Okay.  And that's a DVD coming from the forensic image?

25  A.  Yes, ma'am.

Chappell - Direct by Ms. Zack

1   Q.  And how many images -- are you aware of how many images

2   there were?

3   A.  Approximately 57 images.

4   Q.  Okay.  And from the white box, did you do the same thing?

5   Did you pull out just the images that you believed were child

6   pornography of the Barry children?

7   A.  Yes, ma'am.

8   Q.  And that's Government's Exhibit 14?

9   A.  Yes, ma'am.

10  Q.  And the camera, that has what's called an SD card in it; is

11  that correct?

12  A.  Yes, ma'am.

13  Q.  Is that equivalent to a hard drive for the camera?  What is

14  it?

15  A.  It's flash memory.  It's just a more -- way of storing

16  data.

17  Q.  Like a thumb drive?

18  A.  Thumb drive, correct.

19  Q.  Okay.  And Government's Exhibit No. 9 contains some of

20  those images, correct?

21  A.  That is correct.

22  Q.  Okay.  And Government's 15 contains all of it, correct?

23  A.  Correct.

24  Q.  All right.  So let's talk about what was found on the

25  camera.  There was more than what's in Government's Exhibit

Chappell - Direct by Ms. Zack

1  No. 9, correct?

2  A.  That is correct.

3  Q.  Okay.  And not all of these images that you found were

4  child pornography, correct?

5  A.  That is correct.

6  Q.  What would you say the ratio was, as far as normal, regular

7  camera images to child pornography?

8  A.  My best estimate is probably four to one, maybe five to one

9  of normal versus CP.

10  Q.  Okay.  And did you examine these images?

11  A.  Yes, ma'am.

12  Q.  And of images in the home, how many of them approximately

13  would you say were clothed?

14  A.  Probably more than half were clothed.

15       MR. JARVIS:  Judge, I'm sorry.  I would object.  Are

16  you talking about from the camera or from all?

17       MS. ZACK:  The camera.

18       MR. JARVIS:  Okay.  Thank you.

19       THE COURT:  So that takes care of your objection?

20       MR. JARVIS:  Yes, ma'am.  Thank you.

21       THE COURT:  All right.  Thank you.

22  BY MS. ZACK:

23  Q.  And in the home -- or outside of the home, how many were

24  the children undressed?

25  A.  None.

Chappell - Direct by Ms. Zack

1  Q.  And let's look at the images in Government's Exhibit 9, and
2  let's start with 9A.  And what is picture 9A, to the best of
3  your ability to describe that?
4  A.  To the left is Mr. Noonan.  To the right is Mr. Barry.
5  It's either O.B. or R.B. handing a camera to Mr. Barry.
6  Q.  And that camera, is that Government's Exhibit 8 that we
7  just admitted into evidence?
8  A.  No, ma'am.
9  Q.  In fact, that is Government Exhibit 26; is that correct?
10 A.  That is correct.
11 Q.  And where was that camera found?
12 A.  That camera was actually taken on February 7th by HSI
13 Dallas during their warrant at Mr. Barry's residence.
14 Q.  Okay.  And that camera somehow traveled to Houston; is that
15 correct?
16 A.  Yes, ma'am.
17 Q.  And you know this is in Houston because this picture that
18 we're looking at, 9A, is in Mr. Noonan's residence; is that
19 correct?
20 A.  That is correct.
21 Q.  And you believe, based on the other pictures, that this is
22 one of Mr. Barry's children that's handing this camera to
23 Mr. Barry?
24 A.  That is correct.
25 Q.  Or taking the camera from Mr. Barry?

Chappell - Direct by Ms. Zack

1   A.  Either way, yes, ma'am.

2   Q.  Okay.  And let's look at 9B.  And you believe this to be

3   who?

4   A.  O.B. and R.B.

5   Q.  And this was also found on Mr. Noonan's camera, this image?

6   A.  That is correct.

7   Q.  Okay.  And 9c -- and just so we're clear, those children

8   had no clothes on in that picture?

9   A.  That is correct.

10  Q.  Okay.  And the one child facing us, his genitals were

11  exposed?

12  A.  Correct.

13  Q.  Okay.  9c is who?

14  A.  Either O.B. or R.B. and Mr. Noonan.

15  Q.  And in this picture it appears that the child has nothing

16  on at least from the waist up and neither does Mr. Noonan?

17  A.  That is correct.

18  Q.  All right.  And 9d, is this also one of the Barry children

19  taken at the Noonan residence?

20  A.  Correct.  Yes, ma'am.

21  Q.  And in this the child's genitals are exposed?

22  A.  Yes, ma'am.

23  Q.  And 9e, this is taken where?

24  A.  In Mr. Noonan's residence.

25  Q.  And do you know where in the residence?

Chappell - Direct by Ms. Zack

1   A.  I believe in the family -- the formal living room.  It's a

2   room that was towards the front of the house, between the front

3   wall of the house and where the TV room we earlier viewed was

4   at.

5   Q.  And the child in this picture is -- their genitals are

6   exposed?

7   A.  Yes, ma'am.

8   Q.  And 9f, what is this a picture of, Special Agent Chappell?

9   A.  One of the Barry children laying next to Mr. Noonan's dog

10  and Mr. Noonan laying in his bed, taken at his residence.

11  Q.  And are both Mr. Noonan and the child without clothes?

12  A.  Correct.

13  Q.  And let me ask you this:  What appears to be on the floor

14  that the child and the dog are lying on?

15  A.  It's some sort of cot or makeshift mattress.

16  Q.  Okay.  And that's in Mr. Noonan's bedroom?

17  A.  That is correct.

18  Q.  Okay.  And 9g, is this one of the Barry children in the

19  Noonan home?

20  A.  Yes, ma'am.

21  Q.  And that's the back end of Mr. Noonan's dog?

22  A.  Yes, ma'am.

23  Q.  And the child's genitals are exposed?

24  A.  Yes, ma'am.

25  Q.  And 9f -- I'm sorry, h, what is that a picture of?

Chappell - Direct by Ms. Zack

1  *A.*  Mr. Noonan in the center, again, his dog, and one of the

2  Barry children on the right-hand side, laying in Mr. Noonan's

3  bed, in his bedroom.

4  *Q.*  And is anyone wearing clothes?

5  *A.*  No, ma'am.

6  *Q.*  And 9i is a picture of what?

7  *A.*  One of the Barry children laying in between Mr. Noonan's

8  legs, on Mr. Noonan's bed, in his residence.  None of them are

9  wearing clothes.

10  *Q.*  And 9j?

11  *A.*  The Barry children are in the bathtub in Mr. Noonan's

12  residence.

13  *Q.*  And just so we're clear, Special Agent Chappell, in this

14  picture the children's genitals are not exposed; is that

15  correct?

16  *A.*  No, ma'am.

17  *Q.*  And nothing wrong with that picture as far as you're

18  concerned?  That's just two little boys in the tub?

19  *A.*  That is correct.

20  *Q.*  Okay.  And the last picture, 9k, what is that a picture of?

21  *A.*  One of the Barry children laying on Mr. Noonan's black

22  couch, naked, not wearing any clothes.

23  *Q.*  Now, in the -- Item 9, these are just selected images of

24  what's in Item 15, which is all of the pictures from the

25  camera, correct?

Chappell - Direct by Ms. Zack

1   A.   Correct.

2   Q.   And during the process were you -- while the search was

3   going on, were you in contact with the folks in Dallas who had

4   done a search warrant at Mr. Barry's residence?

5   A.   That is correct.

6   Q.   Okay.   And these images that we just talked about, were any

7   of these pictures from Mr. Noonan's camera ultimately found on

8   any of Mr. Barry's computer media?

9   A.   Yes, ma'am.

10  Q.   And do you know forensically how it got there?

11  A.   No, ma'am.

12  Q.   Okay.   How many different ways could it have gotten there?

13  A.   A myriad of different ways.   Either it was sent via the

14  Internet, transposed or copied over from a flash drive, another

15  SD card, the SD card from the camera, from a disk, having been

16  placed on a disk and then copied onto the computer.   There's

17  any number of ways.

18  Q.   Okay.   And based on where and how you found the photos, did

19  it appear that the person who put them there knew they were

20  putting them there?

21  A.   Yes, ma'am.

22  Q.   And how -- why do you believe that forensically?

23  A.   The particular placing of the folders, which were user

24  created folders, they were not folders that were created by a

25  system by default or automatic, through any automatic process.

Chappell - Direct by Ms. Zack

1  These would have had to have been created by the user.

2  Q.  All right.  And before we get to that, let's talk about the

3  items that were seized in the search in Dallas.  And just so

4  we're clear, you were getting information from Dallas about who

5  these children were, who they belonged to and things like that,

6  correct?

7  A.  Yes, ma'am.

8  Q.  Were you able to verify the relationship between Mr. Barry

9  and the children?

10 A.  Yes, ma'am.

11 Q.  And did you do that via the certified copy of the adoption

12 records for R.B. and O.B. that's Government's Exhibit No. 27?

13 A.  That is correct.

14 Q.  And that document as well as the stipulation, trial

15 stipulation -- the first trial stipulation contained the dates

16 of birth of the children; is that correct?

17 A.  That is correct.

18 Q.  And they were, in fact, well under the age of 12 at the

19 time this was going on, correct?

20 A.  That is correct.

21 Q.  They're still under the age of 12, correct?

22 A.  That is correct.

23 Q.  Okay.  Now, let's talk about the things that were seized in

24 Dallas.  Government's Exhibit No. 1 is a Dell laptop; is that

25 correct?

Chappell - Direct by Ms. Zack

1   A.   Yes, ma'am.

2   Q.   And that was taken from the Barry residence?

3   A.   Yes, ma'am.

4   Q.   And was that forensically imaged?

5   A.   Yes, ma'am.

6   Q.   And that would be Government's Exhibit No. 2; is that

7   correct?

8   A.   That is correct.

9   Q.   And you've reviewed that forensic image, have you not?

10  A.   Yes, ma'am.

11  Q.   And did you copy all of what you believe to be child

12  pornography from that and place it on a DVD, which would be

13  Government's Exhibit No. 3?

14  A.   Yes, ma'am.

15  Q.   Okay.  And we took selected images from No. 3 and created

16  Government's Exhibit No. 4; is that correct?  That's selected

17  child pornography images from Mr. Barry's laptop?

18  A.   That is correct.

19  Q.   Okay.  Now, let's talk about Exhibit 4a.  What is that a

20  picture of?

21  A.   That is a picture of Mr. Barry on the back left, Mr. Noonan

22  on the back right, and the two Barry children up front, sitting

23  naked on a couch.

24  Q.   And that picture was taken where, by your best guess?

25  A.   I do know -- I do not believe it was taken at the Noonan

Chappell - Direct by Ms. Zack

1   residence.  I'm not sure where.

2   Q.  Okay.  Is it possible it was taken at the Whittington

3   residence?

4   A.  Yes, ma'am.

5   Q.  And it's obvious that no one in that picture was taking it,

6   correct?

7   A.  That is correct.

8   Q.  And so either a third party took that picture or the camera

9   has a timer, correct --

10  A.  That's correct, yes, ma'am.

11  Q.  -- the camera?

12  A.  Yes, ma'am.

13  Q.  Okay.  Now, let's talk about EXIF data.  E-X-I-F, what is

14  that?

15  A.  EXIF data is exchangeable image file format.  It's a

16  standard that allows for what's called metadata or extra data

17  to be placed within a file, in this particular case that's jpeg

18  or graphic files, and tifs, which are also graphic files.

19  Q.  Okay.  Now, this particular image of one of the Barry

20  children sitting on Mr. Noonan's exposed penis and the other

21  Barry child leaning up against Mr. Barry's exposed penis,

22  this -- or unclothed penis, because I guess the children are

23  blocking the adult penises from view, was there any EXIF data

24  affiliated with this picture that you could come up with?

25  A.  No, ma'am, it had been stripped.

Chappell - Direct by Ms. Zack

1   *Q.*  Okay.  And this picture was found, though, on Mr. Barry's
2   laptop?
3   *A.*  That is correct.
4   *Q.*  Okay.  And was this also found in a folder or file that
5   leads you to believe that the person who put it there knew what
6   they were doing and that it was intentionally placed there?
7   *A.*  Yes, ma'am.
8   *Q.*  Okay.  Now, let's talk about images b through, I guess, z
9   or -- and hh and ii.  You were able to obtain user account
10  information for those pictures?
11  *A.*  Yes, ma'am.
12  *Q.*  Okay.  So let's look at b.  And b is a picture of what?
13  *A.*  This is one of the Barry children in Mr. Noonan's bathtub.
14  His legs are placed on the edge of the bathtub, his hands down
15  in the bottom of it, and he's thrusted his hips up to expose
16  his penis.
17  *Q.*  Okay.  Varies widely from the innocent bath picture we saw
18  in 9j, correct?
19  *A.*  That is correct.
20          *MR. JARVIS:*  Judge, we would object.  That's leading.
21          *THE COURT:*  I'll sustain.  You can refrain from
22  leading.
23  BY MS. ZACK:
24  *Q.*  Special Agent Chappell, what is the difference between the
25  image in 4b and 9j?

Chappell - Direct by Ms. Zack

1   A.  Besides the obvious that it's only one child, the pose is

2   very different.  The child's positioning is not natural.  It

3   would not be natural in a bathtub.  And the exposure of his

4   penis is pretty much the focus of -- and his nudeness is pretty

5   much the focus of this picture, as opposed to the other one.

6   Q.  Now, you're not able to say who took this picture, correct?

7   A.  No, ma'am.

8   Q.  But were you able to determine with what device this

9   picture was taken?

10  A.  Yes, ma'am.

11  Q.  And would that information be contained in Government's

12  Exhibit 6b?

13  A.  That is correct.

14  Q.  And Government's Exhibit 6b -- I'm sorry, Government's

15  Exhibit 6a, which refers to --

16  A.  6b.

17  Q.  -- Exhibit 4b, and on page 2 of that exhibit, please, what

18  does this information tell you?  Can you explain to the Court

19  what we're looking at?

20  A.  This is considered the exchangeable image file format, EXIF

21  data that's contained within the graphic file of that

22  particular picture.  All digital graphic files are nothing but

23  code.  So what this allows for is a standard for camera makers

24  to place data that they deem important, such as date and time

25  of when the picture was taken, if it's enabled GPS, which in

Chappell - Direct by Ms. Zack

1  this model it was not, make, model of the camera that took it,

2  shutter speed, all of this information.

3  Q.  And what camera were you able to determine took this

4  picture?

5  A.  The Casio camera that belonged to Mr. Noonan.

6  Q.  Okay.  And you talked about date and time.  Let's talk

7  about date and times on cameras.

8  A.  Yes, ma'am.

9  Q.  Who decides what date and time is on a camera?

10  A.  The manufacturer sets it to a predetermined date when it's

11  brand-new.  When the user gets it, the user is responsible for

12  updating that time to the current date and time that they're

13  using it, and then that date and time is maintained by the

14  battery within the camera.

15  Q.  Okay.  And these cameras are rechargeable, correct?

16  A.  That's correct.

17  Q.  What happens if the battery dies to the date and time?

18  A.  It will revert back to the predetermined date and time as

19  set by the manufacturer.

20  Q.  So was there reliable date/time information based on your

21  examination on these pictures?

22  A.  No, ma'am.

23  Q.  Were you able to determine, based on your forensic

24  analysis, when these images appeared on Mr. Barry's computer?

25  A.  Yes, ma'am.

Chappell - Direct by Ms. Zack

1  *Q.*  And when was that?

2  *A.*  There were two sets of dates, the beginning of June and

3  then the middle of June.  June 1st and 2nd, and then another

4  set of June 18th or so for some of them.  And then I had other

5  images that were created -- of the same images created at an

6  even later date, as far forward as September.

7  *Q.*  Were there images found that you believe were taken during

8  the December trip?

9  *A.*  Yes, ma'am.

10  *Q.*  And where were those found?

11  *A.*  As well as on Mr. Barry's computer within a user created

12  folder.

13  *Q.*  Okay.  And those would have had corresponding dates to that

14  as well?

15  *A.*  Yes, ma'am.

16  *Q.*  Okay.  So, Government's Exhibit -- just to be clear,

17  Government's Exhibit 6 is the data that demonstrates that 4b,

18  c, d, e, f, g, h, i, j, k, l, m, n -- I'm sorry, l, m, o, p --

19  no n -- q, r, s, t, u, v, w, x, and z, images that were found

20  on Mr. Barry's computer, were all taken with Mr. Noonan's

21  camera?

22  *A.*  That is correct.

23  *Q.*  Okay.  So let's go back to Exhibit 4 and look at 4c.  And

24  what is that a picture of?

25  *A.*  One of the Barry children laying across Mr. Noonan.  And

Chappell - Direct by Ms. Zack

1   Mr. Noonan's head and face is against the child's neck and

2   Mr. Noonan's dog is laying next to them and they're laying in

3   Mr. Noonan's bed, in Mr. Noonan's residence, all naked.

4   Q.  And what about 4d -- oh, and let me ask you this:  You

5   don't know who took that picture, correct?

6   A.  No, ma'am.

7   Q.  What is this a picture of?

8   A.  This is Mr. Noonan holding one of the Barry children upside

9   down.  The child's head is in the groin area of Mr. Noonan.

10  His hand is on the child's face or head area, and the child's

11  groin area and penis and testicle are close to Mr. Noonan's

12  face and chin.  They are nude, not wearing any clothes.  And,

13  again, this is on Mr. Noonan's bed, in Mr. Noonan's residence.

14  Q.  And 4e?

15  A.  One of Mr. -- one of the Barry children laying on

16  Mr. Noonan's couch, nude, with their exposed penis, and

17  there's -- Mr. Noonan's cat is on the top of the chair -- or

18  the couch.

19  Q.  And 4f -- again, you don't know who took that picture,

20  correct?

21  A.  No, ma'am.

22  Q.  Just what camera it was taken on?

23  A.  Exactly.

24  Q.  And what is this a picture of?

25  A.  This is Mr. Noonan, who appears to be nude, pressed into

Chappell - Direct by Ms. Zack

1  the back of one of the Barry children, who is also nude, in
2  Mr. Noonan's bathroom inside of his residence.
3  Q.  And the child's genitals are exposed?
4  A.  Yes, ma'am.
5  Q.  And 4g?
6  A.  Again, Mr. Noonan laying in his bed, nude, with his penis
7  exposed.  One of the Barry children is laying across his
8  testicles and penis, holding a photograph, one of the Barry
9  children.  Also, Mr. Noonan's dog and cat are in the picture,
10  again, in his residence, in Mr. Noonan's residence.
11  Q.  And 4h?
12  A.  Mr. Noonan nude, his penis and testicles exposed.  One of
13  the Barry children also nude, laying in an opposite position,
14  with his feet across Mr. Noonan's testicles on -- and they're
15  sitting on Mr. Noonan's couch, in his residence.
16  Q.  And does it appear to you that Mr. Noonan has an erection
17  or at least a partial erection in this picture?
18  A.  In my opinion, yes, ma'am.
19  Q.  And is that based on your analysis of the other pictures
20  that you've seen with Mr. Noonan's exposed penis?
21  A.  Yes, ma'am.
22  Q.  And 4i?
23  A.  Mr. Noonan and one of the Barry children, both of them nude
24  with exposed penises, taken in Mr. Noonan's residence, in the
25  TV room.

Chappell - Direct by Ms. Zack

1  Q.  And does it appear to you that Mr. Noonan has an erection

2  or at least a partial erection in this picture as well?

3  A.  Yes, ma'am.

4  Q.  And 4j, this is the same scenario except that the Barry

5  child is facing forward; is that correct?

6  A.  That is correct.

7  Q.  Also at the same -- do you believe these pictures were

8  taken very close in proximity to each other?

9  A.  In timewise, yes, ma'am.

10  Q.  Okay.  And you don't know who took those pictures?

11  A.  No, ma'am.

12  Q.  Okay.  And 4k, what does this appear to be?

13  A.  I believe it's Mr. Noonan nude, with an exposed penis and

14  testicles.  One of the Barry children also nude.  This is in

15  Mr. Noonan's bathroom, in his residence.

16  Q.  And the child is facing Mr. Noonan's penis; is that

17  correct?

18  A.  Yes, ma'am.

19  Q.  And 4l, what does this appear to be?

20  A.  One of the Barry children nude, with his penis exposed, on

21  Mr. Noonan's bed within his residence, and who I assume to be

22  Mr. Noonan's -- well, someone's -- an adult male's buttocks, an

23  anal region exposed.

24  Q.  And this was also found on Mr. Barry's computer?

25  A.  That is correct.

Chappell - Direct by Ms. Zack

1  Q.  Okay.  4m, this is a picture of what?

2  A.  Mr. Noonan and the two Barry children, one of which you can

3  see his penis, and Noonan's dog sitting on Noonan's bed, in his

4  bedroom.

5  Q.  Now, let's talk about this particular picture.  The Barry

6  children didn't take this picture, did they?

7  A.  No, ma'am.

8  Q.  And Mr. Noonan didn't take this picture, did he?

9  A.  No, ma'am.

10          MR. JARVIS:  We object, Judge.  It calls for

11  speculation.  He wasn't there.

12          THE COURT:  Do you want to rephrase to clarify?

13          MS. ZACK:  Sure.

14          THE COURT:  Thank you.

15  BY MS. ZACK:

16  Q.  Other than if a timer was used, the people in this picture

17  didn't take the picture, did they?

18  A.  That is correct.

19  Q.  Okay.  Are you aware of who took the picture?

20  A.  No, ma'am.

21  Q.  And did you discuss with Mr. Barry's roommate whether he

22  ever took any pictures of these children with Mr. Noonan?

23  A.  Yes, ma'am.

24  Q.  And what did he tell you?

25  A.  He vehemently denied it.

Chappell - Direct by Ms. Zack

1   *Q.*  And based on the information you've gathered, Mr. Barry was

2   the only other adult that traveled with these children to

3   Houston -- was the only adult?

4   *A.*  Yes, ma'am.

5   *Q.*  Let's look at Government's Exhibit n.  What is this?

6   *A.*  That is who I believe to be Mr. Noonan on top of one of the

7   Barry children, who appears to be nude.  Mr. Noonan's face is

8   within the lower abdomen/groin area of the child.

9   *Q.*  And what is in the upper left-hand corner?

10  *A.*  I believe that is a Buzz Lightyear stuffed doll.

11  *Q.*  A toy?

12  *A.*  A toy, yes, ma'am.

13  *Q.*  Was that toy found at Mr. Barry's -- at Mr. Noonan's home?

14  *A.*  No, ma'am.

15  *Q.*  And 4o?

16  *A.*  Again, Mr. Noonan nude, his penis and testicles are

17  exposed.  One of the Barry children, whose buttocks are

18  exposed, standing in a doorway in Mr. Noonan's residence.  It's

19  actually the entryway to, I believe, Mr. -- to the living room.

20  *Q.*  And 4p?

21  *A.*  The two Barry children, one of them whom is nude, with

22  exposed penis and testicles, laying on a makeshift mattress in

23  Mr. Noonan's bedroom.

24  *Q.*  Would it be fair to say that the children didn't take this

25  picture?

Chappell - Direct by Ms. Zack

1    A.   Yes, ma'am.

2    Q.   And this picture was found on Mr. Barry's computer?

3    A.   That is correct.

4    Q.   And 4q?

5    A.   This is Mr. Noonan nude, laying next to one of the Barry

6    children with the Barry child pressed up against him, on the

7    floor in Mr. Noonan's bedroom.

8    Q.   And are any of the individuals in this photo clothed?

9    A.   No, ma'am.

10   Q.   And 4r?

11   A.   Mr. Noonan laying on his bed nude, with his testicles and

12   penis exposed, one of the Barry children laying across

13   Mr. Noonan's chest, holding a photograph, and Mr. Noonan's dog

14   next to them.

15   Q.   And 4s?

16   A.   Again, Mr. Noonan laying nude on his bed, with his exposed

17   testicle and penis.  The dog and the cat are to the right, and

18   one of the Barry children, who is also nude, laying up against

19   Mr. Noonan's body to the left.

20   Q.   And Mr. Noonan's right hand is where?

21   A.   On the child's buttocks.

22   Q.   And 4t?

23   A.   One of the Barry children nude, with his penis exposed,

24   laying on the floor -- or on a makeshift bed next to

25   Mr. Noonan's dog.

Chappell - Direct by Ms. Zack

1    Q.   And 4u?

2    A.   Again, one of the Barry children laying nude, with his

3    exposed penis, on the makeshift bed next to -- laying on

4    Mr. Noonan's dog, in Mr. Noonan's bedroom.

5    Q.   And let's look at 4v.

6    A.   This is Mr. Noonan with the two Barry children on the left

7    and unknown child on the right, all are nude, with exposed

8    penises, except for the one that Mr. Noonan is holding -- he is

9    nude, but you can't see his testicles -- or his penis --

10   standing in a wading pool, and I believe this to be

11   Mr. Noonan's backyard.

12   Q.   Could this be a friend of Mr. Noonan's house?

13   A.   It's possible.

14   Q.   Okay.  You never found a kiddy pool, did you?

15   A.   No, ma'am.

16   Q.   4w?

17   A.   Same picture, same pose, just one of the children has his

18   mouth open.

19   Q.   And the Barry children are in this picture, correct?

20   A.   That is correct.

21   Q.   And do you know who took this picture?

22   A.   No, ma'am.

23   Q.   And -- or these two pictures.  And these were found on

24   Mr. Barry's computer?

25   A.   Yes, ma'am.

Chappell - Direct by Ms. Zack

1  Q.  And we'll talk about the file paths in a minute.  Let's
2  talk about 4x.
3  A.  This is Mr. Noonan with one of the Barry children on his
4  back with his arm around Mr. Noonan's neck.  The Barry child is
5  nude.  And Mr. Noonan's holding the Buzz Lightyear doll from
6  the previous picture.
7  Q.  And the child's genitals are pressed up against
8  Mr. Noonan's back?
9  A.  Yes, ma'am.
10 Q.  And 4y?
11 A.  It's a picture of Mr. Noonan laying on a black -- or
12 sitting on a black sofa.  One of the Barry children nude, with
13 his exposed penis, is laying across Mr. Noonan's lap, his head
14 on Mr. Noonan's groin area.
15      MS. ZACK:  Your Honor, Exhibits 4aa through 4gg were
16 subject to a conditional admission by this Court.  At this time
17 the Government would want to go through those pictures.
18      THE COURT:  These are the pictures of the --
19      MS. ZACK:  Unknown --
20      THE COURT:  -- the other children?
21      MS. ZACK:  The unknown child and the unknown adult
22 male found on Mr. Barry's computer.
23      THE COURT:  All right.  Well, why don't you make the
24 predicate that you want me to consider to perform the balancing
25 test that the rules call for.

Chappell - Direct by Ms. Zack

1      *MS. ZACK:*  Yes, Your Honor.

2      *THE COURT:*  Because I gather you are offering these

3  pursuant to --

4      *MS. ZACK:*  414.

5      *THE COURT:*  -- 414 and 404(b)?

6      *MS. ZACK:*  Yes, absolutely, Your Honor.

7      *THE COURT:*  All right.  Thank you.

8  BY MS. ZACK:

9  *Q.*  Special Agent Chappell, when you reviewed the forensic

10  image of the hard drive of Mr. Barry's computer, you reviewed

11  the entire hard drive, correct?

12  *A.*  That is correct.

13  *Q.*  Now, the pictures we were talking about up until now, 4a

14  through 4z, those were found where?

15  *A.*  In user created folders within the user account called

16  "owner" in this case.

17  *Q.*  Okay.  And those were contained in files that had been

18  named by whoever set that file up, correct?

19  *A.*  That is correct.

20  *Q.*  Okay.  Where were the images in 4aa through 4gg found?

21  *A.*  They were found within a temporary folder within a

22  Messenger cache, which is a folder system related to Windows

23  Live and Microsoft instant messaging program.

24  *Q.*  Okay.  What does that mean to people that don't speak

25  computer?

Chappell - Direct by Ms. Zack

1  A.  When a computer user is utilizing an instant messaging

2  program, in this case Windows Live and Windows Messenger, the

3  system files are -- you have to install this program onto your

4  computer, and it will create folders on your computer for it to

5  use.  And one of them being a temporary file, which allows for

6  the temporary storage of data that the Instant Messenger

7  program uses, particularly files or images that are shared via

8  the Instant Messenger program.

9  Q.  And based on your training and experience, you believe that

10 these images got there how?

11        MR. JARVIS:  Objection.  Leading.

12        THE COURT:  Refrain from leading.  Just rephrase it.

13 BY MS. ZACK:

14 Q.  How do you believe the images got there?

15 A.  I believe that they -- well, they got there by use of the

16 Instant Messenger program, Windows Messenger.

17 Q.  Okay.  And meaning they were sent?

18 A.  Or received.

19 Q.  Okay.  By Mr. Barry's computer?

20 A.  That is correct.

21 Q.  Okay.  And was there any way for you to forensically

22 determine whether he sent them or he received them?

23 A.  These particular images, no, ma'am.

24 Q.  Okay.  And was the Instant Messenger cache also where you

25 recovered the chats that are subject of Government's Exhibit 7?

Chappell - Direct by Ms. Zack

1   A.   No, ma'am.

2   Q.   Where were those chats recovered?

3   A.   Those were actually recovered in parts from several

4   different areas within the installed operating system, system

5   volume information, other temporary cache, and then unallocated

6   or unspecified areas.

7   Q.   Okay.  So going back to just the images themselves, they

8   were the subject of some type of Instant Messenger exchange

9   between individuals?

10  A.   That is correct.

11  Q.   Okay.  And is there anything that you were able to

12  determine that tells you when they got on the computer?

13  A.   Yes, ma'am.

14  Q.   And when was that?

15  A.   The -- well, in these -- no, on these particular images,

16  because they were carved data, the dates and times are not

17  associated with them.  They're not -- no longer part of that

18  file.

19  Q.   Okay.  So you were unable to determine when they got on

20  there?

21  A.   These particular ones, that is correct.

22  Q.   Okay.  And based on your training and experience, did you

23  find these images to meet the federal definition of child

24  pornography?

25  A.   Yes, ma'am.

Chappell - Direct by Ms. Zack

1  *Q.*  And did you bookmark them as such?

2  *A.*  Yes, ma'am.

3  *Q.*  Okay.

4       *MS. ZACK:*  Your Honor, the United States believes that

5  these pictures demonstrate a predilection, an interest that

6  Mr. Barry has in -- a sexual interest in children.  These are

7  not his children.  There is no indication that this child is a

8  relative.  Let me, before I go further with my argument --

9  BY MS. ZACK:

10  *Q.*  Special Agent Chappell, have you been able to identify this

11  child?

12  *A.*  No, ma'am.

13  *Q.*  And in all of the computer media that has been seized at

14  both Mr. Barry's and Mr. Noonan's residence, was there any clue

15  or indication as to who this child was?

16  *A.*  No, ma'am.

17  *Q.*  Was any pictures of this child or this unknown adult found

18  on any of Mr. Noonan's computer media?

19  *A.*  No, ma'am.

20       *THE COURT:*  All right.

21       *MS. ZACK:*  Your Honor, we believe that it demonstrates

22  that Mr. Barry has a sexual interest in children and especially

23  in child pornography images of children and we would ask that

24  they be admitted to show that the images that he had -- the

25  other images were not a mistake, were not an accident, and were

Chappell - Direct by Ms. Zack

1    not just the innocent vacation pictures of a supposedly naive

2    individual.

3         THE COURT:  Did you want to respond?

4         MR. JARVIS:  Yes, ma'am.  Judge, he's failed to

5    testify that it was David Barry that actually accepted these.

6    Just because he owns that computer doesn't mean that he

7    accepted them.  There's no testimony that anybody opened those

8    up and saved them.  In fact, they're just in the Messenger

9    cache, so that cannot prove that the person sitting in front of

10   the computer ever even knew that they existed, much less opened

11   them, received them, looked at them, asked for them.  There's

12   no evidence of that at all.  So in that case they're not

13   relevant to anything.  They can't prove Mr. Barry saw them.

14        MS. ZACK:  Your Honor, I believe that absolutely goes

15   to weight, not to admissibility.

16        THE COURT:  What was the e-mail address that was the

17   originating address that sent it to Mr. Barry's Messenger

18   cache?

19        MS. ZACK:  Your Honor, I believe that Special Agent

20   Chappell testified, he doesn't know if these originated from

21   Mr. Barry and were sent from someone else or if they

22   originated --

23        THE COURT:  Is there any metadata that reveals

24   anything about the travels of these photographs?

25        THE WITNESS:  No, ma'am.  Related specifically to the

Chappell - Direct by Ms. Zack

1  EXIF data, when most images are transported through the
2  Internet, particularly a program like this, it strips a lot of
3  that information off.
4       THE COURT:  And there's nothing you can do to
5  forensically recreate it, restore it, or identify it?
6       THE WITNESS:  Well, it is restored.  It's just the
7  data that's contained in there is the data that's put on there
8  by the Instant Messenger program --
9       THE COURT:  No, I understand that.
10       THE WITNESS:  -- but the dates and times are not
11  associated with it.
12       THE COURT:  What about any information about the
13  identity of the address from which these were sent, obtained,
14  however they got to this computer?
15       THE WITNESS:  The only thing that I can say towards
16  that is on other analysis conducted, the only accounts,
17  Microsoft instant messaging accounts that I came across were
18  the wfglassman account.  That's the only one that I found on
19  the computer.
20       THE COURT:  And what does that tell you?
21       THE WITNESS:  That was the one being utilized by
22  Mr. Barry.
23       THE COURT:  All right.  Is there any -- excuse me.  Is
24  there any information at all about how long these photographs
25  were on the computer?

Chappell - Direct by Ms. Zack

1           THE WITNESS:  No, ma'am.

2           THE COURT:  Is there any information as to when or

3   whether they had been accessed?

4           THE WITNESS:  Yes, ma'am.

5           THE COURT:  Tell me about that information.

6           THE WITNESS:  The whole reason this file -- this

7   folder exists is because it's nothing but code going across the

8   Internet.  So the program has to have a place to temporary

9   store the folder -- or the images when it creates them on your

10  screen.  So if they're in this folder, they appeared on the

11  screen of the computer.

12          THE COURT:  So they had been opened?

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  And viewed?

15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  Do you have any idea about how often that

17  had occurred?

18          THE WITNESS:  No, ma'am.  At least one time.  At least

19  one time.

20          THE COURT:  All right.  Anything further?

21          MR. JARVIS:  May I ask a few questions on this issue,

22  Judge?

23          THE COURT:  You may.

24          MR. JARVIS:  If Mr. -- whoever was sitting in front of

25  Mr. Barry's computer had sent these to somebody through IM,

Chappell - Direct by Ms. Zack

1   they would -- you would have found them someplace else on

2   Mr. Barry's computer, correct?

3           *THE WITNESS:* No, sir.  On an Instant Messenger

4   program when you have the chat window up, you're seeing both

5   sides of the conversation.  Okay.  So whatever -- if I'm

6   chatting with someone, whatever I type in or send pops up in

7   that window, whatever they type and send pops up in that same

8   window.  It's just a chain of conversation.  So if I send an

9   image, that image pops up initially, but I sent it to this

10  person.

11          *MR. JARVIS:* Sure.  But that image that you send has

12  to come from within the computer somewhere?  You've got to go

13  up to XJ4 and put it in the IM to send it, right?

14          *THE WITNESS:* Oh, I understand what you're saying.

15  Yes, sir, that is correct.  You have to have the image

16  somewhere on the computer.

17          *MR. JARVIS:* And none of these unknown images were

18  found anyplace else in Mr. Barry's computer, were they?

19          *THE WITNESS:* That is correct.

20          *MR. JARVIS:* So logically, I would think, that means

21  somebody had to send it to him.  He didn't send it to anybody

22  else, because he didn't have these pictures already some place

23  else on his computer?

24          *THE WITNESS:* Unless they were deleted and

25  overwritten, and I didn't find them.  That's the only other --

Chappell - Direct by Ms. Zack

1  what you're saying and or deleted and overwritten and that's

2  why they weren't recovered is the only two scenarios.

3        MR. JARVIS:  Okay.  And these were carved, which means

4  they were deleted already, correct?

5        THE WITNESS:  Unallocated, that is correct.

6        MR. JARVIS:  So that means he -- somebody sitting in

7  front of the computer could have opened it and said, "Oops, I

8  don't want that," deleted it, seen it one time, and that's how

9  it showed up here on all six or seven of these pictures,

10 correct?

11       THE WITNESS:  Not in this particular folder, unless he

12 went and found this particular folder --

13       THE COURT:  Okay.  Keep going.

14       THE WITNESS:  -- which is a -- it's not a readily

15 available folder and typically in most, on default settings, on

16 Windows Vista, it's a hidden folder.  You would have to unhide

17 all your folders to see it.  He would have to go to that

18 particular folder and delete it from there.

19       THE COURT:  So are you saying that based on your best

20 understanding, that these pictures were opened at some point,

21 accessed, viewed, and not deleted because of the type of folder

22 in which they were stored or in which they resided?

23       THE WITNESS:  At some point they were deleted, ma'am,

24 based on -- because it's a temporary folder, so it's only a

25 certain size.  So as things are added, it deletes and

Chappell - Direct by Ms. Zack

1  overwrites automatically.

2          THE COURT:  But it's an automatic deletion?  It's

3  not --

4          THE WITNESS:  Correct.

5          THE COURT:  -- deleted purposefully by the user of the

6  computer?

7          THE WITNESS:  That is correct, ma'am.

8          THE COURT:  All right.  So it's overwritten as opposed

9  to deleted?

10         THE WITNESS:  Yes, ma'am.

11         MR. JARVIS:  May I continue, Judge?

12         THE COURT:  You may.

13         MR. JARVIS:  I'm confused.  Because it doesn't

14 automatically get overwritten every time.  A person can hit the

15 delete button when a picture shows up on Windows Messenger,

16 correct?

17         THE WITNESS:  I know certain other programs do.  I

18 can't tell you for sure if you can click on a Windows Messenger

19 button -- window and remove that photograph from the

20 conversation.

21         THE COURT:  Well, that's an indication that there --

22 it was deleted as opposed to overwritten?

23         THE WITNESS:  Right.  Maybe I'm not understanding.

24         MR. JARVIS:  Okay.  If I'm looking at my computer and

25 somebody sends me an IM, okay --

Chappell - Direct by Ms. Zack

1           *THE WITNESS:*  Uh-huh.

2           *MR. JARVIS:*  -- I'm able to look at it and read it

3   now.  Back before 2012, it was just a notice on MSN saying,

4   "You have a message," right?

5           *THE WITNESS:*  Yes.

6           *MR. JARVIS:*  And you would have to open that to see

7   what the message is?  You don't know what the message is before

8   2012 when they went to MSN Live.  You just had a notification

9   saying, "You've got a message," right?

10          *THE WITNESS:*  No, sir.  MSN Messenger was an open

11  instant messaging program, and it allowed for a real-time

12  one-on-one or one on several chats with other users, where that

13  dialogue window would pop up and as I'm typing something and

14  hit enter, if their dialogue box is open, it pops up

15  automatically right there.

16          *MR. JARVIS:*  So the person who's sitting in front of

17  the computer can't stop the other person from sending whatever

18  they want to send, right?

19          *THE WITNESS:*  That is correct.

20          *MR. JARVIS:*  And if they send something they don't

21  want or don't like or they don't want anybody else to see, they

22  have the delete button right there on the computer, they can

23  just hit delete, correct?

24          *THE WITNESS:*  Possibly.  Again, I'm not sure if MSN

25  has that feature directly.  I know other instant messaging

Chappell - Direct by Ms. Zack

1   programs do though.

2             MR. JARVIS:  In fact, all of the other ones that

3   you're aware of have that feature?  The ones on the computers

4   today, you can delete as they show up, right?

5             THE WITNESS:  Today, nowadays, yes, sir.

6             MR. JARVIS:  Okay.  And you can't tell from the

7   forensic evaluation whether or not it was automatically

8   overwritten or overridden by some other information or somebody

9   deleted it when it first popped up, right?

10            THE WITNESS:  No, sir, I would not be able to

11  determine that --

12            MR. JARVIS:  So it's just --

13            THE WITNESS:  -- as you stated it.

14            MR. JARVIS:  I'm sorry.  So it's just as likely that

15  whoever was sitting in front of Mr. Barry's computer saw these

16  images, they hit "delete," correct?

17            THE WITNESS:  I wouldn't be able to -- not knowing if

18  the program allowed that, I wouldn't be able to say if that

19  could happen or not.  But, yes, it is theoretically possible.

20            MR. JARVIS:  But whoever was sitting there didn't take

21  these pictures, the unknowns, as we've been calling them, and

22  save them to his computer so he could look at them or she could

23  look at them later, correct?

24            THE WITNESS:  That is correct, yes, sir.

25            MR. JARVIS:  Okay.

Chappell - Direct by Ms. Zack

1      THE COURT:  If it is deleted intentionally, somebody

2  pushes the delete button when the image is opened, would it

3  nonetheless remain in the temporary folder unless and until it

4  was overwritten in the automatic operation of the computer?

5      THE WITNESS:  Yes, ma'am, that is my understanding.

6      THE COURT:  All right.  And if it wasn't deleted,

7  would it remain -- but opened, would it remain in that folder

8  unless and until it was purposefully -- unless and until it was

9  overwritten by the computer?

10      THE WITNESS:  That is correct.

11      THE COURT:  All right.  Anything further?

12      MR. JARVIS:  But you don't have any evidence that

13  these pictures were saved by whoever was sitting in front of

14  the computer?

15      THE WITNESS:  These particular images were not saved

16  to any user -- typical user accessible area, no, sir.

17      MR. JARVIS:  You never found them any place else on

18  the computer, basically?

19      THE WITNESS:  No, sir.  Correct.  That is correct.

20      MR. JARVIS:  Okay.  No other questions, Judge.

21      THE COURT:  All right.

22      MR. JARVIS:  We renew our objection.

23      THE COURT:  All right.  I'm going to overrule the

24  objection.  I find that the similarity of the pictures to a

25  pose in subject to those that are the subject of the pictures

Chappell - Direct by Ms. Zack

1   that are already in evidence of the known Barry children,

2   Mr. Barry and Mr. Noonan, makes it much less likely that these

3   simply arrived accidentally as opposed to being purposefully

4   directed to Mr. Barry or obtained by him.  I find that that is

5   a -- that there is a sufficient basis for an inference of tying

6   them to Mr. Barry's computer as the intended place for them to

7   be, to respond to the argument you've raised that there is no

8   information as to how they came to be there in a way that would

9   associate it with Mr. Barry sufficient for admissibility.

10              I also find that the lack of forensic information

11  making it certain or establishing clearly that these were

12  deleted as opposed to simply overwritten goes to their weight

13  and not their admissibility.

14              With respect to the 414 balancing test, I find

15  that the photographs are relevant to showing whether the --

16  whether Mr. Barry's interest in images of men and young boys is

17  one that is associated with a -- simply a nudist lifestyle that

18  he and his family were pursuing as a matter of private choice

19  or if it was something that is relevant to showing motive and

20  intent to knowingly receive and produce child pornography.  I

21  do find that the evidence does demonstrate -- is sufficiently

22  probative of Mr. Barry's sexual interest in children and in men

23  having sexual contact with children that it outweighs the

24  potentially prejudicial effect that this evidence would have.

25              So I'm going to overrule the objection and I'm

Chappell - Direct by Ms. Zack

1   going to admit the photographs under 414.  It would also be

2   admissible under 404, although 414 is of course a clearer path,

3   because it so clearly allows propensity evidence with respect

4   to the charged crimes.

5         MR. JARVIS:  Your Honor, I understand the ruling.  But

6   we also objected based upon the fact that the Government could

7   not prove that Mr. Barry was at the computer and received them,

8   opened them, or saved them.

9         THE COURT:  I'm overruling that objection, too.  It's

10  his computer.  There's evidence that these had to be opened and

11  viewed and accessed, and Mr. Barry is the person who owned the

12  computer and based on the information was clearly at least

13  among those most likely to have opened and viewed the images

14  that were sent to his IM Messenger account and it is his

15  account.

16        MR. JARVIS:  Thank you, Judge.

17        THE COURT:  Overruled.

18        MS. ZACK:  Your Honor, would it be possible to take a

19  five-minute bathroom break?

20        THE COURT:  Sure.  Sure.

21        MS. ZACK:  Thank you.

22        THE COURT:  Five minutes.  Thank you.

23     (Recess from 10:40 a.m. to 10:45 a.m.)

24     (Open court, Defendant present.)

25        THE COURT:  Go ahead and take the stand, please, sir.

Chappell - Direct by Ms. Zack

1   Thank you.

2          Go ahead, please.  Please seated.

3          MS. ZACK:  Thank you, Your Honor.

4                **DIRECT EXAMINATION CONTINUED**

5   BY MS. ZACK:

6   Q.  Special Agent Chappell, I want to discuss with you images

7   4aa through 4gg, and I believe that you indicated those were

8   found in the Instant Messenger cache; is that correct?

9   A.  That is correct.

10  Q.  Okay.  So, let's look at 4aa, and this is an image of what?

11  A.  An unknown male child, under the age of 18, laying in a

12  bathtub, naked, with his penis erect and exposed.

13  Q.  Above the waterline?

14  A.  Yes, ma'am.

15  Q.  Okay.  And 4bb?

16  A.  This same unknown child from the previous image, nude,

17  penis and testicles and part of the anus exposed, sitting on a

18  black couch.

19  Q.  And in reference to this particular picture, did you find

20  similar pictures of the Barry children sitting on a sofa at

21  Mr. Noonan's home?

22  A.  Yes, ma'am.

23  Q.  And 4cc, what is this a picture of?

24  A.  An unknown male child on a -- nude or naked on -- with his

25  penis exposed, on an exercise bicycle.

Chappell - Direct by Ms. Zack

1   *Q.* And dd?

2   *A.* Unknown male child, nude, with exposed penis, next to an

3   adult -- unknown adult male with an exposed penis as well.

4   *Q.* And 4ee?

5   *A.* What appears to be a nude adult male laying on the ground

6   with the unknown child naked, laying on top of the unknown

7   male.  The child's penis is exposed.

8   *Q.* And were there any similar images of children sitting -- or

9   the Barry children, specifically, sitting in Mr. Noonan's lap?

10   *A.* Yes.

11   *Q.* And 4ff?

12   *A.* An unknown male child on the left, nude, with exposed

13   penis.  Unknown adult male on the right also with an exposed

14   penis.

15   *Q.* And 4gg?

16   *A.* This is visually the same picture as the previous picture.

17   It was just in a larger format.

18   *Q.* Okay.  And the images all except for the 4ee, all of those

19   are taken indoors; is that correct?

20   *A.* That is correct.

21   *Q.* Now, let's look at 4hh.  And this is now pictures that were

22   found on Mr. Barry's computer within folders, correct?  This is

23   not from the Instant Messenger cache?

24   *A.* That is correct.

25   *Q.* And this appears to be what?

Chappell - Direct by Ms. Zack

1  A.  One of the Barry children nude, sitting on a black couch,

2  with his legs across Mr. Noonan's leg and by his penis and

3  testicle.  Mr. Noonan is obviously nude sitting on the couch.

4  Q.  Okay.  And 4ii?

5  A.  Mr. Noonan sitting on a black couch, nude, with exposed

6  penis and testicle.  One of the Barry children sitting on his

7  back, with his legs up in the air spread apart, with an exposed

8  penis and testicle.  Mr. Noonan has taken the child's right leg

9  and held it up to his face and mouth.

10  Q.  And in this picture and in 4hh, having looked at the other

11  images, do you believe that Mr. Noonan appears erect or

12  partially erect?

13  A.  Yes, ma'am.

14  Q.  Now, let's talk about the file paths and where exactly the

15  images other than 4aa through gg, those images in 4, where were

16  they found on Mr. Barry's computer?

17  A.  There were two -- this particular operating system had one

18  user account called "owner."

19  Q.  Okay.

20  A.  Within "owner," there were two main folders.  One called

21  "Craig Houston" and another one called "David and the boys."

22  And these were the first folders within the owner account that

23  they would access in order to see these images.

24  Q.  Okay.  And within those folders, were there subfolders?

25  A.  Yes, ma'am.  The folder "Craig Houston" had two subfolders

Chappell - Direct by Ms. Zack

1  entitled "Craig H" and "others."

2  Q.  Okay.  And the other folder -- not the one "others," the

3  second folder that there was?

4  A.  "David and the boys" --

5  Q.  Yes.

6  A.  -- contained two subfolders.  One was "dor," d-o-r, and

7  "new folder."

8  Q.  Okay.  I'm sorry.  You said "new"?

9  A.  New folder, n-e-y -- or n-e-w, I'm sorry.

10  Q.  Okay.  And what do you believe d-o-r stood for, without

11  revealing any names?

12  A.  D for David, and O and R is the first letter of each of the

13  children's names.

14  Q.  Okay.  Now, how do these folders get on someone's computer?

15  A.  They are either created by the user and named -- well, they

16  have to be named by someone.  These are not typical folders

17  that you would find default by an operating system or some

18  program.  So some user created them at some point, then they

19  could be either be transferred over by thumb drive or flash

20  drive or some other media or the user created them at the time

21  they were copying over pictures and placed them into this

22  folder.

23  Q.  Okay.  Now, in this particular case, looking at the

24  evidence from Mr. Barry's computer, was there similar file

25  names or nomenclature used on Mr. Noonan's computer?

Chappell - Direct by Ms. Zack

1   A.   Yes, ma'am.

2   Q.   Can you explain that to the Court, please?

3   A.   Images recovered off Mr. Noonan's computer, both what I

4   believe to be child pornographic in nature and those that

5   weren't, had file names of "David and the boys" and then a

6   series of numbers next to them, 01, 02, 03, so forth.

7   Q.   Okay.

8   A.   That name matches the folders of the "David and the boys"

9   listed under the owner program on Mr. Barry's computer.

10  Q.   And if those images were sent to Mr. Barry, to the computer

11  and he put them in that folder, he would have had to have named

12  that folder "David and the boys"?

13  A.   That is correct.

14  Q.   Okay.  It doesn't come as a folder named "David and the

15  boys"?

16  A.   Right.  If it was sent via e-mail or something, typically

17  it would not.

18  Q.   Okay.  And these images that were found in the "David and

19  the boys," some of those are the exact same images that were

20  found on Mr. Noonan's computer?

21  A.   That is correct.

22  Q.   Okay.  Now, and these folders were folders within folders,

23  some of them?

24  A.   Some of them were, yes, ma'am.

25  Q.   Okay.  And did you break down the folders and the

Chappell - Direct by Ms. Zack

1  subfolders and count the images that were in each?

2  A.  Yes, ma'am.

3  Q.  Okay.  So in looking at that information, what were you

4  able to determine?

5  A.  Within the folder "Craig Houston," that folder itself

6  contained a hundred and fifty-six photos within the root of

7  that photo and then it also contained two subfolders, "Craig H"

8  and "others."

9  Q.  All right.  Before we get to the subfolders --

10  A.  Yes, ma'am.

11  Q.  -- how many of the 156 folders did you bookmark as being of

12  interest to this case or child pornography in general?

13  A.  18 of those photographs were bookmarked.

14  Q.  Okay.  And that's the first folder "Craig Houston"?

15  A.  That is correct.

16  Q.  And then in the subfolder under Craig Houston called "Craig

17  H," how many photos were there?

18  A.  28 photographs, 8 of which I bookmarked.

19  Q.  Okay.  And then under "Craig Houston, others," there were

20  how many?

21  A.  31 photographs.

22  Q.  Were there any of R.B. or O.B. in the "others"?

23  A.  No, ma'am.

24  Q.  Okay.  Now, let's talk about the user's owner, "David and

25  the boys" folder.  That folder itself, did that contain images?

Chappell - Direct by Ms. Zack

1   A.  Yes, ma'am.

2   Q.  And how many?

3   A.  87.

4   Q.  And how many did you bookmark as being child pornography?

5   A.  Eight.

6   Q.  And under "David and the boys," the subfolder "d-o-r," how

7   many images?

8   A.  75.

9   Q.  And how many did you bookmark?

10  A.  11.

11  Q.  And then under "David and the boys," "new folder," were

12  there pictures of R.B. and O.B.?

13  A.  Yes.

14  Q.  Okay.  Were any of those marked as being child pornography?

15  A.  No, ma'am.

16  Q.  Okay.  Now, these folders -- so if we were to turn on

17  Mr. Barry's computer, how long would it take us to get to those

18  folders?

19  A.  Very quickly, accessing the user account.

20  Q.  Okay.  And did you find any evidence that anything on

21  Mr. Barry's computer was password protected?

22  A.  No, ma'am.

23  Q.  Is there any way for you to tell how many times these

24  images were viewed?

25  A.  No, ma'am.

Chappell - Direct by Ms. Zack

1  Q.  What do you know about these images as far as when they

2  were placed on the computer?

3  A.  The images in these -- on Mr. Barry's computer were created

4  on June 1st and 2nd, again on June 18th, and then again -- of

5  2010, and then again in December of 2010.

6  Q.  And did those dates all correspond with the dates you were

7  given for the trips that Mr. Barry took with the boys to

8  Houston?

9  A.  Yes, ma'am.

10  Q.  Okay.  Now, let's talk about whether someone else could

11  have forced these images to Mr. Barry's computer.  First of

12  all, is that technologically possible?

13  A.  Yes.

14  Q.  Okay.  In this case would it have been possible, based on

15  your forensic analysis and what we know about remote services?

16  A.  No, ma'am.

17  Q.  Okay.  What are remote services?

18  A.  Remote service is a function in Windows operating systems

19  that allows a remote user or a third party somewhere else to

20  access a computer, to actually gain control of that computer.

21  Q.  Like when I call IT and tell them I don't know what's going

22  on and they possess the cursor and go in?  I have to do stuff

23  to allow them in to do that?

24  A.  That is correct.

25  Q.  Okay.  So are you able to tell when you forensically

Chappell - Direct by Ms. Zack

1  analyze a computer whether the remote services are turned on or

2  turned off?

3  A.  That is correct, yes, ma'am.

4  Q.  And when a computer is purchased, what is the default for

5  remote services?

6  A.  Off.

7  Q.  And that's a safety precaution, correct?

8  A.  Correct.

9  Q.  And in this case did you find any evidence that Mr. Barry's

10  remote services were ever turned on?

11  A.  No, ma'am.  I found it to be turned off.

12  Q.  Okay.  Now, let's talk about Exhibit 26.  That was

13  Mr. Barry's camera; is that correct?

14  A.  Yes, ma'am.

15  Q.  And that camera was manufactured where?

16  A.  In China.

17  Q.  And the images -- images were taken off of that?

18  A.  Yes, ma'am.

19  Q.  Okay.  And those images are contained in Government's

20  Exhibit 20, selected -- some of those images actually?  There

21  were more images than what we picked, correct?

22  A.  That is correct.

23  Q.  Okay.  So let's talk about the images taken on Mr. Barry's

24  camera.  And let's look at No. 20a.  And what is this a picture

25  of?

Chappell - Direct by Ms. Zack

1  *A.* Mr. Noonan on the left, shirtless, and Mr. Barry on the

2  right, shirtless, laying in Mr. Noonan's bed.

3  *Q.* And this is similar to images found both on Mr. Noonan and

4  Mr. Barry's computer?

5  *A.* That is correct.

6  *Q.* Okay. And 20b, what do you believe that is?

7  *A.* Mr. Noonan's penis.

8  *Q.* And that's based on your analysis of the other pictures?

9  *A.* That is correct.

10 *Q.* And is that the same bedspread?

11 *A.* Yes.

12 *Q.* And based on the picture that you've analyzed of Mr. Barry

13 and Mr. Noonan side by side with their penises exposed, you

14 believe this is Mr. --

15 *A.* Noonan's.

16 *Q.* -- Noonan's penis?

17 *A.* Yes.

18 *Q.* Mr. Barry, for lack of a better term, has no pubic hair?

19 *A.* Or very little, yes, ma'am, at the time.

20 *Q.* Okay. In the images that we've seen?

21 *A.* Correct.

22 *Q.* Okay. And this is Mr. Noonan's penis in a flaccid state?

23 *A.* Semi, yes, ma'am.

24 *Q.* Okay. Now, let's look at 20c. And that's one of the

25 pictures that you used to determine that that -- that 20b was

Chappell - Direct by Ms. Zack

1   Mr. Noonan's penis, correct?

2   A.   Yes, ma'am.

3   Q.   And 20 -- and, oh, in this image, this shows what between

4   Mr. Barry and Mr. Noonan?

5   A.   Mr. Noonan on the left and Mr. Barry on the right, nude.

6   Mr. Noonan has his hand draped across Mr. Barry's shoulder and

7   chest, and Mr. Barry has his arm against Mr. Noonan's leg.

8   Q.   Would you characterize this as an image of just friends or

9   do you believe there's a romantic --

10         MR. JARVIS:   Objection.   Leading.

11         THE COURT:   I think it was not finished yet.

12         MR. JARVIS:   I'm sorry.

13         THE COURT:   And she was about to ask the alternative

14   that would make it not leading.   Go ahead, please.

15   BY MS. ZACK:

16   Q.   Do you believe, based on your review of this picture, that

17   this is an image of individuals that are just friends or does

18   it demonstrate a romantic interest among the parties?

19         MR. JARVIS:   Objection.   Speculation.

20         THE COURT:   Rephrase it to establish a better

21   predicate, if you can.

22   BY MS. ZACK:

23   Q.   Based on the images you've viewed in this case and the

24   images that we have seen so far, how would you characterize the

25   relationship between the individuals in this picture?

Chappell - Direct by Ms. Zack

1          *MR. JARVIS:*  Objection.  Speculation.

2          *THE COURT:*  I'm going to allow it.

3   A.   I believe there's intimacy involved.

4   Q.   And what do you base that on?

5   A.   Not only the closeness, the placement of Mr. Barry's right

6   hand to the area where it's at, the comfortableness next to

7   each other and Mr. Noonan's arm draped across Mr. Barry's chest

8   and Mr. Barry holding Mr. Noonan's hand.

9   Q.   Thank you.  Now, let's look at 20d.  What is this a picture

10  of?

11  A.   This is a picture of Mr. Barry on the left, Mr. Noonan in

12  the middle, with the Barry children sitting on Mr. Noonan, and

13  an unknown male subject on the far right, taken at Mr. Noonan's

14  residence.  All the persons depicted are nude, and you can see

15  Mr. Barry's exposed penis.

16  Q.   And when do you believe this picture was taken?

17  A.   I believe this was taken around New Year's Eve.

18  Q.   And that belief is based on what?

19  A.   Based on recovered chats in which Mr. Barry discussed that

20  they were having a New Year's Eve party at Mr. Noonan's house

21  for New Year's Eve from 2010 to 2011, and within that chat

22  Mr. Barry discusses having R.B. take pictures of everybody and

23  everybody would be nude.

24  Q.   Now, let's look at images 20e.  And 20e, f, g, and h, those

25  are a series of photos of children painting, correct, of the

Chappell - Direct by Ms. Zack

1    Barry children painting?

2    A.   That is correct.

3    Q.   And Mr. Barry painting?

4    A.   Yes, that is correct.

5    Q.   And based on your search of the Noonan residence, this is

6    not -- these images were not taken at the Noonan residence?

7    A.   No, ma'am.

8    Q.   Okay.  So, this is 20e.  Let's see 20f and 20g and 20h.

9    And these are -- none of these are at the Noonan residence?

10   A.   I don't believe so, no, ma'am.

11   Q.   Okay.  And these were taken on Mr. Barry's camera?

12   A.   That is correct.

13   Q.   Okay.  And 20i, where was this picture taken?

14   A.   This picture was taken at Mr. Noonan's residence.

15   Q.   And 20j, is this Mr. Noonan's residence?

16   A.   No, ma'am.

17   Q.   Do you know whose residence this is?

18   A.   I believe this to be Mr. Barry's residence.

19   Q.   And are the children wearing clothes?

20   A.   Yes, ma'am.

21   Q.   Okay.  And 20k?

22   A.   I believe also taken at Mr. Barry's residence.

23   Q.   And this is one of the Barry children?

24   A.   Correct.

25   Q.   Wearing clothes?

Chappell - Direct by Ms. Zack

1   A.   Yes, ma'am.

2   Q.   The child's not wearing socks, is he?

3   A.   No, ma'am.

4   Q.   Okay.  And 20l, also part of the same group of pictures?

5   A.   Yes, ma'am.

6   Q.   And this child's wearing, I guess, a big Superman T-shirt?

7   A.   Yes, ma'am.

8   Q.   No shoes or socks?

9   A.   That I can tell, no, ma'am.

10  Q.   And 20m, is this also in the Barry residence, you believe?

11  A.   Yes, ma'am.

12  Q.   And this is one of the children fully dressed?

13  A.   Correct.

14  Q.   Holding some type of Christmas decoration?

15  A.   Garland or something, yes, ma'am.

16  Q.   Okay.  And 20n?

17  A.   Also a Barry child wearing that same Superman shirt from an

18  earlier picture.

19  Q.   And m?

20  A.   Same Barry child, appears to be decorating the Christmas

21  tree, wearing a white Superman shirt.

22  Q.   And p?

23  A.   Another Barry child fully clothed, not wearing socks,

24  decorating a Christmas tree, taken at the -- I believe to be

25  the Barry residence.

Chappell - Direct by Ms. Zack

1    Q.  And 20q?

2    A.  The two Barry children sitting at a table, clothed.

3    Q.  Okay.  And this picture, other than by timer, does not

4    appear that it could have been taken by the Barry children,

5    correct?

6    A.  That is correct.

7    Q.  And what about 20r?

8    A.  The two Barry children clothed, sitting in front of a

9    Christmas tree.

10   Q.  And other than with a timer, they couldn't have taken that

11   picture?

12   A.  That is correct.

13   Q.  And 20s?

14   A.  One of the Barry children holding up a pajama set.  Barry

15   child appears to be clothed.  I believe this also to be at the

16   Barry residence.

17   Q.  It looks as if this was a Christmas present?

18   A.  Correct.

19   Q.  And 20t?

20   A.  This is Mr. Noonan fully clothed with a Barry child sitting

21   partially on him and against him, also fully clothed.  This was

22   taken in a chair at Mr. Noonan's residence.

23   Q.  Okay.  Now, how many pictures did you find of Mr. Peterson

24   naked?

25   A.  None.

Chappell - Direct by Ms. Zack

1   Q.  And who is Mr. Peterson?

2   A.  Mr. Barry's life partner.

3   Q.  And how many pictures did you find of him with the children

4   clothed?

5   A.  Numerous.

6   Q.  And was Mr. Barry in some of those pictures clothed?

7   A.  Yes, ma'am.

8   Q.  How many pictures of Mr. Peterson did you find on

9   Mr. Noonan's computer?

10  A.  None.

11          THE COURT:  Did Mr. Peterson have a computer?

12          THE WITNESS:  I do not know, ma'am.

13  BY MS. ZACK:

14  Q.  Now, let's talk about the Christmas pictures in reference

15  to when the other picture, the one with the unknown male that

16  you believe was at the New Year's party.  These were on

17  Mr. Barry's camera, correct?

18  A.  That is correct, yes, ma'am.

19  Q.  And based on the order -- the order we showed them in is

20  not the order that they came off the camera, correct?

21  A.  That is correct.

22  Q.  Okay.  You looked at the order they appeared in on the

23  camera, correct?

24  A.  Correct.

25  Q.  And chronologically did they show the picture of the boys

Chappell - Direct by Ms. Zack

1  opening the presents and the around the tree pictures were

2  taken before the picture of the three adult naked males and the

3  Barry children?

4  A.  That is correct.

5  Q.  Okay.  And that corresponds to the information you have

6  that Mr. Barry traveled to Houston between Christmas and New

7  Year's 2010 going into 2011?

8  A.  That is correct.

9  Q.  Okay.  Now, doing your forensic analysis, you do not -- you

10 don't just look for pictures; is that correct?

11 A.  That is correct, yes, ma'am.

12 Q.  Okay.  What other things do you look for?  What else do you

13 analyze?

14 A.  I look for any type of documents, text documents, e-mails,

15 chats, any type of corresponds between the user and anyone else

16 and any other data that may be pertinent to the investigation.

17 Q.  Okay.  Do you look at searches?

18 A.  Yes, ma'am.

19 Q.  And did you check for certain search terms in Mr. Barry's

20 computer?

21 A.  Yes, ma'am.

22 Q.  And what type of things were you looking for?

23 A.  Well, I checked the entire carved or parsed search queries

24 that were available.  There were approximately 30,000 search

25 entries on Mr. Barry's computer.  Probably about 12,000 of

Chappell - Direct by Ms. Zack

1   those were actual unique searches.  They weren't doubled or

2   tripled.  And then I reviewed that information for anything

3   that may have pertained to the investigation.

4   Q.  Okay.  And what did you find that you believed pertained to

5   the investigation?

6   A.  I found approximately 72 Google searches for True Nudists.

7   Q.  And True Nudists is what?

8   A.  The Web site where Mr. Whittington, Mr. Barry, and

9   Mr. Noonan all corresponded or met and also where I also

10  recovered other chats and stuff where it appeared Mr. Barry

11  visited this Web site and contacted other individuals.

12  Q.  Okay.  Before we get to the chats, did you go to True

13  Nudists?

14  A.  Yes, ma'am.

15  Q.  And can you describe for the Court, what is this Web site?

16  A.  True Nudists is a Web site that particularly advertises

17  itself for males interested in nudism.

18  Q.  Okay.  Not a family nudism Web site?

19  A.  It didn't appear anti-family, but the main page talks about

20  adult male nudism.

21  Q.  Were there any warnings or discussions about individuals

22  that can participate in True Nudists?

23  A.  Yes, ma'am.

24  Q.  And what was that?

25  A.  It had to be 21 years of age or older in order to sign up

Chappell - Direct by Ms. Zack

1  for the Web site and you did have to have a membership in order

2  to view anything past the basic information on the Web page.

3  Q.  Okay.  But you could go into the chat -- you could chat

4  without being a member?

5  A.  No, ma'am.  You had to be a member in order to chat.

6  Q.  Oh, then I'm confused.  There's two different kinds of

7  members though, right?  There's a paid membership and an unpaid

8  membership?

9  A.  Right.  Correct.  Correct.

10  Q.  Okay.  I'm sorry.  So you become a member and you can chat

11  in certain chat rooms without paying?

12  A.  That is correct.  Yes, ma'am.

13  Q.  Okay.  And then besides True Nudists -- and we'll talk

14  about chats that you may have found later -- what other

15  searches did you find?

16  A.  I found search terms and most of these were in Google,

17  using Google as a search engine, was Bluebonnet Nudist Resort.

18  Q.  And have you looked up the Bluebonnet Nudist Resort?

19  A.  Yes, ma'am.

20  Q.  And where was that located?

21  A.  I believe that was in Decatur, Texas.

22  Q.  Okay.  And for those of us that are geographically

23  challenged, where is that?

24  A.  I believe that's up by Dallas, northwest of Dallas-Fort

25  Worth region.

Chappell - Direct by Ms. Zack

1   Q.  Okay.  And the Bluebonnet Nudist Resort, was this a child
2   friendly resort?
3   A.  Yes, ma'am.
4   Q.  And what can you tell me about the Bluebonnet Nudist Resort
5   from going to their Web site?  Did they -- well, let me ask you
6   this:  These nudist resorts, you looked at a couple of
7   different Web sites --
8   A.  Yes, ma'am.
9   Q.  -- did some have restrictions about who can wear clothes,
10  who can't wear clothes, when you can wear clothes?
11  A.  Yes, ma'am.
12  Q.  Okay.  Was Bluebonnet one of these cites?
13  A.  Yes, ma'am.
14  Q.  And what was the -- and I don't mean to use the term
15  "restriction," but what was the qualification?
16  A.  Adult males all had to be clothing free.  Being nude was
17  mandatory.  Women and children were clothing optional.
18  Q.  Okay.  And on their Web site were there pictures of nude
19  children?
20  A.  No, ma'am.
21  Q.  And was there any pictures that you saw in the Barry or
22  Noonan computers that matched any of the background or anything
23  from this resort?
24  A.  No, ma'am.
25  Q.  Okay.  Do you have any knowledge whether or not Mr. Barry

Chappell - Direct by Ms. Zack

1   ever traveled to this resort?

2   A.  I have no knowledge of that, no, ma'am.

3   Q.  Okay.  You only know he searched it?

4   A.  That is correct.

5   Q.  And what about, was there a search for a Lone Star Nudist

6   Resort?

7   A.  Yes, ma'am.

8   Q.  Or a Lone Star Nudist?

9   A.  Yes, ma'am.

10  Q.  And did you come up -- how many different things matched

11  "Lone Star Nudist"?

12  A.  On the --

13  Q.  Meaning is there a resort that's called that and is there a

14  group?

15  A.  Yes, ma'am.

16  Q.  Are there two different things?

17  A.  No, I understand.  There is a resort.  There's also a --

18  lack of a better term, an online club.  One of those happened

19  to have a local organization here in Houston.  There were many

20  different things related to Lone Star Nudists.

21  Q.  Okay.  And also were there age restrictions on the Lone

22  Star Club --

23  A.  Yes, ma'am.

24  Q.  -- in Houston?

25  A.  Yes, ma'am.

Chappell - Direct by Ms. Zack

1   Q.  And what was that?

2   A.  21 or older.

3   Q.  Okay.  And was that a family group, the Lone Star, or was

4   that an all male?

5   A.  The nudist resort was family --

6   Q.  Uh-huh.

7   A.  -- similar restrictions as the Bluebonnet.  The other

8   organizations were strictly adults.

9   Q.  Okay.  And did -- was that the extent of the terms that

10  piqued your investigative interest, as far as the searches?

11  A.  Yes, ma'am.  There were many searches for nudists, nudist

12  chat cites, nudist resorts in Texas.  Those are what were

13  actually -- there was actually records of those search terms

14  being used.  Many of the things I looked for and I conducted

15  searches for on Mr. Barry's computer returned no results or had

16  very few results.

17  Q.  Okay.  And based on what you learned in your investigation,

18  did you look for searches that had to do with family nudism?

19  A.  Yes, ma'am.

20  Q.  And searches that had to do with therapeutic nudism for

21  families?

22  A.  Yes, ma'am.  Yes, ma'am.

23  Q.  And did you find -- and did it return anything?

24  A.  Nothing, ma'am.  The only thing that -- involving anything

25  that had to do with therapy at all, was a search for

Chappell - Direct by Ms. Zack

1   respiratory therapists.

2   Q.  Okay.  All right.  Now, let's talk about, you said that

3   this True Nudists cite, there's a chat feature or a chat forum?

4   A.  Yes, ma'am.

5   Q.  Okay.  And you recovered chats in this case?

6   A.  Yes, ma'am.

7   Q.  And these chats, when you reviewed them, did they discuss

8   nudism?

9   A.  Yes, ma'am.

10  Q.  Did they discuss sexuality?

11  A.  Yes, ma'am.

12  Q.  Did they discuss children and children being naked and

13  their sexuality?

14  A.  Yes, ma'am.

15  Q.  Did they discuss masturbation?

16  A.  Yes, ma'am.

17  Q.  And how many chats were there that you were able to

18  recover?

19  A.  I recovered over 37,000 instant messages.

20  Q.  Okay.  And of those you said that this is recovered from

21  space that has not yet been rewritten over; is that correct?

22  A.  Some of it is.  Some of it is system folders and areas that

23  are not user specific but the program itself puts them there

24  and in different places on the hard drive, yes, ma'am.

25  Q.  Okay.  You didn't find any chats that Mr. Barry had

Chappell - Direct by Ms. Zack

1  specifically saved?

2  A.  No, ma'am, I did not.

3  Q.  Okay.  So would Mr. Barry know that these chats -- well,

4  let me rephrase that.  Would a person chatting know that the

5  computer saves this stuff without having any kind of computer

6  knowledge?

7  A.  Probably not, no, ma'am.

8  Q.  Okay.  And of the -- what did you say, 37,000 messages?

9  A.  Approximately 37,000, yes, ma'am.

10  Q.  Were you able to put together several representative

11  examples?

12  A.  Yes, ma'am.  I was able to put together several

13  conversations --

14  Q.  Okay.  That's probably a better way to --

15  A.  -- together, yes, ma'am.

16  Q.  Okay.  So when you say you covered 37,000 messages, these

17  are individual back and forth that you're talking about?

18  A.  That is correct, yes, ma'am.

19  Q.  Okay.  And you were able to put them together based on

20  where they were into -- some, into conversations?

21  A.  That is correct.

22  Q.  Okay.  And not all of it was able to be done that way,

23  correct?

24  A.  That is correct.

25  Q.  Okay.  And why is that?

Chappell - Direct by Ms. Zack

1   *A.*  Just because of the way it was saved.  These are --

2   *Q.*  By the computer?

3   *A.*  By the computer, correct.  There's individual

4   conversations.  Each one is considered an individual message

5   and so there may be missing files related to that and therefore

6   you have something that I can't make head nor tails of, who

7   sent it, where it came from, and so forth.

8   *Q.*  But the ones that you pieced together, did those reference

9   specific dates and times?

10  *A.*  Yes, ma'am.

11  *Q.*  Okay.

12          *MS. ZACK:*  Your Honor, these chats in Government's

13  Exhibit 7 are subject to the same 414/404 analysis.  And we

14  believe that the chats demonstrate, again, that Mr. Barry has a

15  sexual interest in children.  Some of these chats Your Honor

16  will find discuss being naked with the boys, activities being

17  naked, masturbation, all sorts of sexual innuendo as to

18  children and discuss sending and/or receiving images between

19  Mr. Barry and an unidentified individual wherein they discuss

20  the illegality or the potential problems in sending these

21  images, and Mr. Barry acknowledges that he knows that that's a

22  problem.  And we also believe, Your Honor, that the chats by

23  Mr. Barry are also admissions by a party opponent and therefore

24  are admissible.

25          *THE COURT:*  Response?

Chappell - Direct by Ms. Zack

1           MR. JARVIS: Yes, ma'am.  The chats, if you look at

2    the chats, that's not what they talk about, and out of context.

3    First of all, the agent said he had to piece these together.

4    And if you look closely at a lot of the numbers on the

5    left-hand side of each one of the chats, they're not

6    chronological numbers.  So he had to pull these together.

7    These are not a one stream of information that comes as one

8    piece.  He had to pull all of these together, which means it

9    was up to his discretion to pick and choose which lines he

10   wanted to include.

11          Second of all, as our earlier objection, he can't

12   put Mr. Barry in front of the computer typing this information.

13   So, without that, it's not relevant.

14          The third issue is, Judge, when you look at the

15   actual language in these chats, it's not talking about child

16   pornography or how much an individual has enjoyed looking at

17   the pictures of R.B. and O.B. being naked at wherever they were

18   naked at.  These are general conversations about general

19   things, and a lot of it is conversations about parties or just

20   having R.B. take pictures.  And, in fact, a couple of them are

21   just talking about one of the unknowns trying to come on to

22   whoever it is that's using Mr. Barry's name.

23          So there's nothing in these that talk about R.B.

24   or O.B. being in the picture naked and using that for child

25   pornography or production of child pornography.  And there's

Chappell - Direct by Ms. Zack

1    none of these -- actually there's one at the very end, but the

2    first, all -- I think there's about nine of them are not from

3    Mr. Noonan.  We don't know who these other people are.

4                So, we would object because it's not -- it

5    doesn't have anything to do with the production of child

6    pornography or allowing his kids to be in child pornography,

7    because they never talk about producing what -- we're intending

8    to produce child pornography.  And the prejudicial effect is

9    completely outweighed by any probative value, as far as on

10   these certain dates in Houston, did Mr. Barry allow his

11   children to -- intentionally allow them to be in child

12   pornography pictures.

13               *THE COURT:*  Response?

14               *MS. ZACK:*  Yes, Your Honor.  First, I don't believe

15   that Mr. Jarvis is correct in saying that it was at

16   Mr. Chappell's discretion as to how he put these together.  And

17   I think that Special Agent Chappell can explain to you exactly

18   how that was done.  I believe that that's a lack of

19   understanding of the process on Mr. Jarvis's part and a lack of

20   understanding of the forensic process in this case.  These are

21   not just randomly pieced together because they made sense to

22   Mr. Chappell.  The dates and times demonstrate that this was an

23   exchange between two individuals, one of which, wfglassman, is

24   Mr. Barry.

25               And I believe also that Mr. Jarvis is incorrect

Chappell - Direct by Ms. Zack

1  when he talks about the fact that it doesn't reference child

2  pornography.  No, the words "child pornography" are never used,

3  but they certainly talk about sending naked images of children,

4  specifically in chat contained in 7c.  They talked specifically

5  about Mr. Barry's children.  There's extensive conversation

6  with an individual who seems to be very interested in

7  discussing with Mr. Barry O.B.'s circumcision and the

8  activities that Mr. Barry and his children do together when

9  naked and other people, and certainly demonstrate that

10  Mr. Barry is participating in conversations that demonstrate he

11  has a sexual interest in children.

12          These are not conversations about, Oh, hey, you

13  know, we went to the so-and-so resort and had a great time

14  playing volley ball.  It all has to do with nudity, penises,

15  masturbation, ejaculation, the children coming of age and how

16  excited that one of the individuals is about having little

17  children's penises rub up against him, about how little boys

18  like their penises being played with, which is a similar

19  allegation to what XXXXXXX made against Mr. Barry, that he

20  played with his penis while they were lying in Mr. Barry's bed,

21  that it had nothing to do with --

22          MR. JARVIS:  I'm going to object, Judge.  That's not

23  admitted at this point.

24          MS. ZACK:  Yes, they are, Your Honor.  This is

25  Exhibits 28a and b.  They are admitted.  I mean, he has an

Chappell - Direct by Ms. Zack

1  objection to them but --

2         THE COURT:  I admitted them.

3         MS. ZACK:  Okay.

4         THE COURT:  I overruled your objection.

5         MR. JARVIS:  My apologies, Judge.

6         MS. ZACK:  That this is -- you know, all little boys

7  like their penises being played with.  And these are just a

8  selection of the chats.  These aren't all the chats.  And we

9  believe, once again, like Your Honor in -- when we moved and

10 Your Honor admitted the images of the unknown child, that the

11 similarity in the conversations when compared to the pictures

12 demonstrates that this is not an accident or an innocent -- the

13 innocent vacation images of a nudist.

14         And I think it's a good time to point out, once

15 again, that Mr. Barry's life partner does not appear in any of

16 these images.  This was not a family of nudists.  This is

17 Mr. Barry's proclivities and his sexual interest in children

18 being explored and enjoyed through the guise of nudism is the

19 Government's premise, if we're going to put it out there, but

20 we believe this shows this is not accident.  No one talks like

21 this that isn't sexually interested in children.  It's not an

22 accident, and these are Mr. Barry's own words.

23         THE COURT:  Did you want to respond?

24         MR. JARVIS:  Just briefly, Judge.  First of all, we

25 ask the Court to look at each one individually instead of as a

Chappell - Direct by Ms. Zack

```
 1   group, because each one has a different -- each chat that
 2   they're offering into evidence, they're not one group, but each
 3   chat has a different subject that they are talking about,
 4   whoever they are.  When they talk -- when the Government says
 5   they were talking about masturbation, well, yes, that was a
 6   father talking about how he's going to train his growing up
 7   boys in the future how to masturbate safely.  There's nothing
 8   in there sexual at all saying, "I enjoy masturbating my boys."
 9   So, while it may be different for us, it's not an illegal
10   conversation.  It doesn't talk about child pornography or being
11   sexually excited.
12            There's not a single comment in there, that I'm
13   aware of, where Mr. Barry, or whoever wfglassman is, says he
14   gets sexually excited by the sight of his boys naked or that he
15   wants anybody else to do that.  So it's a conversation between
16   nudists and a conversation between grown-ups, but there's
17   nothing about child pornography or sexually being excited
18   sexually about being around naked boys.  It's just not in
19   there.  They're just trying to use this to color the Court's
20   opinion on the pictures, which is the focal point of this case.
21            So we would ask that the Court take a long hard
22   look at these and see if there's anything about sex with -- and
23   child pornography involved in these chats.
24            THE COURT:  Did you want to say anything else on
25   behalf of the Government?
```

Chappell - Direct by Ms. Zack

1        MS. ZACK:  No, I don't think that's necessary, Your
2   Honor.
3        THE COURT:  All right.  There are some of these chats
4   that appear to be less explicitly sexual than others, I agree
5   with that, but there are some that certainly can be viewed as
6   primarily sexual in tone and tenor and content.  So I am going
7   to admit them.  I find that they are sufficiently probative of
8   the type of interest shared by the participants in the chats,
9   most specifically by wfglassman, who is Mr. Barry.  And to --
10  and find that the probative value of the contents of the chats
11  and the occurrence of the chats and the time of the chats
12  outweighs the prejudicial impact of admitting the chats.  So
13  I'm going to overrule your objection and I'm admitting Exhibit
14  7, and that will be 7a through n.
15       MS. ZACK:  And just to clarify, Your Honor.  7a
16  through m are the subject of the 401/404.  7n --
17       THE COURT:  N, as in Nancy?
18       MS. ZACK:  N, as in Nancy, is between Mr. Barry and
19  Mr. Noonan, and that would be a whole different admission as
20  coconspirators, et cetera, et cetera.
21       THE COURT:  I agree with that.
22       MS. ZACK:  Thank you, Your Honor.
23       THE COURT:  All right.
24       MS. ZACK:  May I proceed?
25       THE COURT:  You may.

Chappell - Direct by Ms. Zack

1   BY MS. ZACK:

2   Q.  Okay.  Let's discuss these chats, Special Agent Chappell.

3   When you forensically examine the computer, you're able to

4   determine potentially who is speaking, for lack of a better

5   term?  I mean, they're typing, right?

6   A.  Correct.

7   Q.  Okay.  And how is it that you know that wfglassman is

8   related -- is Mr. Barry?

9   A.  Through information received from the Dallas investigation,

10  through the subpoenas and summons we issued, through

11  information in the chats themselves where wfglassman is

12  referencing things about the Barry children that Mr. Barry

13  would know.

14  Q.  Okay.

15  A.  Such as the circumcision and other information about school

16  and other things.

17  Q.  Okay.  And the one common in all of the chats that you

18  recovered is that one of the chatters is wfglassman; is that

19  correct?

20  A.  That is correct.

21          MR. JARVIS:  Objection.  Leading, Judge.

22          THE COURT:  Refrain from leading, please.

23          MS. ZACK:  I apologize.

24  BY MS. ZACK:

25  Q.  How do you determine who the speaker is from the computer

Chappell - Direct by Ms. Zack

1   that you seized?  Is there a way to do that?

2   A.  Yes, ma'am.  Based on the file, it will reference -- the

3   code will reference who the sender is -- or the log, who the

4   sender is and who the receiver is.

5   Q.  Okay.

6   A.  And if it knows that value, then it's there, such as

7   wfglassman, if he sends a picture -- I mean, a chat, if his

8   value is there, that name is there, it will show it to me.

9   Q.  Okay.  And in 7a through m, as in Matthew, does the

10  wfglassman profile appear?

11  A.  Yes, ma'am.

12  Q.  Okay.  And that -- these chats came from the black Dell

13  laptop taken from Mr. Barry's home?

14  A.  Correct.

15  Q.  Okay.  Now, in looking at the items in the exhibit book --

16  and you don't have one in front of you, do you?

17  A.  No, ma'am, I do not.

18  Q.  Okay.  Mr. Stabe is going to bring you one, so that we can

19  all look together.

20          Can you explain to the Court how to read this

21  information that's in front of us or how you interpreted it?

22          THE COURT:  And what exhibit are you looking at?

23          MS. ZACK:  7a.

24          THE COURT:  What section?

25          THE WITNESS:  7a.

Chappell - Direct by Ms. Zack

1          *MS. ZACK:*  7a.

2          *THE COURT:*  All right.

3  BY MS. ZACK:

4  *Q.*  At the top, what are we looking at?

5          *THE COURT:*  Are you looking at the line that says

6  "source" or "user name"?

7          *THE WITNESS:*  Actually I'm looking at everything in

8  black on the very top.

9          *THE COURT:*  All right.  Thank you.

10 *A.*  Where it says "record," "user name," "date and time sent

11 message," the record is strictly a way of marking each of these

12 entries, because all of these are codes.  So when it's parsed

13 out to put it in something that -- some sort of reference, it

14 will give it a record number.

15 *Q.*  Okay.

16 *A.*  The next one is the user name.  This particular chat --

17 because some of these are different.  This particular one, the

18 user name is the person who sent the message.  Then it gives

19 the date and time local.  That's the date and time this message

20 was created on Barry's computer.

21 *Q.*  Okay.

22 *A.*  Whether it was received and appeared on Mr. Barry's

23 computer or whether it was sent.

24 *Q.*  Okay.

25 *A.*  Then obviously the message, then the source where it came

1  from, and then the physical sector is the actual on the hard

2  drive where this data actually resides.

3  Q.  Okay.  And that's as to this particular chat, 7a?

4  A.  Correct.

5  Q.  Okay.  And in 7a, it appears that the -- and you don't know

6  who Andrew is; is that correct?

7  A.  No, ma'am, I do not.

8  Q.  Okay.  It appears that Andrew and wfglassman are talking

9  about who you should tell about being a nudist.  Is that a fair

10  assessment?

11  A.  Yes, ma'am.

12  Q.  And Andrew says, "Someone might call CPS on you for that,"

13  about three quarters of the way down, next to 195?

14  A.  Yes, ma'am.

15  Q.  And what does wfglassman say?

16  A.  "Have to be real careful."

17  Q.  And then what does he say?

18  A.  "Perverts out there, too."

19  Q.  And then?

20  A.  And, "Can't get in trouble for that if everyone is nude.

21  Can only get in trouble if you are only one that does not -- if

22  you're the only one that does and not the kids.  That's called

23  exposing yourself."

24  Q.  So it appears that Mr. Glassman -- or Mr. Barry believes

25  that as long as he's naked with the kids, he can't get in

Chappell - Direct by Ms. Zack

1  trouble for taking those pictures?

2          *MR. JARVIS:* Objection.  Leading.

3          *THE COURT:* Sustained.

4  BY MS. ZACK:

5  *Q.* Okay.  What do you believe the chat says -- or what does it

6  say?

7  *A.* It says that Mr. Barry believes that as long as everyone is

8  nude, that he's not going to get in trouble.

9  *Q.* Okay.  Now, let's look at 7b.  And when we go to the top of

10  the first page of 7b, can you explain how to interpret or read

11  this particular chat?

12  *A.* Yes.  Basically the same type of header is involved, giving

13  the record, the date, and time.  In this particular case the

14  local user is marked, meaning that the local user is

15  wfglassman.  This is the Barry computer is what it's identified

16  as the local user.

17              This is a chat message.  And then it gives who

18  the sender and who the recipient are of each message.  The

19  record number 8727, for instance, the sender is Quateroy5_2000.

20  The recipient of the message is wfglassman.

21  *Q.* Okay.

22  *A.* And then it gives where -- the file path of where this

23  information was taken and then the file offset, which is

24  actually where the data physically resides on the hard drive.

25  *Q.* And going down the column to where it says 8733, do you see

Chappell - Direct by Ms. Zack

1   that?

2   A.   Yes.

3   Q.   Who is the speaker of that?

4   A.   Wfglassman, Mr. Barry.

5   Q.   And what does wfglassman tell Quarteroy5?

6   A.   "My oldest is turning into a little clown and really good

7   with the camera.  So he will want to take everyone's picture."

8   Q.   And does that thought continue?

9   A.   Yes.  "Which is good.  We'll have fun, pictures to share of

10  the even."  And I believe that to mean "evening."

11  Q.   And does Quarteroy5 respond?

12  A.   Yes.  "I'm sure you will.  Good for him.  We'll have to

13  encourage his interest in photography."

14  Q.   And let's talk about 7c.  Do we look at 7c as far as the

15  sender received the same way we looked at the last chat?

16  A.   Yes, exactly like the last chat, yes, ma'am.

17  Q.   Okay.  And this chat, a lot of it is about O.B.'s

18  circumcision; is that correct?

19  A.   Yes, ma'am.

20  Q.   Looking at -- for lack of a better way to reference it, the

21  information next to 6903 --

22  A.   Yes, ma'am.

23  Q.   -- can you talk about what that says?

24  A.   Yes, ma'am.  The Roxas13066 --

25  Q.   Uh-huh.

Chappell - Direct by Ms. Zack

1   *A.*  -- sent the message to wfglassman, Mr. Barry, in which he

2   states:  "Is the one who needs surgery on the left of the

3   picture?"

4   *Q.*  And what does Mr. Barry respond?

5   *A.*  "Yep."  And then goes on to say, "Did you save the pics?"

6   To which Mr. -- I believe this is Roxas13066 replies, "No."

7   *Q.*  Now, forensically, what do you get from that?  What do you

8   believe that means?

9   *A.*  That Mr. Barry or wfglassman shared a photograph on Instant

10  Messenger with this individual Roxas13066.

11  *Q.*  And when you go down to where it says 6910, what does Roxas

12  say?

13  *A.*  Well, he tells him on the previous one, he says, "I still

14  have the window open.  The photo share window is open."

15  *Q.*  And what do you believe from that was going on?

16  *A.*  That the -- a digital image, a photograph was shared using

17  the Instant Messenger program.

18  *Q.*  And in 6912?

19  *A.*  Wfglassman, Mr. Barry, sent a message to Roxas13066.

20  "Yeah, the little one is on the left and as you can see, they

21  love to be naked."  To which Mr. Roxas replied, "lol."

22  *Q.*  Which means what?

23  *A.*  Chat slang for "laugh out loud."

24  *Q.*  Okay.  And further down does Mr. Glassman indicate -- or

25  Mr. Barry indicate whether or not he enjoys being naked?

Chappell - Direct by Ms. Zack

1   A.   Yes, ma'am.

2   Q.   Let's look at 7d.  How do we -- do we read that one --

3        THE COURT:  Before we go on to another exhibit, I have

4   a conference call that I have to take in just a few minutes.

5   It coincides with lunch, which is why I scheduled it for now.

6   So tell me what your schedule looks like in terms of the

7   remaining time for this witness on direct and how long you

8   anticipate him on cross.

9        MS. ZACK:  I don't have a lot more on direct.

10  Probably another 30 to 40 minutes at most, I believe.

11       THE COURT:  Is this your only witness?

12       MS. ZACK:  Yes, Your Honor.

13       THE COURT:  All right.

14       MR. JARVIS:  It will probably take three -- probably

15  three hours to do the cross, Judge.  It will be lengthy.

16       THE COURT:  All right.  Let's take a break until,

17  let's say, 1:15 and then we'll resume.  Thank you.

18       MS. ZACK:  Your Honor, will we have access to the

19  courtroom?

20       THE COURT:  Yes.

21       MS. ZACK:  Okay.

22       MS. MINICK:  Judge, may we leave things here?

23       THE COURT:  Yes, you may.

24       MS. MINICK:  Thank you.

25       (Lunch recess from 11:55 a.m. to 1:15 p.m.)

Chappell - Direct by Ms. Zack

1      *(Open court, Defendant present.)*

2              THE COURT:  I think we're ready.  Go ahead and take

3      the stand, please, sir.

4                     All right.  You may resume.

5              MS. ZACK:  Your Honor, before we go forward, I need to

6      make a correction.  I told you 20 to 45 minutes.  I forgot

7      we're playing the DVDs and I didn't calculate that in --

8              THE COURT:  All right.  That's fine.

9              MS. ZACK:  -- so I apologize.

10             THE COURT:  That's fine.

11             MS. ZACK:  Thank you, Your Honor.

12                         **DIRECT EXAMINATION CONTINUED**

13     BY MS. ZACK:

14     Q.  All right.  I believe, Agent Chappell, we were talking

15     about the chats and we had gotten through c -- d.  Okay.  We

16     were starting to talk about d.  So if you could direct your

17     attention to d, 7d.  And looking at the first page of 7d, at

18     the -- how you interpret it, the top part, that black line that

19     you've been describing to us, can you tell us who this

20     conversation is between?

21     A.  Mr. Barry and a user named Michael Wright 540.

22             MR. JARVIS:  Judge, excuse me.  We're going to object

23     to identifying it as Mr. Barry.  That has not been done at this

24     point.  It's speculation.  He needs to identify him as the

25     person using wfglassman.

Chappell - Direct by Ms. Zack

1           *THE COURT:*  I think that there's been testimony that

2    that is an association -- that that is a name that has been

3    linked to Mr. Barry as the e-mail or IM account he was using.

4    So, I'm going to allow it with that understanding.

5           *MR. JARVIS:*  All right.

6           *THE COURT:*  You can cross-examine him on that if you

7    would like.

8    BY MS. ZACK:

9    *Q.*  And what does wfglassman tell the Michael Wright user in

10   that first line about his location?

11   *A.*  "That we are in Houston now."

12   *Q.*  And the date of this chat?

13   *A.*  December 27, 2010.

14   *Q.*  And what are they discussing in this chat, in general?

15   *A.*  A naked New Year's Eve party.

16   *Q.*  And directing your attention to line -- and for lack of a

17   better way to do it, 7039 on the second page --

18   *A.*  Yes, ma'am.

19   *Q.*  -- does the Michael Wright user refer to wfglassman with a

20   name?

21   *A.*  Yes, he states, "David, be careful."

22   *Q.*  And what is the "be careful" in reference to?

23   *A.*  The naked New Year's Eve party with several adult males

24   that are all supposed to be nude with the two children, the

25   Barry children there as well nude.

Chappell - Direct by Ms. Zack

1  *Q.*  And is it apparent whether Mr. Wright is going to be able

2  to attend the party or not?

3  *A.*  No, ma'am, he's not going to be able to attend.  He says he

4  wished he could attend.

5  *Q.*  Okay.  Now, I want to draw your attention to 7e.  And this

6  chat occurred when?

7  *A.*  December 31st, 2010.

8  *Q.*  And who -- with whom is Mr. Barry chatting?

9  *A.*  User name nudemac.

10 *Q.*  N-u-d-e-m-a-c?

11 *A.*  Yes, ma'am.

12 *Q.*  And does any other individual besides Mr. Barry and nudemac

13 show up in this chat?

14 *A.*  Yes, ma'am, Quarteroy5_2000.

15 *Q.*  And has Quarteroy5_2000 been present in any other chat?

16 *A.*  Yes.

17 *Q.*  Okay.  Are you able to tell -- is this -- I know you've

18 talked about instant messaging and how this works.  How are

19 there three people able to communicate?

20 *A.*  A group chat or group message.

21 *Q.*  And is that the only way that that could show up this way?

22 *A.*  Possibly through having multiple chat windows open also may

23 get several records together, if he uses the same program.

24 *Q.*  Okay.  So there's only two possibilities here, is that

25 Mr. Barry is conducting two separate chats, correct?

Chappell - Direct by Ms. Zack

1   A.  Correct.

2   Q.  Or it's a three-way chat?

3   A.  Correct.

4   Q.  Okay.  And in reference to the portion on that first page

5   number 7453 down through 7458, is that all with the nudemac

6   individual?

7   A.  Yes, ma'am.

8   Q.  And what is the conversation about?

9   A.  Mr. Barry is asking nudemac if he can see my boys.

10  Q.  And is that -- do you believe that's in reference to a

11  picture?

12  A.  Yes, ma'am.

13  Q.  And what's the response that nudemac says?

14  A.  "How cute, lol."

15  Q.  And the next response by nudemac?

16  A.  He then goes and tells Mr. Barry to be careful about

17  sending naked pics of kids.  You know, it's illegal.

18  Q.  And what is Mr. Barry's response?

19  A.  "I know.  That was just for you."

20  Q.  And what then does Mr. Barry tell nudemac?

21  A.  "Don't show anyone, but you are so far away."

22  Q.  And the chat continues between these two individuals?

23  A.  Yes.

24  Q.  And at the end of this chat -- or actually going to 7471,

25  what does nudemac tell Mr. Barry?

Chappell - Direct by Ms. Zack

1   A.   "I would hate for you to get into trouble."

2   Q.   And what does Mr. Barry tell him?

3   A.   He responds, "I know, not going let that happen, but

4   you" --

5   Q.   And --

6   A.   I'm sorry.

7   Q.   I'm sorry.  And then he says what?

8   A.   "But you can see them live when you come to visit."

9   Q.   And what did you take that to mean?

10  A.   That Mr. Barry had sent a picture of the children nude

11  during this conversation and that he knew that it was illegal,

12  but he did it anyway.

13  Q.   I want to draw your attention to 7f, and this chat occurred

14  when?

15  A.   January 5th, 2011.

16  Q.   And this was between who?

17  A.   Mr. Barry and berlioz53.

18  Q.   And what was the general topic of this text?

19  A.   Christmas and the nude New Year's Eve party.

20  Q.   All right.  And in this text, did they discuss the

21  circumcision of O.B.?

22  A.   Yes.

23  Q.   And was it discussed at the end of this chat approximately

24  how many people were at the New Year's Eve party?  Directing

25  your attention to 6679 and beyond.

Chappell - Direct by Ms. Zack

1   A.  Yes.

2   Q.  And approximately how many people were at the party?

3   A.  According to this, approximately eight.

4   Q.  And were the -- are you able to tell whether or not there

5   were any other children present besides the Barry children?

6   A.  No.  Mr. Barry states that there were no other children

7   there.

8   Q.  Okay.  Now, looking at 7g, who is the subject that

9   Mr. Barry is talking to in 7g?

10  A.  The berlioz53 again.

11  Q.  Okay.  And what is the topic of this chat?

12  A.  Boys reaching puberty and talking to them about

13  masturbation.

14  Q.  And where in this chat does it discuss safely masturbating?

15  A.  I don't believe it really references safely masturbating.

16  Q.  Where in any of the chats that you recovered does it

17  discuss safely masturbating?

18  A.  I did not find any chats that references safely

19  masturbating.

20  Q.  Where in this chat does it discuss anything about anybody

21  being injured or masturbating improperly?

22  A.  I did not find any chats.

23  Q.  And does this discuss Mr. Barry's children?

24  A.  Yes, ma'am.

25  Q.  And going specifically to 7 -- 1789, on the second to last

1  page of this chat --

2  A.  Yes, ma'am.

3  Q.  -- what is being discussed -- or actually let me back that

4  up.  I apologize.  Let's go to 6753.

5  A.  Yes, ma'am.

6  Q.  Okay.  And what's going on there?

7  A.  They're discussing having Mr. Barry talking to his children

8  about masturbation.

9  Q.  Okay.  And do they use the term "masturbation"?

10  A.  No, ma'am.

11  Q.  What term do they use?

12  A.  One of the more common terms they've been using is "wank."

13  Q.  W-a-n-k?

14  A.  Yes, ma'am.

15  Q.  And is that used as a verb as well?

16  A.  Yes, ma'am.

17  Q.  Okay.  So where does the word "masturbation" show up?

18  A.  It doesn't, ma'am.

19  Q.  Let's talk about what is going on in the chat around 1795.

20  A.  It's Mr. Barry discussing his children getting erections.

21  Q.  And in what context is he discussing this?  What is --

22  A.  That they're proud of them and that they show them to him.

23  Q.  And what is the response from berlioz53?

24  A.  He states, "Love it."

25  Q.  Now, let's talk about 7h.  Who is this chat between?

Chappell - Direct by Ms. Zack

1  A.  Mr. Barry and berlioz53 again.

2  Q.  And what is the general context of this one?

3  A.  Mr. Barry is discussing O.B.'s circumcision and issues that

4  he's having with it at school.

5  Q.  Okay.  What did Mr. Barry tell berlioz53 at the end of this

6  chat?

7  A.  He talks about not wanting the schoolteachers to check O.B.

8  or to do anything with it.  That they're there to teach and

9  nothing more.

10  Q.  And 7i, who is that between?

11  A.  Mr. Barry and lookis99, l-o-o-k-i-s-9-9.

12  Q.  And have we seen this lookis -- how did you say that again?

13  A.  Lookis.

14  Q.  Lookis99 before?

15  A.  No, ma'am.

16  Q.  Okay.  Now, what is Mr. Barry telling him about in the

17  section 2137?

18  A.  He's talking about his kids talking to friends of his naked

19  all the time on camera, and they're naked like us.

20  Q.  7j is between -- are you able to tell who that's between?

21  A.  Excuse me, ma'am?

22  Q.  Are you able to tell who that chat is in between?

23  A.  No, ma'am.  This is with an unknown subject.

24  Q.  Okay.  It's Mr. Barry and an unknown subject?

25  A.  Correct.

Chappell - Direct by Ms. Zack

1   Q.   And what are they talking about, generally?

2   A.   A lot of it is Mr. Barry starting to discuss picking up and

3   meeting a gentleman, whoever this unknown subject is.

4   Q.   And do they discuss the children?

5   A.   Yes.

6   Q.   And do they discuss the children getting naked,

7   specifically in line 30766?

8   A.   Yes.

9   Q.   And let's talk about 30768.  What's going on in that part

10  of the chat?

11  A.   The unknown subject here -- well, Mr. Barry had said he

12  can't wait for the three of them -- can't wait to see the three

13  of you naked together.  And when the unknown subject asks why

14  is that, Mr. Barry said, "Because they haven't seen a grown man

15  that is uncut."  And then goes on to say, "You may have a lot

16  of explaining to do."

17  Q.   In line 30779, what is the discussion?

18  A.   About having his camera charged up.

19  Q.   Having whose camera charged?

20  A.   Mr. Barry is saying that.

21  Q.   Okay.  And the person chatting with him responds how?

22  A.   That he wanted to bring his, too, but he wasn't sure if it

23  was okay, to which Mr. Barry tells him he can.

24  Q.   And what else?

25  A.   Mr. Barry tells him, "Bring it tomorrow.  Always need pic

Chappell - Direct by Ms. Zack

1  of your naked adventures."

2  Q.  And let's go down, does the conversation go on about the

3  pictures?

4  A.  Yes, ma'am.

5  Q.  And what does it say?

6  A.  The unknown subject talks about wanting to get a picture

7  with clothes on or off, he doesn't care.

8  Q.  What does Mr. Barry say?

9  A.  Mr. Barry says, "You can have one clothed and one naked, I

10  don't care."  And the unknown subject, "As long as you're

11  cool."  And Mr. Barry states, "Wouldn't have offered if I

12  didn't care."

13  Q.  And 30790 --

14  A.  Correct.

15  Q.  -- Mr. Barry says what?

16  A.  "I am pretty cool with most stuff.  Just ask that if you

17  get a naked picture of the boys, you keep it private."  To

18  which the unknown subject stated, "Yeah, I would never ever

19  share those."

20  Q.  Let's talk about 7k.  That's between who?

21  A.  Mr. Barry and again an unknown subject.

22  Q.  And what is this general tenor of this chat?

23  A.  Going to a Lone Star Nudist Resort.

24  Q.  And does it indicate they've been or that they're going to

25  go?

Chappell - Direct by Ms. Zack

1   A.  That they're wanting to go.

2   Q.  Okay.  And you don't know who that chat is with?

3   A.  No, ma'am.

4   Q.  Okay.  71, when was this chat?

5   A.  January 25th, 2011.

6   Q.  And do you know who it is with?

7   A.  No, ma'am.  Unknown subject.

8   Q.  Okay.  And what is the first part of this chat about?

9   A.  Mr. Barry is talking about a guy in Scotland that does

10  massages and that he does a grandfather, a father, and the son

11  all at the same time.  The son being 11, the father is 32, and

12  the grandfather 55, and they do naked massages.

13  Q.  Okay.  And what is line 31412 discussing?

14  A.  He's talking about the son in this, thinking that it's cool

15  to see his dad and grandfather shoot.

16  Q.  What did you interpret that to mean?

17  A.  Ejaculating.

18  Q.  And what is Mr. Barry's response to that?

19  A.  Well, Mr. Barry's continuing the conversation and says,

20  "Can't wait until he can do it, too."

21  Q.  Does the subject -- the unknown subject ask Mr. Barry about

22  his child -- one of his children?

23  A.  Yes.

24  Q.  And what is that question?

25  A.  "Does the boy get wood yet?"

Chappell - Direct by Ms. Zack

1  Q.  And what do you take that to mean?

2  A.  Asking if the boy gets an erection yet.

3  Q.  And do they go on to discuss this father, son, grandfather

4  massage further?

5  A.  Yes.

6  Q.  And does this conversation get more graphic?

7  A.  Yes, ma'am.

8  Q.  And then does Mr. Barry discuss whether either of his boys

9  masturbate without using the term "masturbate," specifically on

10 line 31430?

11 A.  Yes.

12 Q.  And this conversation continues about masturbation or

13 erections?

14 A.  Yes, ma'am.

15 Q.  Where in this chat do they discuss safe masturbation or

16 anything like that?

17 A.  I didn't see any references to safe masturbation on here.

18 Q.  Does Mr. Barry indicate whether or not his children are

19 interested in masturbation yet, in line 31450?

20 A.  He's asked about whether or not they're curious about their

21 penises, too, grabbing or whatever, and here he states, "No."

22 Q.  And what does Mr. Barry say about whether or not he has

23 erections in front of the children?

24 A.  He states -- he talks about having erections in front of

25 the children.

Chappell - Direct by Ms. Zack

1   *Q.*   And does he claim that that's not sexual?

2   *A.*   Yes.

3   *Q.*   Do they discuss -- does Mr. Barry discuss touching and/or

4   hanging out naked in the home?

5   *A.*   Yes.

6   *Q.*   And this goes on talking about the bathroom?

7   *A.*   Yes.

8   *Q.*   Or tub?

9   *A.*   Yes, ma'am.

10  *Q.*   Okay.  Now, I want to draw your attention to line 31465.

11  Who's speaking in that line?

12  *A.*   Mr. Barry.

13  *Q.*   What does he say?

14  *A.*   He's asking the unknown subject, "So you got to rub some

15  young boys?"  To which the unknown subject replied, "Yeah."

16  *Q.*   And then Mr. Barry says?

17  *A.*   "You get to rub dad's, too?"  To which the unknown subject

18  replied, "Yeah."

19  *Q.*   And then what does the unknown subject say in 31470?

20  *A.*   He tells Mr. Barry, "Got to horseplay with them a little

21  bit, too.  That was fun.  Cool to hug them and be pressed up

22  against them."  To which Mr. Barry replied, "Good deal.  Get to

23  press against dad's, too?"  And the unknown subject replied,

24  "Yeah, all four of us."

25  *Q.*   And what is Mr. Barry's response to that?

Chappell - Direct by Ms. Zack

1   A.   "Awesome."

2   Q.   And then what does the unknown subject say?

3   A.   He states, "That our dicks would slip through their legs,

4   but they didn't think anything of it.  Just boys horseplaying."

5   Q.   And Mr. Barry's response?

6   A.   "Of course."

7   Q.   And what does he says then?

8   A.   "Boys don't think real sexual at that age."  The unknown

9   subject replied, "Right."

10  Q.   And is that pretty much the end of the sexual talk in that

11  chat?

12  A.   Yes, ma'am.

13  Q.   Now, you don't know who that chat was with; is that

14  correct?

15  A.   No, ma'am.

16  Q.   Okay.  Now, let's talk about 7m.  In 7m, is the subject

17  still erections?

18  A.   Yes.

19  Q.   And going to line 30396, who's speaking?

20  A.   The unknown subject.

21  Q.   And what does he say?

22  A.   He asked Mr. Barry, "So do you play with other guys in

23  front of your sons?  Do they know you are gay?"

24  Q.   And what is Mr. Barry's response?

25  A.   "No, they don't get to see that.  Their minds aren't ready

Chappell - Direct by Ms. Zack

1   to think about sex between two people."

2   Q.  And does he continue to speak?

3   A.  Yes.  "You not sure you could contain yourself if we both

4   got hard paying Wii?"

5   Q.  And what does the other individual respond?

6   A.  "Ha, ha, maybe.  Also met a guy who was telling me that he

7   and his son were nudists and didn't mind showing off and

8   playing."  To which Mr. Barry responded, "Some guys do that."

9   Q.  Now, later on in this same chat, on line 30408, what's

10  going on?

11  A.  The unknown subject asks Mr. Barry if he was going to teach

12  them about j-o, which I took as jerking off.

13  Q.  And what is Mr. Barry's response?

14  A.  "That I will do."

15  Q.  And does he continue?

16  A.  Yes.  He states, "Want them to know that it is normal and

17  okay to do."  To which the unknown subject replies, "That's

18  cool."  And then states, "I think that's a more nurturing way

19  to approach."

20  Q.  And do they go on to talk about doing that in the home?

21  A.  Yes.

22  Q.  And in 30419, what's the -- who's speaking?

23  A.  The unknown subject.

24  Q.  And what is he saying?

25  A.  He asked Mr. Barry, "Have they seen you do it already?"  To

Chappell - Direct by Ms. Zack

1  which Mr. Barry replied, "No.  Have seen me hard and leaking
2  precum.  Always leak when hard."
3  Q.  Now, the chat continues along that same tenor; is that
4  correct?
5  A.  Yes, ma'am.
6  Q.  Then let's go further into this chat.  On 30451, who's
7  speaking?
8  A.  30451?
9  Q.  Yes.
10  A.  That is Mr. Barry.
11  Q.  And what is he saying?
12  A.  He said, "Cool."
13  Q.  And then?
14  A.  That he doesn't turn on the -- "I don't turn on the cam
15  home naked."
16  Q.  And does he then go on to say that he's just being
17  cautious?
18  A.  Yes.
19  Q.  And in 30459, what does he say?
20  A.  But he doesn't care if people are here naked with them,
21  referring to the children.
22  Q.  And does that thought continue further?
23  A.  Yes.
24  Q.  And what does he say?
25  A.  But he would love to see you naked, referring to the

Chappell - Direct by Ms. Zack

1  unknown subject.  Unknown subject replies, "Hee, hee.  I would
2  like to see you, too."  And then asks, "Are the kids behind you
3  or on your lap?"
4  Q.  And what does Mr. Barry say?
5  A.  "They are next to me on the couch, but can't see my
6  laptop."
7  Q.  And what does the other person say?
8  A.  He then asks Mr. Barry to turn on the cam.  To which
9  Mr. Barry replies, "Hang on.  I will start mine."
10  Q.  Now -- and then he continues.
11  A.  The unknown subject says, "It's unavailable."  And
12  Mr. Barry states, "Hang on."  And that particular chat ends.
13  Q.  Now, these are not the only chats that you recovered,
14  correct?
15  A.  No, ma'am.
16  Q.  This is just a sampling of them?
17  A.  Yes, ma'am.
18  Q.  Okay.  Now, there's been discussion about images that were
19  found on Mr. Noonan's computer and Mr. Noonan's camera,
20  correct?
21  A.  Yes, ma'am.
22  Q.  And some of those images you testified to were also found
23  on Mr. Barry's computer, correct?
24  A.  Yes, ma'am.
25  Q.  And then there were images found on Mr. Barry's camera.

Chappell - Direct by Ms. Zack

1  What other links do you have between Mr. Barry and Mr. Noonan?

2  A.  I do have a chat where the user names listed are related to

3  a David and a Creger.

4  Q.  Okay.

5  A.  Yes.

6  Q.  And who do you know Creger to be?

7  A.  As William Craig Noonan or as they call him, Craig.

8  Q.  Okay.  There's a chat and it's represented as 7n; is that

9  correct?

10  A.  Yes, ma'am.

11  Q.  And what is the nature of this chat?

12  A.  This is discussion between Mr. Barry and Mr. Noonan,

13  talking about jobs and the kids and seeing each other and so

14  forth.

15  Q.  Now, do they discuss talking on camera?

16  A.  I don't believe they directly relate to talking on camera,

17  no, ma'am.

18  Q.  Well, I'm going to direct your attention to page 2, the

19  one, two --

20  A.  Oh, yes, ma'am.  Okay.

21  Q.  Okay.  So --

22  A.  Yeah, he states, Come on cam -- while one of them, David,

23  Mr. Barry's asking him to finish cooking and then we can talk,

24  and Creger asks him to come on cam, talk to him while he's

25  cooking.

Chappell - Direct by Ms. Zack

1   Q.  And do you have a time frame for this chat?

2   A.  As a date, no, ma'am.

3   Q.  Okay.  As a time?

4   A.  There are times listed.  It's in the early evening.

5   Q.  And does Mr. Noonan refer to the boys in the chat where

6   they talk about coming on camera?  13 lines down.

7   A.  On page 2?

8   Q.  On page 2, yes.

9   A.  Well, Mr. Barry talks about, "Maybe in a bit.  Almost time

10  for the boys to get ready for bed."  To which Mr. Noonan

11  replies, "Oh, I miss my boys and bedtime."

12  Q.  And what is Mr. Barry's response to that?

13  A.  "I know you do.  Soon, I really hope."

14  Q.  Okay.  And Mr. Noonan says?

15  A.  "Me too."

16  Q.  And how many o's are in "too"?

17  A.  15, 16.

18  Q.  And is there any part of the chat between Mr. Noonan and

19  Mr. Barry, specifically at the bottom of the third page, that

20  indicates that their relationship is more than just friends?

21  A.  Yes.

22  Q.  And what is that?

23  A.  It talks about wanting to get together again or waiting

24  until we are together again to have fun.  Well, actually before

25  that, Mr. Barry states, "Okay.  Now, I would have done it once

Chappell - Direct by Ms. Zack

1   for you had I known -- I would have been playing with it."

2   Q.  And what do you believe "it" refers to?

3   A.  A penis.  Because he's talking about right before using the

4   potty, shake it once, and then goes on to say, "Now, if I would

5   have done it once for you, I would have been playing with it."

6   Q.  And is that the majority of the sexual banter in this

7   particular chat?

8   A.  Yes, ma'am.

9        MS. ZACK:  Your Honor, at this time I believe the

10  Government would like to play the two DVDs.

11       THE COURT:  That's fine.

12       MS. ZACK:  And with permission and if there's no

13  objection, we fast-forwarded to the point -- because there's

14  some dead space, where both the child and the interviewer are

15  in the room and if we can fast-forward it through any of the

16  dead spots, we will attempt to do so, if that's okay with Your

17  Honor.

18       THE COURT:  That's fine.

19       MS. ZACK:  Okay.

20    (Playing DVD.)

21       THE COURT:  Can you turn it up, please?

22       MS. ZACK:  Give us one second, Your Honor.

23       THE COURT:  It's hard to hear.

24       MS. ZACK:  It's somewhat difficult -- Your Honor, what

25  we can do is I'll move on to something else and we'll get some

Chappell - Direct by Ms. Zack

1    speakers and see if we can make it louder.
2              THE COURT:  All right.  Thank you.
3              MS. ZACK:  Because I have some other stuff that we
4    can --
5              THE COURT:  That's fine.
6              MS. ZACK:  -- discuss and we can come back to this.
7              THE COURT:  That's fine.  Thank you.
8              MS. ZACK:  Okay.
9    BY MS. ZACK:
10   Q.  So, Special Agent Chappell, let's talk about Item No. 16 --
11   Government's Exhibit 16, which is the child pornography images
12   from the Messenger cache on the Dell Inspiron, the black
13   computer.  That was Mr. Barry's, correct?
14   A.  Yes, ma'am.
15   Q.  Okay.  And the images were found in several places on
16   Mr. Barry's computer, correct?
17   A.  Correct.
18   Q.  And can you refresh us again where on Mr. Barry's computer
19   these images were found?
20   A.  Some of the images were found within Mr. Barry's Messenger
21   cache.  Some of those same images were also found within the
22   user created folders mentioned earlier, "Craig Houston" and
23   "Craig H," "dor," and those.
24   Q.  Okay.  All right.  Other than the unknown child and unknown
25   adult images, the ones that were 4aa to gg --

Chappell - Direct by Ms. Zack

1   A.  Correct.

2   Q.  -- in what would be, I believe, 17n through t, you would

3   agree those are the same images, correct?

4   A.  Yes, ma'am.

5   Q.  Those were only found in the Instant Messenger cache; is

6   that correct?

7   A.  The aa through gg, correct, were only found in Instant

8   Messenger cache.

9   Q.  4aa through gg?

10  A.  Correct.

11  Q.  And those are the same images that are in 17n through t?

12  A.  Correct.

13  Q.  Okay.  Now, let's talk about this Instant Messenger cache

14  and the other images that were in there.  You just indicated

15  that some of those images were also found in other places on

16  Mr. Barry's computer?

17  A.  That is correct.

18  Q.  Forensically what does that tell you?

19  A.  Several things.  Depending on the date and time of the

20  image and stuff, as to whether or not it existed first as an

21  image in a user created folder and then was used in the Instant

22  Messenger, meaning it was sent or possibly received.

23  Q.  And is it possible that it was both sent and received?

24  A.  Yes, ma'am.

25  Q.  Okay.  Now, based on the chats that you reviewed and the

Chappell - Direct by Ms. Zack

1  way the files were saved in structure, do you believe

2  forensically that Mr. Barry sent pictures over the Internet of

3  the boys naked?

4  A.  Yes, ma'am.

5  Q.  And you believe he also received images, correct?

6  A.  Yes, ma'am.

7  Q.  Okay.  But there's no way for you to determine, as you

8  explained to the Court earlier with the unknown boy pictures,

9  the -- whether it was the originating location or the

10  recipient?

11  A.  That is correct.

12  Q.  You just know that they were on the computer and opened and

13  looked at at some time?

14  A.  Using an Instant Messenger cache, yes, ma'am.

15  Q.  Right, within the Instant Messenger forum -- or format?

16  A.  Correct.

17  Q.  Okay.  Now, let's talk about Item 17.  This is selected

18  images from the Instant Messenger cache on Mr. Barry's

19  computer, correct?

20  A.  Correct.

21  Q.  Okay.  And let's look at 17a.  And this is an image that

22  we've seen before, correct?

23  A.  Correct.

24  Q.  And this was contained where else in the -- besides the

25  Instant Messenger cache?

Chappell - Direct by Ms. Zack

1  A.  This is one of the photos contained within one of the
2  folders or subfolders within "Craig Houston."
3  Q.  Okay.  Let's talk about 17b.  We've seen this image before,
4  have we not?
5  A.  Yes, ma'am.
6  Q.  This image was also 4b from Mr. Barry's laptop?
7  A.  That is correct.
8  Q.  And from Government's Exhibit 6A, the EXIF data, that shows
9  this was taken with what?
10  A.  Mr. Noonan's camera, Casio camera.
11  Q.  And this was also present in Government's Exhibit No. 13,
12  which is Mr. Noonan's laptop?
13  A.  Yes, ma'am.
14  Q.  Okay.  And then 24a, can you go to that exhibit, please, in
15  your notebook?  Do you see 24a?
16  A.  Yes, ma'am.
17  Q.  Okay.  And what is that?
18  A.  A thumbnail of what's visually the same picture.
19  Q.  Okay.  And where did 24a come from?
20  A.  Mr. Noonan's computer.
21  Q.  Okay.  And what does the fact that that's in a thumbnail
22  image on Mr. Noonan's computer tell you?
23  A.  That it was not the only photo that existed on Mr. Noonan's
24  computer.  It was rendered -- whether an instant messaging
25  program or through Windows somehow had to create this thumbnail

Chappell - Direct by Ms. Zack

1    for it to be rendered.

2    Q.  Okay.  And let's talk about 22 in reference to this same

3    image 4b.  What is Government's Exhibit No. 22?

4    A.  This is part of the EXIF data -- I'm sorry.  This is part

5    of the file properties for what was Government's Exhibit 4b.

6    Q.  And what does that tell you?

7    A.  This tells me the file name, which was "David and the

8    boys37.jpeg" and that it was created on Mr. Noonan's computer

9    on June 18th, 2010, at approximately 7:26:17 a.m. and that this

10   particular file resided under the folder "David and the boys"

11   within the "owner" user account, folder "David and the boys,"

12   subfolder "dor," d-o-r.

13   Q.  Okay.  Now, you said it was created on Mr. Noonan's

14   computer.  Do you mean Mr. Barry's?

15   A.  I mean Mr. Barry's computer.

16   Q.  Okay.

17   A.  I stand corrected.

18   Q.  All right.  I just want to make sure we're clear, this data

19   comes from Mr. Barry's computer?

20   A.  Mr. Barry's computer, correct.

21   Q.  Okay.  And this would have been -- based on what we know

22   about the dates of the visits, this would have been after the

23   second June visit?

24   A.  That is correct.

25   Q.  Okay.  And Exhibit 17b, that's from the Instant Messenger

Chappell - Direct by Ms. Zack

1  cache?

2  A.  Yes, ma'am.

3  Q.  And what does that tell us?

4  A.  That this picture was -- just from the picture, was either

5  sent or received, it was used within the Messenger program.

6  Q.  In what -- on what date?  I'm sorry.  Number -- this is

7  Exhibit 23.

8  A.  23, correct.

9  Q.  It tells you what about Exhibit 17b?

10  A.  17b was created on September 16th, 2010, at approximately

11  11:40 p.m.

12  Q.  Created where?

13  A.  In the Messenger cache.

14  Q.  Okay.  So that doesn't mean that was the first time it was

15  put on the computer, does it?

16  A.  No, ma'am.

17  Q.  Okay.  And, in fact, you believe it was on the computer

18  prior to that; is that --

19          MR. JARVIS:  Object to leading, Judge.

20          THE COURT:  Sustained.

21  BY MS. ZACK:

22  Q.  What do you know about that image being on the computer

23  prior to that date?

24  A.  The fact that the image existed in June, June 18th in a

25  user created folder and then it appeared approximately three

Chappell - Direct by Ms. Zack

1  months later in the Messenger cache indicates to me that it was

2  probably sent from Mr. Barry's computer via the Messenger

3  program to some individual --

4  Q.  Okay.

5  A.  -- or individuals.

6  Q.  But there was no way for you to forensically determine to

7  whom it was sent?

8  A.  No, ma'am.

9  Q.  Okay.  Now, going back to 17, 17c, have we seen this image

10  before as well?

11  A.  Yes, ma'am.

12  Q.  Okay.  And -- well, let me do it this way:  Images 17a

13  through m, as in Mary, did those all happen in other places on

14  Mr. Barry's computer?

15  A.  Yes, ma'am.

16  Q.  Now, the fact that they're in the Instant Messenger cache

17  means what forensically?

18  A.  The fact that they're in the Messenger cache and exist in

19  another location and all -- most if not all of these images

20  resided on the -- in their user created folders prior to being

21  in Messenger cache indicates that they were more likely sent

22  using the Instant Messenger cache from Mr. Barry's computer.

23  Q.  Okay.  So let's look then at 17c.  This is -- we've seen

24  this image before, correct?

25  A.  Yes, ma'am.

Chappell - Direct by Ms. Zack

1   Q.  And 17d?

2   A.  Yes, ma'am.

3   Q.  And 17e?

4   A.  Yes, ma'am.

5   Q.  And f?

6   A.  Yes, ma'am.

7   Q.  17g?

8   A.  Yes, ma'am.

9   Q.  And 17h?  What about 17i?

10  A.  Yes, ma'am.

11  Q.  Now, 17j, why is that so small?

12  A.  Depending on how the program uses it, sometimes it will

13  create varying sizes of thumbnails.  A lot of it has to do with

14  the proprietary nature of the instant messaging program,

15  algorithms, coding, whatever.  It's hard to determine exactly

16  why this particular image was so small, other than the program

17  created it that way.

18  Q.  And does that response apply to 17k, l, and m?

19  A.  Correct.

20          MS. ZACK:  And can we see 17k, please, and 17l and

21  17m.

22  BY MS. ZACK:

23  Q.  And all of these thumbnails, j, k, l, and m, 17, were in

24  other places and we've seen larger versions of these?

25  A.  Yes, ma'am.

Chappell - Direct by Ms. Zack

1   Q.  Okay.

2           MS. ZACK:  All right.  Your Honor, at this time we're

3   going to attempt to play --

4           THE COURT:  All right.  Thank you.  Is there something

5   you can do to improve the quality?  I assume you've played it

6   before and haven't had these issues.

7           MS. ZACK:  It's always been low, Your Honor.  I don't

8   know if it would be better -- yeah, we're going to try with the

9   speakers, Your Honor.

10          THE COURT:  All right.  Thank you.

11          MS. ZACK:  Is that better, Your Honor?

12          THE COURT:  Yes.

13      (Playing DVD.)

14          MS. ZACK:  We're going to start it all the way back.

15          THE COURT:  Okay.

16      (Playing DVD.)

17  BY MS. ZACK:

18  Q.  Special Agent Chappell, have you seen that video before?

19  A.  Yes, ma'am.

20  Q.  And that is 28b.  That's the 6-14 video, correct?

21  A.  Correct.

22  Q.  And have you viewed 28a, the 6-7 video?

23  A.  Yes, ma'am.

24  Q.  And what would you say the difference is between those

25  videos?

Chappell - Direct by Ms. Zack

1   A.  The second one goes into a little more detail.  The first

2   one has the same -- talks about the same thing happening, just

3   not in detail.

4   Q.  And these videos were taken -- these interviews were taken

5   a week apart?

6   A.  Yes, ma'am.

7   Q.  And that was after Mr. Barry was arrested on these charges;

8   is that correct?

9   A.  That is correct.

10  Q.  Okay.

11          MS. ZACK:  Your Honor, the first video is in evidence.

12  I don't think it's necessary to play it unless there's some

13  specific objection in addition to what they've already lodged.

14          THE COURT:  I don't think so.

15          MS. ZACK:  Okay.

16          THE COURT:  It's in the record.

17          MS. ZACK:  Okay.  Thank you, Your Honor.

18  BY MS. ZACK:

19  Q.  Special Agent Chappell, let's talk about Exhibits 24b

20  through f.  What are these?  And of you have them in front of

21  you, correct?

22  A.  Yes, ma'am.

23  Q.  Okay.

24  A.  These are images I believe taken from Mr. Noonan's

25  computer.

Chappell - Direct by Ms. Zack

1   Q.  Okay.  And --

2   A.  Yes.

3   Q.  -- when you say "from Mr. Noonan's computer," you mean

4   either from the -- either from the UT laptop or the white box

5   computer, correct?

6   A.  Actually these are taken from the Dell laptop, the one with

7   the UT logo on the top.

8   Q.  Okay.  And that was found at the search of Mr. Noonan's

9   home?

10  A.  That is correct.

11  Q.  Okay.  And these images also -- they all contain the Barry

12  children; is that correct?

13  A.  That is correct.

14  Q.  Or Mr. Barry and Mr. Noonan?

15  A.  That is correct.

16  Q.  And the majority of them, if not all of them, appear on

17  Mr. Barry's computer?

18  A.  That is correct.

19  Q.  Okay.  Now, let's look at 25a.  25a comes from Exhibit 14,

20  Mr. Noonan's white box computer; is that correct?

21  A.  That is correct.

22  Q.  And 25b also comes from that same place?

23  A.  Yes.

24  Q.  And these images also appear in Mr. Barry's computer?

25           MR. JARVIS:  Objection.  Continuous leading, Judge.

Chappell - Direct by Ms. Zack

1        *THE COURT:*  I'll sustain the objection.

2        *MS. ZACK:*  I apologize, Your Honor.

3    BY MS. ZACK:

4    *Q.*  Where else do these images appear?

5    *A.*  On Mr. Barry's computer.

6    *Q.*  When reviewing the computers forensically, all of them,

7    Mr. Noonan's, Mr. Barry's, in regards to these images, what

8    were your conclusions forensically?

9    *A.*  In regards specifically to?

10   *Q.*  To how they got on the computer and how they were

11   maintained.

12   *A.*  Well, some of the images were -- or most of the images were

13   created with Mr. Noonan's camera and then transferred at one

14   point somehow to Mr. Barry's computer and then also transferred

15   at some point somehow to Mr. Noonan's computer.  But all three

16   computers had a lot of the same images.

17   *Q.*  And would it be possible for Mr. Barry to take the SD card

18   from Mr. Noonan's computer and put it in his computer?

19   *A.*  Yes, ma'am.

20   *Q.*  Could you then put that same -- could Mr. Noonan have put

21   that same SD card in his own computer?

22   *A.*  That is correct.

23   *Q.*  And just so I'm clear, putting an SD card in a computer

24   does not erase the SD card?

25   *A.*  No, ma'am.

Chappell - Direct by Ms. Zack

1   *Q.*  I mean, unless you're specifically asking it to erase?

2   *A.*  Right, unless you do something beyond to actually delete

3   it, purposefully delete it, yes.

4   *Q.*  Okay.  So the pictures can be maintained in multiple

5   locations --

6          *THE COURT:*  Can you refrain from leading, please.

7          *MS. ZACK:*  I apologize.

8   BY MS. ZACK:

9   *Q.*  Is it possible for pictures to be maintained in multiple

10  places at the same time that are the same pictures?

11  *A.*  Yes, ma'am.

12  *Q.*  And when you analyzed Mr. Noonan's computers, the items in

13  4aa through gg and 17n through t, did they appear anywhere on

14  Mr. Noonan's computers, the unknown child?

15  *A.*  No, ma'am.  No, ma'am.

16         *MS. ZACK:*  Your Honor, we've come almost to the

17  conclusion of the Government's case in chief.  The only

18  additional piece of evidence the United States has is -- would

19  be called 29, which is in reference to the third trial

20  stipulation.

21         *THE COURT:*  All right.

22         *MS. ZACK:*  Which is the testimony of Mr. Peterson, the

23  defendant's life partner, at a detention hearing that occurred

24  for this case, but that occurred in Dallas because Mr. Barry

25  was arrested there.  I would move to admit this based on the

Chappell - Cross by Mr. Jarvis

1   trial stipulation.  I don't know -- I don't think it's

2   necessary to read it out loud, but I would like to be able to

3   reference parts of it in my closing argument as being in

4   evidence.  I mean, if the Court wants it --

5              THE COURT:  I think you should read it --

6          MS. ZACK:  Okay.

7              THE COURT:  -- so that it's part of the transcript.

8          MS. ZACK:  Okay.  Two choices.  I could have either

9   Mr. --

10             THE COURT:  Have Mr. Stabe do answers and you do

11  questions.

12         MS. ZACK:  Okay.  Perfect.  That's fine.  We can do

13  that.  So I have no further questions at this time for Special

14  Agent Chappell.

15             THE COURT:  All right.  Are you going to ask him

16  any -- I assume then the next appropriate thing would be to

17  have him cross-examined.

18         MS. ZACK:  Yes.  And we don't have to do this part

19  until --

20             THE COURT:  Are you passing the witness at this time?

21         MS. ZACK:  Yes, I am, Your Honor.

22             THE COURT:  All right.

23         MR. JARVIS:  Judge, can we take our afternoon break at

24  this point so I can pull this together, please?

25             THE COURT:  All right.  We'll take a ten-minute break.

Chappell - Cross by Mr. Jarvis

1   Thank you.

2        (*Recess from 2:55 p.m. to 3:05 p.m.*)

3             *THE COURT:*  Ready?  Go ahead and take the stand,

4   please, sir.

5                  Go ahead, please.

6             *MR. JARVIS:*  Thank you, Judge.

7                         **CROSS-EXAMINATION**

8   BY MR. JARVIS:

9   *Q.*  Agent Chappell.

10  *A.*  Yes, sir.

11  *Q.*  All right.  You have never ever actually interviewed R.B.

12  or O.B., have you?

13  *A.*  No, sir, I have not.

14  *Q.*  And they are the eyewitnesses and alleged victims of these

15  crimes, correct?

16  *A.*  That is correct.

17  *Q.*  And they are the only independent eyewitnesses, other than

18  perhaps Mr. Noonan and Mr. Barry, correct?

19  *A.*  No, sir.

20  *Q.*  Who else would be an independent eyewitness?

21  *A.*  Depending on specific events, Mr. Spitler stated --

22  *Q.*  That's the roommate, right?

23  *A.*  That's Mr. Noonan's roommate, correct.  Jeffery Spitler, he

24  had stated he had seen them there without clothes on.

25  *Q.*  But he didn't talk about pictures being taken, did he?

Chappell - Cross by Mr. Jarvis

1   A.  Not specifically, no, sir.

2   Q.  So he wouldn't be any type of witness to any of the

3   pictures or who took them or when they were taken, because he

4   didn't see any picture taking, did he?

5   A.  That would be correct, no, sir.

6   Q.  Okay.  So for the pictures, the only four people involved

7   that you know of are O.B., R.B., Mr. Noonan, and Mr. Barry,

8   correct?

9   A.  And then the white-haired gentleman that appeared in a

10  couple of the pictures, but I have no idea who this person is.

11  Q.  Okay.  So there's at least one independent adult male that

12  you don't know of?

13  A.  Correct.

14  Q.  Okay.  Now, when you got the case or began working on it

15  back -- I think you said January 2011, did you review the

16  records about the boys?  And when I say "the boys," I'm talking

17  about O.B. and R.B.  Okay?

18          MS. ZACK:  Objection.  Vague.  What records?

19          THE COURT:  Can you be more precise, please?

20          MR. JARVIS:  Yes, ma'am.

21  BY MR. JARVIS:

22  Q.  Did you review their adoption records?

23  A.  At that time, no, sir.

24  Q.  At any time since then?

25  A.  Yes, sir, later on.

Chappell - Cross by Mr. Jarvis

1   Q.  The adoption records being the formal adoption paperwork or

2   the box of adoption records that comes with it?

3   A.  No, sir.  Just the approved application and the order to

4   adopt.

5   Q.  So, as I recall, the application was probably about ten

6   pages maybe long and then the order is about two pages long?

7   A.  That's correct.

8   Q.  Is that fair?

9   A.  Yes, sir.

10  Q.  Okay.  Did you review the original CPS removal records when

11  CPS removed the boys from their natural mother?

12  A.  No, sir.

13  Q.  Okay.  Did you review the original termination records when

14  they had a termination hearing about terminating the boys --

15  the mother of the boys rights to the boys?

16  A.  The biological mother?

17  Q.  Yes.

18  A.  No, sir, I did not.

19  Q.  And did you review the psychological evaluation by

20  Dr. Sabine of the boys back in July of 2011?

21  A.  No, sir, I have not.

22  Q.  Did you review the early childhood intervention records,

23  where they were given special help in teaching --

24          MS. ZACK:  Objection.  Assumes facts not in evidence.

25          THE COURT:  I think the adoptions records are part of

Chappell - Cross by Mr. Jarvis

1   the record.

2           *MS. ZACK:*  No, no, these records that he's talking

3   about now are not the adoption records.

4           *THE COURT:*  Would you be a little more precise about

5   "these records" and the ones that are -- and refer to them if

6   they are in evidence by their exhibit number.

7           *MR. JARVIS:*  Yes, ma'am.  These are not in evidence at

8   this point in time.

9           *THE COURT:*  Are you going to offer them?

10          *MR. JARVIS:*  We had offered them earlier and the Court

11  didn't admit them.

12          *THE COURT:*  All right.  Well --

13          *MR. JARVIS:*  So that's why I'm asking if he reviewed

14  them before I --

15          *THE COURT:*  He can answer the question if he reviewed

16  them.

17          *MR. JARVIS:*  Yes, ma'am.

18  BY MR. JARVIS:

19  *Q.*  Did you review the early childhood intervention records?

20  *A.*  By who directly?

21  *Q.*  A company called -- or they call themselves ECI.  It was

22  about a box full of records of all the educational things they

23  did for the boys, especially O.B.  Does that ring a bell?

24  *A.*  I have not reviewed those, no, sir.

25  *Q.*  Okay.  Did you review any of the Wichita Falls school

Chappell - Cross by Mr. Jarvis

1  records or their ARD records for the boys?

2  A.  Yes, sir.

3  Q.  And did you review all of their school records, or what

4  part did you review?

5  A.  I went through several of them.  I didn't read it exactly

6  page per page continuously.  I would read several, skip over,

7  and read some more.  I perused them.

8  Q.  Okay.  Were these the ones that we provided to y'all, or

9  did you get them from the school?

10  A.  No, sir, those were the ones that you provided.

11  Q.  Okay.  And did you see where the boys had done pretty well

12  in school?

13  A.  Yes, sir.

14  Q.  And that Mr. Barry had been a good parent to the boys

15  during that period of time?

16        MS. ZACK:  Objection.  Calls for facts not in

17  evidence.

18        THE COURT:  I'll sustain it.

19            Can you tone it down a little bit?

20        MS. ZACK:  Yes, Your Honor.

21        THE COURT:  I will sustain the objection as to good

22  parent.

23  BY MR. JARVIS:

24  Q.  Did you see any records from the school which indicated

25  Mr. Barry's participation in the schooling of the boys?

Chappell - Cross by Mr. Jarvis

1    A.   Yes, sir.

2    Q.   Were they good or bad reviews?

3    A.   They were good reviews, yes, sir.

4    Q.   Did you review the foster parent training and evaluation

5    records?

6    A.   No, sir.

7    Q.   Did you review the CPS filing and removal from Mr. Barry

8    back at the beginning of this, in February of 2011?

9    A.   Not until recently in preparation for this trial.

10   Q.   What records did you review?

11   A.   CPS records regarding the removal and transcripts from the

12   family hearing.

13   Q.   Okay.  So we're both understanding what we're talking

14   about, CPS files a lot of petitions and notices.  Those

15   official documents that are in the court records, is that what

16   you reviewed?

17   A.   Yes, sir.

18   Q.   And then there was a transcript of Mr. Barry's testimony,

19   correct?

20   A.   Correct.

21   Q.   And Mr. -- and that was the only transcript prepared that

22   I'm aware of.  Were there others that you reviewed?

23   A.   Yes, sir.

24   Q.   What other transcripts of the Wichita Falls trial did you

25   review?

Chappell - Cross by Mr. Jarvis

1  *A.* They had other witnesses, a CPS worker, I believe a Wichita

2  Falls police officer.

3  *Q.* Those are the excerpts that I provided at the detention

4  hearing and then gave to y'all later?

5  *A.* Exactly, yes, sir.

6  *Q.* Okay.  So that would be Detective Jones, Kim Gustafson

7  (phonetic) and I think some questions from Versal Russ

8  (phonetic), the regional CPS lawyer, and I think his name is

9  Brett Hale, the ad litem for the boys, correct?

10  *A.* That is correct.

11  *Q.* And those are one or two pages each?

12  *A.* That is correct.

13  *Q.* All right.  So did you review the forensic videotape of the

14  boys back in 2011, the original ones?

15  *A.* Yes, sir.

16  *Q.* And when did you review those?

17  *A.* I reviewed those probably at least six to eight months

18  after the investigation started.

19  *Q.* Sometime in 2011 probably?

20  *A.* Yes, sir.

21  *Q.* Okay.  And do you recall there wasn't an outcry of sexual

22  abuse at that time on those forensic videos?

23  *A.* On the videos, no, sir, there was not.  There was an

24  audiotape that there was.

25  *Q.* Right.  And to make sure we're on the same page, so the

Chappell - Cross by Mr. Jarvis

1   Judge understands, there were two audiotaped what I call quick
2   interviews at the beginning of the day, during the search
3   warrant, and then later on they had a forensic video by a
4   forensic interviewer in the afternoon, correct?
5   A.  No, sir.  If I'm -- unless I'm mistaken, the audiotaped
6   interviews were conducted by CPS at the school, not during the
7   search warrant.
8   Q.  I didn't mean at the search warrant place, but, yes, during
9   the time that the search warrant was being conducted, they went
10  to the school and talked with the boys?
11  A.  Yes, sir.  Yes, sir.
12  Q.  So we're on the same page.  But the audiotape claim first
13  and then the videotape with the forensic expert, correct?
14  A.  The forensic interviewer, yes, sir.
15  Q.  All right.  Did you review the CPS court documents from
16  2013 when this -- these series of videotapes were made?
17  A.  The CPS documents?  No, sir, I have not.
18  Q.  Okay.  You are aware, though, that they have filed for
19  termination again, correct?
20  A.  That is correct, yes, sir.
21  Q.  And that was basically based upon Mr. Barry being indicted
22  for these offenses, correct?
23          MS. ZACK:  Objection.  Calls for a legal conclusion
24  and assumes --
25          THE COURT:  If he knows.  If he knows, he can answer.

Chappell - Cross by Mr. Jarvis

1   A.  Yes, ma'am.  I believe it's based on this investigation and
2   trial, yes, sir.
3   BY MR. JARVIS:
4   Q.  Okay.  All right.  And did you review the CPS file on these
5   new allegations or just the documents they filed with the
6   court?
7   A.  On these new allegations?
8   Q.  Yeah, the videotape we just saw, the 2013 allegations.
9   A.  I have only seen the videotapes and the Wichita Falls
10  Police Department report, that's it.
11  Q.  Have you talked with anybody at CPS about this?
12  A.  Not at length, no, sir, only that there's a pending
13  termination trial or hearing.
14  Q.  And what about the police department?  Have you talked with
15  the police officers involved with the 2013 allegation?
16  A.  Yes, sir, one police officer who provided me with these
17  interviews.
18  Q.  And who was that?
19  A.  I don't remember.  I spoke to him briefly for a few
20  minutes.  I don't remember his name off the top of my head.  It
21  was not Detective Jones.
22  Q.  So it was a different one from the first one?
23  A.  Yes, it was a different detective.
24  Q.  And you just basically asked him to send you a copy of the
25  videotape?

Chappell - Cross by Mr. Jarvis

1   A.   Yes, sir.

2   Q.   And when did you get that videotape?

3   A.   That was towards the end of March, March 25th, 28th,

4   somewhere in there.

5   Q.   So about a month ago?

6   A.   Yes, sir.

7   Q.   Okay.  Did you review the counselor Julie Porter's weekly

8   records that we provided you?

9   A.   Again, I went through several of them.  I didn't read it

10  page per page, but I did go through them.

11  Q.   There were quite a bit of them, weren't there?

12  A.   Yes, sir.

13  Q.   About 17 months of once a week, correct?

14  A.   Yes, sir.

15  Q.   Did you call Ms. Porter and talk to her about her

16  impression of the boys and what they act like and normally do?

17  A.   No, sir, I did not.

18  Q.   So you haven't talked to anybody about how the boys'

19  demeanor normally is or what it was back then or how they

20  acted?

21  A.   No, sir.

22  Q.   So it's going to be -- it's difficult for you then to say

23  what's natural and normal for them to do if you haven't talked

24  to anybody about what they acted like when they were 5 and 6

25  years old, correct?

Chappell - Cross by Mr. Jarvis

1   A.   Yes, sir.

2   Q.   Okay.   Now, in Ms. Porter's records, did you realize or did

3   you see the references, the two or three or four references to

4   cameras or pictures?

5   A.   Not specifically, no, sir.   I don't remember that.

6   Q.   Weren't you looking for those?

7   A.   I was basically looking to see if there was any reports as

8   to them acting out or crying out or making any outcries.

9   Basically a lot of her -- of the stuff that I read was very

10  short, one or two paragraph things, stating that they came in,

11  the kids were fine, they played for a little bit and that was

12  the end of the session.

13  Q.   Did you see the comments about R.B. and O.B. not

14  remembering or knowing much about cameras or pictures?

15       MS. ZACK:   Objection.   He's asking him to comment on

16  items that are not in evidence.

17       THE COURT:   Repeat the question.

18  BY MR. JARVIS:

19  Q.   You reviewed these documents, correct?

20  A.   Yes, sir.

21  Q.   Okay.   And did you see any comments from the boys talking

22  about taking pictures?

23       MS. ZACK:   Objection.   It's also hearsay, Your Honor.

24       THE COURT:   The question simply is, did he review any

25  comments, not what they said, just the general topic.

Chappell - Cross by Mr. Jarvis

1   A.  I don't remember seeing any, no, sir.

2   BY MR. JARVIS:

3   Q.  You so you don't have any information then from any source

4   of -- originating from the boys about taking pictures, do you?

5   A.  Other than the information of the pictures themselves and

6   the computer and stuff, no, sir.

7   Q.  Right.  Other than looking at the pictures?

8   A.  Correct.

9   Q.  You don't have -- because Mr. Noonan didn't say anything at

10  all, right?

11  A.  No, sir.

12  Q.  So you don't have any information describing the events or

13  when it happened or what they were doing before or after or

14  during picture taking at all, do you?

15  A.  Just the only thing that there is that I've reviewed is a

16  statement that Mr. Barry made at the family hearing, and that

17  was the only thing that was discussed.

18  Q.  Okay.  You mean his testimony?

19  A.  Yes.

20  Q.  Okay.  Let's call that the transcript from the Wichita

21  Falls case so that we're both talking about the same thing.

22  Okay?

23  A.  Okay.

24  Q.  Because you are aware, though, that R.B., through your

25  investigation, you believe that he can take pictures and has

Chappell - Cross by Mr. Jarvis

1   taken pictures, correct?

2   A.  Yes, sir.

3   Q.  All right.  Would you agree that little boys are -- or

4   these boys were about 5 or 6 when these pictures were taken; is

5   that about right?

6   A.  5 to 7, yes, sir.

7   Q.  Okay.  Would you agree that boys that age are pretty hyper

8   or can be hyper --

9   A.  They can be.

10  Q.  -- bouncing off the walls?

11  A.  Yes, sir, they can be.

12  Q.  Okay.  And they can do kind of unusual and sometimes, in

13  adult's eyes, stupid things, right?

14  A.  Yes, sir.

15  Q.  I mean, they're little boys, right?

16  A.  Yes, sir.

17  Q.  As they were described in one of the chats, they're like

18  little monkeys, right?

19  A.  Yes, sir.

20  Q.  They can be up -- hanging upside down and that's just

21  normal for them to be hanging upside down somewhere, isn't it?

22  A.  Sometimes, yes, sir.

23  Q.  Okay.  And we can't use our adult views of natural and

24  normal and superimpose them on a 5, 6, or 7-year-old boy, can

25  we?

Chappell - Cross by Mr. Jarvis

1  A.  Actually, yes, sir, I can.  That would be parenting.

2  That's exactly what parenting would be, is putting your values

3  and what's normal and natural and instilling those into your

4  children.

5  Q.  I agree with that, but you can't look at when they do

6  something and say that's unnatural for a 7-year-old based on

7  what would be natural for a 50-year-old man, can you?

8  A.  No, sir, that -- I see what you're saying.  No, sir.

9  Q.  Right.  Because they can be kind of show-offs, can't they?

10  A.  Yes, sir.

11  Q.  And because you didn't investigate the boys or even talk to

12  them yourself, you can't testify about whether or not any of

13  these poses or pictures or positions they were in are normal

14  and natural for these -- O.B. and R.B., can you?

15  A.  Honestly, sir, I would have to say that based on my

16  training, experience, being a father, some of those pictures

17  and some of those poses are not natural for a child.

18  Q.  But you don't know these boys, do you?

19  A.  No, sir, I do not know these boys.

20  Q.  And, in fact, when you testified at the detention hearing,

21  you said that these were just roughhousing pictures.  Do you

22  remember that?  Horseplay.  Excuse me.

23  A.  Some of them, yes, sir, some of them were horseplay-type

24  pictures, yes, sir.

25  Q.  And would that be the group of pictures on the bed with the

Chappell - Cross by Mr. Jarvis

1   dog and sometimes a Superman picture or something?  Would you

2   consider those to be the horseplaying -- the roughhousing

3   pictures?

4   A.  No, sir.  Those are a different set of pictures.

5   Q.  Okay.  Because I asked you, "I mean, they're just pictures

6   of boys roughhousing on a bed, correct?"

7           MS. ZACK:  Objection.

8           THE COURT:  What's the objection?

9           MS. ZACK:  Counsel is reading from a document not in

10  evidence.

11          THE COURT:  What's the document you're reading from?

12          MR. JARVIS:  It's his testimony at the detention

13  hearing.

14          THE COURT:  If it's impeachment, then he can

15  certainly -- why isn't that legitimate cross-examination if

16  he's giving a statement now?

17          MS. ZACK:  Well, I don't think it's been

18  demonstrated --

19          THE COURT:  But he can't demonstrate it unless he asks

20  the question and gets a different answer than he's given

21  before, can he?  Am I missing something here?

22          MS. ZACK:  No, Your Honor.  We would ask that if

23  counsel is going to read something from another document, that

24  he at least reference it so we can follow along.

25          THE COURT:  Well, that's appropriate.

Chappell - Cross by Mr. Jarvis

1  BY MR. JARVIS:

2  Q.  Page 37 of the detention hearing.  I asked you -- we were

3  talking about the photographs.  You remember the detention

4  hearing, don't you?

5  A.  Yes, sir.

6  Q.  Okay.

7          THE COURT:  You're on page and line what?

8          MR. JARVIS:  37.

9          THE COURT:  Thank you.  Line?  What line?

10 BY MR. JARVIS:

11 Q.  Starting at about line 3, I asked you:  "Some of the

12 photographs, you can't -- you don't actually see, I guess you'd

13 say, the actual body parts touching?"

14          "But the positions would lend a person viewing

15 that picture to show that they are touching," that's your

16 answer, correct?

17 A.  Yes, sir.

18 Q.  And then I asked:  "And there was nothing.  There's no sex

19 toys.  There's no posing.  There's nothing like that in any of

20 those pictures.  I mean, they're just pictures of boys

21 roughhousing on a bed, correct?"

22          And your answer was:  "Yes, sir."

23          Do you remember that?

24 A.  Yes, sir.

25          MS. ZACK:  Objection, Your Honor.  We don't know to

Chappell - Cross by Mr. Jarvis

1   what pictures these are referring.  We don't have any --

2           *THE COURT:*  We've seen all the pictures.  There are a

3   number of them that fall into that category.  So for some

4   pictures, that may well be true, and I think with that

5   understanding, I'm going allow it.

6           *MS. ZACK:*  Okay.  Thank you, Your Honor.

7   BY MR. JARVIS:

8   *Q.*  Do you remember answering that?

9   *A.*  Yes, sir.

10  *Q.*  Okay.  So back then, on June 11, 2013, the pictures of the

11  boys on the bed, that would be roughhousing, that was your

12  definition or agreement with me.  Would that be a fair

13  statement?

14  *A.*  Yes, sir, some of the pictures on the bed would -- I would

15  agree with that, yes, sir.

16  *Q.*  Okay.  And we'll go through the pictures later, and you can

17  show me which ones you don't agree with me.  Okay.  Fair

18  enough?

19  *A.*  Yes, sir.

20  *Q.*  All right.  When were you first made aware that there was a

21  termination petition filed by CPS in Wichita Falls way back

22  when?

23  *A.*  The first time or the second time?

24  *Q.*  The first time.

25  *A.*  The first time was after the hearing had already taken

Chappell - Cross by Mr. Jarvis

1  place.

2  Q.  Well, the trial -- the jury trial was in June or July --

3  July of 2012.  So that's about 17, 18 months after the search

4  warrant.  So getting our dates straight.

5  A.  Right.

6  Q.  Is that fair?

7  A.  Correct.

8  Q.  So are you telling the Court that from the date the search

9  warrant was executed at Mr. Barry's house, February 7th, 2011,

10  for 18 months you had no knowledge whatsoever that CPS was

11  trying to terminate his rights to the boys?

12  A.  I knew CPS was involved in the investigation.  I did not

13  have details where they stood, what was going on with the

14  investigation, and did not know about the trial until after the

15  trial had already occurred.

16  Q.  So you had no communication with anybody at CPS in Wichita

17  Falls until afterwards?

18  A.  That is correct, sir.

19  Q.  Okay.  What about with the Wichita Falls Police Department

20  or the Northern District?

21  A.  Only with my office, the HSI office in Dallas is who I was

22  communicating with.  Did not communicate with Wichita Falls

23  Police Department or with the federal courts up there prior to

24  that.

25  Q.  But you had communications somewhat with the Northern

Chappell - Cross by Mr. Jarvis

1   District HSI folks?

2   A.  Yes, sir.

3   Q.  Okay.  And were they also investigating these pictures or

4   these events?

5   A.  Yes, sir.

6   Q.  And they were the lead on it at the beginning.  Would that

7   be a fair statement?

8   A.  Excuse me?

9   Q.  Would you consider them to be the lead agency since most of

10  it occurred up there, or they were the first ones that had the

11  computers?

12  A.  That is correct, yes, sir.

13  Q.  Because they had the computers and analyzed them first,

14  correct?

15  A.  Correct, sir.

16  Q.  And who was that person who analyzed the computers?

17  A.  Patrick McGaha.

18  Q.  McGaha?

19  A.  Yes, sir.

20  Q.  Did you get a report from Agent McGaha?

21  A.  No, sir.

22  Q.  Did he create a report?

23  A.  I believe so, yes, sir.

24  Q.  Why didn't you get a report from him on these computers to

25  give to us?

Chappell - Cross by Mr. Jarvis

1   A.   Because I had -- prior to that we had discussed -- the way

2   the evidence happened, Mr. Noonan's side did the whole

3   investigation and it was decided that I would take over the

4   investigation.  At that point I asked them to provide me with

5   the forensic images and I reprocessed and did everything on my

6   deal and that's what I used for the investigation.

7   Q.   Okay.  But there's another expert Government employee

8   report forensically evaluating Mr. Barry's computer, correct?

9   A.   Possibly, yes, sir, I believe so.

10   Q.   And you didn't ask for it and y'all haven't turned it over

11   to us, have you?

12   A.   I haven't asked for it.  I didn't have a need for it.  So I

13   recreated, because I was redoing the investigation.

14        MR. JARVIS:  Well, Judge, I think at this time they're

15   required to turn over any expert reports.  We've asked for any

16   expert report.  The fact that he decided he didn't want to use

17   it -- he's just testified Agent McGaha made a forensic report

18   on my client's computer and they haven't turned it over.

19        THE COURT:  Response?

20        MS. ZACK:  He said he doesn't know if Agent McGaha

21   made a report.  He's never reviewed that report.  That report

22   is not the basis of any of the testimony that's being

23   presented; and I am not in possession of any reports created

24   forensically, other than Special Agent Chappell's, all of which

25   we've turned over in discovery, Your Honor.

Chappell - Cross by Mr. Jarvis

1      *THE COURT:*  Did you make inquiry of Agent McGaha to
2   see if he had generated a report?
3      *MS. ZACK:*  No, Your Honor, I've never had --
4      *THE COURT:*  You need to do that, please, and let me
5   know.
6      *MS. ZACK:*  I can do that, yes, Your Honor.
7      *THE COURT:*  Go ahead, please.  Thank you.
8   BY MR. JARVIS:
9   Q.  All right.  Let's go back to the Wichita Falls case.  Okay?
10  A.  Yes, sir.
11  Q.  The CPS case.  Approximately when did you find out about
12  the jury trial after it was over?  A couple of months or when?
13  A.  I believe it was fairly quickly after, a few days
14  afterwards.
15  Q.  And how did you find out?
16  A.  I believe I was contacted by HSI Dallas office telling me
17  the results of it.
18  Q.  And who was that?
19  A.  I believe it was Bradley Hudson was the investigator.
20  Q.  So they were informed pretty quickly, and then they called
21  you?  Is that fair to say?
22  A.  Correct.  Yes, sir.
23  Q.  Okay.  And what was decided to do about that?
24  A.  The CPS?
25  Q.  Yes.

Chappell - Cross by Mr. Jarvis

1   A.  I don't know what they decided to do about it.

2   Q.  Not CPS.  You and Agent Hudson.

3   A.  At that point there was nothing we could do about what

4   happened with CPS.  That was not within our purview or our

5   jurisdiction.

6   Q.  I understand that.  I'm not making my question clear.

7   A.  All right.

8   Q.  For about 18 months HSI Dallas had access and did an

9   analysis of Mr. Barry's computer.  Fair statement?

10  A.  It wasn't quite that long.  We had already shifted the

11  focus of the investigation, for me to work the investigation

12  prior to that --

13  Q.  Okay.

14  A.  -- well before that, I believe.

15  Q.  All right.  So for some period of time, whether six months,

16  eight months, ten months, Dallas had the computers.  They were

17  analyzing them.  Then they gave it to you.  Is that fair?

18  A.  Correct.  Yes, sir.

19  Q.  All right.  And up until the CPS jury trial was concluded,

20  y'all didn't file any charges against Mr. Barry, did you?

21  A.  No, sir.

22  Q.  And maybe I'm wrong, but it didn't take you very long to

23  find the suspected child pornography pictures on this computer,

24  did it?

25  A.  No, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  And so you found those and we probably can assume that

2  Agent McGaha found some of those, but y'all didn't indict him

3  until after the CPS jury trial was over and the boys were

4  returned, did you?

5  A.  Yes, sir.

6  Q.  So why would you let a child pornographer producer run

7  around the streets for 17, 18, 19 months when you had evidence

8  he was guilty?

9       THE COURT:  I'll allow it.

10  A.  A myriad of reasons.  One is making sure that the process

11  is done correctly, thoroughly, gathering as much of the

12  evidence, processing it.  Processing does take time.  At the

13  same time I'm also working the Noonan side of the

14  investigation.  So I'm processing, being thorough with that,

15  preparing everything to present to the U.S. Attorney's Office.

16  On top of that, this is not the only case and the only

17  responsibility I had as well, working all of those as well.  So

18  just making sure that it's a thorough job, done correctly, and

19  done properly just took time.

20  Q.  Could it be that you didn't have to do any -- you felt like

21  you didn't have to do anything, because during the wait for the

22  CPS jury trial, the boys were in foster care with CPS and

23  Mr. Barry didn't have custody of them?

24  A.  Not for me, no, sir, that was not an issue at all.

25  Q.  Because after the trial, the CPS trial, he got custody

Chappell - Cross by Mr. Jarvis

1   back, correct?

2   A.  Yes, sir.

3   Q.  And is that when you picked the case back up, after Dallas

4   called you and started working it harder?

5   A.  No, sir.  I was already working the case and working it

6   hard.

7   Q.  Now, the -- we talked at the detention hearing -- you

8   brought five pictures, correct?

9   A.  I believe so, sir.

10  Q.  I think it was five.  And when we -- I questioned you,

11  you -- I say agreed, but I informed you there was at least

12  three of those that were introduced in the Wichita Falls case,

13  remember?

14  A.  Vaguely, yes, sir, I remember something about that, yes,

15  sir.

16  Q.  It wasn't all of them --

17  A.  Right.

18  Q.  -- but I think there were three of the five.  When I asked

19  you that question and told you that, did you go back and look

20  at the pictures that were introduced in the Wichita Falls case

21  to confirm whether or not all those same pictures had already

22  been looked at in that trial?

23  A.  No, sir.  I do not know which pictures were presented to

24  Wichita Falls during that trial.

25  Q.  Since I -- you ordered the transcript of Mr. Barry's

Chappell - Cross by Mr. Jarvis

1  testimony from Wichita Falls.  You got that transcript, didn't
2  you?
3  A.  Yes, sir.
4  Q.  And inside that transcript were all of the exhibits,
5  correct?
6  A.  Correct.  Yes, sir.
7  Q.  And so all the exhibits that he was questioned about these
8  pictures were inside that box that you got, right?
9  A.  Yes, sir.
10 Q.  So at that point in time you could have looked at and seen
11 what pictures had already been reviewed in the CPS trial,
12 correct?
13 A.  At that time, yes, sir, once I reviewed it.
14 Q.  I'm sorry.  Did you do that?
15 A.  Yes, sir.
16 Q.  Okay.  And isn't it true that inside the pictures that you
17 talked about today, all of those same pictures, with the
18 exception of some other ones that you found, like the unknown
19 ones, were introduced in that trial?
20 A.  No, sir, not all.  And I also reviewed that within the last
21 week or so, looking at it, because we haven't had it that long,
22 so I haven't actually sat down and done an image comparison
23 with the case and with everything else we had.  It was
24 basically going through and again reading, perusing, looking at
25 the transcripts.

Chappell - Cross by Mr. Jarvis

1   Q.  But just eyeballing those pictures, they sure look the

2   same, don't they?

3   A.  Some of them do, yes, sir.

4   Q.  Okay.  All right.  Now, Mr. Noonan was indicted

5   November 8th, 2012, correct?

6   A.  Yes, sir.

7   Q.  And he was indicted in an indictment all by himself, right?

8   A.  Yes, sir.

9   Q.  And then later on Mr. Barry was added to that indictment

10  back in June of 2013, approximately?

11  A.  Correct.  Yes, sir.

12  Q.  And that's when he got arrested, correct?

13  A.  Yes, sir.

14  Q.  And you had had Noonan's computer and Barry's computer the

15  same amount of time, correct?

16  A.  No, sir.

17  Q.  No, sir?

18  A.  No, sir.

19  Q.  Whose had you had longer?

20  A.  Noonan's.

21  Q.  Okay.  When did you get Barry's?

22  A.  It was several months after the search warrant.  So maybe

23  four, four to six months tops after the Noonan search warrant.

24  Q.  Okay.  So you had Noonan's five months earlier, fair?

25  A.  More or less, yes, sir.

Chappell - Cross by Mr. Jarvis

1    Q.  But you went ahead -- y'all went ahead and indicted Noonan

2    by himself, but didn't include Mr. Barry, correct?

3    A.  At that time, yes, sir.

4    Q.  And then what is that, a year later, nine months later you

5    indicted Mr. Barry -- almost ten months later, November to

6    June; is that fair?

7    A.  November to June, so about -- yes, sir, eight months later.

8    Q.  And that's because you were being more thorough with

9    Mr. Barry's computer than Mr. Noonan's?

10   A.  No, sir.

11   Q.  Why was that?

12   A.  That was after processing and getting the probable cause to

13   indict Mr. Noonan and then putting the pieces together for the

14   total charges of conspiracy and putting the case together where

15   they're both involved just took a little bit of time.

16   Q.  All right.  I want to talk a little bit about

17   Mr. Whittington.  Okay?  It was the search of Mr. Whittington's

18   computer along with his interview and a proffer that he made

19   that got the search warrant for Mr. Barry's computer, correct?

20   A.  Yes, sir.

21   Q.  And he said that Mr. Barry and Mr. Noonan had visited him

22   sometime in the fall of 2010?

23   A.  I believe that's correct, yes, sir.

24   Q.  And that they all got naked and there were pictures taken,

25   basically?

Chappell - Cross by Mr. Jarvis

1   A.   Yes, sir.

2   Q.   All right.  And inside one of the offense reports or in the

3   search warrant, Mr. Whittington says that he was the only one

4   with a camera, so he took pictures of the boys wrestling.  Do

5   you remember that?

6   A.   I believe that's correct, yes, sir.

7   Q.   And obviously y'all believed that enough to put it in the

8   search warrant, basically, correct?

9   A.   Yes, sir.

10   Q.   So you don't have any evidence that David Barry was taking

11   any pictures at Tim Whittington's house, do you?

12   A.   No, sir.

13   Q.   And you don't have any evidence or at least none that

14   you've brought today where you can show that Mr. Barry's

15   computer ever received any images from Mr. Whittington's, do

16   you?

17   A.   Only the one image that I don't know where it's taken at.

18   I don't know if it was at Mr. Whittington's or not, of the --

19   Mr. Noonan, Mr. Barry, and the two children sitting on a couch,

20   with a blue cloth or something over the couch and a yellow wall

21   with a picture.  I have no idea where that picture was taken.

22   Q.   Okay.  But that wasn't my question.  My question was:  The

23   forensic analysis of Mr. Barry's computer, you don't have

24   anything from that that says this item in Mr. Barry's computer

25   came from Mr. Whittington's computer, do you?

Chappell - Cross by Mr. Jarvis

1   A.  No, sir.

2   Q.  So when Mr. Whittington said and y'all put in -- somebody

3   put in the search warrant that he gave those pictures to

4   Mr. Barry after they were taken, that wasn't true, was it?

5   A.  That's not necessarily true.  I didn't find any forensic

6   evidence.  That doesn't mean that it didn't occur.  I just

7   didn't find any evidence of it.

8   Q.  Okay.  So your forensic analysis then is incomplete or

9   inadequate, because you can't show and confirm what

10  Mr. Whittington said?

11  A.  No, sir, not true at all.  If Mr. Whittington had provided

12  those images on a thumb drive or a flash drive or somehow they

13  were downloaded on Barry's computer and Mr. Barry or someone

14  deleted those files and they're overwritten, I'm not going to

15  find them.

16  Q.  Well, I thought that was the reason for the TKE and the

17  special EnCase investigative tools that you use to find all of

18  these images that had been erased?

19  A.  No, sir.  I said overwritten.  If they've been deleted and

20  not overwritten, they are potentially recoverable.  If a file

21  is overwritten, they're gone, because they are replaced by a

22  new file and so they -- the record of that file is gone.

23  Q.  So if Mr. Barry or whoever was at his computer and

24  intentionally overwrote those two images, then they wouldn't

25  show up at all under any circumstances using your techniques

Chappell - Cross by Mr. Jarvis

1   that you're aware of?

2   A.   Not in a visual format.   If I had file names or more

3   information regarding the picture, it might be possible to find

4   some record of it.   But being able to see the picture, no, sir.

5   Q.   How about if you had Mr. Whittington's e-mail address,

6   wouldn't you be able to compare that with all of the chats and

7   the e-mails received by Mr. Barry's computer?

8   A.   Yes, sir.

9   Q.   You didn't get any of those connections, did you?

10  A.   No, sir, not through Mr. Whittington's e-mail address, no,

11  sir.

12  Q.   Okay.   So there's nothing that you found on Mr. Barry's

13  computer that supports what Mr. Whittington said, is there?

14  A.   Yes, sir, there is.

15  Q.   What's that?

16  A.   That they met on True Nudist.   Mr. Barry does go to True

17  Nudist.   That information was on the computer.   Mr. Whittington

18  provided Mr. Noonan's e-mail address as sunman75.   That

19  information was found on Mr. Barry's computer.

20  Q.   I'm sorry.   I'm not making my question clear.   I apologize.

21  From Mr. Barry's computer, there's nothing that you found from

22  Mr. Whittington -- and there's pieces of information that he

23  told you about going on True Nudist or their e-mails, but

24  there's nothing in Mr. Barry's computer that says it came from

25  Mr. Whittington's, is there?

Chappell - Cross by Mr. Jarvis

1  *A.*  That I know of, no, sir.

2  *Q.*  Okay.  All right.  What about chats?  You don't have any

3  chats where Mr. Whittington and Mr. Barry were chatting, do

4  you, from Mr. Barry's computer?

5       *MS. ZACK:*  Objection, Your Honor.  Relevance.

6  Mr. Whittington is not named in this indictment.

7       *THE COURT:*  But you've introduced evidence as to his

8  involvement.  I think it's a legitimate question.  Overruled.

9  *A.*  Not the name Whittington, no, sir.

10 BY MR. JARVIS:

11 *Q.*  Or his e-mail addresses?

12 *A.*  The Texas Ford guy, no, sir.

13 *Q.*  So there's nothing -- because we've got chats between

14 Mr. Barry and Mr. Noonan, right?

15 *A.*  Correct.

16 *Q.*  Tons of those, correct?

17 *A.*  Yes, sir.

18 *Q.*  But we don't have a chat between Mr. Barry and

19 Mr. Whittington, do we?

20 *A.*  Not with a user name that I would know would be

21 Mr. Whittington, no, sir.

22 *Q.*  Okay.  And Mr. Whittington didn't tell the agents there at

23 his house or during the proffer agreement he used any type of

24 fake name, did he?

25 *A.*  Not to my knowledge, no, sir.

Chappell - Cross by Mr. Jarvis

1  *Q.*  Because y'all ran a warrant or application for whatever it

2  is, Ford guy, Texas Ford guy and figured out who that was and

3  the IP address, you got all that information, and Whittington

4  never said, Oh, yeah, I was really Steve Jones 1415 when I was

5  talking to Mr. Barry, did he?

6  *A.*  Not to my knowledge, no, sir.

7  *Q.*  So, based upon all of the information y'all knew at the

8  time, y'all checked the computer, you checked the computer and

9  you checked Mr. Barry's computer and Mr. Whittington wasn't

10  telling the truth, was he?

11  *A.*  I believe he was telling the truth, yes, sir.

12  *Q.*  But you don't have any computer forensic evidence to back

13  that up, do you?

14  *A.*  Directly from Mr. Whittington that I can say is

15  Mr. Whittington, no, sir, not on Mr. Barry's computer.

16          *MR. JARVIS:*  Judge, at this time we would renew our

17  motion to suppress.  You asked us at the time was there any --

18          *THE COURT:*  Overruled.  I don't see any basis for

19  changing the prior ruling.

20          *MR. JARVIS:*  Thank you, Judge.

21  BY MR. JARVIS:

22  *Q.*  Well, but you said that he could have sent pictures or

23  images under another name, correct?

24  *A.*  Yes, sir.

25  *Q.*  Now, Mr. Whittington pled guilty to what, producing child

Chappell - Cross by Mr. Jarvis

1  pornography also?

2  A.  One of the charges, yes, sir.

3  Q.  What were the other charges?

4  A.  I believe providing a minor for sexual performance,

5  something to that effect.

6  Q.  The same parenting thing?

7  A.  I believe it was state charges though.

8  Q.  Okay.  Well, putting aside the state charges --

9  A.  Okay.

10  Q.  -- let's concentrate on the fed charges for right now.

11  A.  Production, yes, sir.

12  Q.  Just the production.  He got 14 years.  But did you ever

13  find any of those bad pictures, as he described them when they

14  came in, any of those bad pictures sent to Mr. Barry?

15  A.  No, sir.

16  Q.  Wouldn't you think if Mr. Barry was a child pornographer,

17  producer and was enjoying that, he would have asked

18  Mr. Whittington, "Gosh, send me some of your pics"?

19  A.  Not necessarily, no, sir.

20  Q.  Well, isn't it common among people that produce child

21  pornography and people that enjoy child pornography to trade

22  pictures?

23  A.  Yes, sir.

24  Q.  But Mr. Barry never got a picture from Mr. Whittington, who

25  had great stuff, for that bad stuff, right?

Chappell - Cross by Mr. Jarvis

1    A.   Yes, sir.

2    Q.   Okay.  Now, let's talk a little bit about Mr. Spitler.  Am

3    I saying that right?  S-p-i-t-l-e-r?

4    A.   Yes, sir.

5    Q.   All right.  And he is the roommate of Mr. Noonan, correct?

6    A.   Correct.

7    Q.   And you actually talked to him yourself, right?

8    A.   Yes, sir.

9    Q.   All right.  Because you did the search warrant at

10   Mr. Noonan's house?

11   A.   Correct.  Yes, sir.

12   Q.   All right.  He wasn't there all the time that Mr. Barry and

13   the boys were there, was he?

14   A.   No, sir.

15   Q.   He is a nurse?

16   A.   Correct.

17   Q.   So he kind of works different 24-hour cycle hours.  Fair

18   enough?

19   A.   Yes, sir.

20   Q.   And so he wouldn't be there when the pictures were taken,

21   correct?

22   A.   Depending on when the pictures were taken, it's possible

23   that he wasn't there, yes, sir.

24   Q.   But you don't have any information and he didn't say

25   anything, "Yeah, I was here one day.  They were taking

Chappell - Cross by Mr. Jarvis

1   pictures"?

2   A.  No, sir.

3   Q.  So as far as you know, he probably wasn't there when the

4   pictures were taken.  Pretty fair?

5   A.  Yes, sir.

6   Q.  All right.  And, in fact, he knew he saw them naked

7   together, right?

8   A.  Yes, sir.

9   Q.  And he knew that Mr. Noonan was a registered sex offender,

10  right?

11  A.  Yes, sir.

12  Q.  But he never told Mr. Barry that, did he?

13  A.  Not to my knowledge, I don't know, sir.

14  Q.  Well, that's what he told you?

15  A.  Yes, sir.

16  Q.  So if he didn't tell Mr. Barry, you have no information

17  that anybody told Mr. Barry that Mr. Noonan was a registered

18  sex offender, do you?

19  A.  That's correct.

20  Q.  So as far as you know, Mr. Barry did not know that Craig

21  Noonan was a registered sex offender --

22  A.  That is correct.

23  Q.  -- isn't that true?

24  A.  Yes, sir.

25  Q.  So when you're looking at these pictures now and seeing a

Chappell - Cross by Mr. Jarvis

1  registered sex offender in the pictures, if Mr. Barry saw them,
2  that's not what he saw, is it?
3  A.  No, sir.
4  Q.  Because he didn't know, did he?
5  A.  No, sir.
6  Q.  Okay.  But you know and you knew at that time that
7  Mr. Noonan practiced the nudist lifestyle also, right?
8  A.  Yes, sir.
9  Q.  And, in fact, Mr. Noonan took Mr. Barry and the boys to a
10  backyard barbecue, right?
11  A.  I don't know, sir.
12  Q.  Okay.  Well, do you remember Mr. Peterson's testimony at
13  the detention hearing that's been stipulated to?  Do you
14  remember that?
15  A.  Yes, sir.
16  Q.  Do you remember Mr. Peterson -- do you have the exhibit?
17  Do you remember us talking -- or me talking to Mr. Peterson
18  about one of the pictures and another couple that was also
19  nudists?
20  A.  I don't remember specifically, no, sir.
21  Q.  Do you remember Pam and Robert Isaacksons being discussed?
22  A.  No, sir, I don't remember that.
23        MS. ZACK:  Objection, Your Honor.  At this point it's
24  not impeachment.  This isn't testimony that Mr. Chappell gave,
25  and he's asking him to comment on other evidence.

Chappell - Cross by Mr. Jarvis

1        *THE COURT:*  I'll sustain the objection.

2   BY MR. JARVIS:

3   *Q.*  Did you ever do an investigation based upon what the

4   information that was gleaned during either the Wichita Falls

5   case or the detention hearing about this other couple that

6   Craig Noonan took Mr. Barry and the boys to?

7   *A.*  No, sir.

8   *Q.*  Why not?

9   *A.*  I specifically don't remember the information and where

10  they were taken to.

11  *Q.*  When you read Mr. Barry's testimony, he testifies under

12  oath, gives the name of the people, the Isaacksons, who

13  actually live here in Houston?

14  *A.*  Correct, but I reviewed that material within the last few

15  weeks.  This is not something that I reviewed two years ago or

16  during the course of the investigation.  This is for preparing

17  for today's trial.

18  *Q.*  I understand.  But in the last two weeks, did you look up

19  Robert Isaacksons here in Houston?

20  *A.*  Not yet, no, sir.

21  *Q.*  Well, he's got a LinkedIn.  He works for the government

22  here.  Did you even try to find another heterosexual couple

23  who's a nudist that you have a picture of with Craig Noonan and

24  their son in their backyard in that pool?

25  *A.*  I didn't know that that's who that son was.  I didn't know

Chappell - Cross by Mr. Jarvis

1   that they were related.

2   Q.  Were you aware that Mr. Isaacksons and his wife came all

3   the way to Wichita Falls and testified about that?

4   A.  No, sir.

5   Q.  When you read the transcript of Mr. Barry, didn't it strike

6   you as, gosh, there's somebody else here who knows Craig

7   Noonan, when Mr. Barry testified that we went to the

8   Isaacksons' house and took pictures in the back -- or they took

9   pictures, that picture right there is in the Isaacksons'

10   backyard?

11   A.  No, sir, I don't remember that, reading that.

12   Q.  Do you remember the picture though?

13   A.  Of -- yes, sir.

14   Q.  The one with Mr. Noonan and an unknown third boy and the

15   Barry boys, the O.B. and R.B., correct?

16   A.  Correct.

17   Q.  Okay.  And you testified on direct that you thought that

18   was taken in Mr. Noonan's backyard?

19   A.  I believe, yes, sir.

20   Q.  Did you look at the fence in Mr. Noonan's backyard to see

21   if it matches the fence in that picture?

22   A.  Yes, sir.  And it -- at the time that I did, it did not

23   match.

24   Q.  Okay.  That would be Exhibit 3v and w.

25   A.  Yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  So it did not match?

2   A.  Right, the --

3        MS. ZACK:  Objection, Your Honor.  There is no Exhibit

4   3v.

5        MR. JARVIS:  I'm sorry.  4v and w.

6        MS. ZACK:  Okay.

7        THE COURT:  Thank you.

8        MS. ZACK:  Okay.

9   A.  The fence looks similar.  It's hard to say if it's exact.

10  The street sign that was posted on the fence was no longer

11  there when I went back to look.

12  BY MR. JARVIS:

13  Q.  The one that says, "Keep right"?

14  A.  Excuse me?

15  Q.  The one that says, "Keep right"?

16  A.  Right.  And there was -- I found no evidence of a swimming

17  pool, so I believed it to be, but I had no direct evidence that

18  it was Mr. Noonan's backyard.

19  Q.  Now, did you get a chance to review the previous statements

20  of Mr. Barry other than the --

21  A.  I believe so, yes, sir.

22  Q.  I'm not counting the transcript, but statements that

23  Mr. Barry has given to whatever agency, state or federal, when

24  they did a search warrant back in 2011?

25  A.  Yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  You read through that report?

2   A.  Yes, sir.

3   Q.  And you know that he went -- Mr. Barry went voluntarily to

4   talk to Detective Jones at the Wichita Falls Police Department

5   about a week later, correct?

6   A.  Yes, sir.

7   Q.  And you reviewed that videotape, haven't you?

8   A.  Yes, sir.

9   Q.  And he went without a lawyer?

10  A.  Correct.

11  Q.  And isn't his story or what he told then the same as you've

12  heard in his defense throughout this whole ordeal?

13        MS. ZACK:  Objection.  Hearsay.  It's a self-serving

14  statement, Your Honor.  We had this conversation when we moved

15  to exclude it.

16        THE COURT:  I'm going to sustain the objection.

17  BY MR. JARVIS:

18  Q.  Were you aware that Mr. Barry gave ICE agent, I think it's

19  Jesse Larra (phonetic) -- do you know him from Dallas?

20  A.  I heard the name, yes, sir.

21  Q.  Okay.  After the search warrant, they took his computers,

22  he gave them his online identity, correct?

23  A.  No, sir, I was not aware of that.

24  Q.  Okay.  Because it's in the police report.  Did you not

25  remember reading that?

Chappell - Cross by Mr. Jarvis

1   A.  No, sir, I don't remember reading that.

2   Q.  Wouldn't that be a normal thing that the agents ask for?

3   A.  No, sir, it's not.  I mean, it can be, but it is not every

4   single time, no, sir.

5   Q.  Have you received any information from anybody that there

6   was any child pornography or sex with children conversations or

7   phone calls or e-mails or chats after David Barry gave his

8   e-mail address to that ICE agent?

9   A.  Not that I'm aware of, sir.

10  Q.  So do you think they would have told you that?  Surely they

11  would have called and said, "Hey, we've got a hit on this guy

12  from Mr. Barry's computer," right?

13  A.  I would think so, yes, sir.

14  Q.  Because that's how you get more guys, correct?

15  A.  Correct.

16  Q.  And so because you haven't gotten that information, we can

17  then assume that there hasn't been any further information?

18          MS. ZACK:  Objection.  Calls for speculation.

19          THE COURT:  Sustained.  You can rephrase.

20  BY MR. JARVIS:

21  Q.  You haven't conducted any further investigation based upon

22  information provided from law enforcement -- from any law

23  enforcement about any other contacts with Mr. Barry's computer

24  after it was seized, have you?

25  A.  None that I know of, no, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  Okay.  And also there were 26 videos seized from
2  Mr. Barry's house, correct?
3  A.  Yes, sir.
4  Q.  And none of them contained any child pornography, did they?
5  A.  I have not reviewed them.  But as far as I know, no, sir.
6  Q.  Surely somebody has reviewed them, right?
7  A.  I couldn't tell you if they have or haven't, sir.
8  Q.  Well, there's been no charges about videos, though,
9  correct?
10 A.  Correct.
11 Q.  All right.  Let's talk a little bit about the pictures in
12 Government's Exhibit No. 3.  You have that listed as all the
13 child pornography in Mr. Barry's computer, correct?
14 A.  Yes, sir.
15 Q.  And would that include the ones that are in the Messenger
16 cache?
17 A.  Yes, sir.
18 Q.  All right.  Because we have the Messenger cache ones, what
19 I call the unknown ones in another section, which would be 17,
20 correct?
21 A.  Yes, sir.
22 Q.  Do you have a copy up there of the exhibit list?
23 A.  Yes, sir.
24 Q.  All right.  So, every child pornography -- suspected child
25 pornography picture that you found should be on 3, correct?

Chappell - Cross by Mr. Jarvis

1   A.  Should be, yes, sir.

2   Q.  All right.  And I got confused.  You said there were two or

3   three folders that you found all the child pornography in?

4   A.  There were specifically one, two, three -- one, two, three,

5   four, five, and then including the Messenger cache would make

6   six.

7   Q.  All right.  Let's put the Messenger cache by itself for

8   right now.

9   A.  Yes, sir.

10  Q.  Just for this conversation.  Okay?  The way I understood

11  you to testify, there is a main folder called "Craig Houston,"

12  correct?

13  A.  Correct.

14  Q.  And then there is another main folder called "David and the

15  boys," correct?

16  A.  That is correct.

17  Q.  And then within those two main folders, there are two other

18  folders, what I would call subfolders.  Would that be fair?

19  A.  Correct.

20  Q.  All right.  Now, explain to me, in the main folder, does it

21  have pictures itself in it or does the main folder just have

22  these subfolders that have pictures?

23  A.  No, sir.  The "Craig Houston" folder and the main folders

24  also have pictures as well as the subfolders.

25  Q.  Okay.  So the main folder can hold pictures and hold

Chappell - Cross by Mr. Jarvis

1   folders of other pictures?

2   A.  Correct.

3   Q.  Okay.  And you said the "Craig Houston" main folder had a

4   hundred and fifty-six pictures, correct?

5   A.  Correct.

6   Q.  And only 18 were suspected child pornography, right?

7   A.  Correct.

8   Q.  Which one of the exhibits in 4 are in the folder labeled

9   "Craig Houston"?

10  A.  The -- I would have to pull up or create a separate report,

11  taking each of the individual pictures and giving them their

12  full file paths.  I don't have the full file paths for each

13  individual picture here.

14  Q.  Did you not make that a part of your original report, where

15  you found the pictures, in what folder?

16  A.  Well, I have them.  I just have to pull up the report and

17  get it and pull up the original FTK report that lists

18  individual file paths for each individual picture.

19  Q.  Okay.  Well, what are the other 138 pictures about in the

20  main "Craig Houston" folder?

21  A.  A lot of them are pictures of O.B. and R.B. either in

22  Galveston, NASA, at a park, outside pictures, with Mr. Noonan

23  and Mr. Barry at a pizza place, those kind of pictures.

24  Q.  Were they the same pictures that we found -- y'all found on

25  Mr. Barry's computer -- I mean, camera?

Chappell - Cross by Mr. Jarvis

1   A.  No, they were not the exact -- not the same pictures, no,
2   sir.
3   Q.  Not at all or --
4   A.  Not at all, no, sir.
5   Q.  -- just not these?  Okay.  Because putting aside the child
6   pornography one, it says Christmas pictures of Christmas lights
7   and Christmas trees and opening Christmas presents?
8   A.  Right.  He had a separate folder called "Christmas" that --
9   I believe 2008, that had a myriad of Christmas pictures in
10  them, and I believe some of those were the same as off the
11  camera.
12  Q.  Okay.  But those aren't in the 140?
13  A.  I don't believe so, no, sir.
14  Q.  Okay.  So those would be traditional family vacation type
15  pictures.  Fair?
16  A.  Yes, sir.
17  Q.  And the child pornography ones that you say are child
18  pornography that are within this main "Craig Houston" file,
19  they weren't hidden, were they?
20  A.  No, sir.
21  Q.  They weren't password protected, were they?
22  A.  No, sir.
23  Q.  I mean, anybody could open up his computer and turn it on
24  and start flipping through and find all these pictures, right?
25  A.  Correct.

Chappell - Cross by Mr. Jarvis

1  Q.  That's kind of unusual, isn't it, not to hide child
2  pornography, knowing it's illegal?
3  A.  Actually, no, sir, it's fairly common.
4  Q.  Okay.  And then the two subfolders, you have "Craig H" and
5  "others," correct?
6  A.  Yes, sir.
7  Q.  And in the "Craig H," you have 28 pics, 8 of them are child
8  pornography, correct?
9  A.  Yes, sir.
10  Q.  And you can't tell us which one of these are on
11  Government's Exhibit 3, can you?
12  A.  Oh, they're all in Government's Exhibit 3.  I couldn't tell
13  you the exact file path of which folder they were in.
14  Q.  And then "others," this 31 pictures, there's no R.B. or
15  O.B, is what you testified to earlier, right?
16  A.  Right, there are no pictures of R.B. and O.B., correct.
17  Q.  What are the pictures of?
18  A.  They are other individuals nude, other children nude in
19  various scenarios and settings.
20  Q.  But you didn't feel like any of those were child
21  pornography?
22  A.  No, sir, many of them I considered child pornography.
23  Q.  Okay.  But not R.B. and O.B.?
24  A.  No, there are no pictures of R.B. and O.B. in that folder,
25  period.

Chappell - Cross by Mr. Jarvis

1  Q.  Okay.  And then the "David and the boys" is another main

2  one that has "d-o-r" and "new folder"?

3  A.  Correct.

4  Q.  Now, "David and the boys," that was the name given by

5  somebody to that file, correct?

6  A.  Correct.

7  Q.  It's not a computer-generated name?

8  A.  That is correct.

9  Q.  Wouldn't it be more likely that Mr. Noonan would have named

10  that "David and the boys" as opposed to David naming it "David

11  and the boys"?

12  A.  Possible, yes, sir.

13  Q.  Okay.  And then "Craig Houston," that could be fifty-fifty

14  either way, correct?

15  A.  Correct.

16  Q.  All right.  But you testified that they came on the

17  computer -- could have come on the computer by a disk or a

18  thumb drive, correct?

19  A.  Correct.

20  Q.  And if someone creates a disk labeled "David and the boys,"

21  puts a bunch of pictures on it and creates that disk, they can

22  put it in another computer and the whole file comes, including

23  the name, correct?

24  A.  Not the disk.  If the folder put on the disk is named that,

25  then, yes.  Yeah, whatever the folder is named, yes, that's

Chappell - Cross by Mr. Jarvis

1  what would be put on the computer, yes.

2  Q.  Okay.  You'll have to help me with my terminology.  But if

3  the folder is named "David and the boys" on the disk, it gets

4  into another computer, it's going to show up as "David and the

5  boys," right?

6  A.  Yes, sir.

7  Q.  Okay.  And you don't have -- and maybe I didn't hear you,

8  but you don't have any information about whether or not it

9  occurred that way onto Mr. Barry's computer?

10  A.  That is correct.

11  Q.  It could be any one of those three different ways, right?

12  A.  Correct.

13  Q.  So you don't know if somebody just inserted that disk in

14  there, do you?

15  A.  No, sir.

16  Q.  But you said that it was done in June, 1st or 2nd, and then

17  also again in -- or on December 18th, correct?

18  A.  June 18th.

19  Q.  June 18th.  Excuse me.

20  A.  Yes.  And then again in December.

21  Q.  So when you said June 1st and 2nd, that means it was put on

22  the computer two different days?

23  A.  Correct.

24  Q.  So there were really four days that somebody put these

25  pictures on Mr. Barry's computer, correct?

Chappell - Cross by Mr. Jarvis

1   A.   Correct.

2   Q.   And you don't know who that was?

3   A.   No, sir.

4   Q.   And you don't know how it was done?

5   A.   No, sir.

6   Q.   Sounds like, though, at the end of the day, after taking

7   pictures, somebody made sure everybody had the same pictures,

8   right?

9   A.   Possible, yes, sir.

10  Q.   That would be one explanation of it, correct?

11  A.   Yes, sir.

12  Q.   So just like when we do a family -- go on a family vacation

13  or go on an event, you want to share pictures with the other

14  family, right?

15  A.   Yes, sir.

16  Q.   So you make sure they have a copy of it, correct?

17  A.   Correct.  Yes, sir.

18  Q.   And you can make a disk or you somehow e-mail it to them,

19  right?

20  A.   Correct.  Yes, sir.

21  Q.   It's really cumbersome to IM them 25 pictures, isn't it?

22  A.   Yes, sir.

23  Q.   It's a lot easier to just put it on a zip drive or a disk

24  or a thumb drive and give it to them that way, right?

25  A.   Yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  Okay.  Now on the other disk, the "d-o-r," you said there

2   were 75 pictures and 11 of them were, in your opinion, child

3   pornography, correct?

4   A.  Yes, sir.

5   Q.  And in the "David and the boys" big file, there's 87

6   pictures and only 8 of them were child pornography, right?

7   A.  Correct.  Yes, sir.

8   Q.  And in the, quote, "new folder," which is a subfolder of

9   "David and the boys," there were pictures of R.B. and O.B. but

10  no child pornography?

11  A.  Correct.

12  Q.  So were any of the pictures in these four subfolders and

13  the two main folders, are any of those copies or the same

14  pictures?

15  A.  There might be a few in there.  Those would not have been

16  included.  But for the most part, they're all separate.

17  They're all separate images.

18  Q.  Are there probably -- since you don't have them defined

19  that way, but would I be fair in assuming that let's call them

20  the bedroom pictures with the dogs, that section, that group --

21  okay?

22  A.  Okay.

23  Q.  Are you with me?  Would those all be contained in one of

24  these files together?

25  A.  Yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  All right.  And so would it be fair to say that the --

2   let's call them the bedroom picture files, the horseplay ones

3   we talked about earlier, they're on one, and let's say the boys

4   in the bathtub are in another folder?

5   A.  Correct.  Yes, sir.

6   Q.  And then there's pictures of the unknown, they're in

7   another -- well, they're in the Messenger cache, right?

8   A.  Correct.

9   Q.  Okay.  So they're not in any of these folders, right?

10  A.  No, sir.

11  Q.  Okay.  So would it be difficult for you this evening to run

12  that program again and be able to tell us which ones are where?

13  A.  Yes, sir.

14  Q.  I mean, it would be difficult or it would not be?

15  A.  No, it would not be difficult.

16  Q.  Okay.  So you have the capability to do that, right?

17  A.  Yes, I already have it.  It's just a matter of pulling it

18  up, yes, sir.

19  Q.  Okay.  Maybe you can do that for us for in the morning, if

20  you could, please.

21  A.  Yes, sir.

22          THE COURT:  He's asking you to do it.

23          THE WITNESS:  In the morning or right now?

24  BY MR. JARVIS:

25  Q.  No, you -- how long would it take you to do it?

Chappell - Cross by Mr. Jarvis

1  A.  Well, I would have to --

2          THE COURT:  You would have to go back to your

3  computer?

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  All right.  In the morning?

6      MR. JARVIS:  In the morning would be great.

7  BY MR. JARVIS:

8  Q.  Would you mind doing that for us, please?

9  A.  Not a problem.

10  Q.  All right.  Thank you.

11          Now, let's look at the pictures from Government's

12  Exhibit No. 4.

13          MR. JARVIS:  Would that be Mr. Will?

14      MS. ZACK:  Hold on.  I think the computer fell asleep,

15  Your Honor, if you could give us a second.

16      MR. JARVIS:  Are you doing it?  Okay.  Thank you.

17  BY MR. JARVIS:

18  Q.  All right.  So let's start with 4a, and is that the picture

19  where you don't know where it's from?

20  A.  Correct.

21  Q.  All right.  So that could be anyplace, correct?

22  A.  Yes, sir.

23  Q.  Now, what camera was this one taken with?

24  A.  I don't know, sir.  The properties and EXIF data were

25  removed from the picture.

Chappell - Cross by Mr. Jarvis

1   Q.  I'm sorry.  You have to --

2   A.  Oh, I'm sorry.  The EXIF data and the property files were

3   removed from the picture.

4   Q.  Can you tell us whether or not that was done intentionally

5   or was it done through some computer deal?

6   A.  Oh, that was done through a computer deal.

7   Q.  Okay.

8   A.  Yes, sir.

9   Q.  So it wasn't intentional by someone trying to hide

10  something.  It just happened?

11  A.  It just happened, yes, sir.

12  Q.  Okay.  Fair enough.  But can you tell us where this came --

13  I mean, how it got on Mr. Barry's computer?

14  A.  No, sir.

15  Q.  You can't tell us the date?

16  A.  I have to go back and look, but I believe this was -- the

17  information was stripped off it.  There's no properties or

18  anything else on it, so I have no way to tell when it was

19  created.

20  Q.  Okay.  Will you agree with me, though, that there's either

21  another person taking the picture or a timer, right?

22  A.  Yes, sir.

23  Q.  Okay.  And you say that -- is this one of the ones that you

24  suspect of being child pornography?

25  A.  Yes, sir.

Chappell - Cross by Mr. Jarvis

1  *Q.*  Is that because the boys' penises are showing, or privates?

2  *A.*  And the two males being nude, yes, sir.

3  *Q.*  Well, how is the males being nude child pornography?  I

4  don't believe that's one of the *Dost* factors, do you?

5        *MS. ZACK:*  Objection.  Calls for a legal conclusion.

6        *THE COURT:*  I'll sustain the objection to the way the

7  question is framed.

8        *MR. JARVIS:*  Okay.

9  BY MR. JARVIS:

10  *Q.*  Explain to me how a naked male in a picture creates child

11  pornography in your opinion.

12  *A.*  In this particular picture, the totality of the two males

13  being nude, the two children sitting on top of the males being

14  nude, therefore sitting on top of their -- the adult males'

15  genitalia and then being able to visibly see the genitalia of

16  the two children is what leads me to believe this to be a child

17  pornographic image.

18  *Q.*  Is there a suggestive pose?

19  *A.*  The boy in the front on the left can be looked at that way,

20  it is possible.

21  *Q.*  I'm asking your opinion.

22  *A.*  Yes, my opinion, that's what I'm saying, it can be looked

23  at that way, I believe so.

24  *Q.*  I'm sorry.  I didn't mean to interrupt you.

25  *A.*  No, I'm sorry.

Chappell - Cross by Mr. Jarvis

1  Q.  But it doesn't appear the focal point is the boys' penises.

2  It's more the faces, as if they're all taking kind of a

3  portrait, doesn't it?

4  A.  That, I can see that, yes, sir.

5  Q.  It's not an unnatural pose?  People pose like that -- I

6  mean, I've got pictures like that with my kids, right?

7  A.  Except they're nude.

8  Q.  Well, I'm talking about the pose itself though.  The pose

9  is not unnatural, is it?

10 A.  Except for the boy on the front left seems a little

11 unnatural to me, yes, sir.

12 Q.  Kind of leaning back, that's unnatural for a 7-year-old

13 boy?

14 A.  With one leg appearing to be draped over the other leg of

15 Mr. Barry.  It just seems unnatural to me.

16 Q.  And is there anything in this picture that suggests any

17 type of sexual coyness or come-hither look or however you want

18 to define that?

19 A.  No, sir.

20 Q.  And is there anything that you know of that anybody told

21 the boy on the left to pose like that?

22 A.  To my knowledge, no, sir.

23 Q.  And was there anything about this picture that you're aware

24 of that would intend or is it designed to elicit some sexual

25 response in a viewer?

Chappell - Cross by Mr. Jarvis

1  A.  Not to me, sir, no, sir.

2  Q.  All right.  All right.  Let's go to 4b, and this was a

3  picture that apparently has been in -- or is in several places,

4  right?

5  A.  Yes, sir.

6  Q.  The way I understand it, it's in Mr. Barry's laptop

7  regular, in one of those folders, correct?

8  A.  Yes, sir.

9  Q.  It's also in Craig Noonan's laptop regular, correct?

10  A.  Yes, sir.

11  Q.  And it came from or was originated from Craig Noonan's

12  camera, correct?

13  A.  Yes, sir.

14  Q.  But the pictures in Craig Noonan's camera were all carved?

15  Doesn't that mean deleted?

16  A.  Yes, sir.

17  Q.  All right.  So we know it started -- we think we started it

18  at Mr. Noonan's camera, correct?

19  A.  Correct.

20  Q.  All right.  But you don't have a date when the picture was

21  taken, do you?

22  A.  No, sir.

23  Q.  Now, there's a series of photographs in some other places

24  with one of the other boys, whichever one this is, O.B. or R.B.

25  There's another one with both boys in this same bathtub, right?

Chappell - Cross by Mr. Jarvis

1    A.  Correct.  Yes, sir.

2    Q.  With the same bubbles on their chins, like kids normally

3    do, right?

4    A.  Yes, sir.

5    Q.  And then there's another picture with just the other boy in

6    the bathtub, right?

7    A.  Yes, sir.

8    Q.  That's going to be in Mr. Noonan's laptop, correct, 037 and

9    038?

10   A.  Yes, sir.

11   Q.  Do you remember those pictures?

12   A.  Yes, sir.

13   Q.  All right.  I think that's going to be contained in 24,

14   Government's Exhibit 24.  Do you have that in front of you

15   still?  If you will look at the second page -- well, the first

16   page of Government's Exhibit 24A, is this same picture in the

17   thumbnail?

18   A.  Correct.

19   Q.  All right.  And isn't it true that when they're -- well,

20   strike that.

21          And then on the second page, Government's Exhibit

22   24b, the upper right and the middle left are both a part of

23   that series of pictures.  Is that fair to say?

24   A.  Correct.  Yes.

25   Q.  Because you can see the shampoo in the right-hand corner,

Chappell - Cross by Mr. Jarvis

1  right?

2  A.  Yes, sir.

3  Q.  And then there's another one on 24d, the bottom right and

4  the upper left.  Can you tell whether or not on 24d, the kid at

5  the bottom right is the same one on the upper left?

6  A.  It's hard to tell from these pictures, sir.  But I

7  believe -- I don't believe they're the same child, based on the

8  haircut.

9  Q.  Okay.  And that's all the bathtub pictures from

10  Mr. Noonan's computer, the laptop, correct?

11  A.  Yes, sir.

12  Q.  So we know there was a series of pictures of the boys at

13  some point in time being in a bathtub, right?

14  A.  Yes, sir.

15  Q.  Did you confirm that was Mr. Noonan's bathtub?

16  A.  Yes, sir.

17  Q.  Okay.  So we can say it was at Mr. Noonan's house --

18  A.  Correct.  Yes, sir.

19  Q.  -- with Mr. Noonan's camera?

20  A.  Yes, sir.

21  Q.  But you don't know who took these pictures, do you?

22  A.  No, sir.

23  Q.  You have no idea?

24  A.  No, sir.

25  Q.  It could be on the timer, couldn't it?

Chappell - Cross by Mr. Jarvis

1           *THE COURT:*  I'm sorry.  Could be what?

2   BY MR. JARVIS:

3   *Q.*  Timer, couldn't it?

4   *A.*  It's possible, yes, sir.

5   *Q.*  Well, you agree with me that Mr. Noonan's camera, which is

6   this one, the Casio, it comes with a timer, doesn't it?

7   *A.*  Yes, sir.

8   *Q.*  And it's either a -- I think it's a ten-second or a

9   three-second timer, right?

10  *A.*  Correct.

11  *Q.*  And then there's a two-second timer, correct?

12  *A.*  Yes, sir.

13  *Q.*  Okay.  So we know that this camera used to take these

14  bathtub pictures could have been taken by the boys themselves,

15  right?

16  *A.*  No, sir, I don't believe so.

17  *Q.*  Well, it's physically possible with a timer on a camera to

18  put the camera up here and jump in the tub in ten seconds, for

19  a little 7-year-old boy, isn't it?

20  *A.*  I guess, yes, sir, it would be possible.

21  *Q.*  And even if both boys are in the picture, it's still

22  possible to push the timer and the other boy get in the bathtub

23  with his brother and wait the ten seconds for the picture to

24  take, correct?

25  *A.*  Yes, sir.

Chappell - Cross by Mr. Jarvis

1  *Q.*  So it's entirely possible that these pictures are taken by

2  the children and therefore can't be child pornography, can

3  they?

4  *A.*  It could be, sir.  Again, I don't believe that's the case,

5  but, yes, sir.

6  *Q.*  Well, I understand you disagree, but the evidence says that

7  it --

8         *MS. ZACK:*  Your Honor, I'm going to object to the

9  characterization or the statement that children taking --

10  pictures taken by children can't be child pornography.

11         *THE COURT:*  I'm disregarding that.

12         *MS. ZACK:*  Okay.

13         *THE COURT:*  It's simply not -- it's not anything that

14  he observed.  It's a statement of law, a question -- a

15  proposition of law and it's not for this witness to opine on

16  one way or the other.

17  BY MR. JARVIS:

18  *Q.*  So it's entirely possible that the boys -- one of the boys

19  could have taken their own pictures with this camera that took

20  the picture, correct?

21  *A.*  Yes, sir.

22  *Q.*  Okay.  Now, going back to 4, I think we go to 4c, correct?

23         Oh, or before we leave 4b, I thought I heard you

24  testify at some point in time, and maybe I'm confusing the

25  detention hearing with what happened today, but you believe

Chappell - Cross by Mr. Jarvis

1    this is child pornography, correct?

2    A.  Yes, sir.

3    Q.  Because of the unnatural pose of his legs being outside of

4    the bathtub or that's one of the reasons?  I'm not trying to

5    limit you, but that's one of the reasons, right?

6    A.  Yes, sir.

7    Q.  But haven't we already agreed that 6 and 7-year-old boys do

8    crazy things?

9    A.  Yes, sir.

10   Q.  Okay.  And your other reason, I think you testified before,

11   is because the focus on the genitalia, correct?

12   A.  Yes, sir.

13   Q.  But isn't it just an equal focus on his face and his little

14   bubbly beard as it is on his genitalia?

15   A.  It's still a focus, yes, sir.

16   Q.  But there could be two focuses, right?

17   A.  Yes, sir.

18   Q.  Okay.  And it's not really in a place -- a sexual

19   suggestive setting.  I mean, I guess you would call a bathtub

20   somewhat sexual setting --

21   A.  It can be, yes, sir.

22   Q.  Normally it wouldn't be, wouldn't you agree?

23   A.  Again, it can be.

24   Q.  All right.  And then let's go to 4c.  And this is one where

25   you considered it to be child pornography, correct?

Chappell - Cross by Mr. Jarvis

1   A.   Yes, sir.

2   Q.   And the boy's penis is showing, correct?

3   A.   Yes, sir.

4   Q.   But Mr. Noonan isn't showing his, right?

5   A.   Correct.

6   Q.   And there's a dog asleep, looks like, correct?

7   A.   Yes, sir.

8   Q.   Now, the focus of this picture could again be on the boy's

9   face, Noonan's face, or the boy's genitalia, correct?

10  A.   Yes, sir.

11  Q.   And the center of the photograph is the boy's face and

12  Noonan's face, right?

13  A.   Well, the center of the photograph is actually the child's

14  torso, which again leads me to the first thing I see is the

15  genitalia when I look at this picture and the first time I saw

16  it when I looked at this picture.

17  Q.   Well, let's talk about the angle of the picture.  Okay?

18  A.   Yes, sir.

19  Q.   Because as I looked at this picture, it looks like somebody

20  is taking the picture at about a two-and-a-half-foot high

21  angle?

22  A.   Yes, sir.

23  Q.   And that would be more likely that the other boy took that

24  picture, correct?

25  A.   Yes, sir.

Chappell - Cross by Mr. Jarvis

1  *Q.* So there's no evidence -- so you can't bring us any
2  evidence that says Mr. Barry knew this picture was taken, can
3  you?
4  *A.* No, sir.
5  *Q.* And certainly not at the time it was taken?
6  *A.* At the time it was taken, no, sir.
7  *Q.* Okay.  So you don't have any evidence that he had any
8  intent to conspire with Mr. Noonan to create at this moment in
9  time when this picture was taken a child pornographic picture,
10  which is 4c, can you?
11  *A.* At the time that this picture was taken, no, sir, I don't
12  have any evidence of that.
13  *Q.* All right.  Well, let's go to 4d.  Now, 4d has Mr. Noonan
14  sitting cross-legged on the bed.  I don't know if it's the same
15  bed.  It looks like a different bed, right?
16  *A.* No, sir, it's still Mr. Noonan's.
17  *Q.* Well, I know, but you testified there were two beds in his
18  house, like one in the den area and one that he sleeps in.  Do
19  you know which bed this one was?
20  *A.* This would be his bedroom.
21  *Q.* Okay.  All right.  And the boy is upside down with his legs
22  open over Mr. Noonan's face, right?
23  *A.* Yes, sir.
24  *Q.* And his -- the boy's face is facing looks like kind of up,
25  but it's certainly facing out away from Mr. Noonan's privates,

Chappell - Cross by Mr. Jarvis

1  correct?

2  A.  Yes, sir.

3  Q.  So a sexual pose -- a more sexual pose would have had the

4  boy reversed and his head in Mr. Noonan's privates, his face in

5  Mr. Noonan's privates and the boy's privates in Mr. Noonan's

6  face, correct?

7  A.  Not necessarily.  The position of the child and stuff is

8  still sexual and it still puts Mr. Noonan's hand and face very

9  close to the child's genitalia.

10  Q.  Okay.  But a more sexually suggestive photograph would have

11  been what I suggested, correct?  It would be more sexually

12  suggestive?

13  A.  It could be more sexually suggestive, yes, sir, I agree

14  with that.

15  Q.  And obviously Mr. Noonan is -- can with these boys of this

16  size make the decision on where to place their legs and place

17  their hands if he so desires, correct?

18  A.  Yes, sir.

19  Q.  And so if he really wanted a more sexual picture, he could

20  have flipped the boy around or he could have just stuck his

21  head down and put his mouth right on the little boy's penis,

22  right?

23  A.  He could have, yes, sir.

24  Q.  But you don't have any of those photographs, do you?

25  A.  No, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  No photographs where Mr. Noonan is playing with one of the

2  boys' penises, is there?

3  A.  That you can see -- tell that's what he's doing, no, sir, I

4  do not.

5  Q.  Well, that's all we've got to go on, right, is what you can

6  see, correct?

7  A.  Yes, sir.

8  Q.  So there could be more or better child pornography where

9  Noonan was actually doing something on camera, right?

10  A.  There could be, yes, sir.

11  Q.  But there isn't, is there?

12  A.  No, sir.

13  Q.  And he had the ability to do that, didn't he?

14  A.  Yes, sir.

15  Q.  You can't in the darkness of this photograph, you can't

16  even see the boy's penis, can you?

17  A.  Not very well, no, sir.

18  Q.  Okay.  And you sure can't see Mr. Noonan's, right?

19  A.  No, sir.

20  Q.  And, again, the angle of this picture is from a short

21  person, probably R.B. or the other child, correct?

22  A.  Possibly, yes, sir.

23  Q.  Well, if you were an adult, you would have been a lot

24  higher vantage point, correct?

25  A.  If he held the camera up to his face, yes, sir.  Yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.   And isn't that what normal people do?

2   A.   Yes, sir.

3   Q.   Okay.  And then there's always the possibility of a timer,

4   right?

5   A.   Possibly, yes, sir.

6   Q.   Okay.  All right.  Now, going to 4e, now this is the one

7   that y'all have listed, I think, as the protesting picture,

8   right, on the exhibit list?

9   A.   Yes, sir.

10  Q.   Okay.  But you don't know what that child was doing with

11  his hands up, right?

12  A.   It appears to me protesting having his picture taken.

13  Q.   Okay.  But my question was, you don't know, do you?

14  A.   No, sir.

15  Q.   Because one of the other alternative theories behind it is,

16  he could be waving at his brother, right?

17  A.   Could be, yes, sir.

18  Q.   Okay.  So the focal point on this one could be his penis

19  area or his penis, but it also could be his hand waving, right?

20  A.   Depending on the person's opinion, yes, sir.

21  Q.   Okay.  And then the pose, that's not an unnatural boy for a

22  little boy on a couch, is it?

23  A.   It's not an unnatural pose, no, sir.

24  Q.   And that's the way kids sit on couches.  They cross their

25  legs and watch TV all the time, right?

1    A.  Yes, sir.

2    Q.  Okay.  And then there's no suggestive coyness or anything,

3    come-hither look or anything like that on this picture, right?

4    A.  Again, to me, yes, sir, there is somewhat of that.  That's

5    my opinion.

6    Q.  Explain that.

7    A.  Again, the positioning of the body, leg curled up, resting

8    one arm, having his other arm up, somewhat of a smile.  This is

9    a little more than just sitting there watching TV on a couch,

10   especially given the fact that he is nude.  It's a little bit

11   more than him sitting there watching TV or watching video games

12   on a couch.

13   Q.  Wouldn't it be a more suggestive pose if his right leg was

14   bent and open?

15   A.  It could be, yes, sir.

16   Q.  Okay.  So if somebody was posing him, they sure could pose

17   him a lot better, right?

18   A.  There could be better poses, I guess, yes, sir.

19   Q.  And you don't have any evidence from any source whatsoever

20   that anybody posed this boy this way, do you?

21   A.  No, sir.

22   Q.  And you don't have any evidence from anybody whatsoever as

23   to who took this picture, do you?

24   A.  No, sir.

25   Q.  And you don't have any evidence from anybody whatsoever

Chappell - Cross by Mr. Jarvis

1  that Mr. Barry knew at the time this picture was being taken

2  that it was being taken, right?

3  A.  No, sir.

4  Q.  And you don't have any evidence from anybody whatsoever

5  that Mr. Barry intended this to be child pornography when the

6  picture was taken, do you?

7  A.  No, sir.

8  Q.  And, again, the angle could be low enough to where the

9  brother took the picture?

10  A.  My opinion, this particular image is higher, because it's

11  at a downward angle.  So it's probably more either the child

12  held the camera up above his head or an adult took this

13  picture.

14  Q.  What if the child was standing on the other end of the

15  couch a little higher up taking the picture?

16  A.  No, sir, at the angle of it, you can see the floor on the

17  bottom right-hand corner.  At the angle of this picture, he

18  wouldn't have been able to be on the couch and take that

19  picture.

20  Q.  Okay.  But it could have been another piece of furniture in

21  the den, right?

22  A.  Yes, sir.

23  Q.  All right.  Going to 4f, now this is the series -- I don't

24  know how many, would you say about eight or nine maybe of

25  Mr. Noonan and one or two of the boys in the bathroom?  I'm

1  going to call these shower pictures, just to separate them from

2  the boys in the bathtub.  Is that fair?

3  A.  Yes, sir.

4  Q.  Okay.  So we know which pictures we're talking about?

5  A.  Yes, sir.

6  Q.  And there's about six or seven of them, right?

7  A.  Yes, sir.

8  Q.  Okay.  And so this is the first one in that series, 4f.

9  Now, the focal point of this picture is the two faces, right?

10  A.  Yes, sir.

11  Q.  And that looks like with Mr. Noonan bent over and the boy

12  bent over, again, the other boy taking the picture, right?

13  A.  Yes, sir.

14  Q.  And while it does show his penis, it doesn't show any

15  sexual contact, does it?

16  A.  The sexual position and -- or the pose that they're in is a

17  sexual position in and of itself.  That's my opinion, that

18  this -- the focal point of this picture is the actual position,

19  along with being able to see his genitalia and that's a -- to

20  me that is a very sexually suggestive pose.

21  Q.  All right.  Let me make sure I understand this.  In your

22  opinion the focal point is something you can't see in this

23  picture?

24  A.  It's Mr. Noonan pressed up against the child.  That's very

25  evident in the photograph.

Chappell - Cross by Mr. Jarvis

1  Q.  How do you know Mr. Noonan's not wearing clothes underneath
2  there in this photograph by itself?
3  A.  He may or may not.  It's the position itself that's
4  sexually suggestive.
5  Q.  But if Mr. Noonan had clothes on, would this still be
6  considered child pornography in your opinion?
7  A.  Yes, sir.
8  Q.  Okay.  So in this one it's not the child's genitalia or the
9  fact that they're nude.  It's the fact that Mr. Noonan has a
10 hold of his hands, holding him in front and they're bent
11 over -- I'm not going to say slightly, but not all the way.
12 Fair?
13 A.  It's that along with the fact that you can see the
14 genitalia and that the child is nude, yes.
15 Q.  Okay.  So it's both of those.  But, again, you don't have
16 any information that Mr. Barry knew about this picture, right?
17 A.  At the time the picture was taken, no, sir.
18 Q.  And no information that he authorized it or gave Mr. Noonan
19 permission to take a picture or I guess the other child to take
20 a picture of Mr. Noonan and his other son, right?
21 A.  At the time of the picture, no, sir.
22 Q.  Okay.  All right.  Then moving to 4g, this is Mr. Noonan on
23 the bed in -- I want to say in the morning, but this is the bed
24 pictures that we've talked about.  Remember?  You've got to say
25 "yes."

Chappell - Cross by Mr. Jarvis

1   A.  Yes, sir.

2   Q.  Okay.  Thank you.  And this is a cat and a dog and a man

3   laying naked and a boy showing a picture.  Do you know who's in

4   the picture?

5   A.  No, sir.

6   Q.  Okay.  It looks like whoever it is, is wearing a Superman

7   costume, right?

8   A.  Yes, sir.

9   Q.  Now, the boy's elbow is right on the inner thigh or the

10  thighs of Mr. Noonan, correct?  Very close to his penis?

11  A.  Yes, sir.

12  Q.  All right.  And do see his left hand?  Do you see where his

13  left hand is?

14  A.  Not really, no, sir.

15  Q.  It's underneath the right armpit, down Mr. Noonan's right

16  leg.

17         MR. JARVIS:  May I approach, Judge?

18         THE COURT:  You may.  You need not ask permission to

19  approach the witness.

20         MR. JARVIS:  I forgot.

21  BY MR. JARVIS:

22  Q.  Right there.  It's easier to see on this deal.

23  A.  Yes, sir.

24  Q.  Okay.  See where that is now?

25  A.  Yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  Okay.  Now, it would be a lot more sexually suggestive if

2   he had the opportunity to actually put his hand on the penis,

3   right?

4   A.  It would be more sexually suggestive, yes, sir.

5   Q.  And you don't have any evidence that anybody told him to

6   pose like that, do you?

7   A.  No, sir.

8   Q.  But in your opinion because the proximity of the boy's

9   elbow and hand to Mr. Noonan's penis, is that what makes this

10  one child pornography?

11  A.  That's part of it, yes, sir.

12  Q.  What's the other part?

13  A.  They're laying in -- Mr. Noonan is laying in bed nude with

14  a child draped -- basically draped across his penis and

15  testicles and is touching that area.  To me that's sexually

16  suggestive and I consider this child pornography.

17  Q.  Does the fact that Mr. Noonan is a registered sex offender,

18  does that enter the equation?

19  A.  No, sir.

20  Q.  Well, does the fact that Mr. Noonan and the boys are

21  nudists and run around naked all the time enter into the

22  equation?

23  A.  No, sir.  Because I don't have information that they run

24  around all the time nude.  That's only something that I've

25  heard.

Chappell - Cross by Mr. Jarvis

1  *Q.*  Okay.  But Mr. Spitler told you that, and you didn't have
2  any reason to doubt him?
3  *A.*  He didn't say all the time.  He said "sometimes."
4  *Q.*  My apologies.
5  *A.*  Yes, sir.
6  *Q.*  They run around sometimes naked at least at Mr. Noonan's
7  house?
8  *A.*  Correct.
9  *Q.*  And so if they're normally usually naked in Mr. Noonan's
10 house and these pictures are taken in Mr. Noonan's house, that
11 wouldn't be an unnatural pose then if they're naturally naked
12 in Mr. Noonan's house, would it?
13 *A.*  Again, my information is that it wasn't all the time.  It
14 was sometimes, by Mr. Spitler.  I also have other photographs
15 and other digital evidence that shows they are in the house
16 fully clothed and doing stuff.  So, no, this is not -- that's
17 why this being a nudist act is not what I consider it to be.
18 *Q.*  And was the picture -- do you have any evidence that the
19 picture was designed to or intended to elicit some sexual
20 response in a viewer?
21 *A.*  It can be, yes, sir.
22 *Q.*  That wasn't my question.  My question was:  Do you have any
23 information saying that this picture was designed or intended
24 to be at the time it was taken, elicit a sexual response in a
25 viewer?

Chappell - Cross by Mr. Jarvis

1   A.  No, sir.

2   Q.  And, again, it looks like it's about the same angle, so

3   that maybe the other brother probably took that picture?

4   A.  Possible, yes, sir.

5   Q.  Or the timer?

6   A.  Possible, yes, sir.

7   Q.  But you don't have any information that Mr. Barry knew

8   anything about this picture when it was taken, do you?

9   A.  At the time of the picture, no, sir.

10  Q.  Or gave permission for this picture to be taken, right?

11  A.  At the time that the picture was taken, no, sir.

12  Q.  Well, isn't that the important part of the exercise, is

13  when the picture was taken, what the intent was at the time?

14          MS. ZACK:  Objection.  Calls for a legal conclusion.

15          THE COURT:  Sustained.

16  BY MR. JARVIS:

17  Q.  Then 4h we have Mr. Noonan sitting on his couch with one of

18  the boys, and again the angle suggests the other boy took the

19  picture.  Is that fair?

20  A.  Yes, sir.

21  Q.  All right.  And there is that boy's, let me see, left foot

22  on top of, touching perhaps Mr. Noonan's penis, correct?

23  A.  Yes, sir.

24  Q.  Now, I hate to ask this question, but you testified some of

25  these were partially erect penis pictures, correct?

Chappell - Cross by Mr. Jarvis

1   A.  Yes, sir.

2   Q.  Is this one of them?

3   A.  Yes, sir.

4   Q.  Well, would you tell us which picture shows Mr. Noonan's

5   fully erect penis as a comparison?

6   A.  I don't have one that shows a fully erect penis.  I have

7   some that where it's not erect at all.

8   Q.  Okay.  And is the focal point -- isn't the focal point the

9   faces or the focal point the penis?

10  A.  No, sir.  In this case it is the penis and the feet

11  touching the penis, yes, sir.

12  Q.  But it's the adult penis is the focal point on this one,

13  not the child's penis, right?

14  A.  That is correct.

15  Q.  So wouldn't this be adult porn, if it's porn at all, and

16  not child porn, because the child isn't showing his penis?

17  A.  No, sir.  The child is interacting with the adult and the

18  adult's penis and his body is touching it; therefore, it would

19  be child porn -- child pornography.  Excuse me.

20  Q.  All right.  And you don't have any information that

21  Mr. Barry knew about this, right, at the time the picture was

22  taken, correct?

23  A.  No, sir.

24  Q.  Okay.  Or that he gave permission for Mr. Noonan to take or

25  somebody to take that picture, right?

Chappell - Cross by Mr. Jarvis

1  A.  Correct.

2  Q.  Okay.  And then going to 4i, this is Mr. Noonan and one of

3  the boys, looks like they're exercising on the Wii exercise

4  program, right?

5  A.  Yes, sir.

6  Q.  And the boy's not even looking at the camera, is he?

7  A.  No, sir.

8  Q.  So it's really a snapshot, an action snapshot, wouldn't you

9  agree?

10  A.  Yes, sir.

11  Q.  All right.  And so the focal point obviously is not on the

12  boy's genitalia, is it?

13  A.  No, sir.

14  Q.  It's on Mr. Noonan standing there on one leg looking goofy,

15  right?

16  A.  Correct.

17  Q.  Now, you said this was a, in your opinion, partially erect

18  penis, correct?

19  A.  Yes, sir.

20  Q.  Well, it looks like an action shot, doesn't it, like

21  they're actually moving?

22  A.  Well, he's not -- I don't think he's moving.  I think he's

23  balancing.  And if he was moving, there would be a lot more

24  blurriness on the extremities, the hands, the feet.  I think

25  he's just balancing, so he's somewhat still.

Chappell - Cross by Mr. Jarvis

1  Q.  So unlike the boy's left arm that's a little unfocused, it

2  looks like he's moving, but Mr. Noonan is not, correct?

3  A.  Correct.

4  Q.  Is that fair?

5  A.  Yes, sir.

6  Q.  All right.  But, again, the focus is on Mr. Noonan being

7  naked and not the boy being naked, right?

8  A.  Yes, sir.

9  Q.  And the angle of the picture suggests that the other boy

10  took the picture, correct?

11  A.  Correct.  Yes, sir.

12  Q.  And you don't have any information that Mr. Barry was

13  around or knew or gave permission for this picture to be taken,

14  do you?

15  A.  That is correct.

16  Q.  All right.  4i, same basic picture, except this time the

17  boy in the picture does know that the picture is being taken,

18  right, because he's obviously looking right at the camera,

19  correct?

20  A.  This is?

21  Q.  4i or what I show is i.  Is that a j?

22  A.  Yes.

23  Q.  It's a j.  Excuse me.

24  A.  J.

25  Q.  So the boy knows about this one, in the picture, right?

Chappell - Cross by Mr. Jarvis

1   A.  Correct.

2   Q.  But, again, the focus isn't on his genitalia, is it?

3   A.  The direct focus, no, sir.

4   Q.  All right.  And it's a picture of Mr. Noonan balancing,

5   doing a Wii exercise, correct?

6   A.  Correct.

7   Q.  And, again, Mr. Barry didn't -- there's no evidence that

8   Mr. Barry knew about this, gave permission, or was even aware

9   that it was being taken, correct?

10  A.  At the time the picture was taken, no, sir, I do not.

11  Q.  And then again the angle, it looks like the other brother

12  probably took that picture, correct?

13  A.  Possibly, yes, sir.

14  Q.  Or the timer, right?

15  A.  Correct.  Yes, sir.

16  Q.  Because an adult wouldn't get down on one knee to take that

17  picture, probably?

18  A.  Probably not, no, sir.

19  Q.  All right.  And then 4k, now I've got this one back as one

20  of the shower pictures we talked about before.

21  A.  Yes, sir.

22  Q.  You can't even see Mr. Noonan's face.  The boy's not even

23  facing the camera, correct?

24  A.  No, sir.

25  Q.  So you can't even say if he was posed or knew the picture

Chappell - Cross by Mr. Jarvis

1   was being taken, can you?

2   A.  That is correct, yes, sir.

3   Q.  And you can't see his genitalia, can you?

4   A.  No, sir.

5   Q.  All you can see is Mr. Noonan's genitalia, right?

6   A.  That is correct.

7   Q.  There's no contact or sexual posing at all, is there?

8   A.  No, sir.

9   Q.  There's no sexual coyness or come-hither look, right?

10  A.  No, sir.

11  Q.  And you don't even know that they were even told to be in

12  this position, right?

13  A.  No, sir.

14  Q.  And it's not an unnatural pose, is it?

15  A.  No, sir.

16  Q.  And it's not -- you don't have any information that it was

17  intended or designed to elicit sexual response from the viewer

18  of this picture?

19  A.  No, sir.

20  Q.  So was this one that you considered to be child

21  pornography?

22  A.  Yes, sir.

23  Q.  Why?

24  A.  Based on the positioning, focal point is again the penis

25  and testicles of Mr. Noonan, an adult male.  There are children

Chappell - Cross by Mr. Jarvis

1  present within the bathtub and, again, possible that the child

2  is taking this photograph.  And so for that reason I believe

3  that it should be considered child pornography.

4  Q.  Okay.  The next one is 41.  This is on Mr. Noonan's bed.

5  You have a boy kind of far away compared to the other pictures.

6  And then you believe Mr. Noonan's bottom, correct?

7  A.  Yes, sir.

8  Q.  All right.  And you can barely see the boy's genitalial,

9  correct?

10  A.  Yes, sir.

11  Q.  And, again, the angle suggests that the brother took this

12  picture, right --

13  A.  Yes, sir.

14  Q.  -- or a timer at worst?  And you don't have any evidence

15  that Mr. Barry knew about this or gave permission at the time

16  the picture was taken, right?

17  A.  Correct.

18  Q.  And there's no evidence that suggests that this was

19  intended to elicit a sexual response in the viewer, correct?

20  A.  Correct.

21  Q.  I mean, because it looks like -- let's assume that's

22  Mr. Noonan -- he's mooning the brother with the camera, like

23  stupid kids do all the time, right?

24  A.  Except Mr. Noonan's an adult.

25  Q.  I understand that, but adults act like kids, too, don't

Chappell - Cross by Mr. Jarvis

1  they?

2  A.  Yes, sir.

3  Q.  And so the mooning shot isn't really a sexually suggestive

4  shot.  It's more of a fun shot, isn't it?

5  A.  Again, it depends on who's looking at the picture.  I mean,

6  some people, that might be considered sexually suggestive.

7  Q.  But generally speaking, it's somebody mooning somebody.

8  It's not sex, right?

9  A.  Yes, sir.

10  Q.  Okay.  And then looking at 4n, this one has both boys and

11  Mr. Noonan, correct?

12  A.  Yes, sir.

13  Q.  And the big dog?

14  A.  Yes, sir.

15  Q.  And you can just barely see one of the boys' penises just

16  barely right next to his right elbow, right?

17  A.  Correct.

18  Q.  So obviously the focal point is not the boy's penis,

19  correct --

20  A.  Possibly, yes, sir.

21  Q.  -- because you can barely see it?

22  A.  Excuse me?

23  Q.  Because you can barely see it?

24  A.  Yes, sir.

25  Q.  And doesn't it look like this is one of the pictures with

Chappell - Cross by Mr. Jarvis

1  the timer and then it looks like to me the boy in front has

2  just jumped in to make the ten seconds?

3  A.  Possibly, yes, sir.

4  Q.  Because if you look real closely to Mr. Noonan's hand, his

5  hand is not really on his shoulder.  It's almost on his

6  shoulder, right?

7  A.  Correct.

8  Q.  So it looks like the kid just barely made the timer, right?

9  A.  Correct.

10  Q.  And so there's nothing sexually coy about that picture, is

11  there?

12  A.  Not necessarily in this picture, no, sir.

13  Q.  Okay.  And there's not any unnatural pose, right?

14  A.  No, sir.

15  Q.  I mean, the boy on top has got his mouth open, I guess

16  sticking his tongue out at the camera, right?

17  A.  Correct.  Yes, sir.

18  Q.  That would be the focal point, is the three faces, correct?

19  A.  Yes, sir.

20  Q.  So there's really nothing sexual about this picture at all,

21  is there?

22  A.  Other than the children being nude, no, sir.

23  Q.  Okay.  And would you agree that's usually not enough to

24  make it child pornography?

25  A.  For this particular picture possibly, yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  Okay.  And, again, there's no evidence Mr. Barry knew about

2   this, gave permission for it, or allowed Mr. Noonan to have

3   that picture taken, right?

4   A.  At the time this picture was taken, no, sir, I don't have

5   evidence for that.

6   Q.  Well, let's explore that a second.  Mr. Barry -- Mr. Noonan

7   never said anything about having permission, right?

8   A.  Mr. Noonan, no, sir.

9   Q.  R.B. never said anything to you about giving permission or

10  hearing his dad give permission to have these pictures taken,

11  correct?

12  A.  R.B. never directly told me, no, sir.

13  Q.  O.B. never told you that dad said we could take these

14  pictures with Uncle Craig, did he?

15  A.  Directly, no, sir.

16  Q.  You don't have any information Mr. Barry saying, "I gave

17  Mr. Noonan permission to take these pictures," right?

18  A.  Directly, no, sir.

19  Q.  And you don't have any chats out of the 30,000 lines of

20  chats that say, from David to Mr. Noonan, "I'm glad you got

21  those pictures taken," or anything suggesting that he gave

22  permission at any time for Mr. Noonan to take these pictures

23  with his boys, do you?

24  A.  No, sir.

25  Q.  So all you have really is your opinion based upon what you

Chappell - Cross by Mr. Jarvis

 1  see as opposed to the evidence that you've gleaned from the

 2  computer, correct?

 3  A.  No, sir, I have evidence gleaned from the computer, other

 4  than what you've mentioned, that suggests that Mr. Barry had

 5  knowledge, knew that these pictures were taken and went and

 6  made more.

 7  Q.  Okay.  We're going to get to those pictures in a second.

 8  A.  All right.

 9  Q.  Let's look at 4n.  Now, this one, do you really know who

10  that is?

11  A.  It's one of the Barry children.

12  Q.  How can you tell?

13  A.  Skin tone, the size of the child.  It's definitely

14  Mr. Noonan.  And also that toy is -- has been identified as a

15  Buzz Lightyear and appears in a different picture with one of

16  the Barry children and Mr. Noonan again.

17  Q.  So it's likely it's one of the Barry boys?

18  A.  And it's also within the same series of photographs, the

19  same EXIF data.  So, it's taken with Mr. Noonan's camera,

20  created on the same day on the computer.  So, it matches the

21  rest of the images.

22  Q.  But there's no sexually suggestive posing, correct?

23  A.  No, sir, given the position Mr. Noonan's face, where it's

24  at in relation to the body, as close as it is to the groin

25  area, it's very -- to me it's very apparent that the child is

Chappell - Cross by Mr. Jarvis

1    nude.  To me it's a very sexually suggestive picture.

2    Q.  Maybe I'm missing it, but it looks like his face is right

3    about here on the side, right?

4    A.  No, sir.  To me the picture -- the face is more towards the

5    body as --

6    Q.  When you say "more towards" --

7    A.  -- and not so much towards the side.

8    Q.  When you say "towards the body," you mean towards the

9    center?

10   A.  Towards the center of the torso, yes, sir.

11   Q.  Thank you.

12   A.  More so than it is to the side, yes, sir.

13   Q.  Okay.  But what if he's blowing a raspberry on his stomach

14   like people do to kids, would that be sexually suggestive?

15   A.  On a nude child, yes, sir, it would be.

16   Q.  As opposed to pulling up their shirt and blowing on their

17   nonshirt tummy?  That's going to be more sexually suggestive

18   than just the lips on the skin?

19   A.  On -- in that scenario you still have clothes and stuff

20   covering the genitalia and the groin area of the child.  In

21   this particular picture, we don't have that.

22   Q.  Do you have any pictures -- excuse me.  To be more sexually

23   suggestive, at least in your opinion, his face could have been

24   on the boy's penis, right?

25   A.  That would be more sexually suggestive, yes, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  There wouldn't be any doubt about that, right?

2  A.  Correct.

3  Q.  That would be easily, that's called child porn, we're done,

4  right?

5  A.  Yes, sir.

6  Q.  But this picture, he has the opportunity to put his mouth

7  on the boy's penis, but he doesn't do that, does he?

8  A.  In this picture, no, sir, he doesn't.

9  Q.  In fact, in none of the pictures does he put his mouth on

10  the boy's penis, does he?

11  A.  In any of the pictures I have, no, sir.

12  Q.  And he had the opportunity, because nobody was stopping

13  him, if that's what he wanted to do, right?

14  A.  Again, that's something that Mr. Noonan -- that was a

15  decision Mr. Noonan had to make.

16  Q.  That wasn't my question.  My question was:  He had the

17  opportunity to put his mouth on the boy's penis, right?

18       MS. ZACK:  Objection, Your Honor.  Calls for

19  speculation.

20       THE COURT:  I'll sustain the objection.  You can

21  rephrase the question.

22  BY MR. JARVIS:

23  Q.  Was there anything that you saw in these pictures that

24  would have prevented Mr. Noonan from putting his mouth on the

25  boy's penis?

Chappell - Cross by Mr. Jarvis

1   A.  No, sir.

2   Q.  Okay.  So other than him deciding not to do that, there

3   wasn't anything stopping him, right?

4           MS. ZACK:  Objection, Your Honor.  Assumes facts not

5   in evidence.

6           THE COURT:  Nothing apparent -- are you simply asking

7   from the appearance of the photograph itself?

8           MR. JARVIS:  Yes, ma'am.

9           THE COURT:  All right.  You can answer that question.

10  A.  From these photographs, no, sir.

11  BY MR. JARVIS:

12  Q.  Okay.  And this again was -- at least looks like an angle

13  where the child could have taken that picture, right?

14  A.  Yes, sir.

15  Q.  And you don't have any evidence that Mr. Barry knew about

16  this, gave permission for it, or participated in any way,

17  correct?

18  A.  At the time these pictures were taken, no, sir.

19  Q.  All right.  Then 4o.  That's the one -- I'm going to call

20  that another shower photo.  Is that fair?

21  A.  4o?

22  Q.  That's what mine looks like.

23  A.  My 4o is --

24  Q.  Hard to see?

25  A.  Well, they're not in the shower.  They're walking from the

1   family room to the formal living room in front.

2   Q.  Okay.  So this is a separate picture?

3   A.  Separate picture, separate room of the house, yes, sir.

4   Q.  Okay.  But the boy's genitalia isn't showing, just his

5   bottom, right?

6   A.  Yeah, just his buttocks, yes, sir.

7   Q.  And then it's Mr. Noonan with his penis showing, correct?

8   A.  Correct.  Yes, sir.

9   Q.  And the focus of the picture -- it's kind of far away.  It

10  looks like about 8 or 10 feet, fair?

11  A.  Possibly, yes, sir.

12  Q.  So the focus is just on Mr. Noonan.  Would that be a fair

13  statement?

14  A.  Well, Mr. Noonan and the backside of the child.

15  Q.  Okay.  And there's no touching that you can tell from the

16  picture, right?

17  A.  No, sir.

18  Q.  And there's no sexual coyness on the part of the child in

19  this picture, right?

20  A.  No, sir.

21  Q.  And he's not even looking at the camera, is he?

22  A.  No, sir.

23  Q.  It's not a sexually suggestive setting?  You said it was a

24  hallway, right?

25  A.  An entryway, yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  So that wouldn't be sexually suggestive, correct?

2   A.  No, sir.

3   Q.  And there's no sexual coyness or willingness to engage in

4   sexual activity, based upon what you see of the boy, correct?

5   A.  No, sir.

6   Q.  Okay.  And there's no evidence that it was designed or

7   intended to elicit a sexual response from a viewer, correct?

8   A.  No, sir.

9   Q.  And it looks like from the angle, that it was taken

10  probably by the other boy, right?

11  A.  Yes, sir.

12  Q.  And there is no evidence from any source that Mr. Barry

13  knew about this picture when it was taken, gave permission for

14  it to be taken, or intended for it to be child pornography,

15  right?

16  A.  At this particular picture, no, sir.

17  Q.  Okay.  Then we have 4p.  This is a picture of the boys, I'm

18  assuming, asleep.  Would that be fair?

19  A.  Yes, sir.

20  Q.  And this is their little bed they made on the side of

21  Mr. Noonan's bed, correct?

22  A.  Yes, sir.

23  Q.  And it looks like the one on the right is obviously covered

24  up, but the one on the left is not.  But it looks like part of

25  his left leg is still under the covers, right?

Chappell - Cross by Mr. Jarvis

1  A.  Lower part of his shin, yes, sir.

2  Q.  Okay.  His foot and his shin area?

3  A.  Yes, sir.

4  Q.  Now, how often or how many times do you think a little kid

5  kicks the covers off when they're sleeping?

6  A.  It's common, yes, sir.

7  Q.  So that by itself, unless you had some evidence that

8  somebody intentionally did that, that's a normal occurrence for

9  a little kid sleeping, right?

10  A.  Yes, sir.

11  Q.  Okay.  So you can't just say from the picture that, hey,

12  that's a posed deal, because that could happen normally just as

13  easily, right?

14  A.  But poses can also -- I mean, poses are created to elicit

15  that as well, to make it look natural.  It could go both ways.

16  Q.  I'm agreeing with you.

17  A.  Right.

18  Q.  It could go both ways.

19  A.  Yes, sir.

20  Q.  So it's an even call.  Fair?

21  A.  Yes, sir.

22  Q.  All right.  But you don't have any evidence from any source

23  that anybody posed this picture, do you?

24  A.  Direct evidence, no, sir, I do not.

25  Q.  Okay.  And the -- what circumstantial evidence would you

Chappell - Cross by Mr. Jarvis

1  have that somebody posed this?

2  A.  The totality of the pictures being taken and everything

3  that we'd already learned in this investigation.

4  Q.  So the focal point -- I know his penis is showing, but

5  would that, in your opinion, be the focal point of this

6  picture?

7  A.  Yes, sir.

8  Q.  Or the fact that the boys were asleep?

9  A.  No, sir.  The groin, the penis, the testicles, that to me

10  is the focal point of this picture.

11  Q.  So, but it's not an unnatural pose, right?

12  A.  No, sir.

13  Q.  And you don't have any evidence that it was intended or

14  designed to elicit a sexual response from the viewer, correct?

15  A.  No, sir.

16  Q.  And that could be either a timer or somebody taller,

17  regular size person?

18  A.  Given the angle of it, someone would have to be holding

19  that camera, in my opinion.

20  Q.  But you don't have any evidence of who that was, do you?

21  A.  No, sir.

22  Q.  Okay.  And you don't have any evidence that Mr. Barry knew

23  about this picture when it was taken, right?

24  A.  At the time of the photograph, no, sir.

25  Q.  And you don't have any evidence that he gave permission or

Chappell - Cross by Mr. Jarvis

1  that he intended for this to be child pornography, right?

2  A.  Of this picture, no, sir.

3  Q.  When was this picture taken?

4  A.  I have to pull the exact date on it off of that file list

5  again, and which folder it came from would determine which date

6  this particular picture was taken -- or created, not taken,

7  created on the computer.

8  Q.  All right.  That's what confused me.  So you don't know

9  when any of these pictures were taken, right?

10  A.  Correct.

11  Q.  You only know when somebody somehow put it on a computer,

12  right?

13  A.  I know which camera these were taken with.

14  Q.  Fair.

15  A.  And then I know when they were placed on Mr. Barry's

16  computer.

17  Q.  But you don't know when they were actually taken?

18  A.  No, sir.

19  Q.  And that goes for all these pictures?  I don't have to ask

20  that question again, right?

21  A.  Correct.

22  Q.  Okay.

23       THE COURT:  Tell me when you get to a convenient

24  stopping point and we'll recess for the evening.

25       MR. JARVIS:  We're probably there, Judge.  I've got

1    plenty more.

2            THE COURT:  All right.  About how much longer will you

3    be with this witness?

4            MR. JARVIS:  I don't know, Judge, maybe two hours.

5            THE COURT:  All right.  And --

6            MR. JARVIS:  Just a guess.

7            THE COURT:  -- how many -- I assume you'll have

8    redirect.  So let's assume we have the bulk of the morning on

9    this witness, which sounds reasonable.  Are you -- and this is

10   your only witness, right?

11           MS. ZACK:  Yes, Your Honor, plus the transcript that

12   we're going to read.

13           THE COURT:  And do you know yet what your case is

14   going to be?

15           MR. JARVIS:  I do know what I think it's going to be.

16           THE COURT:  Can you give us some idea?

17           MR. JARVIS:  We'll be here all day tomorrow, Judge, in

18   my --

19           THE COURT:  All right.  We're going to plan on then

20   going into Wednesday, because I've got to recess tomorrow at

21   about 3:30 and I have a conference call before then.  So we are

22   going to be here on Wednesday.

23           MR. JARVIS:  Yes, ma'am.

24           THE COURT:  All right?

25           MR. JARVIS:  Yes, ma'am.

1      *THE COURT:*  All right.  Anything further that we need

2  to take up this evening?

3          *MS. ZACK:*  Nothing from the United States.

4          *THE COURT:*  Do you want findings and conclusions?  Do

5  you intend to request them, or do you want a general verdict?

6          *MR. JARVIS:*  Probably findings and conclusions because

7  of the type of case it is, all these pictures, please.

8          *THE COURT:*  All right.  I just needed to know.

9              All right.  Anything further at this point?

10         *MR. JARVIS:*  No, ma'am.

11         *MS. ZACK:*  Nothing from the United States, Your Honor.

12         *THE COURT:*  Thank you very much.  You're excused for

13  the evening.

14     *(Concluded at 5:00 p.m.)*

15                              * * *

16  I certify that the foregoing is a correct transcript from the

17  record of proceedings in the above-entitled cause, to the best

18  of my ability.

19

20  /s/ *Kathy L. Metzger*                    *3-31-2015*
    Kathy L. Metzger                     Date
21  Official Court Reporter

22

23

24

25