```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3   UNITED STATES OF AMERICA       .  CR. NO. H-12-691-2
                                    .  HOUSTON, TEXAS
 4   VS.                            .
                                    .  APRIL 22, 2014
 5   DAVID MORSE BARRY              .  9:00 A.M. to 3:37 P.M.

 6

 7                           DAY 2 of 5
                       TRANSCRIPT of BENCH TRIAL
 8            BEFORE THE HONORABLE LEE H. ROSENTHAL
                     UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11
     FOR THE GOVERNMENT:           MS. SHERRI L. ZACK
12                                 U.S. Attorney's Office
                                   1000 Louisiana
13                                 Suite 2300
                                   Houston, Texas   77002
14

15
     FOR THE DEFENDANT:            MR. ROBERT T. JARVIS
16                                 Robert T. Jarvis Law
                                     Firm, P.C.
17                                 123 W Houston
                                   Sherman, Texas  75090
18
                                   MS. KIMBERLY F. MINICK
19                                 Minick Law Firm, P.C.
                                   3340 Camp Bowie Blvd.
20                                 Suite 100
                                   Fort Worth, Texas  76107
21
     THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
22   CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
     COURT ORDER.  UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
23   ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
     COPY AT THE OFFICIAL RATE.  General Order 94-15, United States
24   District Court, Southern District of Texas.

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

1                       APPEARANCES CONTINUED

2
ALSO PRESENT:                      MR. JEFFERY G. CHAPPELL
3

4
OFFICIAL COURT REPORTER:           MS. KATHY L. METZGER
5                                  U.S. Courthouse
                                   515 Rusk
6                                  Room 8004
                                   Houston, Texas  77002
7                                  713-250-5208

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    <u>INDEX</u>

2                                                                    PAGE

3    <u>GOVERNMENT'S WITNESSES</u>

4    Jeffery G. Chappell

       Cross-examination continued by Mr. Jarvis              241
5      Redirect Examination by Ms. Zack                       364
       Recross-examination by Mr. Jarvis                      395
6
     Mark Peterson
7      (Testimony read.)                                      410

8

9    GOVERNMENT RESTS                                         423

10

11   MOTIONS                                                  423

12

13

14

15                                * * *

16

17

18

19

20

21

22

23

24

25

```
1                      P R O C E E D I N G S
2          (Open court, Defendant present.)
3              THE COURT:  Good morning, everybody.  Are we ready to
4      proceed?
5              MS. ZACK:  Yes, Your Honor.  Good morning.
6              MR. JARVIS:  Yes, ma'am.
7              THE COURT:  Anything we need to take up before we
8      resume with the testimony?
9              MS. ZACK:  Yes.
10             THE COURT:  You may all be seated.
11             MS. ZACK:  Yes, Your Honor.
12             THE COURT:  All right.
13             MS. ZACK:  You had asked us to inquire about any
14     reports --
15             THE COURT:  Yes.
16             MS. ZACK:  -- that may have been prepared by Special
17     Agent McGaha.  Special Agent Chappell spoke to him yesterday.
18     Special Agent McGaha did not prepare a written forensic report.
19     What he did was an EnCase preview prior to the CPS trial, and
20     those were the images he supplied to CPS that were used in the
21     CPS trial.
22                  Mr. Jarvis represented Mr. Barry in the CPS
23     trial, so he had access to everything that was previously done.
24     And those pictures, some of which -- all of which are contained
25     in the DVDs but some of which we have selected for presentation
```

1   here, but there was no completed forensic report like Special

2   Agent Chappell did in this case.

3           THE COURT:  All right.  Very good.  Thank you.

4           MS. ZACK:  Yes, Your Honor.

5           THE COURT:  All right.  In light of the request that

6   the Court enter findings and conclusions, does the Government

7   have any proposed findings and conclusions that it wishes me to

8   consider?  You probably need to.

9           MS. ZACK:  Not at this time, Your Honor.  I wasn't

10  prepared to answer that question, but I could by the end of --

11          THE COURT:  Which is why I asked Mr. Jarvis yesterday

12  if that's what he intended, so we would all be somewhat

13  prepared to do that.  And in any bench trial, criminal case, I

14  think it's a pretty good assumption that there will be a need

15  for or a request for findings and conclusions.  So I would

16  suggest that you-all have some proposed findings and

17  conclusions --

18          MS. ZACK:  Yes, Your Honor.

19          THE COURT:  -- as quickly as you can get them done.

20          MS. ZACK:  Yes, Your Honor.

21          THE COURT:  And on behalf of Mr. Barry as well, of

22  course --

23          MR. JARVIS:  Yes, ma'am.

24          THE COURT:  -- happy to consider them.  Are we ready?

25          MR. JARVIS:  Yes, ma'am.

Chappell - Cross by Mr. Jarvis

1      *THE COURT:*  You remain under oath, sir.

2      *THE WITNESS:*  Yes, ma'am.

3      *(Jeffery G. Chappell, Government's witness, previously*

4  *sworn.)*

5                    **CROSS-EXAMINATION CONTINUED**

6  BY MR. JARVIS:

7  *Q.*  All right.  Agent Chappell, I think the last picture I

8  looked at was 4P.  Is that what you remember, the boys laying

9  on the floor and one of them uncovered and the other one

10 covered asleep?

11     *THE COURT:*  Can you use the mike, sir?

12     *MR. JARVIS:*  Yes, ma'am.

13     *THE COURT:*  Thank you.

14 *A.*  Yes, sir, I believe that is correct.

15 BY MR. JARVIS:

16 *Q.*  Okay.  Now, you gave us some new information today, this

17 morning concerning the pictures and their path.  Do you have

18 those pieces of paper with you?

19 *A.*  Yes, sir.

20 *Q.*  Let's go to the one on 4P, the one we finished with

21 yesterday and look at it.  And then we'll pick it up from

22 there.  Okay?  Now, my understanding is that on 4P, according

23 to your forensic analysis, it was created -- the created date

24 is 6-18-2010, correct?  Are you there yet?

25 *A.*  Yes, sir.

Chappell - Cross by Mr. Jarvis

1   *Q.*   Okay.  And the created date is when it was put on the
2   computer, right?
3   *A.*   That is correct.
4   *Q.*   So that doesn't tell us when the picture was taken?
5   *A.*   No, sir.
6   *Q.*   It just gives us a date.  We know it wasn't taken after
7   that?
8   *A.*   Correct.
9   *Q.*   All right.  But then the modified date, isn't that usually
10  the date that somebody went on and did something with the
11  image?
12  *A.*   No, sir, not in this case.  Starting with Windows Vista,
13  the operating system recording, how it records information on
14  files changed.  Starting with Windows Vista, the only date that
15  is significant is the created date.  The modified date is
16  something that the operating system handles.  There's no rhyme
17  or reason.  It can be the day before the image is actually put
18  on the computer.  It could be several days after.  It's -- no
19  one's been able to really nail down exactly what the modified
20  date does.  So, forensically we ignore the modified date.  It
21  doesn't really do anything.
22  *Q.*   And when was this change?
23  *A.*   With Windows Vista.  When Microsoft came out with Windows
24  Vista, which is what the operating system Mr. Barry has on his
25  laptop.

Chappell - Cross by Mr. Jarvis

1   Q.  And when was that, approximately?

2   A.  2004, 2005, somewhere around there.

3   Q.  So since 2005, if it's a Windows Vista operating system,

4   the modified date doesn't mean anything?

5   A.  Correct.

6   Q.  Okay.  So the created date is when it got put on the

7   computer and you don't have -- and this picture was taken by

8   Noonan's camera, correct?

9   A.  Correct.

10  Q.  And because we don't -- you don't have the date in his

11  camera, you can't tell us when this picture was taken, correct?

12  A.  That is correct.

13  Q.  Well, I'm looking at the selected images from the Casio,

14  which is exhibit -- Government's Exhibit 9.  And these are just

15  the selected pictures.  Is this picture in the disk itself,

16  which is, I'm assuming, Government Exhibit 8?

17  A.  I believe it should be, yes, sir.

18  Q.  Okay.  All right.  Well, let's move forward to 4G -- excuse

19  me, Q.  This is the one with Noonan and one of the Barry boys

20  on the ground?

21  A.  Yes, sir.

22  Q.  Now, you don't have any evidence that Mr. Barry knew this

23  was being taken at the time, correct?

24  A.  That is correct.

25  Q.  And you don't have any evidence that Mr. Barry gave

Chappell - Cross by Mr. Jarvis

1   permission for this picture to be taken, do you?

2   A.   That is correct.

3   Q.   And you don't have any evidence that Mr. Barry was even in

4   the room and saw this picture being taken, do you?

5   A.   No, sir.

6   Q.   And you don't have any evidence that he instructed anybody

7   to take this picture, do you?

8   A.   No, sir.

9   Q.   All right.  And there's no genitalia of the boy showing, is

10  there?

11  A.   No, sir.

12  Q.   Or of Mr. Noonan, just his bottom --

13  A.   Correct.

14  Q.   -- or his buttocks, correct?

15  A.   Correct.

16  Q.   All right.  And the focal point appears to be just on them

17  laying on the bed -- or on the floor, excuse me, right?

18  A.   Well, to me, sir, as soon as I look at the picture, my

19  focal point is going to the buttocks of Mr. Noonan and then

20  seeing the child there.

21  Q.   Okay.  And would you agree with me that the focus of the

22  picture changes from person to person?

23  A.   It can be subjective, yes, sir, right.

24  Q.   Okay.  So reasonable people could disagree, correct?

25  A.   Yes, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  Okay.  For example, all these pictures that you have in
2  David Barry's computer, the Northern District and Special Agent
3  McGaha had and they haven't charged him with any of these, have
4  they?
5          MS. ZACK:  Objection.  Relevance.
6          THE COURT:  Rephrase the question.
7  BY MR. JARVIS:
8  Q.  These pictures were found on his computer by Special Agent
9  McGaha, correct?
10 A.  Some of them, sir.
11 Q.  Some of these pictures that you have in Exhibit No. 4,
12 right?
13 A.  Yes, sir.
14 Q.  And they haven't charged him with producing or possession
15 of these pictures even though they found them on his computer
16 in Wichita Falls, correct?
17         MS. ZACK:  Objection.  Relevance.
18         THE COURT:  Sustained.
19 BY MR. JARVIS:
20 Q.  Now, this is not an unnatural pose?  People lay -- sleep
21 like this all the time, correct?
22 A.  Yes, sir.
23 Q.  And it's -- there's no sexual coyness or suggestion by
24 Mr. Barry's face -- I mean, excuse me, Mr. Noonan's face,
25 certainly not the boy's, he looks like he's asleep, right?

Chappell - Cross by Mr. Jarvis

1   A.   In my opinion, actually there is.

2   Q.   In their faces?

3   A.   His -- well, I wouldn't say coyness, but his face, it's --

4   to me it's an odd expression.

5   Q.   Okay.  But there's no evidence that it was intended at the

6   time it was taken to elicit a sexual response in the viewer, is

7   there?

8          MS. ZACK:  Objection.  Calls for speculation.

9          THE COURT:  I'll sustain that objection.

10  BY MR. JARVIS:

11  Q.   Do you have any evidence or information saying that when it

12  was taken it was intended to cause a sexual response in the

13  viewer?

14  A.   No, sir.

15  Q.   All right.  Then let's go to 4r.  This is another one in

16  the bedroom pictures.  One of the boys is holding a Superman

17  picture, correct?

18  A.   Yes, sir.

19  Q.   And the dog is in the picture, right?

20  A.   Yes, sir.

21  Q.   And you can't see the boy's penis, can you?

22  A.   No, sir.

23  Q.   But you can see Mr. Noonan's, right?

24  A.   Correct.

25  Q.   And it looks like Mr. Noonan is looking at the dog, not at

Chappell - Cross by Mr. Jarvis

1  the camera, correct?
2  A.  Possibly the dog or the picture, yes, sir.
3  Q.  Either one.  And the boy's face is definitely looking at
4  the person or thing or the camera, right?
5  A.  Correct.
6  Q.  And in that one, that's the angle, again, that is --
7  suggests that the other boy took the picture, correct?
8  A.  It's possible, yes, sir.
9  Q.  And there's no erect penises, right?
10  A.  No, sir.
11  Q.  And you don't have the boy anywhere near Mr. Noonan's
12  penis, correct?
13  A.  No, sir.
14  Q.  And it doesn't appear that Mr. Noonan is touching him
15  anyplace in inappropriate, correct?
16  A.  No, sir.
17  Q.  And there's no sexual coyness or leering in the picture,
18  right?
19  A.  No, sir.
20  Q.  And you can't even tell if the boy is nude?
21  A.  Correct.
22  Q.  So, there's not -- that's not an unnatural pose either, is
23  it?
24  A.  No, sir.
25  Q.  It's just the boy showing a picture to whoever is taking

Chappell - Cross by Mr. Jarvis

1   the picture, right?

2   A.  Yes, sir.

3   Q.  Okay.  And then moving to 4s, this is Mr. Noonan, the dog

4   again, looks like the cat's joined in, and one of the boys on

5   his right side, correct?

6   A.  Yes, sir.

7   Q.  And, again, the angle is such that it looks like somebody

8   short, like the other boy, took the picture, right?

9   A.  It's possible, yes, sir.

10  Q.  And you can see Mr. Noonan's right hand on or close to the

11  boy's buttocks, correct?

12  A.  Yes, sir.

13  Q.  But other than that, the boy is not looking at the camera,

14  and there's no erect penises, correct?

15  A.  No, sir.

16  Q.  And it doesn't look like Mr. Noonan has any type of

17  expression on his face, other than just looking at the camera,

18  correct?

19  A.  Correct.

20  Q.  And so this is not an unnatural pose for a young person to

21  be cuddled up in the arm or the side of a grownup, is it?

22  A.  Yes -- to me, yes, sir, it is, given the fact that they're

23  both nude and the fact that that is not Mr. Noonan's child and

24  they're in the bed nude together and in a cuddling position,

25  that does strike me as unnatural.

Chappell - Cross by Mr. Jarvis

1   Q.  If they're nudists, would that be unnatural for people that
2   are naked inside the house?
3   A.  Again, a small child with an adult male, who is not related
4   to him, nude in the bed in this position, yes, sir, that would
5   be unnatural.
6   Q.  If they were clothed would that be?
7   A.  It wouldn't be as unnatural, but it would still seem
8   strange to me, yes, sir.  I would still question that.
9   Q.  And you don't know when this picture was taken, right?
10  A.  No, sir.
11  Q.  But according to what we received today, it was created,
12  which means put on the computer, June 18th, 2010, right?
13  A.  That is correct.
14  Q.  Okay.  And you don't have any evidence today that David
15  Barry knew this picture was being taken, right?
16  A.  No, sir.
17  Q.  And you don't have any evidence that he gave Mr. Noonan
18  permission or one of the boys permission to take this picture,
19  right?
20  A.  No, sir.
21  Q.  And you don't have any evidence that he intended for this
22  to be child pornography or to elicit a sexual response to a
23  viewer, correct?
24  A.  No, sir.
25  Q.  All right.  Then going to 4t.  This is what y'all have

Chappell - Cross by Mr. Jarvis

1    labeled the Band-Aid picture, Band-Aid on leg.  The dog and the

2    boy.  Now, the boy obviously is naked.  But there's not an

3    adult in there, correct?

4    A.  No, sir.

5    Q.  And it looks like the boy's petting the dog, right?

6    A.  Yes, sir.

7    Q.  So that wouldn't be an unnatural pose, for a boy to pet a

8    dog, would it?

9    A.  No, sir.

10   Q.  And they're laying on a floor, which is generally where

11   dogs lay.  So that wouldn't be an unnatural place for a boy to

12   pet a dog, would it?

13   A.  No, sir.

14   Q.  So there's no suggestion in the boy's face that I can tell

15   that it's some kind of a sexual coyness or anything like that,

16   right?

17   A.  No, sir.

18   Q.  And without an adult around, there's no sexual coyness on

19   the part of an adult to add to the picture, right?

20   A.  No, sir.

21   Q.  So do you have any evidence that it was intended to elicit

22   a sexual response from a viewer?

23   A.  At the time the picture was taken, no, sir.

24   Q.  What about at a later time?

25   A.  No, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  Okay.  So there's nothing about this, other than the
2   nudity, that suggests it could be considered child pornography,
3   correct?
4   A.  Yes, sir.
5   Q.  All right.  And that one is out of the "Craig Houston"
6   file, correct?
7   A.  "Craig Houston" and then the subfolder "Craig H."
8   Q.  And that was created on June 13th, 2010, right?
9   A.  Correct.
10  Q.  Does your information you gave us today show us where or if
11  it went someplace else?
12  A.  In what way?  What do you mean, sir?
13  Q.  That it left that computer and was transferred someplace
14  else?
15  A.  No, sir.
16  Q.  Okay.  Do you have that information some place --
17  A.  No, sir, there's no information indicating that.
18  Q.  Let me ask my question first.  Because you're answering it,
19  but I'm making sure I understand it.  You can tell from your
20  forensic analysis of the computer if a picture was sent or IMed
21  someplace else, right?
22  A.  And depending on the circumstances, sometimes, yes, sir, we
23  can.
24  Q.  All right.  And you don't have that information for this
25  picture, correct?

Chappell - Cross by Mr. Jarvis

1    A.  No, sir, I do not.

2    Q.  Well, on the documents you gave us today, where would that

3    information be?

4    A.  That would be culled from some other area of our program or

5    software, such as an Instant Messenger program that may have

6    listed what files were sent out.  This file path and property

7    data for the file would not indicate if it was ever sent via

8    e-mail, Instant Messenger, or anything like that.

9    Q.  Okay.  So the information you gave us this morning does not

10   contain that?

11   A.  Right.  It does not show that ever.

12   Q.  Okay.  That's what I was trying to make sure, that I wasn't

13   missing something.  But do you have that information?

14   A.  Not on this file, because this file didn't have anything.

15   The files that do have that are -- is what's been provided.

16   Like the Instant Messenger chats, that's what I have for

17   Instant Messenger, that's all that's there.   The Messenger

18   cache, those images that was part of an Instant Messenger

19   program.  That's what I have.

20   Q.  Okay.  So you don't have any information about any of these

21   pictures being e-mailed, attached to an e-mail?

22   A.  Correct, I do not have any, no, sir.

23   Q.  Well, are you able to figure that out?

24   A.  Yes, sir, it was looked -- the information was not

25   available.  It's not there.

Chappell - Cross by Mr. Jarvis

1  Q.  Okay.  So that either means nobody sent from the computers
2  through e-mail these pictures, or what?
3  A.  Or that in the e-mail services that were used are Web-based
4  and the computers don't maintain a lot of the information
5  anymore, as opposed to AOL or Outlook, which in the past you
6  download the program to your computer and it saves that
7  information and saves your library and PST files and stuff to
8  your computer.  Web-based e-mails don't do that.  They're
9  Web-based.  So you end up with Internet caches and stuff, and
10  those are wiped.  And so the information could have been there
11  at one time and then wiped over.  It's just -- it's hit or miss
12  as to whether or not -- what we're going to recover in that
13  area.
14  Q.  All right.  So you can't tell the Court whether or not it
15  was e-mailed someplace else, because either it wasn't or that
16  information doesn't exist?
17  A.  Correct.
18  Q.  Okay.  All right.  Let's move to -- well, I hope I asked --
19  but you don't have any information that Mr. Barry knew about
20  this picture at the time it was taken, gave permission for his
21  son to be in that picture, or intended for it to be any type of
22  child pornography, correct?
23  A.  No, sir.
24  Q.  And he was -- you don't have any information that he was
25  even aware that this picture was being taken, right?

Chappell - Cross by Mr. Jarvis

1   A.  Correct.

2   Q.  Or that he allowed Mr. Noonan to take this picture?

3   A.  Correct.

4   Q.  Or the other son, if that's who took the picture, correct?

5        MS. ZACK:  Your Honor, I'm not objecting, but because

6   this information was asked for and because Special Agent

7   Chappell prepared it and we all have copies of it, I would ask

8   that this be admitted as Government's 30 so it becomes part of

9   the record so that there is some --

10        THE COURT:  Any objection?

11        MR. JARVIS:  Yes, ma'am.  This should have been

12   provided months and months ago.  I asked for something just

13   like this.  I said make me a list --

14        THE COURT:  From what I've been told -- I'm sorry.

15   Make you a list of all of the photographs?

16        MR. JARVIS:  Make me a list like this that I have

17   gotten in the past in other child pornography cases, you black

18   out and put a description and then it matches up and then it's

19   something that I can take to my computer guy and compare to

20   what he's found out.  But my computer guy can't look at this,

21   because it doesn't have the picture.  And I asked for something

22   like this months ago, so --

23        THE COURT:  What's your response?

24        MS. ZACK:  I would ask that Special Agent Chappell

25   respond to that, because he dealt with all of the evidence

1  review in this case and he can better attest to that.  We have
2  never refused anything to Mr. Jarvis.  We have made everything
3  continuously available.
4      THE COURT:  Okay.  I need a response to the question
5  of whether in response to his request for this kind of list
6  there was a decision made -- A, whether you understood that
7  that request was made and if not, what was provided.  I
8  understand --
9      MS. ZACK:  If this specific request was made, I do not
10  recall that request being made.
11      THE COURT:  All right.
12      MS. ZACK:  I know that a great many things were
13  requested and everything -- it's my understanding everything
14  that was requested was provided by Special Agent Chappell.
15  This material has been continuously available.  His expert had
16  access to this material, was never denied it, came in --
17      THE COURT:  Okay.  This material is really a very
18  broad label.  Can you be more specific?
19      MS. ZACK:  I'm sorry.  The creation dates associated
20  with the images associated in Government's Exhibit No. 4.
21      THE COURT:  Okay.
22      MS. ZACK:  And the fact that this was Government's
23  Exhibit No. 4 has been made available and what these images
24  were for over a month now, because the notebook has been
25  prepared.  They saw it at, I believe, two separate pretrial

Chappell - Cross by Mr. Jarvis

 1   conferences and up until yesterday to have this prepared in
 2   this manner had never been requested in this way.  And we don't
 3   deny information to the defense when the information is
 4   available.
 5              The only issue would have been if depending on
 6   how something might be requested, if it is too voluminous or
 7   too onerous because of the child pornography.  As Your Honor
 8   can see, the pictures are provided in this.  I couldn't turn
 9   this over to him in this format.  This could have never been
10   turned over like this because it contains child pornography.
11   So I don't know what was asked for specifically, but if -- this
12   information has all been continuously available and no one came
13   to me -- Mr. Jarvis never came to me and said, "You're not
14   giving me that.  Why aren't you giving me this?  I'm asking for
15   this information.  I've asked Special Agent Chappell for this
16   information.  He hasn't given it to me."  And none of that, I
17   think, Your Honor, goes to whether or not this is admissible.
18   This information is already contained in --
19              THE COURT:  You keep saying "this," and it's really
20   very --
21              MS. ZACK:  I'm sorry.  The file path information for
22   each and every picture that we have is already contained in the
23   forensic images of these computers that has already been
24   admitted into evidence.  This item is already in evidence.  All
25   I'm asking for is that we mark this -- these specific pages to

Chappell - Cross by Mr. Jarvis

1   make a better record.

2        MR. JARVIS:  And, Judge, I would like to clarify, that

3   Agent Chappell and the U.S. Attorney's Office has been

4   wonderful to work for and have not hidden and I'm not accusing

5   them of that at all.  They have always answered our calls and

6   responded.  I did send Ms. Zack an e-mail about three weeks

7   ago, I believe, maybe a month ago, asking for the pictures she

8   intends to use with a black mark across the boys' privates,

9   because they sent us some pictures out of Mr. Barry's

10  computers, and they're already in evidence, where she had

11  blacked out their privates and sent those to us.

12        And so I responded by saying, Why don't you do

13  that with all the other pictures, because I can't communicate

14  with my computer expert, because he doesn't have the pictures

15  in front of him.  And then to have him have to come to Houston

16  every time to go through all of that is an onerous burden on

17  us, when they've already put black marks across it.  That's

18  what I've gotten from U.S. attorneys in the past, is a picture

19  with either a black or description of the picture so my

20  computer guy can look at the picture and say it started here,

21  went to here and went to there.  Without the actual picture, he

22  can't do that.  So --

23        THE COURT:  All right.  I'm going to -- and I

24  certainly agree that it will be helpful for the record to have

25  this marked and admitted as an exhibit and that way we will all

Chappell - Cross by Mr. Jarvis

1    know what it is we are referring to.

2                    I am unclear that your expert has not been able

3    to get all the information that he needs.  If he's going to

4    testify, then you can explore that further and we can deal with

5    any holes in his access to information that may exist.  I'm not

6    persuaded that there are any.  But certainly I agree that this

7    should be marked and admitted as exhibit.  What would the

8    number be?

9            MS. ZACK:  30, Your Honor.

10           THE COURT:  All right.  It's admitted.  Thank you.

11           MS. ZACK:  Thank you, Your Honor.

12           THE COURT:  Go ahead, please.  Go ahead, please.

13           MR. JARVIS:  Yes, ma'am.

14   BY MR. JARVIS:

15   Q.  Let's go to 4u, I believe is our next one.

16   A.  Yes, sir.

17   Q.  Now, this is the picture probably either right before or

18   right after the picture before it.  Would that be a fair

19   statement --

20   A.  Yes, sir.

21   Q.  -- the boy and the dog?

22   A.  Correct.

23   Q.  Okay.  And it certainly looks like this was taken by

24   someone who isn't good with cameras apparently or good enough

25   to get the boy and the dog in the frame, right?

Chappell - Cross by Mr. Jarvis

1   A.   Yes, sir.

2   Q.   And, again, the angle suggests that it was the other

3   brother that took the picture, correct?

4   A.   It's possible, yes, sir.

5   Q.   Or I guess the timer could have taken this one, right?

6   A.   Possible, yes, sir.

7   Q.   And while the boy's genitalia is showing, it doesn't look

8   like it's any kind of sexual pose, does it?

9   A.   No, sir.

10  Q.   Was that a "no"?  I'm sorry.

11  A.   No, sir.

12  Q.   Thank you.  And the boy is smiling and it looks like he's

13  just kind of laying down on the dog, right?

14  A.   Correct.  Yes, sir.

15  Q.   Okay.  So there wouldn't be anything in this being child

16  pornography, would there?

17  A.   I still view it as -- my opinion, it's still child

18  pornography, sir.  It's still a nude child whose penis is

19  clearly visible.  It's -- again, he's laying against the dog.

20  It's not necessarily a sexual pose, but it could still elicit

21  depending on the viewer and what they want to see out of the

22  picture.

23  Q.   Well, that's -- so, in your opinion, based on this picture,

24  any nude photograph showing the little boy's penis is going to

25  be child pornography?

Chappell - Cross by Mr. Jarvis

1  A.  It's possible, yes, sir, depending on the person looking at

2  the picture, yes, sir.

3  Q.  Well, if that's the case, then why aren't pictures of

4  clowns considered child pornography?  Because it depends on

5  whether or not the viewer has a fetish for clowns, right?

6  A.  Is the clown nude?  And the child, are their genitalia

7  showing?  That's part of it as well.  And in this case his

8  genitalia is clearly visible.

9  Q.  But my question is, though, if your definition of it is

10  whatever turns on the viewer, whether it's nude sexual poses,

11  provocative clothes or a clown suit?

12  A.  No, sir, that's not what I said.  I said that's part of the

13  viewer looking at it.  And, in my opinion, looking at this

14  picture, it is being able to see his genitalia, laid across the

15  bed with the dog, to me it's -- in my opinion, it's child

16  pornography.

17  Q.  And you understand that mere nudity is not sufficient.  You

18  have a right to be naked, don't you?

19          MS. ZACK:  Objection.

20          THE COURT:  I'm going to sustain the objection to the

21  way the question is phrased.

22  BY MR. JARVIS:

23  Q.  Well, there's no evidence that Mr. Barry knew this picture

24  was taken, correct?

25  A.  No, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  Or that he instructed or induced or told somebody to take
2  that picture, correct?
3  A.  No, sir.
4  Q.  And there's no evidence that he intended for it to be child
5  pornography when it was taken, right?
6  A.  No, sir.
7  Q.  Or at any other time, correct?
8  A.  Yes, sir.
9  Q.  Okay.  We don't even know if Mr. Noonan was available or
10 took that picture, right?
11 A.  No, sir.
12 Q.  And there's no evidence on any of the pictures I've talked
13 about so far that Mr. Noonan or Mr. Barry conspired or
14 discussed or made some type -- any type of agreement that
15 you're aware of to take these pictures, correct?
16        MS. ZACK:  Objection.  Calls for a legal conclusion.
17        THE COURT:  Sustained.
18 BY MR. JARVIS:
19 Q.  Do you have any evidence suggesting that?
20        MS. ZACK:  Objection.  Again, calls for a legal
21 conclusion.
22        THE COURT:  Does he have any evidence suggesting that.
23 I'm going to allow that question.
24 A.  Suggesting?
25 BY MR. JARVIS:

Chappell - Cross by Mr. Jarvis

1  *Q.*  That they made some type of agreement to create these

2  pictures?

3  *A.*  No, sir.

4  *Q.*  Okay.  All right.  Then 4v, this is the backyard swimming

5  pool, barbecue pictures.  This is Craig Noonan, unknown child,

6  and the two, O.B. and R.B., correct?

7  *A.*  Correct.

8  *Q.*  Now, other than the mere nudity, Mr. Noonan's hands are not

9  in an inappropriate position, are they?

10  *A.*  Inappropriate, yes, sir.  Again, they're all nude.  Three

11  nude children that are not related to him.  He has his arm

12  around one, holding him.  The third child on the far left is

13  leaning against Mr. Noonan and is touching and holding his own

14  penis.

15  *Q.*  Okay.  But let's go to Mr. Noonan.  He's got one arm

16  wrapped around the bicep of a child.  And one -- excuse me,

17  hand around the bicep and a hand around the thigh of the

18  child -- of the other child.  Looks pretty far away from any

19  closeness to his penis.  So what would be sexual about a man's

20  hand on a bicep and a thigh?

21  *A.*  Well, you said inappropriate.  I was responding.  It's

22  they're nude.  He's not related to these children.  They're all

23  together and he has his arm around one, across his chest and

24  arms, and the other child is resting his buttocks on his arm.

25  To me that is inappropriate.

Chappell - Cross by Mr. Jarvis

1   *Q.*  But those wouldn't be an unnatural pose for taking a

2   picture, correct?

3   *A.*  Those three, no, sir.

4   *Q.*  Okay.  I mean, this could have been a picture taken at a

5   nudist resort and that would be legal, couldn't it?

6   *A.*  Possibly, yes, sir.

7   *Q.*  So if it's in somebody's private backyard, why is it

8   illegal?

9          *MS. ZACK:*  Objection.  Calls for a legal conclusion.

10          *THE COURT:*  Sustained.

11  BY MR. JARVIS:

12  *Q.*  Well, there's no sexual coyness or suggestion by anybody,

13  right?

14  *A.*  The child on the left is touching his penis.

15  *Q.*  Does he appear to be doing anything other than just have

16  his hand there?  I mean, he's not holding it or masturbating or

17  simulating masturbation, correct?

18          *MS. ZACK:*  Objection.  Calls for speculation.  This is

19  a still photograph.

20          *THE COURT:*  If he can tell.  If he can tell.

21  *A.*  It's a still photograph.  I wouldn't be able to tell if

22  there's any motion or not.  The hand -- but the hand is on his

23  penis, and it looks like he's touching it more than just his

24  hand resting there.  His fingers appear to be curved around it.

25  BY MR. JARVIS:

Chappell - Cross by Mr. Jarvis

1  Q.  All right.  You don't have any information that Mr. Barry
2  knew about this picture or gave permission for it, correct?
3  A.  No, sir.
4  Q.  Or that he intended for it to be child pornography,
5  correct?
6  A.  No, sir.
7  Q.  Or that he agreed with Mr. Noonan that he could or somebody
8  could take the picture?  Obviously Mr. Noonan didn't, right?
9  A.  Right, Mr. Noonan agreed, yes, sir.
10  Q.  Okay.  But you don't have any information that Mr. Barry
11  agreed with Mr. Noonan?
12  A.  No, sir.
13  Q.  Okay.  Then that one, though, it shows on the -- I guess
14  the Government's Exhibit 30 brought today, this one and the
15  next one are created June 1st, 2010, correct?
16  A.  This one actually has two created dates, because it was in
17  two separate locations, 4v, that we're talking about.  And
18  then, yes, 4w was June 1st as well.  It actually has two
19  created dates.
20  Q.  All right.  Let me make sure I understand this.  4v which
21  is the first one of these two?
22  A.  Correct.
23  Q.  But it certainly looks like they're the same in a series.
24  Would that be a fair statement?
25  A.  It's the same picture, yes, sir.  If you look at 4v, the

Chappell - Cross by Mr. Jarvis

1  very next entry isn't 4w.  It's the same picture, because it's

2  created in a different folder.  So I put both create dates

3  there.

4  Q.  I'm sorry.  I'm looking at the actual pictures, not your

5  deal.

6  A.  Oh, okay.

7  Q.  But 4v and 4w in the notebook are the same in a series, one

8  right after another?

9  A.  Yes, sir.  Correct.

10  Q.  Okay.  But on 4v, we've got a created 6-1 and then again on

11  6-18, correct?

12  A.  Correct.

13  Q.  So how does it get created twice?

14  A.  It was copied or moved to a different folder.

15  Q.  So it was in the created "Craig Houston" folder first,

16  correct?

17  A.  Yes, sir.

18  Q.  Because it was created on 6-1-2010, right?

19  A.  Correct, with a different file name.

20  Q.  Okay.  And then somebody created it again on June 18th,

21  2010, with another file name, "David and the boys," right?

22  A.  Correct.  In a different folder, yes, sir.

23  Q.  Okay.  Did you see that occur in other pictures?

24  A.  Yes, sir.  The ones in 4a that we're reviewing now, the

25  ones that are that way have been listed this document, in

Chappell - Cross by Mr. Jarvis

1    Exhibit 30.

2    Q.  So somebody had to take the picture before June 1st, either

3    on or before June 1st, right, on v?

4    A.  Correct.

5    Q.  And then they took from the camera to a computer -- do you

6    know which computer it went to?

7    A.  Well, this was created on Mr. Barry's computer on June 1st.

8    Q.  Okay.  So somebody took it from the camera June 1st or

9    before and put it on Mr. Barry's computer?

10   A.  On -- put it on Mr. Barry's computer on June 1st, yes, sir.

11   Q.  Right.  I'm with you.

12   A.  Correct.

13   Q.  All right.  And then somebody took it from either

14   Mr. Barry's computer or the camera and put it on Mr. Noonan's

15   computer on 6-18?

16   A.  No, sir.  This is Mr. Barry's computer both times.

17   Q.  Well, why would somebody put the same picture on there both

18   times?

19          MS. ZACK:  Objection.  Calls for speculation.

20          THE COURT:  Sustained.

21   BY MR. JARVIS:

22   Q.  So is this picture anywhere on Mr. Noonan's computer?

23   A.  No, sir.

24   Q.  That you could find?

25   A.  Correct.

Chappell - Cross by Mr. Jarvis

1    Q.  So what camera was it taken with?

2    A.  Mr. Noonan's.

3    Q.  So Mr. Noonan's camera is made -- makes the pictures, but

4    it never makes it to Mr. Noonan's computer?

5    A.  It wasn't on his computer, no, sir.

6    Q.  Was that because it never got there or you just didn't find

7    it?

8              MS. ZACK:  Objection.  Calls for speculation.

9              THE COURT:  If he knows.

10   A.  I don't know if it ever made it on there, because there's

11   no evidence.  It was not in an allocated.  So, I don't know if

12   it was overwritten or if he just never downloaded that

13   particular photograph to his computer.

14   BY MR. JARVIS:

15   Q.  So it's a 50/50 shot either way?

16   A.  Either way, yes, sir.

17   Q.  Okay.  Well, and then the same questions for 4w, which is

18   the -- in your list, the second in the series of the pool

19   pictures, right?

20   A.  Yes, sir.

21   Q.  Would your answers be the same of the questions already

22   asked?

23   A.  Yes, sir.

24   Q.  Okay.  Then 4x, this is Mr. Noonan and one of the boys,

25   correct?

Chappell - Cross by Mr. Jarvis

1    A.   Correct.

2    Q.   And you can barely see the boy's penis there on the almost

3    far left side, correct?

4    A.   That is correct.

5    Q.   And the expression on their faces doesn't seem to be very

6    sexual, does it?

7    A.   No, sir.

8    Q.   It's kind of, I guess, sticking their tongue out or doing a

9    raspberry at whoever is doing the camera, right?

10   A.   Correct.  Yes, sir.

11   Q.   So that wouldn't be considered a sexual focus or pose,

12   would it?

13   A.   No, sir.

14   Q.   And then the Buzz Lightyear doll is in there.  The same one

15   that you say we see in the other pictures, correct?

16   A.   Correct.

17   Q.   And other than -- and you can't even tell, I guess, what

18   the setting is on this one, whether it's in the bedroom or den

19   or anyplace, can you?

20   A.   No, sir.

21   Q.   So there's no sexually suggestive setting.  It's not an

22   unnatural pose, no sexual coyness, and then you have -- the

23   focal point, where would be the focal point be?  The faces?

24   A.   It could be.  It's one possibility, yes, sir.

25   Q.   And, again, it looks like it was taken at the angle that

Chappell - Cross by Mr. Jarvis

1   suggests one of the other brothers took the picture, correct?

2   A.  It's possible, yes, sir.

3   Q.  Or maybe a timer, right?

4   A.  Possible, yes, sir.

5   Q.  And you don't have any evidence that Mr. Barry knew this

6   was being taken at the time it was taken, correct?

7   A.  That is correct.

8   Q.  Or that he agreed with Mr. Noonan to allow him to take this

9   picture or to have one of the boys take the picture, right?

10  A.  That is correct.

11  Q.  And there's no information that you have saying that he

12  told the boys to take the picture, correct?

13  A.  That is correct.

14  Q.  Or that he induced them or coerced them or in any way,

15  encouraged them to take any of these pictures, right?

16  A.  Correct.

17  Q.  Okay.  And then moving to 4y -- in Government's Exhibit 30,

18  you have a 4y?

19  A.  Yes, sir.

20  Q.  But on the list provided to us, there's not a y.  It goes

21  w, x, z on the amended exhibit list.  Maybe I have the one

22  before.

23          MS. ZACK:  You're confusing it with Government's

24  Exhibit 6a, which contains the EXIF data.  We don't have EXIF

25  data for all of those pictures.  And so if you look at the --

Chappell - Cross by Mr. Jarvis

1          MR. JARVIS:  See if you can find the page.  I'm sorry.
2      (Mr. Jarvis and Ms. Minick conferring.)
3          MS. ZACK:  That's the wrong version.  The one in your
4  notebook has --
5          MS. MINICK:  You said that yesterday.
6          MS. ZACK:  No, that's in 6.  In 4 there absolutely is
7  a y.
8          MR. JARVIS:  Okay.
9  BY MR. JARVIS:
10  Q.  All right.  So this picture is Mr. Noonan and one of the
11  boys laying on his lap faced towards the camera, correct?
12  A.  That's correct.
13  Q.  And that was created on 9-16-2010, right?
14  A.  That is correct.
15  Q.  Now, you can see the boy's penis barely off to the right,
16  correct?
17  A.  Yes, sir.
18  Q.  And it looks like Mr. Noonan is smiling, if you can call
19  that a smile, right?
20  A.  Yes, sir.
21  Q.  So there's no sexual coyness by the child or Mr. Noonan
22  that I can see.  Would you agree with that?
23  A.  For the child, I -- to me there is.  An expression on his
24  face, the way he's laying, it's a little more suggestive to me,
25  yes, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  Well, it's just laying on his lap.  That wouldn't be an
2  unnatural pose for a child, to lay on a grownup's lap, correct?
3  A.  An adult male not related to him, appears to be nude, the
4  child is nude, yes, sir, to me that's unnatural.
5  Q.  But if they have clothes on, it wouldn't be unnatural.
6  Would that be a fair statement?
7  A.  It would be less unnatural, but it's still, again, not
8  related to the child.  Laying like that would still be
9  unnatural to me, just not as unnatural as this.
10  Q.  And the focal point I'm assuming is Mr. Noonan or maybe the
11  face of the boy, because the camera isn't directed towards the
12  private parts of the child, correct?
13  A.  Yeah, Mr. Noonan's centered on it, but given where the
14  child's head is at and being able to see his penis, it quickly
15  because the focal point in this picture.
16  Q.  In your opinion?
17  A.  Yes, sir.
18  Q.  Okay.  But there's no information that you have that it was
19  intended or designed to elicit a sexual response when it was
20  taken, correct?
21  A.  No, sir.
22  Q.  And there's no information that you have that Mr. Barry
23  knew about this picture when it was being taken?
24  A.  No, sir.
25  Q.  And that he agreed to allow Mr. Noonan to be in this

Chappell - Cross by Mr. Jarvis

1   picture with this child -- his child, right?

2   A.  That is correct.

3   Q.  Or that he intended it to be child pornography at any time,

4   correct?

5   A.  That is correct.

6   Q.  And there's no information that he was even around when

7   this picture was taken, as far as being in the room and seeing

8   it being taken?

9   A.  That is correct.

10  Q.  Okay.  And, again, the angle is such that it looks like

11  it's probable the other boy took the picture?

12  A.  It's possible, yes, sir.

13  Q.  Okay.  Now, this one, though, was created 9-16 --

14  A.  Correct.

15  Q.  -- at 11:38 p.m.  And that's when it was put on somebody's

16  computer, right?

17  A.  Yes, sir.

18  Q.  Mr. Barry's computer?

19  A.  Correct.

20  Q.  And it was taken with Mr. Noonan's camera?

21  A.  I do not know, sir.

22  Q.  How do we not know that?

23  A.  Because there's no EXIF data.  This is a recovered image

24  from Messenger cache.

25  Q.  Okay.  But didn't you check Mr. Noonan's camera and find

Chappell - Cross by Mr. Jarvis

1  his remnants of the pictures taken on his camera?

2  A.  Some were there and some weren't.

3  Q.  So your -- I'm not trying to be mean, but I just want to

4  make sure I understand.  Your forensic analysis is more of a

5  science -- I mean, an art than an exact science, because you're

6  not able to recover everything, are you?

7          MS. ZACK:  Objection.

8          THE COURT:  What's the objection?

9          MS. ZACK:  It's to the characterization that it's not

10  a science.

11          THE COURT:  He's an expert on computer forensics.  I

12  think he can answer the question, if it can be answered.  If it

13  can't, he can say that too.

14          THE WITNESS:  Yes, ma'am.

15  A.  It is a science.  Obviously not everything is recoverable

16  due to factors that are beyond control of the forensic analysts

17  due to files being overwritten, files not being loaded on a

18  particular computer or media.  There's any myriad of different

19  reasons why a file cannot be or is not recovered.

20  BY MR. JARVIS:

21  Q.  And I'm not disparaging you or your techniques.  I'm just

22  saying you're right, because of all those other factors, it's

23  not a math equation where two plus two is going to equal four

24  every time.  You go in and you have to piece it together using

25  the tools you have and sometimes you're successful in getting

Chappell - Cross by Mr. Jarvis

1  everything and sometimes you're not.  And that's not anybody's
2  fault.  That's just the way it is, right?
3  A.  Correct.
4  Q.  Okay.  So it's not an ironclad proof that it was either not
5  on there or on there if you find it or don't find it, because
6  there's a lot of variables that means that just because you say
7  it's not on there doesn't mean it wasn't ever on there at one
8  time?
9  A.  That is correct.
10  Q.  All right.  And the vice versa is true.  These are not
11  completely accurate because you can't get to everything
12  sometimes, right?
13  A.  I don't understand.  Not accurate in what way?
14  Q.  Well, if you can't tell us when it was made through the
15  camera or when it was put on or if it was on Mr. Noonan's
16  computer, then that leaves a gaping hole on how it got into
17  Mr. Barry's computer, right, through no fault of your own?
18  A.  No, you're correct, I cannot answer how it got onto
19  Mr. Barry's computer.  I can only show that it was on
20  Mr. Barry's computer and it was created in the Messenger cache.
21  Q.  So one explanation is somebody e-mailed it to him or
22  messengered it to him, right?
23  A.  Possibly, yes, sir.
24  Q.  Another explanation is that somebody could have put it on a
25  disk and put it in his computer?

Chappell - Cross by Mr. Jarvis

1   *A.*  That is highly improbable with the Messenger cache.  It's
2   either he sent it or he received it.
3   *Q.*  Okay.  For him to have sent it to somebody, he would have
4   to have it on his computer first?
5   *A.*  Or some media attached to his computer.
6   *Q.*  Okay.  A part of his computer.  He would have to have it,
7   possess it, and then send it, right?
8   *A.*  Correct.
9   *Q.*  Okay.  And you don't have any evidence of that, though, for
10  this picture?
11  *A.*  Correct.
12  *Q.*  So you can't tell us if it was ever on his -- what I call
13  the main part of his computer, not the Messenger part.  Is that
14  fair?
15  *A.*  I don't have information as to where this file resided
16  outside of the Messenger cache.  I only know it only resides in
17  the Messenger cache at that date and time.
18  *Q.*  Okay.  All right.  Well, let's go to the next picture.  All
19  right.  These are the -- is this one of the O.B. or R.B.'s?
20  Can you tell, 4z?
21  *A.*  I'm not sure which.  I just know it's one of the Barry
22  children.
23  *Q.*  Okay.  And he appears to be nude.  But it's really hard to
24  tell in this picture, isn't it?
25  *A.*  In this picture it is.  The -- because it's a digital

Chappell - Cross by Mr. Jarvis

1  graphics, it actually -- the actual image itself appears better
2  on a computer when you see it natively.  So, in that case you
3  can tell.  This is obviously a printed copy, so it's not as
4  clear.
5  Q.  Okay.  But there's nobody else in the picture but the boy,
6  right?
7  A.  No, sir, just the boy.
8  Q.  And it looks like it's at the same angle that would suggest
9  that the other brother took the picture?
10  A.  Possible, yes, sir.
11  Q.  Or a timer even?
12  A.  Possible, yes, sir.
13  Q.  And I can't tell from the face, but it doesn't look like
14  there's any sexual coyness.  He's just standing there having
15  his picture taken?
16  A.  Correct.
17  Q.  He's not actually doing anything, just standing there,
18  right?
19  A.  Correct.
20  Q.  Just a naked little boy, right?
21  A.  Correct.
22  Q.  So it's not an unnatural pose.  It's not an unnatural
23  setting.  There's no sexual coyness, correct?
24  A.  Correct.
25  Q.  So other than the nudity, there's nothing there to say it

Chappell - Cross by Mr. Jarvis

1   should be considered child pornography, right?

2   A.   Correct.

3   Q.   And yet you still have it in there as child pornography?

4   A.   Yes, sir.

5   Q.   So -- okay.   And there's nothing to suggest and you don't

6   have any evidence that David Barry knew this picture was being

7   taken, encouraged it, enticed the child, or anything along that

8   nature, correct?

9   A.   Correct.

10  Q.   Or that he conspired with Mr. Noonan to have this picture

11  taken?

12  A.   Correct.

13  Q.   Or that he, Mr. Barry, intended for this to be child

14  pornography at the time it was taken?

15  A.   Correct.

16  Q.   Okay.   Then we have the unknowns, 4aa, bb, cc, dd, ee, ff,

17  gg.   And ff and gg are duplicates, right?

18  A.   Correct.

19  Q.   Okay.   So there's really only six?

20  A.   Correct.

21  Q.   All right.   And then looking at aa, when was that created?

22  A.   On 11-20 of 2010.

23  Q.   And were all these created on 11-20, 2010?

24  A.   No, sir.

25  Q.   No?

Chappell - Cross by Mr. Jarvis

1  A.  No, sir.

2  Q.  Okay.  So they were put on Mr. Barry's computer two

3  different times?  Is that what that means?

4  A.  One, two -- on two different dates.

5  Q.  12-18-2010 and 11-20-2010; is that correct?

6  A.  That is correct.

7  Q.  And somebody, it looks like, sent that to him, correct?

8  A.  That's one possibility.

9  Q.  All right.  And it doesn't show from what you gave us today

10 on Government's Exhibit 30 that they were opened up, correct?

11 A.  What are you referring to?  I'm not --

12 Q.  Your Government's Exhibit 30.

13 A.  Correct.

14 Q.  All right.  And they weren't obviously not saved to

15 Mr. Barry's computer?  You didn't find any evidence of that?

16 A.  They're saved in a different location?

17 Q.  Yes, sir.

18 A.  No, sir, I didn't have any evidence of that.

19 Q.  So these were all in his Messenger cache and not saved,

20 right?

21 A.  They were saved to -- I mean, they were saved on his

22 Messenger cache.  If you're asking if they were saved to a

23 different location, no, sir, I don't have any evidence of that.

24 Q.  All right.  So they're saved automatically in the Messenger

25 cache?

Chappell - Cross by Mr. Jarvis

1   A.   Correct.

2   Q.   If they go, they stay.   But in order to keep them on your

3   computer and put them some place, you would create a file or a

4   folder and you would save them to that file and folder so you

5   can look at them again, right?

6   A.   Correct.

7   Q.   And, in fact, I think in the other part of your -- of the

8   Government's exhibit, it says these were carved.   Doesn't that

9   mean deleted?

10  A.   No, sir, carved does not mean deleted.   Carved means that

11  they were extracted -- you can carve from any number of

12  different types of files.   A database file, unallocated, which

13  means they're deleted.   You can carve from any number of system

14  files, system volume information.   Carving just means

15  extracting a file.

16  Q.   What does extracting mean?

17  A.   The extracting means pulling the file out.   In this case

18  this was carved from the Messenger cache.   It's not a deleted

19  file.   It resided in allocated space on the Messenger cache.

20  Does that make sense?   It's not a deleted file.

21  Q.   Well, because I thought I asked you yesterday -- I know I

22  asked you yesterday if the carved meant deleted, and you said

23  yes yesterday.

24  A.   It can, yes, sir.   Carve can be deleted.   In this case it

25  does not.

Chappell - Cross by Mr. Jarvis

1   *Q.* Okay. So these are on -- in his Messenger cache some

2   place?

3   *A.* Yes, sir.

4   *Q.* But you don't have any information that Mr. Barry ever

5   looked at these, do you?

6   *A.* The probability is very high they have to, because they

7   would have appeared on his computer on his screen in order for

8   them to be in the Messenger cache.

9   *Q.* Don't they automatically appear? You can't stop that?

10  *A.* If you're using Windows Messenger, yes. If Windows

11  Messenger is turned off and you're not using it, then, no, it's

12  not going to appear.

13  *Q.* But when you turn it back on and all the messages just pop

14  up and you look at them and go, ooh, I didn't order that?

15  *A.* That's possible, yes, sir.

16  *Q.* Okay. So it's possible that he either didn't see them or

17  saw them and immediately said, "Those aren't for me" and got

18  rid of them, right?

19  *A.* I don't know, sir, I wasn't there. That's possible.

20  *Q.* Okay. Now, looking at all these pictures together,

21  especially dd and ee, these look like similar pictures to what

22  we've already seen, correct, in the sense of nudity and nudists

23  and a naked man and a naked boy?

24          *MS. ZACK:* Objection, Your Honor.

25          *THE COURT:* I don't think that there's a question yet,

Chappell - Cross by Mr. Jarvis

1   unless I missed it.  What is the question?

2   BY MR. JARVIS:

3   Q.  Are these, in your opinion, similar to the ones we've

4   already gone over that were in the other parts of Mr. Barry's

5   computer?

6   A.  In some ways, yes, sir.

7   Q.  Okay.  Because it could just as easily be another nudist

8   father and son, couldn't it?

9          MS. ZACK:  Objection.  Calls for speculation.

10          THE COURT:  I'll sustain that objection.

11  BY MR. JARVIS:

12  Q.  Well, in dd and ee -- well, actually in all of them,

13  there's no sexual stimulation or simulation in any of these

14  pictures, is there?

15  A.  Simulation --

16  Q.  Yeah.

17  A.  -- or stimulation?

18  Q.  Both, either or neither.

19  A.  In any of these pictures?

20  Q.  In the six.

21  A.  Correct.  If you look at 4aa, the child obviously has an

22  erect penis laying in the bathtub.

23  Q.  I grant you that, but there's no picture of anybody

24  simulating sex other than a little boy with an erect penis?

25  A.  That's correct.

Chappell - Cross by Mr. Jarvis

1    Q.  And the males in -- or the male in the three pictures, he

2    doesn't have an erect penis, correct?

3    A.  Correct.

4    Q.  And with the exception of one of them being outside,

5    they're very similar poses to the other pictures that we've

6    already talked about.  We've got cc where the boy's on an

7    exercise bike.  We've got the O.B. and R.B. doing Wii

8    exercises, correct?

9    A.  Yes, sir.

10   Q.  So other than the different people, different faces,

11   they're of a similar type.  Would that be a fair statement,

12   similar vein?

13   A.  Yes, sir.

14   Q.  Okay.  And then looking at ee, this is where the man and

15   the boy are outside.  He's got his shoes on, and it looks like

16   they're sticking their tongue out at the camera or at least the

17   boy is, right?

18   A.  Correct.

19   Q.  And you don't have any evidence that Mr. Barry produced

20   these or allowed them to be produced, correct?

21   A.  No, sir.

22   Q.  All right.  Or in any way participated in the production,

23   correct?

24   A.  That is correct.

25   Q.  And you don't know who these people are, do you?

Chappell - Cross by Mr. Jarvis

1   A.   I have no idea, no, sir.

2   Q.   Okay.  And those were under "Craig Houston"?  No, those

3   were just in the Messenger cache.

4             All right.  Going to 4hh, this is again

5   Mr. Noonan and one of the Barry boys.  This is where his --

6   well, there's a laundry basket at the bottom, correct?

7   A.   Yes, sir.

8   Q.   And it looks like clothes down at the floor or something at

9   the feet?

10  A.   Some sort of material.

11  Q.   All right.  Now, except for the left toe or feet of the boy

12  that is near the groin area, the boy's penis is not showing,

13  correct?

14  A.   Correct.

15  Q.   And Mr. Noonan is just smiling at the camera, right?

16  A.   Correct.

17  Q.   The boy's smiling?

18  A.   Correct.

19  Q.   And as you've testified before, would this be an unnatural

20  pose if they had clothes on?

21  A.   It would be less unnatural, but -- if they had clothes on,

22  yes, sir.

23  Q.   Well, does it appear that it's just like the boy is

24  crawling over him?

25  A.   Correct.

Chappell - Cross by Mr. Jarvis

1   Q.  Like little monkeys, like little boys do?

2   A.  Correct.

3   Q.  Okay.  And that would be natural for a boy to do, correct?

4   A.  Yes, sir.

5   Q.  So the fact that they don't have clothes on makes it

6   unnatural, in your opinion?

7   A.  In this particular case, that's a big factor in it, yes,

8   sir.

9   Q.  Okay.  But there's not any sexually suggestive setting,

10  right?

11  A.  No, sir.

12  Q.  And the focal point is certainly not on the boy's

13  genitalia.  It looks like it's more on Mr. Noonan's face.  But

14  again I guess that's up to the viewer, right?

15  A.  Correct.

16  Q.  And you don't have any evidence that Mr. Barry knew this

17  picture was taken being, correct?

18  A.  No, sir.

19  Q.  And you don't have any evidence that he conspired with

20  Mr. Noonan to allow this picture to be taken?

21  A.  Correct.

22  Q.  Or even made any type of agreement?

23  A.  Correct.

24  Q.  And you have no evidence that Mr. Barry was even in the

25  room when this picture was being taken?

Chappell - Cross by Mr. Jarvis

1    A.   That is correct.

2    Q.   You don't have any evidence that Mr. Barry enticed or

3    allowed or coerced the boys to either take or to be in the

4    pictures, right?

5    A.   Correct.

6    Q.   Okay.  The next one is 4ii.  Mr. Noonan is -- looks like

7    got the boy's foot up next to his mouth, right?  Is that

8    correct?

9    A.   Correct.  Yes, sir.

10   Q.   Oh, I'm sorry.  You're looking at the screen.

11   A.   Yes, sir.

12   Q.   And that one's kind of blurry as if they were moving?

13   A.   Or the camera was moving is a possibility.

14   Q.   Okay.  But, again, the angle is such that it looks like the

15   other brother took it?

16   A.   Possible, yes, sir.

17   Q.   And the genitalia is visible, but Mr. Noonan doesn't have

18   an erect penis, correct?

19   A.   It's semierect, yes, sir.

20   Q.   Okay.  But the boy is just -- looks like he's rolled over

21   from one of the previous pictures, right?

22   A.   He's rolled over, yes, sir.

23   Q.   I mean, it's on the couch.  You've got the same laundry

24   basket and the same cloths down at the bottom.  So it appears

25   that these were in some series.  Do you have them numerically

Chappell - Cross by Mr. Jarvis

1   listed?

2   A.   Yes, sir.  They're within two numbers of each other on

3   their file paths, so, yes, sir.

4   Q.   So a couple of seconds?

5   A.   It could be several minutes.  But they're -- as far as the

6   file listing goes, they're within the same series, yes, sir.

7   Q.   Okay.  And, again, it's just on the couch, so that's not a

8   sexually suggestive setting, correct?

9   A.   The couch in and of itself, no, sir.

10  Q.   And it's not an unnatural pose for a child this age to be

11  laying on his back?

12  A.   In this position without any clothes on and his legs

13  spread, yes, sir, to me it's not a natural position.

14  Q.   But if he had his clothes on it wouldn't be unnatural?

15  A.   If he had his clothes on, then probably not, no, sir.

16  Q.   And you have no information that Mr. Barry knew about this,

17  participated in it, agreed to it, enticed any of the children

18  to participate into it or forced them or coerced them or had

19  any intent to make this a child pornography picture, correct?

20  A.   No, sir.

21  Q.   Okay.  Let's look at the pictures -- Government's Exhibit

22  No. 5, why is this one separate?

23         MS. ZACK:  Objection.  Relevance.

24         THE COURT:  I'll sustain the objection.  It also seems

25  to call for speculation, if you're asking why it was retrieved

Chappell - Cross by Mr. Jarvis

1  in a separate way.

2  BY MR. JARVIS:

3  Q.  Well, it was found in Mr. Barry's computer, correct?

4  A.  Correct.

5  Q.  And the file date, that wasn't provided today.  When was it

6  created?

7  A.  I would have to go back and look at it, sir, and see

8  exactly when it was created.

9  Q.  Is this the only picture in this bed?  Is that why it's not

10  with the rest of them?

11      MS. ZACK:  Objection.  Relevance.

12      THE COURT:  Relevance?  I think the more difficult

13  point is that how would he know why it was filed in a

14  particular place in the computer.  Is that what you're asking?

15  Perhaps I'm misunderstanding.

16      MR. JARVIS:  Yes, ma'am.  I'm asking why it was

17  separated from all of 3 and 4, if it's out of Mr. Noonan's,

18  unless he can tell me it's in a separate folder.

19      THE COURT:  Are you asking if the witness separated it

20  in the course of sorting through the evidence?  Is that what

21  you're asking?

22      MR. JARVIS:  Yes, ma'am.

23      THE COURT:  All right.  Ask that question.

24  BY MR. JARVIS:

25  Q.  Okay.  Well, did you separate this from the other exhibits,

Chappell - Cross by Mr. Jarvis

1  the pictures in 4 and 3, as you were going through the

2  exhibits?

3      MS. ZACK:  Objection, Your Honor.  As I'm

4  understanding this, he's asking this witness why I created the

5  Government's evidence.

6      THE COURT:  No, no, not you.  This witness, if he did.

7  If he did.

8      MS. ZACK:  Okay.

9      THE COURT:  If he didn't, then he'll say so.

10 A.  From the collection of images and stuff, no, sir, I did not

11 separate this from those images.

12 BY MR. JARVIS:

13 Q.  And was this found on Mr. Barry's computer or in the

14 Messenger cache?

15 A.  Which is on Mr. Barry's computer though.  But, no, this was

16 found on -- it was found in Mr. Barry's computer within his

17 folders.

18 Q.  Which folder?

19 A.  I would have to go and pull up the actual file to tell you

20 exactly where.  But it came from either "Craig Houston," "Craig

21 H," or "David and the boys" and those subfolders.

22 Q.  But you don't know when this was taken?

23 A.  Not at the moment, no, sir.

24 Q.  And you don't know -- you don't have any information that

25 who took the picture?

Chappell - Cross by Mr. Jarvis

1   A.  Other than it's not Mr. Noonan or the two children.

2   Q.  Well, it could have been the timer, right?

3            MS. ZACK:  Objection.  Calls for speculation.

4            THE COURT:  Sustained.

5   BY MR. JARVIS:

6   Q.  What about another person other than Mr. Barry being there

7   to take the picture, is that possible?

8   A.  It is possible, yes, sir.

9   Q.  And were you aware that Mr. Noonan's family showed up

10  during Christmastime and New Year's?

11  A.  No, sir.

12  Q.  Mom, brother, sister, up from upstate showed up, were you

13  aware of that?

14           MS. ZACK:  Objection.  Asked and answered.

15           THE COURT:  Sustained.

16  BY MR. JARVIS:

17  Q.  So it's possible that somebody else could have taken this

18  picture other than Mr. Barry, correct?

19           MS. ZACK:  Objection.  Asked and answered.

20           THE COURT:  I'll sustain the objection.

21  BY MR. JARVIS:

22  Q.  Do you have any evidence that Mr. Barry knew this picture

23  was being taken?

24  A.  No, sir.

25  Q.  Do you have any evidence that he agreed to allow it to be

Chappell - Cross by Mr. Jarvis

1  taken?

2  A.  No, sir.

3  Q.  Any evidence that Mr. Barry posed the children to be in

4  this picture?

5  A.  No, sir.

6  Q.  Any evidence that he agreed with Mr. Noonan to allow him to

7  be photographed with his boys?

8  A.  Can you repeat that again, sir?  Sorry.

9  Q.  Any information that Mr. Barry allowed Mr. Noonan to be

10  photographed with his boys?

11  A.  We do have evidence that Mr. Barry has -- allows Mr. Noonan

12  to be photographed with the children, because we have pictures

13  with Mr. Barry in photographs with the children.

14  Q.  But for this photo and all these other photos, separating

15  them out, you don't have any information that Mr. Barry agreed

16  to that photo, other than the one they're all four in, right?

17  A.  That is correct, yes, sir.

18  Q.  Okay.  And in this one, there's no nudity at all?

19  A.  No, sir.

20  Q.  So would this be considered child pornography under your

21  definitions?

22  A.  No, sir.

23  Q.  Okay.  Then why is it in here?

24          MS. ZACK:  Objection.

25          THE COURT:  Sustained.

Chappell - Cross by Mr. Jarvis

1   BY MR. JARVIS:

2   Q.  All right.  Going to 9, how many of these pictures are

3   different than the pictures we already covered in 3 and 4?

4   Looks like the majority of them, correct?  I'm sorry.  I'll

5   wait until you get your notebook ready.

6   A.  I don't have the evidence list here to see what was in 9.

7   Thank you.  Now, the selected, are you talking about 9a through

8   9k?

9   Q.  Yes, sir.

10  A.  Okay.  Yes, these would be -- these selected photographs

11  are different from the ones we've already gone through.

12  Q.  Okay.  Well, let's go through these.  9a is the picture of

13  Mr. Noonan and Mr. Barry and one of the boys either handing or

14  getting the camera, correct?

15  A.  That is correct.

16  Q.  So there wouldn't be any child pornography in this

17  photograph, right?

18  A.  The -- of the children nude?  No, sir.  But children are

19  present within the photograph.

20  Q.  An arm?

21  A.  That's a child's arm.

22  Q.  Is that a sexually suggestive pose for the child?

23  A.  For the child, no, sir.

24  Q.  Well, how would you consider this to be child pornography

25  if the only thing of the child is the arm?

Chappell - Cross by Mr. Jarvis

1   A.  The children present during what I consider to here are two

2   males in close proximity and showing an intimacy that are nude

3   with their exposed genitalia could be viewed that way.

4   Q.  Well, explain to me if these are two gay men, why that is

5   somehow wrong for them to be sitting around naked and --

6           MS. ZACK:  Objection.

7           MR. JARVIS:  I'm sorry.  Go ahead.

8           MS. ZACK:  Go ahead, finish --

9           THE COURT:  He's not finished his question.  Go ahead.

10  BY MR. JARVIS:

11  Q.  Explain to me how that's somehow wrong if they're gay and

12  nude and there's an arm of a child?

13          MS. ZACK:  Objection.  Calls for speculation.  There's

14  no evidence of Mr. Noonan's sexual orientation that's been

15  brought forward at this point, and he's asking him to speculate

16  about a hypothetical situation that is not this photograph.

17          THE COURT:  I'll sustain the objection.  Although I

18  think it's more -- I don't think the issue is whether this is

19  right or wrong.  The question is whether there is -- I don't

20  hear you objecting to the relevance of the photograph, and

21  therefore I'm not sure that your question makes sense.

22          MR. JARVIS:  Yes, ma'am.

23          THE COURT:  So can you rephrase it?

24          MR. JARVIS:  Yes, ma'am.

25  BY MR. JARVIS:

Chappell - Cross by Mr. Jarvis

1  *Q.*  Explain to me again how you can say this is some type of

2  child pornography merely because it's two naked men with

3  nonerect penises?

4           *MS. ZACK:*  Objection, Your Honor.  It calls for a

5  legal conclusion.

6           *THE COURT:*  Overruled.

7  *A.*  Again, the presence of the children with two nude males and

8  an intimate pose or position.  There's obviously a camera

9  involved, because there is a picture taken of them.  And the

10 child is handing the camera to Mr. Barry.

11 BY MR. JARVIS:

12 *Q.*  So do you believe that if some pedophile was to get just

13 this picture, he or she would look at it and be sexually turned

14 on?

15          *MS. ZACK:*  Objection.  Calls for speculation.

16          *THE COURT:*  If he knows, he can answer the question.

17 *A.*  I believe, yes, sir.

18 BY MR. JARVIS:

19 *Q.*  Okay.  And would the fact that they're both nudists and

20 have a right to be naked in their own home, would that factor

21 into your opinion?

22          *MS. ZACK:*  Objection, relevance.  Objection, calls for

23 facts not in evidence.

24          *THE COURT:*  Sustained.

25 BY MR. JARVIS:

Chappell - Cross by Mr. Jarvis

1   Q.  Okay.  Looking at 9b, you have two boys at the sink,
2   correct?
3   A.  Correct.
4   Q.  And one of them -- they're both naked, it looks like,
5   right?
6   A.  Yes, sir.
7   Q.  And wouldn't that be a normal thing for children to be
8   taught, how to wash dishes and to wash their own dishes?
9   A.  Not in the nude, no, sir.
10  Q.  Okay.  So the fact that they're nude or nudists, that makes
11  all these pornography, in your opinion, correct?
12  A.  The fact that they're nude, yes, sir, that's part of it.
13  Being nudists, no, sir.
14  Q.  Okay.  You understand that people have a right to be
15  nudists.  Even kids have a right to be nudists, correct?
16          MS. ZACK:  Objection.  Relevance.
17          THE COURT:  I'm going to sustain the objection.
18  BY MR. JARVIS:
19  Q.  So would you consider that an unnatural pose?
20  A.  Somewhat, yes, sir.
21  Q.  Standing next to his brother while his brother washes the
22  dishes is unnatural?
23  A.  Him leaning up against his brother, nude, with his penis
24  exposed, yes, sir, I consider that unnatural.
25  Q.  But if he had his clothes on, it wouldn't be unnatural?

Chappell - Cross by Mr. Jarvis

1   *A.*  Well, yes, sir, if they had their clothes on, yes, sir.

2   *Q.*  Yes, sir?

3   *A.*  It would be less unnatural.

4   *Q.*  Have you ever seen two brothers while one of them is doing

5   something, the other one comes up and kind of bumps them in

6   their back with their bottom?  Would that be unnatural?

7   *A.*  That, no, sir.

8   *Q.*  Well, how do you know that's not what was happening here,

9   they just don't have clothes on?

10          *MS. ZACK:*  Objection.  Calls for speculation.

11          *THE COURT:*  I'll sustain the objection.

12  BY MR. JARVIS:

13  *Q.*  But that's a possibility though, isn't it?

14  *A.*  It's a possibility, yes, sir.

15  *Q.*  Okay.  So other than the nudity, there isn't any sexual

16  coyness.  They're just smiling at the camera, right?

17  *A.*  Yes, sir.

18  *Q.*  And you have no information that it was intended or

19  designed to elicit a sexual response from a viewer, correct?

20  *A.*  At the time the picture was taken, no, sir.

21  *Q.*  At any later time?

22  *A.*  No, sir.

23  *Q.*  Okay.  And that can be either somebody taking the picture

24  or the timer, correct?

25  *A.*  It's possible, yes, sir.

Chappell - Cross by Mr. Jarvis

1   Q.  You don't have any information that Mr. Barry knew this
2   picture was being taken or that he took it, correct?
3   A.  Correct.
4   Q.  And you don't have any information that he coerced or told
5   the boys to go stand over there so somebody can take your
6   picture, right?
7   A.  Correct.
8   Q.  You don't have that information on any of these pictures,
9   correct?
10  A.  Correct.
11  Q.  Do you know where this was taken?
12  A.  Mr. Noonan's kitchen.
13  Q.  Okay.  All right.  Moving to 9c, this is a facial picture
14  of Mr. Noonan and one of the boys, right?
15  A.  Correct.
16  Q.  And there's no genitalia showing at all?
17  A.  That's correct.
18  Q.  And yet you still consider that to be child pornography,
19  right?
20  A.  No, sir.
21  Q.  No, this one is not?
22  A.  No, sir.
23  Q.  Then what's the purpose of it being in here?
24          MS. ZACK:  Objection.
25          THE COURT:  I'm sorry.  He didn't finish the question.

Chappell - Cross by Mr. Jarvis

1   BY MR. JARVIS:

2   *Q.*   What's the purpose of it being in here if it's not

3   suspected child porn?

4          *MS. ZACK:*  Objection.

5          *THE COURT:*  Sustained.

6   BY MR. JARVIS:

7   *Q.*   Okay.  9d, the overexposed chest.  His penis is showing.

8   Does it look like to you that he's standing on his tiptoes?

9   *A.*   Yes, sir.

10  *Q.*   Okay.  All right.  Can't even see the boy's face, right,

11  except his mouth?

12  *A.*   Correct.

13  *Q.*   And the angle again could be the other child, the other boy

14  taking the picture, right?

15  *A.*   It's possible, yes, sir.

16  *Q.*   And there's no adult in this photograph?

17  *A.*   No, sir.

18  *Q.*   And then you don't any evidence that Mr. Barry knew it was

19  being taking or gave permission for it to be taken or coerced

20  or enticed or ordered the boys to take or be in the picture,

21  correct?

22  *A.*   Correct.

23  *Q.*   And no information that he conspired with Mr. Noonan to

24  allow this picture to be taken or to coerce or get the boys to

25  take this picture or to be in this picture, correct?

Chappell - Cross by Mr. Jarvis

1   A.  Correct.

2   Q.  Okay.  All right.  Then 9e, one of the boys laying on a

3   couch with a cat and a red blanket it looks like.  Is that the

4   same picture you have?

5   A.  Yes, sir.

6   Q.  And the genitalia is exposed.  But we've already

7   discussed -- is the couch still not necessarily a sexually

8   suggestive place, setting?

9   A.  It can be, yes, sir.  It can be used as such and it cannot

10  be.  It depends on the photograph.

11  Q.  Okay.  So in this photograph, would that be sexually

12  suggestive, the fact that he's actually on a couch?

13  A.  With the red blanket and the totality of it, it's possible,

14  yes, sir.

15  Q.  So the color of the blanket makes a difference?

16  A.  Not the color, no, sir.  The fact he's got a blanket on

17  there and the positioning of him, it can be, yes, sir.

18  Q.  Okay.  Help me out.  Separate these items, because it's the

19  first time we've had a blanket.  Is a blanket a part of some

20  sexual deal or do people normally have blankets and afghans on

21  couches here in Texas?

22  A.  It depends on how it's being used, sir.

23  Q.  Okay.  And this one it looks like he's using it to cover up

24  his chest perhaps at that moment in time when the picture's

25  taken?

Chappell - Cross by Mr. Jarvis

1  *A.*  Or possibly uncovering himself for the photograph to be

2  taken.

3  *Q.*  Wouldn't that be speculation on your part?

4       *MS. ZACK:*  Objection, Your Honor.  Mischaracterization

5  of the answer given in response to the question Mr. Jarvis

6  posed, which was in fact speculation.

7       *THE COURT:*  I think that the witness can point out if

8  there is in fact a mischaracterization.

9  BY MR. JARVIS:

10  *Q.*  So in this case, in your opinion, the fact that it's a

11  blanket on a couch makes it sexually suggestive?

12  *A.*  Well, including the child that's nude with his exposed

13  penis, the totality of those together, it could be possible,

14  yes, sir, that the couch can be used as a sexual --

15  *Q.*  And what about the pose?  To me it looks like he is sliding

16  off, basically, the couch, because his feet -- his right leg is

17  not on the ground.  It appears his left leg could be on the

18  ground -- or his foot.  But he's not spread eagle, spread out,

19  opened up.  He just looks like he's sliding down what appears

20  to be a leather or vinyl couch.  Is that what it appears like

21  to you?

22  *A.*  Not sliding, no, sir.  I do agree with the leg positioning.

23  The legs are slightly apart, making the penis clearly visible,

24  which to me is also the focal point of this photograph.

25  *Q.*  And could it be he was jumping into the photograph with the

1  timer on and just landed there?  Is that a possibility?

2  A.  It's possible, yes, sir.

3  Q.  And, again, it's a little bit higher angle than the other

4  ones.  But it's possible that the other boy could have taken

5  this picture, correct?

6  A.  It's possible, yes, sir.

7  Q.  And you don't have any information that Mr. Barry took this

8  picture, right?

9  A.  No, sir.

10  Q.  Or that he was even in the room?

11  A.  No, sir.

12  Q.  Or that he told the boys to either take or participate in

13  this picture?

14  A.  No, sir.

15  Q.  Or that he agreed or made any type of agreement or

16  conspiracy with Mr. Noonan to have this picture created,

17  correct?

18  A.  No, sir.

19  Q.  So you don't have any of that?

20  A.  Correct.

21  Q.  All right.  Then under 9f, we have Mr. Noonan it looks like

22  in his bedroom and a very dark picture of one of the boys and

23  the dog on the floor, right?

24  A.  Correct.

25  Q.  Would this be in the same series as the just the dog and

Chappell - Cross by Mr. Jarvis

1    the boy?

2    A.  I don't know about -- I don't have any time frame

3    reference.   I just know that they were taken with Mr. Noonan's

4    camera.

5    Q.  I'm going back to Government's Exhibit 4t, and it's hard to

6    tell -- all right.  So anyway, I can't see on my picture the

7    boy's genitalia.  Can you see it on a computer?

8    A.  On a computer it's more clearly visible, because this is

9    printed off of a printer --

10   Q.  Right.

11   A.  -- it appears darker and then also projecting it on the

12   screen.

13   Q.  But certainly it's not the focal point.  I don't think

14   there is a focal point to this picture, do you?

15   A.  No, sir.

16   Q.  And so while it is in the bedroom, there's no sexual

17   coyness or anybody playing with themselves or any erect

18   penises, correct?

19   A.  No, sir.

20   Q.  And I guess -- can you tell on the computer if the boy is

21   actually nude?

22   A.  Yes, sir.

23   Q.  All right.  But there's no information that it was intended

24   or designed to elicit a sexual response in a viewer, correct?

25   A.  Correct.

Chappell - Cross by Mr. Jarvis

1    Q.   And you have no information that Mr. Barry was in the room,
2    knew the picture was taken, or going to be taken, correct?
3    A.   No, sir.
4    Q.   And you have no information that Mr. Barry agreed
5    with Mr. Noonan to allow the picture to be taken, right?
6    A.   Correct.
7    Q.   And no information that Mr. Barry forced or coerced or
8    enticed either one of the boys to either be in the picture or
9    take the picture, right?
10   A.   Correct.
11   Q.   And, again, the angle is such that it's entirely likely
12   that the other boy took the picture, right?
13   A.   Possibly, yes, sir.
14   Q.   And Mr. Noonan's not even looking at the camera, correct?
15   A.   Correct.
16   Q.   Okay.  Then the next one is 9g.  One of the boys pointing
17   at the bed, and it looks like the side and almost back of the
18   dog, correct?
19   A.   Correct.
20   Q.   Now, in this one you can barely see his penis right next to
21   his left hand, correct?
22   A.   It's -- I can see it clearly.
23   Q.   Okay.  Well, he's pointing at the bed, it looks like, and
24   laughing, right?
25   A.   Correct.

Chappell - Cross by Mr. Jarvis

1  Q.  So that wouldn't be a sexual pose, would it?

2  A.  No, sir.

3  Q.  And there's no adults, no other adult penises, or any

4  adults in the picture at all, right?

5  A.  Correct.

6  Q.  And with him laughing, that's not a sexual coyness,

7  correct?

8  A.  No, sir.

9  Q.  And other than him being nude, there's nothing sexual about

10  this picture at all, right?

11  A.  Correct.

12  Q.  And there's no information that Mr. Barry knew this picture

13  was being taken or that he allowed it or that he coerced or

14  enticed the boys to be either in it or to take the picture,

15  right?

16  A.  Correct.

17  Q.  And the angle of the picture looks like it could easily be

18  one of -- the other boy taking the picture, correct?

19  A.  It's possible, yes, sir.

20  Q.  All right.  And you have no information that Mr. Barry took

21  the picture?

22  A.  That's correct.

23  Q.  Or that he conspired with Mr. Noonan to let the picture be

24  taken, had the picture be taken, put the boys in it, or had the

25  boys take it or that it was going to be child pornography at

Chappell - Cross by Mr. Jarvis

1  all, do you?

2  A.  Correct.

3  Q.  All right.  9h, it looks like one of the boys and Mr. Barry

4  and the dog, and the dog is turning back around I'm assuming to

5  look at the camera when it flashed.  That makes sense, right?

6  A.  It's possible, yes, sir.

7  Q.  But Mr. Noonan is looking straight at the camera, the boy's

8  not.  Do you agree with that?

9  A.  Correct.

10  Q.  All right.  So there's no penises showing in this one,

11  correct?

12  A.  No, sir.

13  Q.  And the other boy's not in the picture.  So, again, with

14  the angle, it's entirely conceivable that he took the

15  photograph, correct?

16  A.  That is possible, yes, sir.

17  Q.  Okay.  And David Barry is not in here and you have no

18  information that he gave permission for this picture to be

19  taken, correct?

20  A.  That is correct.

21  Q.  Or that he allowed the boys to be in it or coerced them or

22  enticed them in any way?

23  A.  Correct.

24  Q.  Or that he conspired with Mr. Noonan to make this picture

25  or put the boys in it or have him take it, correct?

Chappell - Cross by Mr. Jarvis

1   A.  That is correct.

2   Q.  So in this picture, would that be child pornography, too?

3   A.  No, sir.

4   Q.  Okay.  9i, one of the boys sitting in the lap of

5   Mr. Noonan.  Can't see any penises, correct?

6   A.  No, sir.

7   Q.  And it looks like Mr. Noonan's eyes are closed, correct?

8   A.  Yes, sir.

9   Q.  And, again, the angle is such that one of the other boys --

10  the other boy could have taken the picture, right?

11  A.  Possible, yes, sir.

12  Q.  And you have nobody touching any genitals, correct?

13  A.  Well, the child is between Mr. Noonan's legs.  Mr. Noonan

14  is nude.  So, therefore, he could be pressed against his

15  genitalia.

16  Q.  You're right.  I apologize.  Touching with hands.  I'm

17  sorry.  But you're correct, his back, of the boy, could be next

18  to Mr. Noonan's genitals?

19  A.  Correct.

20  Q.  Is that fair?

21  A.  Yes, sir.

22  Q.  All right.  But you don't have any information that David

23  Barry knew this picture was to be taken or allowed the boys to

24  be in it, enticed them, coerced them, or forced them to be in

25  it, correct?

Chappell - Cross by Mr. Jarvis

1   A.  Correct.

2   Q.  Or that he conspired with Mr. Noonan to create the picture

3   or have the boys in it, correct?

4   A.  Correct.

5   Q.  And you don't have any information that Mr. Barry intended

6   for this to be child pornography at the time it was taken?

7   A.  Correct.

8   Q.  Or at any time thereafter, correct?

9   A.  Correct.

10  Q.  All right.  Then 9j.  All right.  This is the series of the

11  boys in the bathtub.  You've got that --

12          MS. ZACK:  Objection to counsel testifying.

13          THE COURT:  But it's simply a description by way of

14  introducing the question.

15          MS. ZACK:  This picture has not been introduced as

16  part of any series.  This is a characterization by Mr. Jarvis,

17  and unless he can qualify --

18          THE COURT:  It's not that it's a -- I think you're

19  putting too much emphasis on the word "series."  It's not meant

20  to be any technical term.  It's a description that could apply

21  to more than one of the pictures is how I understood it and

22  that's all.

23          MS. ZACK:  Okay.

24  BY MR. JARVIS:

25  Q.  Now, in this picture they're both in the tub together and

Chappell - Cross by Mr. Jarvis

1  they've got the little bubbles on their face like kids do,

2  right?

3  A.  Correct.

4  Q.  And you can't see -- or at least in my picture you can't

5  see any of their genitalia?

6  A.  No, sir.

7  Q.  All right.  Now, we know this was in -- made from what

8  camera?

9  A.  Mr. Noonan's camera.

10  Q.  Okay.  And that's the one that we know has a timer on it,

11  right?

12  A.  Yes, sir.

13  Q.  Okay.  So either somebody took the picture or the timer

14  took the picture, correct?

15  A.  Correct.

16  Q.  But you don't know who it is that took the picture?

17  A.  No, sir.

18  Q.  And you don't know even when this was taken, do you?

19  A.  No, sir.

20  Q.  We just know there were a couple of shots of the boys in

21  and out of the bathtub area, right?

22  A.  Correct.

23  Q.  And we assume -- you assume that they were taken pretty

24  much at the same time or right then, one right after another,

25  correct?

Chappell - Cross by Mr. Jarvis

1   A.  No, sir.  They could have been taken minutes, hours, a

2   couple of days apart.

3   Q.  Okay.  Do you have their numbers in order?

4   A.  Some of them are in order of the bathroom shots, some of

5   them aren't.  So some of them could have been taken together,

6   some of them could not.

7   Q.  Okay.  But you don't have any information that Mr. Barry

8   was in the room when the picture was taken?

9   A.  No, sir.

10  Q.  Or that he gave permission for it to be taken?

11  A.  Correct.

12  Q.  Or that he knew that it was even going to be taken?

13  A.  Correct.

14  Q.  And there's no information that Mr. Barry allowed his boys

15  to be in the bathtub and have their picture taken by anybody

16  else, correct?

17  A.  Correct.

18  Q.  And there's no information that he conspired with

19  Mr. Noonan to have that picture taken or to allow the boys to

20  be in it or to take it themselves, correct?

21  A.  Correct.

22  Q.  And there's no information that Mr. Barry intended for this

23  to be any type of child pornography, right?

24  A.  Correct.

25  Q.  At any time?

Chappell - Cross by Mr. Jarvis

1  A.  Correct.

2  Q.  Okay.  And 9k, this is -- I'm assuming this is the same boy

3  that we had a picture of before.  Does that look like the same

4  boy?  It looks like a different boy.

5  A.  It looks like the same one to me but --

6  Q.  From 9e to 9k?

7        MS. ZACK:  Your Honor, I'm going to object to

8  relevance, whether it's one of the boys or the other of the

9  boys, it doesn't change what it's a picture of.

10        THE COURT:  I'll sustain that objection.

11  BY MR. JARVIS:

12  Q.  All right.  This one, he's obviously naked on the couch

13  with the red blanket.  He's got his head tilted.  Looks like

14  the same angle.  That could have been his brother taking the

15  picture, correct?

16  A.  Possible, but for me highly unlikely.

17  Q.  And he's obviously naked and you can see his penis, right?

18  A.  Correct.  Yes, sir.

19  Q.  And his penis is at the bottom quarter of the page and his

20  face is more in the middle.  But one could argue the focus is

21  either one, correct?

22  A.  Correct.

23  Q.  All right.  But there's no adult, there's no adult penises

24  in the picture, right?

25  A.  No, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  And there's no evidence that Mr. Barry knew this was being

2  taken, was in the room while it was being taken, or gave

3  permission for it being taken before it was taken?

4  A.  That is correct.

5  Q.  And no information that Mr. Barry agreed with Mr. Noonan or

6  conspired with him to have this picture taken or for the boys

7  to be in the pictures, right?

8  A.  That is correct.

9  Q.  And no information that Mr. Barry intended for this to be

10  child pornography, correct?

11  A.  Correct.

12  Q.  And none of these nine pictures -- or, excuse me,

13  Government's Exhibit No. 9 are in David Barry's computer,

14  right?

15  A.  Of these selected ones, no, sir, I do not believe so.

16  Q.  So these came from Mr. Noonan's camera and are not on

17  Mr. Barry's computer, right?

18  A.  I would have to double-check to make absolutely sure, but I

19  believe these selected pictures are not.

20  Q.  Because otherwise we already have gone through them in

21  four --

22  A.  Not necessarily, sir, because those were four selected

23  pictures.

24  Q.  Okay.  But as far as you know, they're not on there?

25  A.  I would have to double-check to answer that correctly.

Chappell - Cross by Mr. Jarvis

1  Q.  Okay.  Let's go to 17.

2        MS. ZACK:  Your Honor, if we may, before we start 17,

3  could we take a quick break?

4        THE COURT:  Sure.

5        MS. ZACK:  Thank you.

6        MS. MINICK:  Judge, if we may have a couple extra

7  minutes, because earlier the rest rooms out here were not open,

8  so we have to go up or down to find another one.

9        THE COURT:  I'm glad you told me.  That's fine.  Is 15

10 minutes enough?

11        MS. MINICK:  That would be great.  Thank you.

12        THE COURT:  All right.  Thank you.  You're excused

13 until then.

14    (Recess from 10:38 a.m to 10:53 a.m.)

15    (Open court, Defendant present.)

16        THE COURT:  I think we're ready to proceed.  Thank

17 you.  Take the stand, please.  You may all be seated.

18                **CROSS-EXAMINATION CONTINUED**

19 BY MR. JARVIS:

20 Q.  All right.  Let's go to 20, Government's Exhibit 20.  Tell

21 me when you're there, Agent.

22 A.  Yes, sir.

23 Q.  Okay.  20 is from Mr. Barry's camera, correct?

24 A.  That is correct.

25 Q.  And it says these are selected images, but when we looked

Chappell - Cross by Mr. Jarvis

1  at them the other day, I counted 20 images on the camera and

2  there are 20 images prepared.  Is that what your records show,

3  that he only had 20 images on his camera?

4  A.  No.  He's got far more images than that on the camera.

5  What you reviewed is probably the same 20 that are -- we

6  selected.

7  Q.  Okay.  All right.  Well, let's look at those.  The first

8  one, 20a, is a picture of Mr. Noonan and Mr. Barry, correct?

9  A.  Yes, sir.

10  Q.  There's not any children in that picture?

11  A.  No, sir.

12  Q.  And Mr. Noonan has his arm around Mr. Barry.  But it looks

13  like a second shot of a previous picture we've already seen.

14  Would that be fair?

15  A.  A similar picture, yes, sir.

16  Q.  Okay.  But there's no children in that one.  So that

17  wouldn't be considered child pornography at all, correct?

18  A.  No, sir.

19  Q.  No, sir, I'm correct or no, sir, I'm wrong?

20  A.  No, sir, it's not child pornography.

21  Q.  Okay.  Thank you.  And then 20b is what appears to be a

22  picture of Noonan's penis, correct?

23  A.  Correct.

24  Q.  Now, going back to a, you don't know who took this picture,

25  right?

Chappell - Cross by Mr. Jarvis

1    A.  No, sir.

2    Q.  Same with b, you don't know who took that picture?

3    A.  Correct.

4    Q.  And the same with c, you don't know who took that picture?

5    A.  Correct.

6    Q.  It could be either an adult, one of the boys, or the timer,

7    correct, on all three of those?

8    A.  Correct.

9    Q.  But the 20b is certainly not child pornography, right?

10   A.  No, sir.

11   Q.  Same with 20c?

12   A.  Correct.

13   Q.  All right.  Then we have 20d.  This is with Mr. Barry,

14   Mr. Noonan in the middle, a white-haired man with a mustache,

15   and the two boys, correct?

16   A.  Correct.

17   Q.  And you don't know who took that picture?

18   A.  No, sir.

19   Q.  But compare it to -- scoot on down to 20i, the one that has

20   Mr. Noonan holding one of the boy's arm up.  And mine shows a

21   black line across it.

22   A.  Correct.

23   Q.  Is that the way it came on the computer?

24   A.  Yes, sir.

25   Q.  But it looks like one in this -- I don't want to say

Chappell - Cross by Mr. Jarvis

1   series, but one after another or some very similar pose as 20d?

2   A.   Correct.

3   Q.   Okay.  So we can -- you can assume that they were taken one

4   before the other or really close together in time?

5   A.   More than likely, yes, sir.

6   Q.   Okay.  And let's go to d.  There's no children penises

7   showing, correct?

8   A.   No, sir.

9   Q.   And there is Mr. Barry's and the unknown man's penis

10  showing a little bit, correct?

11  A.   Correct.

12  Q.   Now, with the angle, it could easily be a timer taking this

13  picture, right?

14  A.   It's a possibility, yes, sir.

15  Q.   It could be set up right where either the TV or little

16  table is and one of the boys run right in and jump in

17  somebody's lap?

18  A.   That's possible, yes, sir.

19  Q.   Okay.  And would you consider this child pornography?

20  A.   No, sir.

21  Q.   Okay.  And then since we're talking about that, 20i,

22  there's no penises at all in that picture, right?

23  A.   No, sir.

24  Q.   So that wouldn't be child pornography either?

25  A.   No, sir.

Chappell - Cross by Mr. Jarvis

1   Q.   Okay.   Then we go to 20e, and this is the beginning of a

2   group of what I've been calling the painting pictures.   20e, f,

3   g, and h, correct?

4   A.   Correct.

5   Q.   All right.   And this is one of the boys painting.   Do you

6   know where this was taken?

7   A.   No, sir, I do not.

8   Q.   Do you know when it was taken?

9   A.   No, sir, I do not.

10   Q.   And you don't know who took it?

11   A.   No, sir.

12   Q.   And there's no -- I can't tell if their penis is showing,

13   can you?

14   A.   It's very difficult to see, correct, sir.

15   Q.   So would that be considered child pornography?

16   A.   No, sir.

17   Q.   But that would be taking a picture of a naked boy in a

18   home, right?

19   A.   Correct.

20   Q.   Kind of like doing regular things that people do, painting.

21   They just happened to be painting naked?

22   A.   Correct.

23   Q.   Like a nudist, right?

24   A.   Yes, sir.

25   Q.   Okay.   And then 20f, this is a picture of both boys

Chappell - Cross by Mr. Jarvis

1    painting; and you can barely see in the first, the front boy,

2    his little penis hanging there, I think.  Is that what you see?

3    A.  Correct.  Yes, sir.

4    Q.  But certainly not a suggestive pose?

5    A.  Correct.

6    Q.  And it doesn't even look like they're posed.  They're

7    actually painting?

8    A.  Correct.

9    Q.  They're just painting naked, right?

10   A.  Yes, sir.

11   Q.  And would that be considered child pornography?

12   A.  No, sir.

13   Q.  All right.  Because it's just nudists doing regular stuff

14   that people do, right?

15   A.  It's two nude boys painting.  I wouldn't -- I don't know if

16   I would characterize it that way, but it's just two nude boys

17   painting.

18   Q.  Okay.  Same thing with g.  You can see one of the boy's

19   penises, the far one, but you can't -- I mean, you don't know

20   when this was taken or who took it, correct?

21   A.  Correct.

22   Q.  Would you consider that to be child pornography?

23   A.  A little more -- more so than the other pictures only

24   because the genitalia is clearly visible.  But, again, they are

25   painting.  There's no other activity going on.  So probably not

Chappell - Cross by Mr. Jarvis

1   on this picture, no, sir.

2   Q.   I mean, if this was the only picture you had --

3   A.   Correct.

4   Q.   -- you probably wouldn't consider that child pornography?

5   A.   Right, if it's the only picture I had in and of by itself,

6   no, sir, I would not.

7   Q.   Because they're actually doing an activity.  They just

8   happen to be naked while they're doing it?

9   A.   Correct.

10  Q.   Okay.  All right.  And then 20h is Mr. Barry painting

11  naked, and there's no kids in there at all, right?

12  A.   Correct.

13  Q.   And you don't know where that was taken, right?

14  A.   No, sir, I do not.

15  Q.   It could have been taken in his own home?

16  A.   Correct.

17  Q.   Most people don't paint other people's houses.  I try not

18  to.

19  A.   Unless they're getting paid.  But, no, sir, I don't know

20  where this was taken.

21  Q.   Okay.  And he happens to be naked?

22  A.   Right.

23  Q.   We've already discussed i.  And then the rest of the

24  photos, I think, j, k, l, m, n, o, p, q, r, s -- through s, all

25  have one of the two of the boys with clothes on, most of them

Chappell - Cross by Mr. Jarvis

1  are Christmas pictures, right?

2  A.  Right.

3  Q.  All right.  So none of those are going to be child

4  pornography, correct?

5  A.  Correct.

6  Q.  And then the last one in this series, 20t, do you know

7  where that was taken?

8  A.  Mr. Noonan's residence.

9  Q.  Okay.  So that's Mr. Noonan and one of the boys, right?

10 A.  Correct.

11 Q.  And you don't know who took that picture?

12 A.  No, sir.

13 Q.  And they obviously have all their clothes on?

14 A.  Correct.

15 Q.  And so that wouldn't be considered child pornography

16 either?

17 A.  No, sir.

18 Q.  Okay.  All right.  And these pictures are not on anybody's

19 computer, right?

20 A.  Some of the pictures are, not all of them, no, sir.

21 Q.  Some of them are?

22 A.  Yes, sir.

23 Q.  The ones with Mr. Barry and Mr. Noonan sitting together and

24 then the one with the unknown male on the right-hand side of

25 the couch, right?

Chappell - Cross by Mr. Jarvis

1   A.  And we have -- and some of the Christmas pictures are on

2   Mr. Barry's computer.

3   Q.  Okay.  But looking at 20t, would that be an unnatural pose?

4   A.  Unnatural?  No, sir.

5   Q.  But they're not related?

6   A.  No, sir.  I didn't say unnatural, but, yes, they're not

7   related, correct.

8   Q.  Because we talked about a pose very similar to this earlier

9   and they were naked and you said that was an unnatural pose

10  because they weren't related and they were naked.  And here

11  they're not related but they have clothes on and this one is

12  not an unnatural pose, is it?

13  A.  No, sir, this particular pose in this picture is not --

14  does not appear to be unnatural.

15  Q.  Okay.  I think -- have we covered all of the naked pictures

16  that you're aware of?

17          MS. ZACK:  Objection.  Vague.

18          THE COURT:  Of the -- can you be more precise about

19  what you are including in the description?

20          MR. JARVIS:  Yes, ma'am.

21  BY MR. JARVIS:

22  Q.  That have been admitted into evidence.  Have we covered all

23  of them?

24  A.  That are within this exhibit list, I believe so, yes, sir.

25  Q.  Okay.  I'm just making sure --

Chappell - Cross by Mr. Jarvis

1   A.  Right.

2   Q.  -- that me and you have covered all of them.  I don't want

3   to leave one behind accidentally.

4                Now -- well, we did.  Look at 24.  On the 24b, I

5   think you and I talked about this one before at the top and the

6   center?

7   A.  Correct.

8   Q.  And -- well, as I recall, and correct me if I'm wrong, but

9   I think you told me you couldn't tell if that was one of the

10  O.B. or R.B., correct?

11  A.  Correct.

12  Q.  Because it's just too difficult to tell?

13  A.  Correct.

14  Q.  So you're not counting that one as part of the case, is

15  what, I think, you and I talked about, if I remember correctly?

16       MS. ZACK:  Objection, Your Honor.  It's not for him to

17  determine what is or isn't part of something.  That's a legal

18  conclusion.  That's for the Court to determine.

19       THE COURT:  Rephrase the question.

20  BY MR. JARVIS:

21  Q.  Are you using this picture to say that Mr. Barry produced

22  or conspired to produce child pornography?

23       MS. ZACK:  Objection.

24       THE COURT:  I'm going to ask you to rephrase the

25  question.  I don't understand what you're asking.

Chappell - Cross by Mr. Jarvis

1    BY MR. JARVIS:

2    Q.  Okay.  It's obvious in these other pictures taken -- I

3    think these are from Mr. Noonan's computer, right?

4    A.  Correct.

5    Q.  That you can tell who the people are, correct?

6    A.  Correct.

7    Q.  And that top center photo, you can't tell who that child

8    is?

9    A.  Correct.  It is difficult for me, yes, sir.

10   Q.  Okay.  And so you don't have any information that Mr. Barry

11   conspired to produce that or who took the picture, correct?

12   A.  Correct.

13   Q.  And you don't have any information that he even knew it was

14   taken?

15   A.  Correct.

16   Q.  Or even knows who the person is?

17   A.  Correct.

18   Q.  All right.  And that he didn't conspire with Mr. Noonan to

19   do anything with this picture, right?

20   A.  That I know of, no, sir.

21   Q.  Okay.  All right.  And this six -- or actually nine photos

22   on one sheet of paper, why are they like this?

23   A.  Some of these are thumbnail pictures and so they're small

24   to begin with.  The very first picture in this series is about

25   the size that they would be very difficult to see.  So only for

Chappell - Cross by Mr. Jarvis

1  presentation purposes, so they would be a little bit easier to
2  see, we made them larger and put them on a contact sheet.
3  Q.  Okay.  So you took them as thumbnails, put nine on a piece
4  of paper, blew them up and made them so we could see them?
5  A.  Correct.
6  Q.  Okay.  All right.  So they didn't come like this in the
7  computer?
8  A.  No, sir.
9  Q.  Okay.  So we've already covered all of those pictures in
10 other areas, right?
11 A.  Correct.  Yes, sir.
12 Q.  Now, Craig had two computers, correct -- Mr. Noonan, sorry?
13 A.  Mr. Noonan, yes, sir.
14 Q.  He had a laptop and a desktop, right, and they've been both
15 been admitted into evidence, correct?
16 A.  Correct, yes, sir.
17 Q.  And in Government's Exhibit 25 are the three pictures from
18 Mr. Noonan's desktop?
19 A.  Correct.
20 Q.  And we've gone over, I think, each one of those, haven't
21 we?
22 A.  Correct.  Yes, sir.
23 Q.  Okay.  All right.  Now, I want to go over the chats a
24 little bit with you.  Can you pull those up, please?  Are you
25 ready?

Chappell - Cross by Mr. Jarvis

1    A.   Yes, sir.

2    Q.   Okay.  As I recall your direct testimony yesterday, you

3    said there were at least 37,000 lines or messages.  Did I write

4    that down right?

5    A.   Approximately, yes, sir.

6    Q.   Okay.  That's a number we can use and be pretty close?

7    A.   Correct.

8    Q.   All right.  And when you say "lines," does that mean if one

9    of these chats has a line that says "hey" and then space and

10   then another line that says "whatcha" and then the next line

11   says "doing," would that be three lines or one line?

12   A.   No, sir.  It's approximately 37,000 messages, not lines.

13   So one messages could have five lines of text.

14   Q.   Okay.  That's what I needed to understand.  Thank you.

15   A.   Yes, sir.

16   Q.   All right.  Let's look at 7A.  And what's this date created

17   on the first page, January 8th, 2013?

18   A.   That's this report.  This report was created.  That's our

19   date.  That's when this chat report was created and put

20   together.

21   Q.   Does that mean within a couple of days before that is when

22   you found this chat?

23   A.   No, sir.  It's just when I put it together in this format

24   right here.

25   Q.   Okay.

Chappell - Cross by Mr. Jarvis

1   A.  And exported it.

2   Q.  All right.  Now, this first one, 7a, which is only a page

3   with Andrew, there's no talk of sex and there's no talk of

4   pictures, is there?

5   A.  No talk of sex and pictures?  No, sir, there isn't.

6   Q.  It's really just talking about being nudists and being

7   careful about being a nudist, right?

8   A.  Being naked, yes, sir.

9   Q.  Well, the third line, 188, says, "You have to be careful

10  who you tell that you're a nudist"?

11  A.  Correct.

12  Q.  Okay.  And I notice on the left-hand side, under the word

13  "record," there's a number and they're all in chronological

14  sequence, correct?

15  A.  Correct.

16  Q.  And is that a number you put on there?

17  A.  No, sir.

18  Q.  Okay.  How's that number come about?

19  A.  The program that I use to parse this uses that record

20  number to keep track of each of the messages depending on where

21  they're found.  So you could have a part of this chat or a

22  conversation, part of it could be found in one part of the

23  computer or the hard drive, another part could be found in

24  another part and it uses the record numbers to keep track of

25  all that.  It's basically -- doesn't really mean anything other

Chappell - Cross by Mr. Jarvis

1   than the program itself utilizing it.

2   Q.  And that's your program you used to analyze it?

3   A.  Correct.

4   Q.  Not the computer's program to produce it?

5   A.  Correct.

6   Q.  Okay.  So you're telling me when I'm chatting with somebody

7   on the computer through Skype or whatever you're doing it,

8   those messages don't go to the same spot in the computer?  They

9   go to two different spots?

10  A.  They can go to the same spot, and they can also go at the

11  same time go elsewhere.  It depends on how the instant

12  messaging program is set up.  Skype, for instance, your

13  example, Skype has a setting where you can save your logs, your

14  calls and all that and that will be saved to a specific folder

15  for Skype, whether it's in your documents or where you decide

16  to.  At the same time the computer utilizes its memory and

17  system volume information and other parts of the operating

18  system and the hard drive to make that program or Skype

19  function properly.  And when it's doing that, it's recording

20  data and then that data is stored in those various different

21  parts that the operating system and Skype is using to create

22  your Skype conversation.  And what this does is it goes in and

23  it finds that information, determines if it's there, and if it

24  is, then makes a record of it and brings it out and then I

25  analyze it.

Chappell - Cross by Mr. Jarvis

1   Q.   Okay.   And you selected these chats out of all of the 37

2   messages, correct?

3   A.   The 37,000?

4   Q.   The 37,000, excuse me.

5   A.   These were -- are selected from the conversations that I've

6   been able to put together out of the 37,000 messages.

7   Q.   And how many have you been able to put together?

8   A.   I don't know off the top of my head.   There's numerous.

9   Q.   Most of them?

10  A.   I don't know how many to start there were to begin with.

11  There's almost 37,000 messages.   How many of those are part of

12  conversations or one-line messages, I don't know.   All I can do

13  is put them together as a conversation if possible to do that.

14  And like I say, I don't know how many of those that I have.

15  There are several though.   There are several more than this

16  that are either unintelligible or basically the same

17  conversation, because we found it in a different spot.   It's

18  the exact same thing.

19  Q.   Okay.   So they can be in two different spots, maybe more?

20  A.   Right.

21  Q.   Okay.   Let's go to 7b.   Now, this is the one where he's

22  talking to Quateroy5 and talking about, "My oldest is turning

23  into a little clown and really good with a camera.   So he will

24  want to take everyone's pictures, which is good.   We'll have

25  fun pictures to share of the event."

Chappell - Cross by Mr. Jarvis

1              Now, there's no sex talk in this page and a half,

2   is there?

3   A.  No, sir.

4   Q.  And he's talking about fun pictures, but he doesn't put

5   "fun" in quotations as if he's meaning something other than

6   just fun pictures, right?

7         MS. ZACK:  Objection.  Calls for speculation.

8         THE COURT:  I'll sustain the objection.

9   BY MR. JARVIS:

10  Q.  Well, reading just the word "fun," he's talking about the

11  regular definition of "fun," correct?

12        MS. ZACK:  Objection.  Calls for speculation.

13        THE COURT:  I'll sustain the objection.

14  BY MR. JARVIS:

15  Q.  He doesn't use the term "sexy pics," does he?

16  A.  No, sir.

17  Q.  Or pictures that is going to turn somebody on, right?

18  A.  No, sir.

19  Q.  And he could have very well put that in there and said,

20  "Yeah, we're going to love wanking to these later," but he

21  didn't do that, did he?

22  A.  No, sir.

23  Q.  Okay.  Now, going to 7c, this is with Roxas13066.  This is

24  the one talking about O.B. having surgery at the beginning of

25  it, right?

Chappell - Cross by Mr. Jarvis

1   A.   Correct.

2   Q.   Oh, and let me ask you:  When you selected these and

3   selected the starting point, is that really the starting point

4   of that conversation?

5   A.   Yes, sir -- well, it's not the starting point of the

6   conversation.  It's the starting point of what I was able to

7   piece together.  There may be other parts of it that the

8   computer was not able to recover, my program couldn't recover.

9   This is what I was able to put together.

10  Q.   So this is not a complete conversation, as far as you know?

11  It's just what you were able to recover?

12  A.   Correct.

13  Q.   There could be pages before or pages after in each one of

14  these, right?

15  A.   That's correct.

16  Q.   Okay.  This was talking about the surgery, and then there's

17  supposedly a picture saying surgery on the left of the picture.

18  But you have no idea what picture, if one was sent, what it

19  looked like, right?

20  A.   Which picture it is, no, sir, I do not know.

21  Q.   Because it could be, just like the ones we saw in 20, with

22  the boys painting, like 20f?

23       MS. ZACK:  Objection.  Calls for speculation.

24       THE COURT:  Rephrase it.

25  BY MR. JARVIS:

Chappell - Cross by Mr. Jarvis

1    Q.  It could be a picture that isn't child pornography, right?

2    A.  It's possible, yes, sir.

3    Q.  Because going on down to line to 6917, he's talking about

4    being nudists and being naked like dad.  That would be

5    wfglassman, correct?

6    A.  Correct.

7    Q.  So this context is about the boys being like dad naked,

8    correct?

9    A.  Correct.

10   Q.  And not any sexual connotation of abusing the boys,

11   touching the boys, or having sex with the boys, right?

12   A.  That's -- yes, sir, that's possible, yes, sir.

13   Q.  Well, there's nothing like that anywhere in this one, two

14   three -- three pages of chat, no sex talk about it at all, is

15   there?

16   A.  No, sir.

17   Q.  And this is the one that supposedly has the picture of

18   naked boys, but it's -- you don't even know if it was child

19   pornography or just a shot of the boys without their clothes

20   on, right?

21   A.  Correct.

22   Q.  And then 7d, this one is with Michael Wright.  And the

23   first couple pages is talking about, "We're in Houston.  We're

24   going to have a big party."  And the other guy, Mr. Wright,

25   saying, "Be careful."  And basically whoever wfglassman is

Chappell - Cross by Mr. Jarvis

1   saying, "That's okay.  Between uncle -- me, myself, and their

2   uncle, they'll be okay," right?

3   A.  Correct.

4         MS. ZACK:  Your Honor, I'm going to object to the

5   phrasing of --

6         THE COURT:  He answered the question.  So I'm not sure

7   if you're objecting to a question that's already been answered.

8         MS. ZACK:  I'm not, Your Honor.  I'm objecting to the

9   way that Mr. Jarvis is phrasing, the we don't know who

10  wfglassman is.  I mean, this Court has already said that

11  there's evidence of who it is.

12        THE COURT:  I have heard it.  So if the witness

13  disagrees with the question, he can answer, no, he doesn't

14  agree with the question.

15  BY MR. JARVIS:

16  Q.  And then on the next page, line 7043 -- actually 7042 and

17  7043, "Most of the guys are friends of his.  A couple of them

18  may bring their own boys.  I hope they do, so the boys can be

19  naked with other boys there," right?

20  A.  Yes, sir.

21  Q.  And so there wasn't any conversation of, gosh, it's going

22  to be fun to have naked boys around us and all naked men, was

23  there?

24  A.  At that point in the conversation, no, sir.

25  Q.  No.  He was talking about having his boys be around other

Chappell - Cross by Mr. Jarvis

1   boys and being comfortable being naked around other boys,

2   right?

3   A.  Correct, at that point in the conversation, yes, sir.

4   Q.  Okay.  But then we go over to the next page and it's 7052,

5   it's Mr. Wright saying, "I wouldn't keep it a clean party

6   then," right?

7   A.  Correct.

8   Q.  And there's no conversation -- in fact, you go farther down

9   in 7057, it's Mr. Wright saying, "Just want you to be willing,"

10  talking to wfglassman, correct?

11  A.  Correct.

12  Q.  He's not saying anything about want the boys to be willing,

13  is he?

14  A.  Correct.

15  Q.  There's no sexual connotation or enticement or anything

16  about I want to see or want to be with those naked little boys,

17  is there?

18  A.  Correct.

19  Q.  And then the back page -- or the next page, 7065 and 7068,

20  is sexual comments between the two grown-ups, right, about

21  grown-ups, correct?

22  A.  Well, between the two users.  I don't know who this Michael

23  Wright is.  So I don't know if he is a grown-up or isn't, but

24  they're talking about each other, yes, sir.

25  Q.  So there's no talking about wanking the boys or being naked

Chappell - Cross by Mr. Jarvis

1  with the boys or taking advantage of the boys of Mr. Barry,

2  right?

3  A.  Correct.

4  Q.  Okay.  Then you go to 7e, talking about with nudemac.  "See

5  my boys.  How cute."  And, again, you don't know what picture

6  it is, right?

7  A.  Specifically, no, sir, I do not.

8  Q.  And there's no talk in this one at all about the pictures

9  turn me on, is there?

10  A.  Specifically that, no, sir.

11  Q.  Well, right after glassman says, "See my boys," nudemac

12  says, "How cute"?

13  A.  Correct.

14  Q.  There's nothing in there, ooh, I'm going to get excited

15  looking at this tonight, anything near that, right?

16  A.  Correct.

17  Q.  So there's no sexual connotation about the picture.  So

18  whoever nudemac is, whatever picture he received, he didn't

19  comment that it was sexually exciting to him, did he?

20  A.  Oh, correct, no, sir.

21  Q.  Okay.  Then on 7f, line 1678, talking about the little one

22  has to have surgery on Friday, they discuss that.  And then two

23  pages down, 6671, Mr. Glassman starts talking about finishing

24  his master's and having 17 essays and all the work he's got to

25  do.  And then again on 1703, another two pages away,

Chappell - Cross by Mr. Jarvis

1   Mr. Glassman says I'm getting excited with the end in sight.

2   So they're still talking about school.  And this was done

3   1-5-11, correct?

4   A.  Correct.

5   Q.  And Mr. Berlioz -- is that how we pronounce that?

6   A.  Berlioz is how I --

7   Q.  Berlioz.  I'll try to do better.  Mr. Berlioz obviously

8   knows that there was a party, right?

9   A.  Correct.

10  Q.  But he never asked for pictures of the boys at the party,

11  does he?

12  A.  In this chat, no, sir.

13  Q.  And in all three of his chats, he never says, "Send me the

14  pictures of the naked boys y'all took at the party"?  Anything

15  like that, correct?

16  A.  I believe so.  I would have to look at the other two chats.

17  Q.  Okay.  Well, we'll get to those.  Well, you've got three

18  from him all on the same date, approximately the same time.

19  A.  Correct.

20  Q.  But there's breaks in them, correct?

21  A.  Correct.

22  Q.  Okay.  So, 7g, down at the -- near the bottom, line 1778,

23  they're talking about the boys growing up and getting to

24  puberty.  And the way I read it, and maybe you can correct me,

25  but it looks like they were talking about them being nudists or

Chappell - Cross by Mr. Jarvis

1   naked and then getting to puberty and that kind of changing

2   stuff.  Kind of having questions.  Is that the way you read it?

3          *MS. ZACK:*  Objection.  Calls for speculation.

4          *THE COURT:*  He can say that.  The question is, is that

5   how he read it.

6   A.  Part of it is, yes, sir, that way.

7   BY MR. JARVIS:

8   Q.  And then there's later on conversations about masturbation

9   and not feeling that there's anything wrong with wanking and

10  not something that they need to hide or feel guilty about, on

11  line 1782.  Do you see that one?

12  A.  Correct, yes, sir.

13  Q.  And that is from glassman to berlioz.  It's not that guy

14  saying back to glassman, I want to touch your kids, is it?

15  A.  No, sir.

16  Q.  There's nothing sexual about abusing the children from

17  either one of those, saying they want to, they're gonna, or

18  they have done that in any of these chats, is there?

19  A.  It depends on your definition of abuse, specifically what

20  you're referring to.  Because at the end of the chat he's

21  talking about them coming up and showing -- the children

22  showing Mr. Barry his -- their erect penises.

23  Q.  Okay.  Where are you?  The --

24  A.  Their hard-ons.

25  Q.  -- 1795?

Chappell - Cross by Mr. Jarvis

1   A.   That would be on, yes, 1795.

2   Q.   Okay.  What glassman says is, "They get hard too and are

3   proud of them.  They have to show me when they get them.  So I

4   think they understand a little bit about hard and soft."  It

5   doesn't say anything about him touching them, wanting to touch

6   them, or has touched them?

7   A.   Right, correct, it does not.

8   Q.   So what you've got is a couple of little boys who are

9   growing up and they're looking at their body and something is

10  changing and they show it off.  Nothing sexual about that.

11  That's what little boys do, right?

12  A.   Correct.

13  Q.   So that isn't sexual at all, is it?

14  A.   Well, in a way, yes, it is.  I mean, it's erect penises.

15  They're going through puberty.  That's sexual in and of itself.

16  Q.   But a 5 and 6 and 7-year-old is not going through puberty

17  yet.  They're just getting random erections as little boys,

18  right?

19  A.   It's -- yes, that is correct, but that's a physiological

20  event and it's related to sex and so therefore it can be sexual

21  in nature.

22  Q.   Are you saying if a 5-year-old little boy gets an erection,

23  that's sexual in nature?

24  A.   To the person that's looking at it?  Yes, it can be.

25  Q.   Yeah, but you don't have any evidence of that in any of

Chappell - Cross by Mr. Jarvis

1   these chats, though, that --

2   A.  No, sir.

3   Q.  -- it was?

4   A.  No, sir.  They're just talking about it.

5   Q.  They're just talking about what naturally happens to little

6   boys, right?

7   A.  Yes, sir.

8   Q.  And doesn't that play right into them showing off their

9   bodies into all these pictures where they're jumping up and

10  down and showing off their naked bodies?  It's just natural,

11  isn't it?

12  A.  I don't believe it's totally natural, no, sir, but that's

13  my opinion.

14  Q.  In line 1798 they're talking about, "It's all good.  Can't

15  wait to see them at a resort with other kids their own age."

16  Again, the family nakedness, nudism thought process there,

17  correct?

18  A.  That's what he says, yes, sir.

19  Q.  Okay.  All right.  And let's move to 7h.  This is with the

20  same person, and there's no sex talk in that one.  It's about

21  going to school and the nurse looking at O.B.'s penis, right?

22  A.  Correct.

23  Q.  But there's no sex talk in that one and no abuse talk or

24  pictures or anything, right?

25  A.  No, sir.

Chappell - Cross by Mr. Jarvis

1  Q.  Okay.  7i, this is with lookis99.  Line 2129, "They don't

2  care, not into all of that yet, only 6 and 7."  And that's

3  glassman.  And then so he's telling the other guy, they look at

4  my penis or has seen my penis and shaved or unshaved, they

5  don't have any sexual thought about it, right?

6  A.  That's what he says, yes, sir.

7  Q.  Okay.  And that's generally true for a 5, 6, 7-year-old,

8  right?  They're not thinking sexually at that point?

9  A.  They shouldn't be, no, sir.

10  Q.  And you don't have any evidence that these boys were at the

11  time these chats were created, do you?

12  A.  No, sir.

13  Q.  Okay.  And then he goes on to say that these two have seen

14  nudity so much they don't even care anymore, right?

15  A.  Yes, sir.

16  Q.  And then the last thing, "They talk to friends of mine

17  naked all the time on cam and they are naked like us."  But

18  compare that to 7m -- and it is going to be four, five pages

19  down, 30449 and 30451 and the one below that.  Are you with me?

20  A.  Yes, sir.

21  Q.  And at the very bottom of the page, it says, "I don't turn

22  on the cam home naked."  And then later on he says, "I normally

23  would if they weren't home."  And then farther on down, 3057,

24  "And I don't want them on the Internet naked.  Just a cautious

25  thing on my part," right?

Chappell - Cross by Mr. Jarvis

1    A.  That's what it says, yes, sir.

2    Q.  And this is on February 3rd, 2011, versus January 6th,

3    2011, on that first one, the other one we've been talking

4    about, correct?

5    A.  Correct.

6    Q.  Okay.  And then turning the page to 30462, 63, and 64,

7    that's where he describes that the kids are on the couch, but

8    they can't see us his laptop, right?

9    A.  Correct.

10   Q.  Which could be the same thing that is happening in this 7i,

11   they could just be sitting on the couch not seeing the laptop,

12   correct?

13           MS. ZACK:  Objection.  Calls for speculation.

14           THE COURT:  I'll sustain that objection.

15   BY MR. JARVIS:

16   Q.  You don't have any evidence that the boys ever got on a

17   Webcam naked, do you?

18   A.  Just the chats saying that they're on the camera, where

19   Mr. Barry states the kids have been on the camera.

20   Q.  Other than that one sentence, you don't have any other

21   information, do you?

22   A.  I believe there's a -- it's referenced in other chats or at

23   least pictures are.  I believe there are other chats as well.

24   Q.  We just went over 7m.  Do you have another one that talks

25   about being on the cam?  Because on 7m he says he doesn't let

Chappell - Cross by Mr. Jarvis

1  them on the cam.

2  A.  Right.  But then in the one we just read, he says he does

3  let them on the cam, so.

4  Q.  Okay.  Now, on the one we're at now, 7i, this guy, whoever

5  lookis99 is -- I'm assuming it's a guy.  It could be a girl --

6  it doesn't show any remarks from him which would make one think

7  that the boys were on the camera naked, does it?

8  A.  In this chat, no, sir.  Correct.

9  Q.  So other than him -- than Mr. Glassman saying they've been

10  on there all the time, there's no evidence within the chat

11  showing they got on one?

12  A.  Correct.

13  Q.  Okay.  Next one, 7j, near the top, 30714, he's talking

14  about working on his essays, correct?

15  A.  What numbers are you on, sir?

16  Q.  I'm sorry.  Second line, 30714.

17  A.  Oh, okay, yes, sir.

18  Q.  Working on his essay, right?

19  A.  Correct.

20  Q.  And then they talk about the kids.  And then we get way

21  over to 30766, top of the page, and 30768.  Are you with me?

22  A.  Correct.

23  Q.  All right.  This is with Mr. Unknown.  The top of the page,

24  "Can't wait to see the three of you naked together."  And then,

25  "Why's that?"  "Because they haven't seen a grown man that is

Chappell - Cross by Mr. Jarvis

1    uncut."

2                    Nothing sexual in that conversation, just they

3    haven't ever seen that before, right?

4    A.   I have an issue with it.  I mean, that to me is sexual in a

5    way, wanting to see his two children with another subject who's

6    possibly unrelated, we don't know obviously, but possibly

7    unrelated nude and letting them looking at this guy's penis.

8    Q.   Well, I have an issue with it, too.  But as far as sexual

9    assault or sexual abuse, looking at a nonerect penis is not any

10   type of abuse, especially if you're a nudist?

11   A.   Indecency by exposure, isn't that a violation of law in the

12   state of Texas?

13   Q.   Yes.  Isn't it if you're in a public place?  Laying around

14   your own home, you can be naked in your own home, can't you?

15   A.   But he's talking about the other gentleman being nude and

16   looking at his penis.

17   Q.   And as you go through this chat, isn't it obvious that that

18   man's a nudist, too, because that's all they're talking about,

19   isn't it?

20            MS. ZACK:  Objection.  Calls for speculation.

21            THE COURT:  Sustained.

22   BY MR. JARVIS:

23   Q.   All right.  And then the next page over, 30779 and 30783,

24   they're talking about the camera and taking pictures.  And

25   there's nothing in here saying it was for any sexual purpose,

Chappell - Cross by Mr. Jarvis

1   correct?

2   A.  That is correct.

3   Q.  And there's no conversation about trading pictures with

4   each other, right?

5   A.  Well, he talks in 3079 that he's pretty cool with most

6   stuff, but if he gets a naked pic of the boys, just to keep it

7   private.  So obviously he would have to get that picture from

8   somewhere.

9   Q.  Well, my question was trading pictures, like a lot of child

10  pornographers do with I trade mine, you'll give me some of

11  yours, so I have new pictures to look at.  Well, you testified

12  about that yesterday a little bit.

13  A.  Correct.

14  Q.  That that's common for child pornographers, to trade

15  pictures, right?  It's kind of a currency for them?

16  A.  That's one of the things they trade, yes, sir.

17  Q.  Certainly.  But it is one of the things, and there's no

18  conversation about that with this guy.  I'll bring some

19  pictures that I have, and I'll let you have them if you'll give

20  me pictures of your boys?

21  A.  Oh, no, sir, that specifically, no, sir, that's not in this

22  chat.

23  Q.  Not anything anywhere near close to that?

24  A.  Correct.

25  Q.  Okay.  All right.  And it doesn't say it's for any kind of

Chappell - Cross by Mr. Jarvis

1   sexual purpose or that he's going to go home and use it for a
2   sexual purpose, right?
3   A.   Correct.
4   Q.   Okay.  And you don't have any evidence that this guy ever
5   even came over or if pictures were even taken, do you?
6   A.   No, sir.
7   Q.   All right.  Then 7k, kind of in the middle of the page
8   30651, this is where he's talking to another unknown and wants
9   to experience our first resort time with you so you can show us
10  the ropes.  He's talking about taking the boys to Lone Star
11  right or Wild Wood?
12  A.   Correct.
13  Q.   And there's no conversation about sex, no conversation
14  about pictures, right?
15  A.   No, sir.
16  Q.   It's just talking about going to a family nudist camp,
17  correct?
18  A.   Correct.
19  Q.   Okay.  7l, this is one about the guy in Scotland.  But over
20  here on 3142, 43, and on down through 3146, that's talking
21  about the Scottish boy, isn't it, not O.B. or R.B.?
22  A.   Correct.
23  Q.   Okay.  And then turning two pages over, 31439 and 4340, the
24  unknown asks Mr. Glassman if he incorporates that into
25  massages, too?  And I'm assuming they're talking about the

Chappell - Cross by Mr. Jarvis

1   penis or the wanking.  And Mr. Glassman says, "No," right?

2   A.  Okay.  Repeat the question again, sir.

3   Q.  Well, in 31439, Mr. Unknown was saying to Mr. Glassman, "Do

4   you incorporate that into massages, too?"  And, of course, the

5   prior conversation is about masturbation after the massages in

6   Scotland, right?

7   A.  Well, right before that comment, they're talking about in

8   the bathtub and the unknown is asking wfglassman about his sons

9   get hard when you're bathing them.

10  Q.  Okay.

11  A.  And then the page before that, they're talking about one of

12  the boys playing with himself.

13  Q.  All right.  But looking at 31422, "Does the massage

14  therapist rub his penis for him, too, even though he hasn't

15  come yet?"

16  A.  Correct.  Yes, sir.

17  Q.  So back over here, "Do you incorporate that into massages?"

18  One of those variations were about the boy's hard penis or

19  masturbation is what they're talking about, correct?

20  A.  Right, I don't know if it's relating back to the first part

21  of the chat, about the Scottish, or if it's referring back to

22  the son itself, I --

23  Q.  But either way, Mr. Glassman says, "No"?

24  A.  Correct.

25  Q.  Okay.  And then on the next page -- or page over, 31450 --

Chappell - Cross by Mr. Jarvis

1   A.  Yes, sir.

2   Q.  -- they are -- are they curious about their penises, too,

3   grabbing whatever?  Mr. Glassman says, "No.  They aren't

4   interested in it yet.  They just like being naked."  And then

5   Mr. Unknown says, "You and your buds have boners a good bit?"

6   And Mr. Glassman says, "We do, not from anything sexual, just

7   being naked."

8               I mean, it's just being naked all the way through

9   here, isn't it?

10          MS. ZACK:  Objection.  Vague.

11          THE COURT:  I'll sustain that objection.

12   BY MR. JARVIS:

13   Q.  Isn't the tenor of this chatting or this part of the chat

14   is it's just being naked, it's not sexual?  Isn't that what he

15   says down here on 31454?

16   A.  I take it, especially since he's talking about adults in

17   being erect and since an adult being erect is typically related

18   to sex, then to me I'm reading this as being naked is a sexual

19   excitement and it's making them erect.

20   Q.  I understand that's how you read it.  But if you look at

21   31454, that's not what Mr. Glassman says, is it?

22   A.  Correct.  That's what he typed, yes, sir.

23   Q.  Okay.  So from his words, that's his thought about it, at

24   least what he typed up that day, correct?

25   A.  Correct.

Chappell - Cross by Mr. Jarvis

1  *Q.* And it could be different from yours and from mine, but it
2  could still be his truth, couldn't it?
3  *A.* That's what was typed in there, yes, sir.  That's -- I
4  don't know what he was thinking.  I just know that that's what
5  he typed.
6  *Q.* And that he's representing that's what he thinks?
7          *MS. ZACK:* Objection.  Calls for speculation.
8          *THE COURT:* I'll sustain that objection.
9  BY MR. JARVIS:
10 *Q.* And then on 31475 and 476, 477, 478, the Mr. Unknown is
11 talking about his dick slipping through their legs.  They
12 didn't think anything about it, just boys horseplaying.
13 Glassman says, "Of course."  And then Glassman says, "Boys
14 don't think real sexual at that age."  And Unknown says,
15 "right."  Isn't that correct?
16 *A.* Correct.
17 *Q.* Okay.  So, again, it's in Glassman's idea that boys aren't
18 thinking sexual at that young age, right?  Whether he's correct
19 or not, that's an interpretation, but that's what he's writing
20 down, correct?
21 *A.* Correct.
22 *Q.* And that he never says in this chat that he's done that,
23 wants to do that, or will do that, does he?
24 *A.* Well, by his statement that he typed saying "cool," that
25 tells me that he's okay with that.

Chappell - Cross by Mr. Jarvis

1  Q.  But that would be okay with somebody else doing it, because
2  that's what Mr. Unknown said.  He never -- Mr. Glassman never
3  said, I'm going to do that, have done that, or look forward to
4  do that, has he?
5  A.  He didn't says that specifically, no, sir.
6  Q.  Or anything close to a plan of action to molest the boys?
7  A.  That I know of, no, sir.
8  Q.  That you have evidence of, right?
9  A.  Correct.
10  Q.  Okay.  Then going to 7m, I have a question on line 30397
11  and 30398.  Are you with me?
12  A.  Yes, sir.
13  Q.  All right.  Because Mr. Unknown saying to Mr. Glassman, "So
14  do you play with other guys in front of your sons so they know
15  you're gay or do they know you're gay?"  Glassman says, "No,
16  they don't get to see that.  Their minds aren't ready to think
17  about sex between two people."  And then later on, "You're not
18  sure if you could contain yourself if we both got hard playing
19  Wii?"
20          But there's no conversation about Wii earlier in
21  that page.  It doesn't seem like it matches.
22  A.  That may be from a previous conversation.  I don't know.
23  Again, this is all I can recover.  I don't have the entire
24  conversation.  Whether this is the entire conversation or
25  whether it's previous conversations that took place that I

Chappell - Cross by Mr. Jarvis

1  don't have evidence, I don't know.  So I don't know where this
2  reference for Wii or if it's referenced earlier or not.
3  Q.  So these aren't the entire conversations then?
4  A.  That I -- I don't know.  That's -- again, this is what I
5  could put together.
6  Q.  Okay.  And then on the next page, 30402, Mr. Unknown is
7  saying, "To each his own."  Mr. Glassman says, "Yeppers.  You
8  think you will when they are older?"  And Mr. Glassman says,
9  "No, probably not" -- excuse me, it says, "Probably not."
10  Talking about nudists and showing off, right?
11  A.  Yes, sir.
12  Q.  And then on 30419, about two pages over -- are you with me?
13  A.  Yes, sir.
14  Q.  Okay.  They had been talking about wanking or masturbation
15  or j-o and then Mr. Unknown asks Mr. Glassman, "Have they seen
16  you do it already?"  I'm assuming that's j-o, correct?
17  A.  Correct.
18  Q.  And Mr. Glassman says, "No," right?
19  A.  Correct.
20  Q.  And then on the next page, "Have they -- did they say
21  anything about it?"  And Mr. Glassman says, "No.  They aren't
22  interested in it," right?
23  A.  Correct.
24  Q.  So he's communicating to Mr. Unknown, that his boys aren't
25  sexual, correct?

Chappell - Cross by Mr. Jarvis

1   A.  Yes.  Correct.

2   Q.  And what a perfect opportunity to say, "They're not into

3   it, but I sure like having some type of sex with them," right?

4   A.  Well --

5           MS. ZACK:  Objection.

6           THE COURT:  Rephrase the question.

7   BY MR. JARVIS:

8   Q.  He doesn't say anything sexual about him and the boys,

9   correct?

10  A.  Yes, he does right before that.  On 30408 and 30409, the

11  unknown subject asks, "Cool.  You're going to teach them about

12  j-o, which is jerking off?"  And Mr. Barry answers, "That I

13  will do."

14  Q.  And then what's the next line?

15  A.  "Want them to know that it is normal and okay to do."

16  Q.  And tying that back to a previous chat where he says he

17  doesn't want them to be embarrassed and ashamed of

18  masturbation, which was in all of the psychology books I read,

19  why is that a sexual --

20          MS. ZACK:  Objection.

21          THE COURT:  Excuse me.  Let him finish his question,

22  please.

23  BY MR. JARVIS:

24  Q.  Why is that you thinking he's sexually molesting his own

25  kids if he's teaching them about masturbation?

Chappell - Cross by Mr. Jarvis

1          *MS. ZACK:*  Objection.

2          *THE COURT:*  I think the witness gave an answer, that

3    this was a sexual comment and now he's being asked to explain

4    his reason for saying that, as I understand the question.  I'm

5    going allow that question.

6    *A.*  I didn't say sexual abuse.  You asked about sexual in

7    nature.  That's sexual in nature.  That's all -- that's what

8    that was.

9    BY MR. JARVIS:

10   *Q.*  Okay.  So you agree with me that teaching boys about

11   masturbation is probably, if done correctly, not sexual abuse?

12   *A.*  Depending on how it's done and everything, yes, sir --

13   well, it's still sexual, but it's not sexual abuse, depending

14   on how it's done.

15   *Q.*  Okay.  We can agree then.  Oh, and the line right above

16   that, Mr. Glassman says, "They will have their own sex.  They

17   don't need to see mine," correct?

18   *A.*  Correct.

19   *Q.*  So -- all right.  And then 30449, he's talking about not

20   being on cam and not turning on the cam when the boys are

21   around.  We've kind of covered that earlier, correct?

22   *A.*  Correct.

23   *Q.*  Okay.  Now, the last one I want to talk about, 7n, is the

24   one between Mr. Noonan and Mr. Barry, correct?

25   *A.*  Correct.

Chappell - Cross by Mr. Jarvis

1  Q.  Now, near the very top, it looks like sunman75 is Noonan,
2  right?
3  A.  Correct.
4  Q.  Okay.  And he says, "I had a horrible day without you and
5  the monkeys to come home to," right?
6  A.  Correct.
7  Q.  That's Mr. Noonan, correct?
8  A.  Correct.
9  Q.  All right.  And then on the next page he calls them
10 "monkeys" again.  "Did you get your monkeys to bed naked and
11 safe," right?
12 A.  Yes, sir.
13 Q.  Okay.  So, and then the last page, "Need to feed monkeys
14 well so they will grow."  Apparently that's what Mr. Noonan
15 thinks about the boys, right?  He makes three references to
16 them.  I'm not saying it's derogatory, but that was just the
17 name he called them, correct?
18 A.  Correct.
19 Q.  Okay.  And I don't see -- is this the full chat that you
20 were able to pull together?
21 A.  Yes, sir.
22 Q.  Okay.  Well, I don't see anyplace on here where Mr. Barry
23 puts the boys on the camera for Mr. Noonan, do you?
24 A.  No, sir.
25 Q.  And it doesn't seem like -- they don't talk like they're --

Chappell - Cross by Mr. Jarvis

1   either one of them are naked, correct?

2   A.   Correct.

3   Q.   And there's no sexual connotation except for an old joke

4   about shaking it more than one time, right?

5   A.   Correct.

6   Q.   And certainly nothing sexual about the boys and Mr. Noonan

7   and Mr. Barry?

8   A.   Correct.

9   Q.   And it talks a lot about Mr. Barry trying to find a job?

10  A.   Correct.

11  Q.   Which is consistent with what he's talked about before,

12  correct?

13  A.   Correct.

14  Q.   So, and then you couldn't find any more chats between

15  Noonan and Barry that had something about taking pictures of

16  the boys?

17  A.   That I can directly relate and say it's Mr. Noonan or

18  Mr. Barry, no, sir.

19  Q.   Because I'm assuming out of all the chats you were able to

20  pull together, as a good investigator would decide, you would

21  bring to court the best ones for your case, correct?

22  A.   Correct.

23  Q.   And there's nothing between Noonan and Barry talking about

24  agreeing to make child pornography, correct?

25  A.   In a chat, no, sir, I don't have anything, you're correct.

Chappell - Cross by Mr. Jarvis

1   Q.  Okay.  Do you have an e-mail?

2   A.  No, sir.

3   Q.  You don't have any written communication between Barry and

4   Noonan saying -- agreeing to creating child pornography, right?

5   A.  Correct.

6   Q.  Agreeing to allow the kids -- the boys to be -- having

7   their picture taken, correct?

8   A.  In writing correct, I do not.

9   Q.  You don't have anything in writing with Mr. Barry saying

10  you can use my boys in a picture, correct?

11  A.  In writing, no, sir, I do not.

12  Q.  You have nothing like that supporting the accusations of

13  the indictment, correct, in writing?

14          MS. ZACK:  Objection.  Asked and answered.

15          THE COURT:  Sustained.

16  BY MR. JARVIS:

17  Q.  And would you agree that they talked a lot?

18  A.  Yes, sir.

19  Q.  And yet you can't find anything other than this?

20  A.  Because the majority of their contact via the computer was

21  by video cam and by Skype, which is not recorded.  So I don't

22  have a written record of it.  I have -- I can show where they

23  know each other on Skype, but the video chats are not recorded.

24  They're not kept.  And so I have no evidence of what was said

25  during that.  I can only show that that's what they did.  So I

Chappell - Cross by Mr. Jarvis

1   do not have any written chats other than this.

2   Q.  Okay.  Did you run a word search on Mr. Barry's computer?

3   A.  Yes, sir.

4   Q.  For the traditional child pornography words like "lolita"

5   and those kind of word searches?

6   A.  No, sir, not specifically those words.

7   Q.  Well, what words did you search?

8   A.  For Mr. Noonan's e-mail address and for Mr. Whittington's

9   e-mail address and for, I believe, a couple of words.  I can't

10  remember off the top of my head which ones I ran specifically.

11  Q.  You didn't run a search for something along the lines of

12  "naked little boys"?

13  A.  I don't specifically remember doing that, no, sir.

14  Q.  "Young tight boys," something that would lead a person to

15  believe that whoever was using this computer was looking for

16  sexual activity with young boys?

17  A.  Okay.  I ran a search similar to that on IEF for search

18  queries, not for evidence on the computer itself through FTK or

19  EnCase.  So maybe I'm misunderstood your question.

20  Q.  I think we're not communicating.  Because you can go on

21  Google and put on "tight young boys" and a bunch of pornography

22  shows up, right?

23  A.  Correct.

24  Q.  And on your computer and in your research, you can find out

25  what they typed in on Google to go look for, right?

Chappell - Cross by Mr. Jarvis

1   A.  If the information is still there, correct.  Because that

2   is volatile information, yes, sir.

3   Q.  And you didn't find anything suggestive of child abuse on

4   Mr. Barry's computer on his queries, did you?

5   A.  No, sir.

6   Q.  Not a single thing --

7   A.  No, sir.

8   Q.  -- right?  And there are no known paid child pornography

9   sites looked at or paid for on his computer, is there?

10  A.  That is correct.

11  Q.  I mean, you went on truenudist.com.  That's obviously not a

12  child pornography site or you guys would have shut that down a

13  long time ago, right?

14  A.  Correct.

15  Q.  You just got on it within the last year, correct?

16  A.  Who, Mr. Noonan?

17  Q.  No.  You.

18  A.  Oh, me?

19  Q.  Yes.

20  A.  Yes, during the course of this investigation, correct.

21  Q.  Exactly.  And on his computer there were literally

22  thousands of hits on truenudist.com, correct?

23  A.  Correct.

24  Q.  And no child pornography hits, which insinuated he was

25  looking for it through his computer, right?

Chappell - Cross by Mr. Jarvis

1   A.  That's written information.  It would be very hard for me
2   to tell if it was child pornography or what he was looking at.
3   Those aren't -- those search queries don't return images.  They
4   return words and text.
5   Q.  But then you take that and you go and check it out.  I
6   mean, y'all have a list of known child pornography sites or
7   child pornography sites that y'all have already busted and you
8   can go up there and look at the list and if those match, then
9   you know he visited a known child pornography site?
10  A.  Right.  It's not a known child pornography Web site,
11  correct.  But the hits that you have are individual profiles on
12  there, don't know what was being said or done contacting that
13  person.  Remember this is -- allows for chat and allows for
14  contact via instant messaging, so I don't know what's being
15  passed back and forth.
16  Q.  Certainly.  But from the queries, you didn't find anything
17  suspicious?
18  A.  No, sir.
19  Q.  Okay.  And you do -- and you did testify that he did look
20  for nudist camps for families so he could take the boys, right?
21  A.  There were -- yes, sir.
22  Q.  Now, going back to the pictures for just a second.  The
23  Messenger cache and these pictures in it, you don't know back
24  or forth, where are the chats that go along with those
25  pictures?

1  *A.*  Don't know.  The Messenger cache does not keep the chats

2  themselves.  It is only a place that the program uses to allow

3  the rendering of the graphic file.  Messenger -- MSN Messenger

4  does not save its chats to the computer by default.  Some of

5  these chats that we've just discussed in the 37,000 instant

6  messages may be related to those.

7  *Q.*  But you don't know?

8  *A.*  But I don't know, correct.

9  *Q.*  Okay.  And you testified, I think, on direct yesterday

10 about a picture 17b and -- which is the same as 4b, which I

11 think you said was the same as 24a?

12 *A.*  Correct.

13 *Q.*  Okay.  And the way I wrote it down was, it was created on

14 Craig Noonan's computer at 7:26 a.m. and then it was also

15 created separately on Barry's computer on a different date,

16 right, but it was taken with Noonan's camera.  Did I get that

17 correct?

18 *A.*  Okay.  Can you repeat how you have it, sir?

19 *Q.*  Okay.  The way I wrote it down was, created on Noonan's

20 camera, right -- or, excuse me, the picture was taken from

21 Noonan's camera?  I'm saying the wrong words.

22 *A.*  Okay.

23 *Q.*  Is that right?

24 *A.*  Is it Noonan's camera or Noonan's computer?

25 *Q.*  You can't take a picture with a computer, so it had to be

Chappell - Cross by Mr. Jarvis

1   somebody's camera, correct?

2   A.   Correct.   Okay.   I see what you're saying.   Go ahead, sir.

3   Q.   It starts with Noonan's camera?

4   A.   Correct.

5   Q.   Created is the wrong word, but the picture was taken from

6   Noonan's camera, correct?

7   A.   Correct.

8   Q.   Okay.   And then on two different dates, on two different

9   times, that picture was put on two different computers, right?

10   A.   Yes, sir.

11   Q.   And from what I understand, your -- you show that it was

12   put on Barry's computer first and then I think it's three

13   months later it's put on Noonan's computer?

14          MS. ZACK:   Your Honor, I'm going to object as to vague

15   as to where he's getting this information.   Is he referring to

16   something specific in an exhibit or just something in general?

17   I don't know what we're trying to follow.

18          THE COURT:   Could you be more precise in what you're

19   referring to?

20          MR. JARVIS:   I can try, Judge.

21          THE COURT:   Thank you.

22   BY MR. JARVIS:

23   Q.   From your testimony yesterday, what I wrote down from the

24   file, I'm just making sure I understand this, it got on Barry's

25   computer in June and then on Noonan's computer in September

Chappell - Cross by Mr. Jarvis

1   2010.  Did I write that down, right?

2   A.  I don't know if you wrote it down right, but what I have is

3   the -- that picture was created on Mr. Barry's computer on

4   June 18th, 2010.  On September 16th of 2010, that same picture

5   was created in the Messenger cache on Mr. Barry's computer.

6   Q.  Did it ever show up on Noonan's computer?

7   A.  Yes, it did, sir.

8   Q.  And when was it created on Noonan's computer?

9   A.  I do not know, sir.  It's a carved file, unallocated,

10  meaning it was probably deleted.

11  Q.  But it was taken with Noonan's camera?

12  A.  That is correct.

13  Q.  Well, as an expert -- let me give you a hypothetical.

14  Noonan and Barry are at Noonan's house in Houston and one of

15  the boys is taking pictures.  And the boys take the pictures.

16  Noonan and Barry both have their computers there in Houston.

17  One of the boys or the gentlemen take the disk from the camera

18  and insert it into Barry's computer.  Would that hypothetical

19  on how that picture -- those pictures would get on Barry's

20  computer, would that work?

21  A.  That is possible but highly improbable, but, yes, sir, it's

22  possible.

23  Q.  To take pictures -- to take an SD card from a camera and

24  put it into somebody else's computer so they would have the

25  pictures?

Chappell - Cross by Mr. Jarvis

1   A.   The boys doing it is what if --

2   Q.   I got all four, any of the four doing it.

3   A.   Oh, okay.  Yes, sir.  That's very possible, yes, sir.

4   Q.   Okay.  And then taking the hypothetical further, somehow

5   the picture is supposedly messengered to Noonan, who has the

6   picture anyway.  Does that make sense?

7   A.   Yes, sir, that's possible.

8   Q.   But why would somebody send the picture back to the person

9   who has it on their own camera?

10        MS. ZACK:  Objection.  Calls for speculation.

11        MR. JARVIS:  Judge, he's an expert.

12        THE COURT:  I think the question is:  Do you know a

13   reason.  Does your expertise allow you to identify any reason

14   that would explain that, or is that something that would

15   require you to speculate as to the subjective reasons that

16   somebody did something?

17        THE WITNESS:  I think it would be more speculative,

18   ma'am.

19        THE COURT:  All right.  Next question, please.

20   BY MR. JARVIS:

21   Q.   You talked the other day about the default aspect of a

22   computer, right?

23   A.   Specifically?

24   Q.   Well, you said -- is it possible to force these pictures?

25   And you said, Yes, but not here.  You can't remote in.  The

Chappell - Cross by Mr. Jarvis

1  user has to have help.  The default is off when it starts --
2  when it gets first sold from the manufacturer, right?
3       MS. ZACK:  Objection.  Mischaracterization of the
4  evidence.
5       THE COURT:  Restate the question, please.
6  BY MR. JARVIS:
7  Q.  Didn't you testify that when it comes from the
8  manufacturer, the default setting is off?
9  A.  For what specifically?
10  Q.  A computer.  We're talking about forcing these pictures --
11  A.  Okay.
12  Q.  -- for remoting in.
13  A.  Remote services?
14  Q.  Yes, sir.
15  A.  Okay.  Yes, remote services is off by default for most
16  computer manufacturers, yes, sir.
17  Q.  Okay.  And then when you found Mr. Barry's computer, it had
18  the remote services in off at that point, right?
19  A.  Correct.
20  Q.  But it's a switch that can go on and off, correct?
21  A.  Yes, sir.
22  Q.  All right.  So the fact that you found it in off doesn't
23  mean it was always in off -- it doesn't mean it was off in 2010
24  and 2011, does it?
25  A.  But the fact that there was no recorded key logs for that

Chappell - Cross by Mr. Jarvis

1   either also indicates that it was never on.  Every time it's
2   turned on, there would be something created showing that it's
3   been turned on and there would be a log of remote services.
4   Q.  Are you familiar with a Web site or an app "pogo"?
5   A.  No, sir.
6   Q.  Okay.  All right.  Okay.  Did you find any apps that
7   required or allowed or needed the remote access to be on, on
8   Mr. Barry's computer?
9   A.  If you're referring to applications, I don't know, sir.
10  I'm not familiar with every application that's out there.
11  There's hundreds of thousands.  What was on Mr. Barry's
12  computer, I'm not familiar with every single one of them.  And
13  it would be extremely time-consuming, months and years to do
14  the research on each and every one of them.
15  Q.  So it is possible he could have an application on his
16  computer that would require the default to be turned on?  It's
17  possible, correct?
18  A.  To have remote services turned on?
19  Q.  Yes, sir.
20  A.  Yes, there are applications that are necessary for that.
21  Q.  And what is VPN?
22  A.  VPN is a private network.  It's a virtual private network.
23  That's where you, for lack of -- or the easiest way to explain
24  it is, you're logging into an encrypted network and it's a
25  compartmentalized connection.

Chappell - Cross by Mr. Jarvis

1   *Q.*  Does that have anything to do with remoting into the

2   computer?

3   *A.*  Yes, sir -- well, it can be.  Not in every instance, but it

4   can be, yes, sir.

5   *Q.*  And did you conduct any analysis of that on Mr. Barry's

6   computer --

7   *A.*  No, sir.

8   *Q.*  -- whether or not he had that?

9   *A.*  No, sir.

10  *Q.*  And is that something that's hidden?

11  *A.*  It's not necessarily hidden, but the vast majority of VPN

12  applications have to do with school and logging into school and

13  it's not something that I would have been looking at in this

14  particular situation.

15  *Q.*  And you understand that he's been in some type of

16  computer -- not computer, but online colleges courses for quiet

17  some time, right?

18  *A.*  Correct.  Yes, sir.

19  *Q.*  So it's entirely conceivable he would have something like

20  that on his computer, because that's how they use it, right?

21  *A.*  A VPN connection, yes, sir.

22  *Q.*  Okay.  All right.

23          *MR. JARVIS:*  We'll pass the witness, Judge.

24          *THE COURT:*  All right.  Do you have much more

25  redirect?

Chappell - Cross by Mr. Jarvis

1             MS. ZACK:  Yes, Your Honor.

2             THE COURT:  About how much longer do you have, do you

3    think?  I'm just trying to schedule the afternoon, because

4    there are several conflicting things.

5             MS. ZACK:  Yes, I understand.

6             THE COURT:  I'm not restricting you.  You can go into

7    tomorrow.  We can go to Thursday.  But I just need to know some

8    idea.

9             MS. ZACK:  20, 30 minutes, if that.

10            THE COURT:  That's it?

11            MS. ZACK:  I don't know, that's the problem.  I mean,

12   it could take longer.

13            THE COURT:  Well, here's the afternoon issues.

14            MS. ZACK:  Okay.

15            THE COURT:  I have a conference call beginning at

16   1:00 o'clock.  It's going to take some time.  I have to leave

17   at 3:30.  So what we could do is work until -- see if you get

18   close to finished in the next 20 to 30 minutes.  If you

19   realize that you're going to take longer, we can recess for

20   lunch.  My call may take an extended period.  I really don't

21   know.  It may not.  But my guess is it will take at least until

22   2:00 o'clock.  So we could recess from about 1:45 -- 12:45

23   until 2:00ish and then again at 3:30 and then resume tomorrow.

24   All right?

25            MS. ZACK:  Thank you, Your Honor.

Chappell - Redirect by Ms. Zack

1                    **REDIRECT EXAMINATION**

2    BY MS. ZACK:

3    *Q.*  You were asked, Special Agent Chappell, about reviewing

4    records, school records, psychological records, correct?

5    *A.*  Yes, ma'am.

6    *Q.*  And you indicated that you did review those records,

7    correct?

8    *A.*  Correct.

9    *Q.*  What, if any, reference to nudism did you find in any of

10   those records?

11   *A.*  None.

12   *Q.*  And you listened to the original interviews of the

13   children, correct, both the audio and the video?

14   *A.*  Correct.

15            *MS. MINICK:*  May I ask you to speak up a little.  I

16   can't hear you.

17            *THE COURT:*  Use the mike.

18            *MS. ZACK:*  I'm sorry.  I'm sorry.  Is that better?

19            *THE COURT:*  Yes.  Thank you.

20            *MS. MINICK:*  Yes.

21   BY MS. ZACK:

22   *Q.*  You reviewed the audio recordings and the video interviews,

23   the original ones, correct?

24   *A.*  Yes, ma'am.

25   *Q.*  And what references do you recall to the children

Chappell - Redirect by Ms. Zack

1  mentioning any type of nudist lifestyle or nudist activities?

2  A.  None.

3  Q.  And in the second interviews, those -- the two that were

4  admitted into evidence of R.B. and the one of O.B., you

5  reviewed those from June of 2013?

6  A.  Yes, ma'am.

7  Q.  And what reference to nudism was in there?

8  A.  None, ma'am.

9  Q.  And so we're clear, you were not part of the civil trial in

10 Wichita Falls, the CPS trial?

11 A.  That is correct.

12 Q.  You were not called as a witness?

13 A.  No, I was not.

14 Q.  You were not asked to prepare exhibits?

15 A.  No, I was not.

16 Q.  And other than looking through a transcript that was

17 received a few weeks ago, you have no knowledge of that trial?

18          MR. JARVIS:  Objection.  Leading.

19          THE COURT:  Refrain from leading, please.

20 BY MS. ZACK:

21 Q.  Who is the unknown chatter in Exhibit 7?

22 A.  I have no idea, ma'am.

23 Q.  Do you know about whether the person is one individual or

24 several individuals?

25 A.  For each of the conversations, it appears to be one

Chappell - Redirect by Ms. Zack

1  individual, but as a whole, I don't know if it's one or more
2  different people for all the various times unknown appears.
3  Q.  Okay.  And what evidence do you have that -- what, if any,
4  evidence do you have as to whether or not Mr. Noonan told
5  Mr. Barry he was a sex offender?
6  A.  I don't have any, no, ma'am.
7  Q.  And you were asked about the online identity of Mr. Barry,
8  correct?
9  A.  Correct.
10 Q.  And I believe you said that occasionally law enforcement
11 asks permission to assume online identities, correct?
12 A.  Correct.
13 Q.  You don't know whether or not that law enforcement
14 officer -- or do you know whether or not that law enforcement
15 ever used that identity?
16 A.  I have no idea, no, ma'am.
17 Q.  Let's talk about the file paths.  I believe you were just
18 asked a hypothetical, if -- I believe the hypothetical was --
19 so that we're talking about the same things -- if Mr. Noonan
20 and Mr. Barry's computers were both at Mr. Noonan's house and
21 Mr. Noonan and Mr. Barry and the boys were there, that any one
22 of those four people could have put the pictures from
23 Mr. Noonan's camera onto Mr. Barry and Mr. Noonan's computer.
24 That was the hypothetical?
25 A.  Correct.

Chappell - Redirect by Ms. Zack

1  Q.  Okay.  And your response was, "It's possible"?

2  A.  Correct.

3  Q.  What evidence do you have as to the computer skills of

4  R.B.?

5  A.  I have none.

6  Q.  And O.B.?

7  A.  I have none.

8  Q.  And these are at the time 5 and 7-year-olds, correct?

9  A.  Correct.

10  Q.  And based on what you know forensically of the file paths

11  of the pictures on Mr. Barry's computer, what would the user

12  have had to do to put those files in those folders?

13  A.  The folder -- the root folders within the owner account

14  that we've referred to as "Craig Houston" and "David and the

15  boys," those folders would have had to have been created in the

16  first place, meaning the typical way it's taught to do it is

17  you right click within the open window, select "new," select

18  "folder."  A new folder pops up and then you type in the name.

19  And I believe that is because some of the pictures within these

20  folders still have the default file name that is assigned to

21  that file by the camera.

22  Q.  Okay.

23  A.  Some of those same pictures, then, have a different name,

24  meaning they've been renamed, which, again, is -- takes

25  knowledge on how to do that.

Chappell - Redirect by Ms. Zack

1  *Q.*  And the process that you just described, what do you know

2  about a 5 or a 7-year-old's ability to save these pictures in

3  the way that they were saved on Mr. Barry's computer?

4          *MR. JARVIS:*  Objection, Judge.  It's outside his

5  expertise.

6          *THE COURT:*  If he knows, he can answer.  If he doesn't

7  know, he can say that.

8  *A.*  Most of the kids that I've been around that age, using

9  computers, are not that knowledgeable.

10  BY MS. ZACK:

11  *Q.*  What I'm asking is, that's a fairly sophisticated process?

12  *A.*  Yes, sir -- yes, ma'am.

13  *Q.*  Okay.  And what evidence do you have that any of the

14  children ever did anything on Mr. Barry's or Mr. Noonan's

15  computer?

16  *A.*  Very little.

17  *Q.*  Now, 24b the picture in the upper right-hand corner --

18  *A.*  Yes, ma'am.

19  *Q.*  -- that picture has been found in many different places,

20  correct?

21  *A.*  That is correct.

22  *Q.*  Okay.  And it's been suggested that you have no evidence

23  that Mr. Barry took that picture, correct?

24  *A.*  That is correct.

25  *Q.*  What evidence do you have that Mr. Barry didn't take that

Chappell - Redirect by Ms. Zack

1  picture?

2  A.  I don't have any evidence of that either.

3  Q.  Now, let's talk about the camera.  That was Mr. Noonan's

4  camera that took that picture?

5  A.  Correct, the Casio.

6  Q.  And you've examined that camera?

7  A.  Yes, ma'am.

8  Q.  And what can you tell us about the timer mechanism on that

9  camera?

10  A.  It's a software-based timer, meaning he has to access it

11  through the menu.

12  Q.  Okay.  So does that mean it's not just a button that says

13  "timer"?

14  A.  That is correct.

15  Q.  Okay.  And what would someone have to know in order to do

16  that?

17  A.  To get in -- how to get into the menu, first off, select

18  the appropriate setting, adjust the setting for the multiple --

19  the timer setting, turn it on and then the multiple settings

20  within it, because there are several second delay type

21  settings, and then set it to that and then actually take the

22  picture.

23  Q.  So this is a several-step process?

24  A.  Correct.

25  Q.  Okay.  And what evidence do you have that either of these

Chappell - Redirect by Ms. Zack

1   children had the technological capability or the skills in

2   order to set a timer that sophisticated on a camera?

3        MR. JARVIS:  Again, Judge, I'm going to have to

4   object.  Based on the notice that the Government gave me, it's

5   not in his realm of expertise to talk about the boys.

6        THE COURT:  The question -- well, he is an expert on

7   the level of skills required.  He's also being asked a question

8   simply about the evidence that he has.  He can answer the

9   question of whether he's aware of any information, evidence

10  that would enable him to answer the question.

11            And, number two, I think your own opening

12  statement said that these children were developmentally

13  disabled.  And I'm not sure how that ties in to this, and that

14  would be a question that I would ask, in terms of simply the

15  level of both expertise and skill required to perform these

16  operations.  So it's really a question about the level of skill

17  and expertise required, and he is knowledgeable about that.

18        MR. JARVIS:  And, Judge, if I may, I agree with you,

19  except he's not knowledgeable about the level of experience a

20  5, 6, or 7-year-old boy has though.

21        THE COURT:  He is familiar -- I mean, those are

22  sufficiently within common information -- lay information that

23  he can give that answer as based on his expert information as

24  to the level of skill required to do this and the complexity of

25  the operation.

Chappell - Redirect by Ms. Zack

1              You may answer the question.

2    A.  Can you repeat the question?

3         THE COURT:  Repeat it.

4    BY MS. ZACK:

5    Q.  Based on the steps that you've just described, what type

6    of capabilities would be needed by an individual or how

7    difficult would it be for a 5 or 7-year-old to set the timer on

8    Mr. Noonan's camera?

9    A.  I believe that they would have to definitely be shown

10   exactly what a timer is and what its function is and how to get

11   to it.  I mean, I don't think that this is something that they

12   would have stumbled on and figured out that this is what it's

13   for.

14   Q.  And what evidence, if any, did you find forensically that

15   the children took any of the pictures?

16   A.  None.

17   Q.  Now, let's talk about this camera, this Casio camera.

18   Digital camera, correct?

19   A.  Correct.  Yes, ma'am.

20   Q.  And when you look at the back of Government's Exhibit 8,

21   there's a big screen there; is that correct?

22   A.  Correct.

23   Q.  Okay.  So a traditional camera you would have to look

24   through that little hole --

25   A.  Correct.

Chappell - Redirect by Ms. Zack

1  Q.  -- to see what was going to be on the picture?

2  A.  Correct.

3  Q.  But on a digital camera, you look at the screen?

4  A.  You can, yes.

5  Q.  Okay.  And you were asked was it possible, based on the way

6  the pictures were taken, that a child took the picture because

7  of the height and the angle of the picture, correct?

8  A.  Correct.

9  Q.  Is it possible that an adult took the picture but was

10 holding it down in front of them with their arms extended,

11 looking at the big screen on the back?

12 A.  That's possible, yes, ma'am.

13 Q.  And are pictures commonly taken that way now with these new

14 digital cameras, because you can see what the picture is going

15 to actually be before you take it?

16 A.  Yes, ma'am.

17 Q.  Now, let's look at 4c.  There was discussion of this

18 picture and that it was not sexually suggestive, not that you

19 said that, but that it was suggested to you that it was not

20 sexually suggestive.  What, if anything, does an adult male's

21 mouth on the neck of a child suggest to you?

22       MR. JARVIS:  Judge, we are going to object.  That's

23 not in the picture.

24       THE COURT:  The picture is in evidence.  You can

25 rephrase the question to be a little more precise about what

Chappell - Redirect by Ms. Zack

1  the visual evidence is in the picture as to the relationship of

2  the adult's mouth and the child's neck.

3  BY MS. ZACK:

4  Q.  What, if anything, do you find sexually suggestive about

5  the location of Mr. Noonan's face to the neck of the boy?

6  A.  It does look close to me to the neck area.  His hand is on

7  top of the head, thereby exposing the side of the neck from

8  the shoulder.  And it does to me just first looking at the

9  picture and the first time I saw the image, looked to me like

10  Mr. Noonan was -- had his mouth against his neck.

11  Q.  Now, in the evidence that you reviewed, the forensic

12  evidence, the cameras, all of that, you found pictures on

13  Mr. Barry's computer of the children naked, correct?

14  A.  Correct.

15  Q.  Pictures of the children naked on Mr. Noonan's computer,

16  correct?

17  A.  Correct.

18  Q.  And pictures of the children naked in Mr. Barry's camera,

19  correct?

20  A.  Correct.

21  Q.  And in Mr. Noonan's camera?

22  A.  Correct.

23  Q.  Now, what evidence were you given or were you informed of

24  from the search of Mr. Barry's house about pictures of the

25  children naked being displayed in the home?

Chappell - Redirect by Ms. Zack

1   A.  I didn't have any information for that.

2   Q.  Would that be something that would have been looked for by

3   the search team?

4   A.  Or they would have seen it --

5           MR. JARVIS:  Objection.  Speculation.

6           THE COURT:  Are you asking about the ordinary

7   procedures that they would follow?

8           MS. ZACK:  Yes.

9           THE COURT:  I'll allow that.

10  A.  Yes, that's something that they would have noticed and

11  looked for, yes, ma'am.

12  BY MS. ZACK:

13  Q.  Would it have been documented as part of that process?

14  A.  I believe so, yes, ma'am.

15  Q.  So what evidence, other than Mr. Barry using the term

16  "nudist," do you have to suggest that Mr. Barry is a nudist or

17  practices a nudist lifestyle?

18  A.  Only what his comments in the chats that I recovered and a

19  few of the search terms that related to True Nudist and Lone

20  Star Nudist Resort.

21  Q.  What evidence was found in his home to suggest that?

22  A.  I don't believe any was found.

23  Q.  And other than the painting pictures contained in

24  exhibit -- I believe it's 9, but let me double-check, yes, in

25  exhibit -- not Exhibit 9, I'm sorry.  In 20, in Exhibit 20,

Chappell - Redirect by Ms. Zack

1  other than 20e, f, and g, those were the only nude pictures of
2  the boys you found on Mr. Barry's camera, correct?
3  A.  That is correct.
4  Q.  And did you find any nude pictures of the boys on
5  Mr. Barry's computer that weren't contained on either
6  Mr. Noonan's camera or in Mr. Noonan's computer?
7  A.  Can you repeat that again?  I'm sorry, ma'am.
8  Q.  Sure.  Other than those three pictures, did you find any
9  pictures of the boys naked on Mr. Barry's computer that were
10  not in Mr. Noonan's computer or Mr. Noonan's camera?
11  A.  Yes, ma'am.  There's several -- if I'm understanding the
12  question correctly, there are images on Mr. Barry's computer
13  that are not on Mr. Noonan's.
14  Q.  Okay.  That were taken somewhere other than Mr. Noonan's
15  home?
16  A.  Oh, no, ma'am.  No, ma'am.  Okay.  I understand.  No,
17  ma'am.
18  Q.  Okay.  So there were no pictures found on Mr. Barry's
19  computer of his children naked other than ones taken at
20  Mr. Noonan's home; is that correct?
21  A.  And the unknown location.
22  Q.  Right.
23  A.  Correct.
24  Q.  And you're talking -- when you say that, you're talking
25  about the pool picture?

Chappell - Redirect by Ms. Zack

1    A.   And the one on the couch with the yellow wall behind it.

2    Q.   Okay.   And that's the picture of the four of them?

3    A.   Correct.

4    Q.   Mr. Noonan, Mr. Barry, and the two children?

5    A.   Yes, ma'am.

6    Q.   Okay.   That's picture 4a actually, correct?

7    A.   Correct.

8    Q.   Okay.

9         THE COURT:   It doesn't seem that you're anywhere near

10   the end of your --

11        MS. ZACK:   No.

12        THE COURT:   All right.   Let's recess now until 2:00

13   o'clock.   If it looks like it's going to be much longer than

14   that, I will arrange to have you notified here in the

15   courtroom.   I'll try to minimize the inconvenience to you, but

16   I really don't have any control over what the afternoon

17   schedule is going to look like, sadly.   So we do need to plan

18   on tomorrow morning as well --

19        MS. ZACK:   Yes, Your Honor.

20        THE COURT:   -- at least.

21        MR. JARVIS:   Do you want us to give our cell phone to

22   your clerk so they can track us down?

23        THE COURT:   Sure.   That will be fine.   Thank you very

24   much.

25        (Lunch recess from 12:40 p.m. to 2:00 p.m.)

Chappell - Redirect by Ms. Zack

1    *(Open court, Defendant present.)*

2              THE COURT:  Are we ready?

3         MS. ZACK:  Yes, Your Honor.

4              THE COURT:  You may be seated, sir.

5                   Okay.  You may proceed.

6         MS. ZACK:  Thank you, Your Honor.

7                   **REDIRECT EXAMINATION CONTINUED**

8    BY MS. ZACK:

9    Q.  Okay.  The images -- there are a number of images that

10   Mr. Barry does not appear in; is that correct?

11   A.  Yes, ma'am.

12   Q.  And I believe you were asked if it was possible if those

13   pictures could have been taken by a child, a timer, or another

14   adult; is that correct?

15   A.  Yes, ma'am.

16   Q.  Okay.  And what evidence do you have that Mr. Barry didn't

17   take those pictures?

18              MR. JARVIS:  Objection.  Not relevant.

19              THE COURT:  Overruled.

20   A.  I have no evidence that he did not take the pictures.

21   BY MS. ZACK:

22   Q.  And what evidence in your investigation uncover that showed

23   Mr. Barry was anywhere other than with his children while he

24   was in Houston?

25   A.  I have no evidence that he was anywhere else other than at

Chappell - Redirect by Ms. Zack

1    Mr. Noonan's.

2    Q.   In the chats there's a discussion about being careful about

3    sending pictures.  Do you recall that chat?

4    A.   Yes, ma'am.

5    Q.   What did that mean to you, based on your training and

6    experience?

7    A.   To basically be careful, because sending the images and

8    stuff are illegal and getting caught.

9    Q.   And what did it tell you about the knowledge of the

10   individuals talking about that?

11   A.   Well, that statement implied that they knew that it's

12   illegal to send the pictures.

13   Q.   Now, 4p -- can we look at 4p?  What does it appear the

14   children are doing in that picture?

15   A.   It appears they're sleeping.

16   Q.   Okay.  What, if any, evidence do you have that they aren't

17   asleep?

18   A.   None, other than the appearance there.

19   Q.   Okay.  And it was suggested that the children may have

20   taken this picture with a timer, correct?

21   A.   Yes.

22   Q.   That was suggested?

23   A.   Yes, ma'am.

24   Q.   Okay.  What evidence do you have that Mr. Barry didn't take

25   that picture?

Chappell - Redirect by Ms. Zack

1  A.  I don't have any evidence that he did not take it.

2  Q.  And let's talk about this picture.  I believe there was a

3  discussion about posing children in general, correct?

4  A.  Correct, yes, ma'am.

5  Q.  Okay.  And based on your training and experience, does

6  something have to be posed in order to be child pornography?

7  A.  No, ma'am.

8  Q.  Can children acting like children be the subject of child

9  pornography even if they're unaware of the fact that they're

10 being photographed?

11 A.  Yes, ma'am.

12 Q.  What -- in reference to many of these pictures, would you

13 agree that many were taken in the bedroom of Mr. Noonan and in

14 the bathroom of Mr. Noonan's house?

15 A.  Yes, ma'am.

16 Q.  When you were questioned about whether there's anything

17 sexually suggestive about the pictures in the bedroom or the

18 bathroom, what makes a bedroom a sexually suggestive location?

19 A.  Any number of things, to include whether or not the persons

20 in the room are nude.  A bedroom is a place commonly known

21 where sex occurs.

22 Q.  And bedrooms and bathrooms, would you agree nudity is often

23 associated with those rooms?

24 A.  Yes, ma'am.

25 Q.  What, if anything, would you say being a nudist has to do

Chappell - Redirect by Ms. Zack

1  with being naked in a bedroom or a bathroom?

2  A.  I wouldn't.

3  Q.  And when you were doing these searches, I know that

4  Mr. Jarvis asked you if you did a query as to search terms used

5  by Mr. Barry on his computer, correct?

6  A.  Yes, ma'am.

7  Q.  Okay.  And I believe he suggested to you that Mr. Barry had

8  been to the True Nudist site thousands of times?

9  A.  Yes, ma'am.

10 Q.  Okay.  Did you specifically look for any time period and

11 chart how many times Mr. Barry went to the True Nudist site?

12 A.  Yes, ma'am.

13 Q.  Okay.  So between September 5th of 2010 and February 6th of

14 2011, were you able to determine how many times approximately

15 Mr. Barry went to the True Nudist Web site?

16 A.  Yes, ma'am.

17 Q.  Approximately how many?

18 A.  Over 500.

19 Q.  Over 500, and that's in a six-month period?

20 A.  Correct.

21 Q.  So would you agree that that's --

22          MR. JARVIS:  Objection.  I'm sorry, but that's

23 leading.

24 BY MS. ZACK:

25 Q.  How many times a day, approximately, would that mean

Chappell - Redirect by Ms. Zack

1   Mr. Barry was going to the True Nudist Web site?

2   A.   Two to three times a day.

3   Q.   For six months straight?

4   A.   Correct.

5   Q.   And what was on this Web site, based on your investigation?

6   A.   Basically it's a social network.   There's a forum where you

7   can pose a question.   It's not live, where you pose a question

8   and people can answer it and respond and then you go back and

9   check that response.   There's live chat.   There's profiles

10  where people provide their names or whatever they want to post

11  about themselves, pictures, and then you can contact these

12  people and you can chat with them.

13  Q.   What did Mr. Barry's profile say?

14  A.   I was not able to find Mr. Barry's profile.

15  Q.   Do you have to have a profile in order to participate in

16  the nonpaid portion of True Nudist?

17  A.   Yes, ma'am.

18  Q.   And who controls the profile?

19  A.   The company that runs True Nudist and their servers.

20  Q.   I phrased that inarticulately.   Who decides what goes on in

21  one's profile?

22  A.   Well, the person who creates their profile puts in what

23  they want other people to know.

24  Q.   Okay.   And if someone creates a profile, can they also

25  delete their profile?

Chappell - Redirect by Ms. Zack

1   A.  Yes, ma'am.

2   Q.  Now, would you say, based on your training and experience,

3   we're talking about sexual places, like a bedroom, correct?

4   A.  Yes, ma'am.

5   Q.  Okay.  Or places associated with sexual activity.  Are beds

6   associated with sexual activity?

7   A.  Yes, ma'am.

8   Q.  So the fact that someone has a bed in a living room, that

9   could be something that you would pay attention to as an

10  investigator?

11  A.  Yes, ma'am.

12  Q.  And there was no evidence that the children slept anywhere

13  other than in Mr. Noonan's bedroom?

14  A.  That is correct.

15  Q.  Or that Mr. Barry slept anywhere other than Mr. Noonan's

16  bedroom?

17  A.  Correct.

18  Q.  What evidence do you have that -- well, let's do it this

19  way:  4w, can we look at that?  This picture you said, based on

20  Government's Exhibit 30, was created twice or has two creation

21  dates on Mr. Noonan's -- I'm sorry, Mr. Barry's computer,

22  correct?

23  A.  Correct.

24  Q.  And what does that tell you about this picture?

25  A.  That the user of the computer moved it and renamed it.

Chappell - Redirect by Ms. Zack

1  Q.  Okay.  And based on what you know about computers and how

2  that process would have to work, what is your opinion as to

3  whether or not a 5 or 7-year-old is capable of doing that?

4  A.  Depending on their ability to read and write, first off,

5  and be able to type "David and the boys," which is what this

6  file name is, and then given how you have to rename a file, I

7  would say it's highly unlikely.

8  Q.  And what does the fact that it was created twice tell you

9  as far as how often or whether it was viewed once it was put

10 there?

11 A.  In all probability the user had knowledge of the file and

12 viewed the file at least once before copying it.

13 Q.  Because it had to be copied or moved to the second place,

14 correct?

15 A.  Correct.

16 Q.  And 4v and 4w are the same image or part of the same group

17 of pictures, correct?

18 A.  Correct.

19 Q.  Okay.  And the creation dates on there show what dates

20 originally?

21 A.  4v, the first creation date was on June 1st of 2010.

22 Q.  And that what was in the "Craig Houston" folder?

23 A.  Correct.  With the file name that is the same as the

24 default, file name assigned by Mr. Noonan's camera.

25 Q.  And then the second time it was created?

Chappell - Redirect by Ms. Zack

1   A.   Was on June 18th of 2010.

2   Q.   And what file folder did it ultimately end up in there?

3   A.   In "David and the boys" with the ampersand, and then it was

4   named "David and the boys" spelling out "and," 009 dot jpeg.

5   Q.   So what does this tell you about Mr. Barry's knowledge of

6   his children being photographed naked?

7   A.   It lends me to believe that he had knowledge that his

8   children were photographed and he had acknowledged of this

9   image and moved it and renamed it and saved it.

10  Q.   Prior to returning to Mr. Noonan's house?

11  A.   Correct.

12  Q.   At least once, if not twice?

13  A.   Correct.

14  Q.   Premised on the fact that there were three trips?

15  A.   Correct.

16  Q.   Beginning of June, approximately two weeks later, and then

17  December?

18  A.   And then again in December, correct.

19  Q.   And let's talk about 4g.  When was that created on

20  Mr. Barry's computer?

21  A.   On January 1st, 2010 -- I'm sorry, correction, June 1st,

22  2010.

23  Q.   And what does that tell you -- and which folder was that

24  in, sorry?

25  A.   This was in "Craig Houston."

Chappell - Redirect by Ms. Zack

1  *Q.*  And what does that tell you about Mr. Barry's knowledge of

2  his children being photographed with Mr. Noonan?

3  *A.*  The -- well, with the other images, again, this one being

4  taken in June 1st and placed in "Craig Houston," I mean, he --

5  with the other images, it tells me that he had to have

6  knowledge, based on the fact that he's traveled there two other

7  times after this one was placed on his computer.

8  *Q.*  And what does the fact that these files existed at all tell

9  you about Mr. Barry's knowledge of his children being

10  photographed?

11         *MR. JARVIS:*  Judge, we're going to object.  That calls

12  for speculation and outside his area of expertise, given the

13  notice.

14         *THE COURT:*  I think it's within the areas you asked

15  about.  I'm going to allow it.

16  *A.*  If Mr. Barry objected to any of the photographs or images

17  that he had -- that I believe he had knowledge of, he obviously

18  didn't delete them and in some cases he's copied them and moved

19  them to other folders that he named more aptly to what they

20  were as a reminder of where they were and who they were with

21  and, again, going back to the fact that he's visited Mr. Noonan

22  three times.

23  BY MS. ZACK:

24  *Q.*  What other evidence do you have that Mr. Barry is not

25  opposed to people taking pictures of his children?  Was there

Chappell - Redirect by Ms. Zack

1   other forensic evidence of that?

2   A.  Yes, ma'am.  There's two separate things.  One, we have the

3   pictures where it shows Mr. Noonan and Mr. Barry being

4   photographed and Mr. Barry is either handing the child a camera

5   or the camera is being -- or he's handing the child to -- the

6   camera to a child or the child is handing the camera to

7   Mr. Barry.  So obviously they know they're getting

8   photographed.

9   Q.  Are you referring to 9a?

10  A.  Correct.

11        MS. ZACK:  Can we go to 9a, please?

12  A.  Correct.  So obviously he has knowledge that photographs

13  are being taken and the children are around.

14  BY MS. ZACK:

15  Q.  I want to talk about 9a real quick.

16  A.  Okay.

17  Q.  9a is a picture of Mr. Noonan and Mr. Barry in Mr. Noonan's

18  bed, naked, sitting right up next to each other, touching side

19  by side, correct?

20  A.  Correct.

21  Q.  And how would you characterize this image in regards to is

22  it casual, is it intimate, is it --

23  A.  In my opinion, it's an intimate knowledge of each other,

24  that this is a close relationship.

25  Q.  Okay.  And in this image there is a child's arm holding a

Chappell - Redirect by Ms. Zack

1    camera, correct?

2    A.   Correct.

3    Q.   And the camera being held in that picture is Government's

4    Exhibit 26, correct?

5            MR. JARVIS:   Judge, we're going to have to object to

6    continued leading.

7            THE COURT:   I'll sustain the objection.

8    BY MS. ZACK:

9    Q.   I'm sorry.   What camera appears in image 9a?

10   A.   That would be Mr. Barry's camera --

11   Q.   Okay.

12   A.   -- which is the Kodak camera.

13   Q.   Okay.   Government's Exhibit No. 26?

14   A.   Correct.

15   Q.   Okay.   And when asked what evidence you had of Mr. Barry's

16   knowledge of pictures being taken involving his children

17   potentially in all these pictures, this is one of the images

18   that leads you to believe he had knowledge, is that what you

19   had said?

20           MR. JARVIS:   Objection.   Leading.

21           THE COURT:   I'll sustain the objection.

22   BY MS. ZACK:

23   Q.   What in this picture makes you believe Mr. Barry has

24   knowledge?

25   A.   The exchange of the camera between Mr. Barry and the child,

Chappell - Redirect by Ms. Zack

1   whichever direction it's going, of Mr. Barry's camera.  Then

2   finding on Mr. Barry's camera, his Kodak camera, an image that

3   is very similar to this picture at just a slightly different

4   angle, taken by someone, which I believe and taken within a

5   short time of this picture being taken.

6   Q.  Are you referring to Government's Exhibit 20c?

7   A.  Correct.

8        MS. ZACK:  Can we see that, please?

9   BY MS. ZACK:

10  Q.  Now, when you reviewed Mr. Barry's computer, what did you

11  find -- what evidence on there did you find that that computer

12  was used by anybody else?

13  A.  Very little.  There were some programs that were child

14  related, but the vast majority of the information that I found

15  seems to be related to David Barry.

16  Q.  And I asked you what, if any, pictures were found in the

17  Barry home that related to nudism?

18  A.  Correct.

19  Q.  And what was your answer?

20  A.  None.

21  Q.  What books or videos or anything was found in the Barry

22  home relating to nudism?

23  A.  My understanding is none.

24  Q.  And what, if anything, was found relating to nudism and

25  child rearing?

Chappell - Redirect by Ms. Zack

1   *A.*   None.

2   *Q.*   Where -- or what pictures were found of Mr. Peterson with

3   the children naked?

4   *A.*   None.

5   *Q.*   And what pictures were found with Mr. Peterson and

6   Mr. Barry naked?

7   *A.*   None.

8   *Q.*   Let's talk about the chats briefly.  In 7e there is a chat

9   about an individual coming to visit, correct, line -- well, the

10  entire chat in general is talking about visits?

11  *A.*   Correct.

12  *Q.*   And in the first part, in 7455 -- well, let's start at

13  7453.  Mr. Barry sends a picture to a third party, correct, to

14  nudemac?

15  *A.*   Correct.

16  *Q.*   And we know that that picture involved nude images based on

17  line 7455?

18  *A.*   Correct.

19         *MR. JARVIS:*  Objection.  Continued leading, Judge.

20  BY MS. ZACK:

21  *Q.*   What do we know about that picture based on the response in

22  7455?

23  *A.*   I believe that it's a nude picture sent by Mr. Barry,

24  because of the statement that nudemac makes about be careful

25  about sending naked pics of kids.  It's illegal.

Chappell - Redirect by Ms. Zack

1   *Q.*  And earlier -- well, let me ask it this way:  Besides the

2   image file folders and the creation dates that you've talked

3   about, what other evidence do you have that Mr. Barry was using

4   the Internet to send or receive nude images of children?

5   *A.*  By the Messenger cache, the Windows Messenger cache, which

6   had graphic files inside of it, meaning that those graphic

7   files had to have been -- were rendered using or sent or

8   received using an Instant Messenger program, particularly MSN

9   chat.

10  *Q.*  And what is the likelihood that images would show up in the

11  Instant Messenger cache on two separate dates by accident?

12  *A.*  It wouldn't unless the sender sent them accidentally, but

13  it wouldn't.

14  *Q.*  So when we're talking about 4aa through gg and we look at

15  the creation dates, and I'm talking about in Government's

16  Exhibit 30, a lot of those were created on 11-20, correct?

17  *A.*  Correct.

18  *Q.*  But 4cc was created on 12-18?

19  *A.*  Correct.

20  *Q.*  And what does that tell you forensically?

21  *A.*  Well, separate and apart from the other pictures and when

22  they were sent or received, it was a separate message.

23  *Q.*  And you were asked if Mr. Barry ever looked at these

24  pictures.  What do you know as far as what would have appeared

25  and why do we have these thumbnails?

Chappell - Redirect by Ms. Zack

1   A.   Correct.   The -- when the Window Messenger program is

2   opened on the desktop, you have a dialogue box.   Within that

3   dialogue box is the contents of the chat that is occurring, the

4   text that's being sent back and forth, the words.   When a user

5   sends another user a picture or a graphic file, that picture

6   will be rendered within that dialogue box and viewable by the

7   other person.

8   Q.   And what do you know about -- you said that the creation

9   date shows you when something got on the computer the first

10  time?

11  A.   Correct.

12  Q.   Are the times here accurate as well, meaning in 4cc, it

13  says "12-18-2010" and then it says "2:53:16 p.m."?

14  A.   On 4cc?

15  Q.   Yes.

16  A.   I'm sorry, I was looking at the wrong one.

17  Q.   In Exhibit 30, Government's Exhibit 30.

18  A.   That's correct.

19  Q.   Okay.   Is that time accurate and reliable forensically?

20  A.   Yes, ma'am.

21  Q.   Okay.   So then let's discuss 4aa was created on

22  November 20th, correct?

23  A.   Correct.

24  Q.   What time?

25  A.   6:50 and 3 seconds p.m.

Chappell - Redirect by Ms. Zack

1  Q.  And what about 4bb?

2  A.  That was at 4:30:12 p.m.

3  Q.  And that's almost a two-and-half-hour difference?

4  A.  Correct.

5  Q.  What does that tell you forensically about how these

6  pictures were received by Mr. Barry?

7  A.  That it was part of a separate and distinct chat from when

8  the other one was sent -- or conversation, should I say.

9  Q.  Okay.  Because it was two and half hours later?

10 A.  Correct.

11 Q.  And then potentially 4bb -- I'm sorry, 4aa and 4dd could

12 have been part of the same chat?

13 A.  Correct.

14 Q.  And whereas 4ee and 4bb may have been part of the same

15 chat?

16 A.  And 4ff, yes, ma'am.

17 Q.  Okay.  So from this, approximately how many different

18 distinct chats with these images do you believe there were?

19 A.  Three.

20 Q.  On two separate dates?

21 A.  Yeah, on this one date.  There were three separate chats --

22 I'm sorry.  Two separate chats on this one day and a third chat

23 on a different day, on December 18th.

24 Q.  And what is the likelihood that those pictures ended up at

25 three separate times on two separate dates on Mr. Barry's

Chappell - Redirect by Ms. Zack

1  computer and Instant Messenger cache by accident?

2  A.  I believe it's unlikely.

3  Q.  Chat 7e, line 7475, what does that line say?

4  A.  "Well, you can see them live when you come to visit."

5  Q.  And who's the speaker there or the sender?

6  A.  Mr. Barry.

7  Q.  And what is he talking about seeing live?

8  A.  I believe he is referring to the children, telling the

9  nudemac, about nudemac visiting the children in person.

10  Q.  And can you tell us what is normal about an adult male

11  discussing his children's penises with other adult males?

12          MR. JARVIS:  Objection, Judge.  That's out of his area

13  of expertise as provided by the notice by the Government?

14          THE COURT:  Response?

15  BY MS. ZACK:

16  Q.  In the context, Special Agent Chappell, of your

17  investigation into individuals with a sexual interest in

18  children.

19          THE COURT:  I'll allow it.

20  A.  There's very little normal about it.  Nothing is normal

21  about it.

22  BY MS. ZACK:

23  Q.  And in your capacity as a forensic investigator, do you

24  examine computers that don't have child pornography on them?

25  A.  Yes, ma'am.

Chappell - Redirect by Ms. Zack

1  *Q.* And how often do you find chats on those computers about
2  nude children and their penises?
3  *A.* I can say that I've never found a chat related to that on a
4  non-CP computer.
5  *Q.* In 7m, line 30421, who is speaking in that line?
6  *A.* Mr. Barry.
7  *Q.* And what is the conversation about up into that point in
8  general?
9  *A.* Male -- or penal erection and masturbating.
10 *Q.* And what does Mr. Barry tell unknown in line 30421?
11 *A.* "Have seen me hard and leaking precum, always leak when
12 hard."
13 *Q.* You indicated that when you forensically examined the
14 computer, you were able to determine that Mr. Barry used Skype;
15 is that correct?
16 *A.* That's one of the programs, yes, ma'am.
17 *Q.* Okay.  And what other video chat programs did you find,
18 what, if any?
19 *A.* That was the only one.
20 *Q.* Okay.  And what do --
21 *A.* Well, let me preface that.  That was the only one that's
22 specifically linked to video.  MSN Live Instant Messenger,
23 Yahoo Instant Messenger, both have video chat features built
24 in.  They're primarily text chatting, but they have that as
25 well.

Chappell - Recross by Mr. Jarvis

1  *Q.*  Okay.  Were both of those programs on his computer?

2  *A.*  Yes, ma'am.

3  *Q.*  Okay.  But you had indicated -- well, let me ask it this

4  way:  Why don't we have the Skype chats?

5  *A.*  By default, Skype when you install Skype, the video

6  sessions are not saved.  That is something that a user has to

7  go in and ask for it to save and have Skype actually save those

8  files to a user specific folder.

9  *Q.*  And where in any of the forensic analysis that you did, did

10  you find any admonition by Mr. Barry to Mr. Noonan not to

11  photograph his children?

12  *A.*  None.

13  *Q.*  And where did you find any evidence that Mr. Barry would

14  refuse people who wanted to photograph his children naked?

15  *A.*  None.

16         *MS. ZACK:*  Can I have a moment, Your Honor?

17         *THE COURT:*  You may.

18         *MS. ZACK:*  No further questions for this witness, Your

19  Honor.

20         *THE COURT:*  All right.  Thank you.

21             Any recross?

22         *MR. JARVIS:*  Thank you, Judge.  Just a few.

23                    **RECROSS-EXAMINATION**

24  BY MR. JARVIS:

25  *Q.*  You told Ms. Zack that there's nothing in the original

Chappell - Recross by Mr. Jarvis

1   forensic videos or in the school records about nudism, correct?

2   A.  Correct.

3   Q.  Did you see anybody ask that question?

4   A.  No, sir, I don't believe it was brought up.

5   Q.  It's probably not something 5, 6, 7-year-old boys are going

6   to be shouting out to their teachers, "We walk around home

7   nude," right?

8           MS. ZACK:  Objection.  Calls for speculation.

9           THE COURT:  I'll sustain the objection.

10  A.  Specifically -- I'm sorry.

11          THE COURT:  Well, wait for the next question.

12          THE WITNESS:  I'm sorry.  I'm sorry.  Yes, ma'am.

13          THE COURT:  Thank you.

14  BY MR. JARVIS:

15  Q.  So if nobody asked them about it, it's not unusual that

16  they wouldn't be saying it.  Would that be a fair statement?

17  A.  It's possible, yes, sir, if no one asked it.

18  Q.  They might not even know what the term "nudism" is.

19          MS. ZACK:  Objection.  Once again, calls for

20  speculation.

21          THE COURT:  I'll sustain the objection.

22  BY MR. JARVIS:

23  Q.  Do you recall reviewing the interview Mr. Barry had with

24  Detective Jones?

25  A.  A little bit, yes, sir.

Chappell - Recross by Mr. Jarvis

1  Q.  And it was definitely discussed in that interview, wasn't

2  it?

3  A.  Yes, sir.

4  Q.  So that was a week after the search warrant was executed in

5  2011, and so we know that that was discussed and that was

6  Mr. Barry's position at least at that time, correct?

7         MS. ZACK:  Objection.  Calls for a response based on

8  hearsay.

9         THE COURT:  Mr. Barry's response, so I'll allow it.

10  I'll allow just the answer to the question.

11  BY MR. JARVIS:

12  Q.  Isn't that true?

13  A.  Correct.

14  Q.  Okay.  And then you talked a little bit about 5, 6,

15  7-year-olds not being able to handle the timer apparatus or

16  sequence of events, correct?

17  A.  Correct.

18  Q.  Okay.  Well, you're aware, though, that there's math and

19  reading software and marketing now for preschoolers, 3 to

20  5-year-olds?

21  A.  Yes, sir.

22  Q.  And kindergartners?

23  A.  Correct.

24  Q.  And kids, once you show them something, they're pretty

25  smart on these new electronic devices, unlike old people like

Chappell - Recross by Mr. Jarvis

1   me, right?

2   A.  For the specific task that they're shown typically, yes.

3   Q.  And how do we know Mr. Noonan didn't show them how to

4   operate the camera?

5   A.  I don't, sir.

6   Q.  So it's not a difficult task.  You just have to have

7   somebody show you the two or three steps and boom, it's done,

8   right?

9   A.  And explain what it is, correct, yes, sir.

10  Q.  Okay.  So you don't have any evidence that that didn't

11  happen, right?

12  A.  No, sir, I do not.

13  Q.  And we know that the timer was used at least a couple of

14  times for sure, because all four of them are in the same

15  picture?

16          MS. ZACK:  Objection.  Calls for speculation.

17          THE COURT:  Sustained.

18  BY MR. JARVIS:

19  Q.  You had a number of how many times somebody went on

20  Mr. Barry's computer and went to truenudism.com from 9-5-10 to

21  2-6-11, correct?

22  A.  Correct.

23  Q.  Did you find his first time to go to truenudism.com?

24  A.  No, sir.

25  Q.  Were you not looking for that?

Chappell - Recross by Mr. Jarvis

1  A.  No, sir.  These are Internet cookie files that are

2  volatile.  They are constantly overwritten, deleted,

3  overwritten, deleted, as you use through the Web browser,

4  whether it's a Mozilla Firefox, Chrome, Google Chrome, or

5  whatever.

6           The first instance I was able to find true

7  nudism, with him visiting, was 9-6 of 2010.

8           Also, let me say, your Internet history file

9  folder is set to a default size; and when it gets to that size,

10  it will start deleting and overwriting stuff.  So that also

11  leads to why there may not be records going further back than

12  what I found.

13  Q.  So you would agree with me it's entirely possible that he

14  visited before September 2010?  You just couldn't find them?

15  A.  Correct.  Yes, sir.

16  Q.  Okay.  And then there was a question about there's no

17  evidence that Mr. Barry was anyplace else other than Craig

18  Noonan's house.  Do you remember saying that?

19  A.  Correct.

20  Q.  Well, going back to the interview with Detective Jones,

21  Mr. Barry said at that time that he went to a job fair.  Do you

22  remember that?

23           MS. ZACK:  Objection.  Calls for a response based on

24  hearsay and commenting on items not in evidence.

25           THE COURT:  I'm going to allow the question.  This is

Chappell - Recross by Mr. Jarvis

1   a bench trial.  I can sort out the information that shouldn't
2   be considered.  But for the moment I think it's -- since it's
3   part of the evidence, I'm going to hear it.
4   BY MR. JARVIS:
5   Q.  Do you remember Mr. Barry saying that he left to go to a
6   job fair and left the boys with Mr. Noonan?
7   A.  Correct.
8   Q.  Okay.  So there is evidence that he was someplace else
9   other than Mr. Noonan's house, at least for a short period of
10  time?
11  A.  There's the statement from Mr. Barry stating that he did,
12  correct?
13  Q.  Well, that would be evidence, right?
14  A.  Okay.
15  Q.  Okay.  And there's not any evidence that Mr. Barry was in
16  the room when the picture was taken, any of these pictures,
17  right, except the ones he's in?
18  A.  Correct.
19  Q.  So, I mean, there's no -- it would be like somebody from
20  outside the courtroom not knowing what's going inside the
21  courtroom, right?
22  A.  Possibility, yes, sir.
23  Q.  You wouldn't hold them liable for what we're doing, would
24  you?
25  A.  In that scenario, no, sir.

Chappell - Recross by Mr. Jarvis

1   *Q.* Okay. Now, during this time period that -- you got

2   September 2010 to February 2011, where are all the chats that

3   he supposedly in on at truenudism.com? Do you not have any of

4   those?

5   *A.* No, sir -- well, they may -- again, it's not a simple, yes,

6   this is where they're at. Truenudism.com uses a chat and forum

7   function that is hosted by the Web site. Just like with

8   Web-based e-mails, that information is not necessarily fully

9   contained on the user's computer. It's not logged and saved

10  all the time. It would have to be parsed into the memory and

11  where a lot of these chats came from. Some of these chats I

12  have no idea what Instant Messenger program they used. These

13  could be from True Nudist.

14  *Q.* And you went there, did you -- surely you talked to

15  somebody at truenudism or truenudist.com and said, "Hey, do

16  y'all have a record of wfglassman ever being on here"?

17  *A.* No, sir.

18  *Q.* Why not?

19  *A.* That wasn't part of what I was doing with the

20  investigation. I never sent anything to True Nudist. I didn't

21  have anything related directly to truenudism, that Mr. Barry

22  posted child pornography at that time to the Web site.

23  *Q.* Well, wouldn't it have been important for you to find out

24  if he did turn in a couple of the people to the moderator,

25  because they were talking bad about sexually abusing kids or

Chappell - Recross by Mr. Jarvis

1  asking questions that led him to believe that?  Wouldn't that

2  be important to confirm that he was telling the truth to

3  Detective Jones a week after the search warrant?

4          *MS. ZACK:*  Objection.  Calls for speculation.  We

5  don't know that --

6          *THE COURT:*  I'll sustain the objection.

7  BY MR. JARVIS:

8  *Q.*  Did you send a subpoena there to that company, like you did

9  AT&T and the other company, tracking down the records?  Because

10 you knew he had been to that site, right?

11 *A.*  Correct.  When I started my investigation -- or during my

12 course of investigation and I looked at truenudism or

13 truenudist.com, it was well after the fact.  And most Web

14 posting companies, Web sites and Internet service providers are

15 only required to keep their records for at least 30 days.  Some

16 of those don't even keep them that long, especially Web sites,

17 as they are not required to.  Being how far out it was that I

18 was starting my investigation, I didn't see it pertinent or

19 that I would get any information back that would have been

20 relevant, even if they had it at all, which was highly likely

21 that they did not have it.

22 *Q.*  And the other question Ms. Zack asked you was about you

23 must have a profile to get on part of that truenudism?

24 *A.*  Correct.

25 *Q.*  And somehow the profile gets you into another section,

Chappell - Recross by Mr. Jarvis

1  right?

2  A.  It can, yes, sir, I believe.

3  Q.  Okay.  And then you said the profile can be deleted,

4  correct?

5  A.  Correct.

6  Q.  And when you went on there, you couldn't find his profile?

7  A.  Correct.  Well, part of it was you can sign up with

8  whatever you want.  I don't know what he used to sign up on

9  there, if he used wfglassman, if he used a different name, if

10  he used his real name, a fake name.  Wfglassman, I did not find

11  on truenudism when I searched it, to the best of my ability to

12  search it, given that I wasn't a paid member, also.

13  Q.  Well, and do you recall, now that we talked about it

14  yesterday and a little bit some today, inside of the original

15  offense report, there is a statement from the men on the

16  ground, the agents on the ground there in Wichita Falls, asking

17  him to voluntarily give over his name and ID.  Have you gone

18  back and looked and confirmed that?

19  A.  No, sir, not since yesterday.

20  Q.  Okay.  Well, they took -- law enforcement, the Homeland

21  Security from the Northern District took all of his computers

22  then, right?

23  A.  Correct.

24  Q.  So it would be almost impossible for him to go on and

25  delete his truenudism.com, right, because he didn't have his

Chappell - Recross by Mr. Jarvis

1   computer anymore?  You guys had it.

2   A.  At that time, yes, sir.

3   Q.  Okay.  Well, to my knowledge, he has never gotten that

4   computer back.  Are you aware of that?

5   A.  But I don't know if he -- I'm sorry.  I don't know if he

6   bought another computer or gone to a library to borrow -- I

7   mean, there's other access besides having his computer taken

8   away from him.  But we did not disconnect his Internet access

9   at his house either.

10  Q.  But he hasn't hidden that from law enforcement from the

11  very beginning, true; isn't that correct?

12  A.  That I know of, no, sir.

13  Q.  Okay.  All right.  Now, there was a question about the

14  file -- that some of these pictures, 4w, being created and

15  moved and put on Mr. Barry's computer, right?

16  A.  Right.

17  Q.  And you said it was on 6-1 and 6-18-2010, correct?

18  A.  Correct.

19  Q.  Well, what if -- isn't it possible that Craig Noonan could

20  have done that on his computer?

21  A.  If he had had access to Mr. Barry's computer, then it's

22  possible he could have.

23  Q.  Right.  And you already testified and agreed with me, his

24  computer is not password protected, right?

25  A.  Correct.

Chappell - Recross by Mr. Jarvis

1  Q.  So I could have got on there had I been sitting next to the

2  computer and done whatever I wanted to, right?

3       MS. ZACK:  Objection.  Calls for speculation.

4  Relevance.

5       THE COURT:  I'll sustain the objection.

6  BY MR. JARVIS:

7  Q.  Well, Mr. Noonan, if the computer was at his house, had

8  access to Mr. Barry's computer, correct?

9       MS. ZACK:  Objection.  Calls for speculation and

10 assumes facts not in evidence.  There's no evidence Mr. Barry's

11 computer was ever at Mr. Noonan's house.

12      MR. JARVIS:  Judge, he's an expert.  I can ask him --

13      THE COURT:  That doesn't answer the question.  I think

14 it was just a hypothetical.  If you can state it explicitly as

15 such --

16      MR. JARVIS:  Yes, ma'am.

17      THE COURT:  -- that would be, I think, responsive to

18 the objection.

19      MR. JARVIS:  Yes, ma'am.

20 BY MR. JARVIS:

21 Q.  Well, hypothetically, if Mr. Barry's computer was at

22 Mr. Noonan's house the first week of June and I guess the

23 second or third week of June, corresponding to those two dates,

24 and if that computer is not password protected, then it is

25 entirely possible that Mr. Noonan could have put those pictures

Chappell - Recross by Mr. Jarvis

1    on Mr. Barry's computer, named a file, created a name, such as

2    "David and the boys," on both those dates, correct?

3    A.   Correct.

4    Q.   So did you ever find any evidence that he did not do that,

5    that Mr. Noonan didn't do that?

6    A.   No, sir.

7    Q.   And isn't it more likely that he created -- Mr. Noonan

8    created the name "David and the boys" than Mr. Barry creating

9    the file saying his name and the boys?

10   A.   I wouldn't say -- it could go either way.  I mean, I

11   wouldn't know what Mr. Barry would be thinking creating file

12   names.

13   Q.   Then Ms. Zack asked you about 9a, the one with the camera?

14   A.   Correct.

15   Q.   Mr. Barry and Mr. Noonan sitting there and the camera going

16   one way or the other.  Do you remember that one?

17   A.   Correct.  Yes, sir.

18   Q.   Okay.  All right.  And you said it shows knowledge on the

19   part of David Barry that the pictures of the boys were being

20   taken, correct?

21   A.   That pictures are being taken, correct, yes, sir.

22   Q.   Now, let me ask you this:  Does it show knowledge that

23   pictures, plural, are being taken of the boys or does it show

24   knowledge that picture, that picture or those series of

25   pictures of those two men on the bed, there's at least two,

1  maybe three of them, that those pictures only are being taken?

2  A.  To me it shows that pictures are being taken with the

3  cameras and the children are involved with taking pictures.

4  Q.  That picture and the other picture with just the two men in

5  it, you don't know who took that picture, right?

6  A.  I have -- I don't have direct evidence of who's physically

7  holding the camera, no, sir.

8  Q.  You don't have any circumstantial evidence other than you

9  think you know all the people that were there, right?

10  A.  Correct.

11  Q.  Now, the mere fact that that picture was taken and the boys

12  are in the room -- let's assume that as a hypothetical.  Okay?

13  A.  Yes, sir.

14  Q.  How does that translate into other pictures being taken at

15  another time in another room and David Barry having knowledge

16  of that?

17  A.  Again, going back to these two sets of pictures, the file

18  paths and file names, the Instant Messenger stuff, it's the

19  totality of those is what leads me to believe that Mr. Barry

20  had knowledge these pictures were being taken and had -- and

21  didn't prevent or otherwise say not to take these pictures.  He

22  didn't -- they're all there.  He sent them in Instant Messenger

23  cache.  They've been renamed.  He's taken pictures with the

24  boys.  We have pictures showing that cameras are involved.

25  Therefore, he -- to me the totality of it shows that Mr. Barry

Chappell - Recross by Mr. Jarvis

1  had knowledge and agreed with this.

2  Q.  Okay.  Isn't it true that it may show knowledge of those

3  pictures that Mr. Barry was in, because you've already

4  testified that you have no evidence at all, either direct or

5  circumstantial, that Mr. Barry knew of each one of these

6  individual pictures that we've talked about that y'all have

7  admitted into evidence, correct?

8           MS. ZACK:  Objection.  Asked and answered.

9           THE COURT:  Sustained.

10  BY MR. JARVIS:

11  Q.  The other question Ms. Zack asked you was about 4ee, 4bb,

12  and 4ff could be part of the same chat.  You said there were

13  two distinct chats, one on this date and a third date on

14  December -- I wrote down 18th.  Is that the right date?

15  A.  Correct.  12-18-2010.

16  Q.  Yes, sir.  And that they're unlikely or by mistakes.  But

17  where are the chats that go with them?

18  A.  This is -- again, going back to what I had mentioned

19  earlier, these images are within the Messenger cache.  The

20  Messenger cache is only for the temporary storage of files that

21  need to be rendered that are being used by the Windows

22  Messenger program.  The chats are not contained in there.  The

23  chats are contained in this particular case in several

24  different areas, because Windows Messenger by default does not

25  log the chats.  And so what I've recovered may be part of a

Chappell - Recross by Mr. Jarvis

1   chat where these images were sent in Messenger cache, they may

2   not.  I have nothing that I can directly tie these chats with

3   these pictures.  I just know that the pictures were used in

4   Windows Messenger.

5   Q.  Okay.  And you testified under questioning of 7c, I

6   believe, 4745 -- that must be the wrong one.  7e.  There's

7   nothing normal about naked men around naked boys, right?  Isn't

8   that what you said?

9   A.  Repeat that again, sir.

10  Q.  There's nothing normal about naked men being around naked

11  boys?

12  A.  Correct.

13  Q.  Okay.

14  A.  That are not related to them.

15  Q.  Right.

16  A.  Correct.

17  Q.  But that's not the test for illegality, is it?

18  A.  In and of itself, no, sir.

19  Q.  Okay.  Because it's -- a lot of stuff is not normal, but

20  that doesn't mean it's illegal, right?

21  A.  Correct.

22  Q.  Okay.

23          MR. JARVIS:  Pass the witness, Judge.

24          THE COURT:  Anything further?

25          MS. ZACK:  No, Your Honor.

1          *THE COURT:*  All right.  Thank you.  You may step down

2     sir.  Thank you.

3          *THE WITNESS:*  Thank you, ma'am.

4          *MS. ZACK:*  Your Honor, we would like to read the

5     transcript.

6          *THE COURT:*  That's fine.

7          *MS. ZACK:*  Do you want Mr. Stabe to take the stand?

8          *THE COURT:*  Yes, that would be fine.  Thank you.

9          *MS. ZACK:*  And, Your Honor, there's a direct and a

10    cross.  Is it okay if I be the questioner for both of those?

11         *THE COURT:*  Sure.

12         *MS. ZACK:*  Okay.

13         *THE COURT:*  Sure.

14         *MS. ZACK:*  There's also a question by the Court.

15         *THE COURT:*  You can be the questioner.

16         *MS. ZACK:*  Thank you.

17              Your Honor, Mr. Peterson was called by the

18    Defendant and sworn in.  At this point I will be reading

19    Mr. Jarvis's questions.

20         *(The following testimony of Mark Peterson was read:)*

21                        **DIRECT EXAMINATION**

22    BY MR. JARVIS:

23    *Q.*  Would you state your name, please.

24    *A.*  Mark Peterson.

25    *Q.*  And are you the life partner of David Barry?

1    A.   Yes, sir.

2    Q.   And how long have you been together?

3    A.   20 years.

4    Q.   And where does David work?

5    A.   WDS in Wichita Falls.

6    Q.   How long has he been doing that?

7    A.   About a year and a half.

8    Q.   How old is he?

9    A.   54.

10   Q.   And has he always either worked or gone to college?

11   A.   Yes, sir.

12   Q.   Now, how long have you and David lived in Wichita Falls?

13   A.   We've lived together for 20 years.  I've lived here all my

14   life, or Wichita Falls.

15   Q.   And how long have y'all lived at the same address?

16   A.   The last -- since 1993.

17   Q.   Now, y'all had the boys arrive in '05.  David formally

18   adopted them in '07.  And at that point in time when David

19   adopted them and you were living there, was David a nudist at

20   that time?

21   A.   No, sir.

22   Q.   And did he later became one?

23   A.   Yes, sir.

24   Q.   Did you ever became a nudist?

25   A.   I dabbled with it, but not really full time.

1  Q.  Did you go visit Craig Noonan or Tim Whittington with David

2  and the boys?

3  A.  No, sir.

4  Q.  Now, have you seen those pictures?  I guess you're going to

5  get to see them, but you've testified in the Wichita Falls

6  case, correct?

7  A.  Yes, sir.

8  Q.  And you saw 40 to 50, however many they wanted to of naked

9  pictures in Craig's house and Tim Whittington's house, correct?

10  A.  Yes, sir.

11  Q.  And that's the first time you had seen those?

12  A.  Yes, sir.

13  Q.  Now, when they executed the search warrant in February of

14  2011, were you there part of the time?

15  A.  Yes, sir.

16  Q.  And did the agents look at the pictures then on the

17  computer?

18  A.  I believe so.  The computer was pointing away from me, so I

19  have no idea what they were looking at, but they were looking

20  at something.

21  Q.  Was anybody arrested for child pornography?

22  A.  No, sir.

23  Q.  And the boys were taken by CPS.  How old were they?

24  A.  Six and seven.

25  Q.  And they were in counseling every week.  Did either of them

1   make an outcry?

2   A.  No, sir.

3   Q.  We had a termination hearing or trial that the judge

4   already said.  Did David Barry testify during that trial?

5   A.  Yes, sir.

6   Q.  About a day and a half, I think?

7   A.  I believe so.

8   Q.  And he had already given the videotapes to the Wichita

9   Falls Police Department, correct?

10   A.  Pardon?

11   Q.  He went a week after the search warrant and gave a taped

12   interview?

13   A.  Oh, yes, sir.

14   Q.  And the jury denied termination and returned the boys to

15   you and David, correct?

16   A.  Yes, sir.

17   Q.  Did they have any stipulations or conditions on that?

18   A.  No, sir.

19   Q.  How did the boys do after that back in y'all's care?

20   A.  They were thrilled to be home.  We couldn't get out of

21   their sight.  Since then they have excelled in school.  They

22   both made the honor roll this year and As and Bs all year long.

23   Q.  And we have their grades if the Court needs them.

24        MS. ZACK:  Then by the Court:  Mr. Peterson, do you

25   also have custody of these children, legal custody?

1          *THE WITNESS:*  No, sir.

2          *MS. ZACK:*  The Court:  It's just Mr. Barry?

3          *THE WITNESS:*  Yes, sir.

4          *MS. ZACK:*  The Court:  So what happens if Mr. Barry is

5     not around?

6          *THE WITNESS:*  For what reason?

7          *MS. ZACK:*  The Court:  For the kids.

8          *THE WITNESS:*  Well, I mean, I was approved foster care

9     and the --

10          *MS. ZACK:*  The Court:  The kids would stay with you

11    though?

12          *THE WITNESS:*  The kids would stay with me, yes, sir.

13          *MS. ZACK:*  Back to Mr. Jarvis:  We're in the process

14    of attempting that.  CPS has made some requests and we're

15    trying to accomplish their goals.  Right now the boys are with

16    Aunt Melonie, which is David's sister.  She had them for a

17    little bit at the very beginning, away back, when she took them

18    originally, but she can't keep them for any length of time.

19    But technically he doesn't have any legal right to them.

20                    The Court:  Okay.  Thank you.

21    BY MR. JARVIS:

22    *Q.*  Now, how long have you and David been aware that the Feds

23    were investigating him for a federal crime in Houston?

24    *A.*  My sister called me earlier this year and informed me of

25    it.  I believe January.

1    Q.   And y'all have stayed in the same place; David hasn't run?

2    A.   No, sir.

3    Q.   Has David ever been arrested before all this?

4    A.   Last October, Tarrant County.

5    Q.   For this same Tarrant County deal?

6    A.   Yes, sir.

7    Q.   And does David have an alcohol and drug problem?

8    A.   No, sir.

9    Q.   Does he have any medical issues?

10   A.   Thyroid problem.

11   Q.   And will he be able to abide by any conditions that the

12   judge sees fit to put on him, if the judge decides to release

13   him?

14   A.   I believe so.

15   Q.   Now, you know that David can't be around the boys if he's

16   released.  Tell the Court what the plan is if that happens.

17   A.   If the -- the plan is if he gets released, if I get

18   conservatorship, the boys will move in with me in our house and

19   the David will go with his dad.

20   Q.   And his dad lives in Wichita Falls?

21   A.   Yes, sir.

22   Q.   And David has his sister and his brother and his dad?

23   A.   Yes.

24   Q.   And all live in Wichita Falls?

25   A.   Yes, sir.

1   Q.  Now, do y'all walk around naked anymore?

2   A.  No, sir.

3   Q.  And when did that stop?

4   A.  As soon as they took the kids the first time.

5   Q.  Back for the CPS deal?

6   A.  Yes, sir.

7   Q.  And has anybody -- y'all allow anybody to take pictures of

8   the boys anymore?

9   A.  No, sir.

10  Q.  And how active is David with the boys in school?

11  A.  Oh, he's quite active as far as their schoolwork goes and

12  any kind of activities that he can go to when he can get off

13  work.

14  Q.  Could either one of the boys actually even talk when they

15  dropped them off at y'all's house?

16  A.  The first time?

17  Q.  Yeah.

18  A.  No, not really.  The oldest one was 2 years old and he was

19  kind of one or two words, but that was about it and it was more

20  babble than anything else.

21  Q.  And now they're making straight As?

22  A.  Yes, sir.

23       MS. ZACK:  Mr. Jarvis:  We pass the witness, Your

24  Honor.

25                 The Court:  Thank you.  Cross?

1                              **CROSS-EXAMINATION**

2    BY MS. HEATH:

3    *Q.*  Mr. Peterson, Candy Heath.  You indicated that you only

4    dabbled in nudism; is that correct?

5    *A.*  Yes, ma'am.

6    *Q.*  Now, in the 20 years that you've been with Mr. Barry, have

7    you-all gone to nudist resorts together?

8    *A.*  No, ma'am.

9    *Q.*  Have you had nudist parties at your house?

10   *A.*  No, ma'am.

11   *Q.*  Has Mr. Noonan ever come to your house to hang out nude?

12   *A.*  No, ma'am.

13   *Q.*  Did Mr. Whittington come to your house to hang out nude?

14   *A.*  No, ma'am.

15   *Q.*  There's no nude pictures of you on Mr. Barry's computer?

16   *A.*  No.

17   *Q.*  In fact, there are no nude pictures of anybody else, like

18   party situations or swimming or volleyball at nudist resorts?

19   There's none of those normal nudist pictures that you would see

20   on Mr. Barry's computer, is there?

21   *A.*  No.

22   *Q.*  So your dabbling in nudism is just being naked around the

23   house?

24   *A.*  Yes.

25   *Q.*  Would you say from your knowledge of Mr. Barry's

1  activities, then his nudism is simply what he's practicing at

2  home?

3  A.  Yes.

4  Q.  Which, I mean, he doesn't go out to a vacation, to a nudist

5  resort, doesn't go to nudist clubs, doesn't go to, you know,

6  the local nudist resorts that they have around the Dallas-Fort

7  Worth area?

8  A.  No, ma'am.

9  Q.  You have since found out that Mr. Noonan is a registered

10  sex offender; is that correct?

11  A.  Yes, ma'am.

12  Q.  That would have been a concern that you would have had ever

13  since the boys were little, to keep them away from individuals

14  who were registered sex offenders?

15  A.  Yes, ma'am.

16  Q.  And do you feel that you have taken precautions to check up

17  on the people that have come in contact or that are taking of

18  the boys at any given time?

19  A.  Yes, ma'am.

20  Q.  In this case did you go with Mr. Barry to Mr. Noonan's

21  house in Houston?

22  A.  No, ma'am.

23  Q.  So you don't know anything that was going on there?

24  A.  No.

25  Q.  Were you aware that they had a close relationship with

1   Mr. Barry and Mr. Noonan?

2   A.  Vaguely.  My mother was very sick in the hospital and

3   dying.  She had a kidney transplant at Methodist Hospital here;

4   and she was a diabetic, high blood pressure, heart condition.

5   I had taken her out to a doctor's visit, Dr. Nasser over here

6   on Live Oak in January.  Fine all the way down there; and they

7   did blood work and immediately put her in the hospital, said

8   she was very ill.  Ten minutes after they got her over there,

9   she couldn't breathe on her own.  She was on a ventilator for

10  about three months, got discharged from the hospital, went home

11  in Wichita Falls --

12          MS. ZACK:  The Court:  I think what you're saying then

13  is that you were preoccupied with this and you weren't paying

14  attention to what David was doing?

15          THE WITNESS:  Exactly, and that was for the whole

16  year.

17  BY MS. HEATH:

18  Q.  And you've seen some photographs in this case; is that

19  correct?

20  A.  Yes, ma'am.

21  Q.  And you would agree that those photographs are very

22  inappropriate?

23  A.  I wouldn't say that.

24  Q.  You wouldn't want them published?

25  A.  No, but I wouldn't -- even nudism I wouldn't want

1   published.

2   *Q.*  Have you taken any new paragraphs of the boys in that

3   manner?

4   *A.*  No.

5   *Q.*  And you understand that the judge needs to do what's in the

6   best interest of protecting the children in this case?

7   *A.*  Yes.

8   *Q.*  As well as protecting anybody else in society?

9   *A.*  Yes.

10  *Q.*  Were you aware that Mr. Barry had naked pictures of

11  Mr. Noonan on his computer?

12  *A.*  No.

13  *Q.*  Were you aware that he had a naked picture of another

14  little boy in a bathtub on his computer?

15  *A.*  No.

16  *Q.*  And those weren't pictures that you took or that you placed

17  on his computer?

18  *A.*  No.

19       *MS. ZACK:*  Ms. Heath:  Your Honor, pass the witness.

20       The Court:  Thank you.  Other questions?

21       Then by Mr. Jarvis.

22                      **REDIRECT EXAMINATION**

23  BY MR. JARVIS:

24  *Q.*  Do you recall a couple of the witnesses that testified in

25  the Wichita Falls trial, Robert and Pam Isaacksons from, I

1    think, Houston?

2    A.   Yes, sir.

3    Q.   And they were friends of Craig Noonan's, correct?

4    A.   Yes, sir.

5    Q.   And do you recall the pictures that were taken there of a

6    backyard barbecue and the kids jumping up and down in the

7    swimming pool, all naked, with Craig Noonan?

8    A.   Yes, sir.

9    Q.   And the Isaacksons?

10   A.   Yes, sir.

11   Q.   And they showed up to testify, to explain the nudists'

12   lifestyle, correct?

13   A.   Yes, sir.

14   Q.   And so there were pictures of other families with kids

15   about the same age, naked?

16   A.   Yes, sir.

17   Q.   And you have been aware of the court dates that David has

18   had for his Tarrant County case?

19   A.   Yes, sir.

20   Q.   And Wichita Falls case?

21   A.   Yes, sir.

22   Q.   Has he ever missed a date?

23   A.   No, sir.

24        *MS. ZACK:*  Mr. Jarvis:   Judge, I offer the letter from

25   Judge Gonzales' court coordinator showing the dates that he has

 1  been to Tarrant County and has not missed a date.

 2                    The Court:  Okay.  Thank you.

 3                    Mr. Jarvis:  And I also have the order denying

 4  termination on the CPS case.

 5                    The Court:  Okay.

 6  BY MR. JARVIS:

 7  Q.  Now, the instant messaging, are you aware of those pictures

 8  being on instant messaging?

 9  A.  No, sir.

10       MS. ZACK:  Mr. Jarvis:  Okay.  We'll pass the witness,

11  Judge.

12                    The Court:  Thank you.  Other questions?

13                    Ms. Heath:  Just to clarify, Your Honor.

14                    **RECROSS-EXAMINATION**

15  BY MS. HEATH:

16  Q.  The picture of this barbecue, backyard barbecue, were not

17  pictures from Mr. Barry's computer; is that correct?

18  A.  I'm not aware.  I have no idea where they came from.

19       MS. ZACK:  Ms. Heath:  No further questions, Your

20  Honor.

21                    The Court:  Thank you.

22                    Mr. Jarvis:  Nothing else, Judge.

23       THE COURT:  All right.  Thank you.  Does that conclude

24  the reading?

25       MS. ZACK:  Yes, Your Honor.

1          *THE COURT:*  All right.  Does the Government now rest,
2    is that where we are?
3          *MS. ZACK:*  One moment, Your Honor.
4          *THE COURT:*  Sure.
5          *MS. ZACK:*  Your Honor, I just want to clarify that
6    this is Government's -- that was just read, was Government's
7    Exhibit No. 29.
8          *THE COURT:*  All right.  Thank you.
9          *MS. ZACK:*  And, yes, Your Honor, the United States now
10   rests.
11         *THE COURT:*  Very good.
12              All right.  Tell me where you are and what you
13   propose to do.
14         *MR. JARVIS:*  Well, we anticipate that Mr. Barry is
15   going to testify.
16         *THE COURT:*  Okay.
17         *MR. JARVIS:*  That will take quite some time.  And, of
18   course, we will have a motion for an instructed verdict.
19         *THE COURT:*  Are you going to make your motion now?
20         *MR. JARVIS:*  I guess I can, Judge.
21         *THE COURT:*  Yes, I think that would be a good idea, if
22   you're going to make it.
23         *MR. JARVIS:*  Yes, ma'am.  I think we would ask for an
24   instructed verdict at this point.  The evidence that the
25   Government has provided is a lot of pictures, but the only

1  testimony we have about Mr. Barry's involvement is he -- no

2  evidence that he knew the pictures -- those exact pictures were

3  being taken.  No evidence that he consented to those pictures.

4  No evidence that he was in the room when the pictures were

5  taken.  No evidence that there was a conspiracy between

6  Mr. Noonan and Mr. Barry to make those pictures.  No evidence

7  that Mr. Barry intended for those pictures to be child

8  pornography.  Those are the elements of the offense.

9           All they have is he was there somewhere and we

10  don't have any evidence that he didn't know about it.

11  Knowledge of the pictures is not enough to prove he conspired

12  with somebody to produce the pictures.  That's all they've got.

13  That's all they brought.  Their whole case is we assume he had

14  to know because he was there and he brought the kids back.  But

15  the direct testimony of their witness says we have no evidence

16  that he did any of the things of the elements of the offense.

17  It's not even close.

18           *THE COURT:*  Response?

19           *MS. ZACK:*  Well, Your Honor, I think it has to be a

20  two-part response because there are two different --

21           *THE COURT:*  That's fine.

22           *MS. ZACK:*  -- there are four different counts, but

23  they address two different charges.  As to Counts 1 and 2, I

24  believe that the Government has been able to demonstrate that

25  two or more persons, particularly in this case Mr. Noonan and

1   Mr. Barry, directly or indirectly reached an agreement to

2   produce child pornography, and that while there is no written

3   agreement or anyone that witnessed any kind of spoken

4   agreement, that the actions of Mr. Barry repeatedly taking his

5   children to Houston and making them available for these

6   pictures, pictures that we believe we have demonstrated he

7   knew were being taken, that were on his computer, that were

8   placed on his computer on several different dates, the fact

9   that he discusses online his children being photographed naked

10  and sending those pictures and understanding that in doing

11  so, it is illegal, demonstrates that he knew of -- that there

12  was this, in fact, agreement and that he joined in this

13  agreement willfully with the intent to further its unlawful

14  purpose.

15        And I believe as to the conspiracy, we've

16  demonstrated that.  As to the production of child pornography,

17  it's very clear that these are his children that were used or

18  employed in these pictures, that the purpose of taking these

19  pictures was to create a visual depiction of this conduct and

20  that he had reason to know that they would be transported.  I

21  mean, we know that they're on Mr. Noonan's camera.  They're on

22  Mr. -- some are on Mr. Barry's camera.  They're on Mr. Noonan's

23  computer.  They're on Mr. Barry's computer.  And there's a

24  great portion of these photographs that are actually the same.

25  That all of the computer media was manufactured outside of the

1  United States.

2        And now we have to get to are they child

3  pornography.  And that seems to be one of the biggest questions

4  posed, that this Court has to answer.  And we believe that

5  we've demonstrated by the totality of the circumstances and in

6  looking at not only the *Dost* factors, because they are not an

7  exclusive list, but in considering -- but let's consider some

8  of the *Dost* factors.  These images, a great many of them are

9  taken in the bedroom and bathroom, two places regularly

10  associated with nudity.  A bedroom very much associated --

11        *THE COURT:*  You mean with sexual nudity?

12        *MS. ZACK:*  Well, with nudity in general, but then also

13  then take it to the next level, a bedroom, certainly associated

14  with sexual nudity.  A bathroom can be associated with sexual

15  nudity.

16        You have images of children naked with an adult

17  male that is not their child, with that child's buttocks

18  pressed up against the genitals of a naked adult male, bent

19  over in a position that can clearly be interpreted as sexual or

20  as simulating anal sex.  You have pictures of children with

21  their legs spread, asleep on a bed in a bedroom, where the

22  focus is the genitals of one of the children.  You have

23  pictures of Mr. Noonan's head in the genital region of one of

24  these children, where the child is naked.  And these, again, as

25  the Court is aware, are not Mr. Noonan's children.

1            There is nothing natural about any of these

2    pictures.  And if we even for a minute assume to accept this

3    nudism premise, where is the -- (A) it's not a defense.  There

4    is no legal defense to child pornography, "Oh, I'm a nudist.

5    Didn't do it."  That doesn't exist.  There's no statutory

6    defense.  But where is the evidence, other than Mr. Barry

7    espousing that he is a nudist?  There's no nudist pictures in

8    their home.  He's never participated in nudist activities.  He

9    came to Houston and got naked with another guy that has a

10   sexual interest in children.  He talks about his sexual

11   interest in children in chats.  He talks about his children's

12   penises.  He talks about other people coming to take pictures

13   of his children and knowing those pictures are illegal.

14           We believe that if Your Honor considers these

15   photos, these images in light of the *Dost* factors, in light of

16   the chats, in light of the fact that there's an unknown child

17   that shows up in instant messaging, pictures that are

18   incredibly similar to the pictures that we know Mr. Barry likes

19   on his computer, the bath pictures, the picture of the male

20   with the child in his genital region, three different times

21   they show up, meaning that there were three different exchanges

22   on two separate dates.  This is not an accident.  This is an

23   individual who has a sexual interest in children, who found

24   like-minded individuals to hang out with, and is now hiding

25   behind the guise of, "I'm a nudist."

1              And we believe we've demonstrated that the

2  photographs in this case, not every single one that we put into

3  evidence, because that wasn't the purpose of them, but that the

4  majority of the photographs where the children are naked and

5  either with each other, alone, or with an adult are, in fact,

6  child pornography, and we would ask that you deny their motion.

7          *THE COURT:*  What is the role or relevance of the

8  information that Mr. Noonan was a registered sex offender?

9          *MS. ZACK:*  None.  Absolutely none.  When I said that

10  was with like-minded individuals, I mean that from the evidence

11  we have presented.  I don't believe this Court should consider

12  that fact, that he's a registered sex offender.

13          *THE COURT:*  And is that because there's no evidence

14  that that was known to Mr. Barry at the time?

15          *MS. ZACK:*  Correct.  We cannot demonstrate that he

16  knew that.

17          *THE COURT:*  All right.  Just seeking a clarification.

18          *MS. ZACK:*  Yes, Your Honor.

19          *THE COURT:*  Did you want to respond?

20          *MR. JARVIS:*  Just briefly, Judge.  I think the

21  attitude of the agent was made clear about his views on these

22  pictures, when just the mere nudity is enough to be child

23  pornography in his opinion.  I don't believe that's the law.

24  If you look at the *Dost* factors, I know they're not exclusive,

25  but that's what the Fifth Circuit goes on, these pictures are

1    nothing more than naked pictures.  Had there been any erect

2    penises, any actual touching, and any type of simulated or

3    sexual innuendo even, but all they have is a naked boy laying

4    on top or laying next to a naked man.  There's no sexual

5    activity, no supposed sexual activity, no simulated sexual

6    activity, when there sure could have been, had these been

7    really wanted to be child pornography.  They're just naked

8    pictures of naked little boys running around, as they've been

9    described, little monkeys.

10             There's nothing to show, even if you believe that

11   those pictures are child pornography, which I disagree with,

12   there's nothing to show Mr. Barry participated in that

13   activity.  That's the problem with the Government's case.

14   They've got two hurdles.  And their own witness testified, they

15   have no evidence about those elements of the crime.

16        *THE COURT:*  Well, I think we have several points on a

17   continuum here.  At one bookend, no one is arguing that mere --

18   that the mere fact that children, particularly one's own

19   children, are nude in the pictures and the children are small,

20   that that is in and of itself enough to amount to child

21   pornography.  No one is arguing -- I mean, but that's one

22   point.  Your argument that nudity alone is not sufficient,

23   certainly in the context of pictures of one's own children,

24   prepubescent, clearly right.

25             On the other hand, if you are arguing that there

1  have to be -- that the children have to be portrayed in

2  explicit sexual acts in order for child pornography to be

3  present, I think that is an overstatement and an inaccurate

4  characterization of the law.

5       MR. JARVIS:  I agree.

6       THE COURT:  So I think we are somewhere in between.

7  And the question is whether there is a sufficient basis to find

8  child pornography to overrule your motion at this point.  And I

9  think there is.

10      I also think there is a sufficient basis to

11 overrule your motion on the basis of -- on the question of the

12 sufficiency of the proof of Mr. Barry's own involvement.  The

13 fact that this is on his computer; the fact that he has all

14 these connections to the activity; the fact that he's in the

15 pictures, many of them; the fact that he is bringing the

16 children into the setting in which the children are being

17 photographed time after time after time; the fact that he has

18 these chats that connect to the subject of the photographs, I

19 think that is more than enough to connect the photographs and

20 their content to Mr. Barry.  So I'm going to overrule your

21 motion.

22      And I agree that it is now too late today to

23 begin -- given the scheduling, to begin your case.  Are you

24 going to have any witnesses other than Mr. Barry, based on what

25 you know now?

1              MR. JARVIS:  No, ma'am.

2              THE COURT:  And how long do you anticipate -- and I'm

3      not holding you to any arbitrary time.  I'm just trying to get

4      some scheduling sense.  How long do you anticipate your direct

5      of Mr. Barry?

6              MS. MINICK:  It will be me questioning Mr. Barry,

7      Judge.

8              THE COURT:  That's fine.

9              MS. MINICK:  And I would say at least a couple of

10     hours --

11             THE COURT:  No, that's fine.

12             MS. MINICK:  -- for my part, possibly more.

13             THE COURT:  All right.  And you think about the same,

14     a couple of hours on cross?  Some time on cross?

15             MS. ZACK:  I hope not a couple of hours, but it will

16     just depend, Your Honor.

17             THE COURT:  And just think, you get to lead.

18             MS. ZACK:  Very excited about that, Your Honor.

19             THE COURT:  All right.  Let's -- I've got the morning

20     clear.  So let's begin tomorrow morning, if we could, at, say,

21     8:30.  Does that work?  I do have a couple of calls in the

22     afternoon.  So I would hope very much that we are done before

23     then, but we'll see.

24                  And will the parties be able to provide me with

25     proposed findings and conclusions at some point tomorrow?

1          *MS. ZACK:*  I hope so, Your Honor, yes.  I'm going to

2     do my best, for the Government, to provide that.

3          *MR. JARVIS:*  Judge, we don't have an office down here,

4     so it's going to be kind of difficult for us.  And if you find

5     Mr. Barry not guilty, which is what we would ask for, I don't

6     know if I need to be proposing findings of fact and conclusions

7     of law at that time.

8          *THE COURT:*  Well, you've asked for them.  What's the

9     Government's position?

10         *MR. JARVIS:*  Well, if we lose, but if we win, I hope

11    to go home and don't do any more work.

12         *MS. ZACK:*  Your Honor, I mean, certainly I don't know

13    whether the Court's intention is to rule immediately from the

14    bench upon the conclusion of taking of the evidence.  If Your

15    Honor wanted to provide us a day or two to prepare these, once

16    they return to Wichita Falls, I don't know.  I mean, I

17    certainly can provide them.  I don't know what to say about

18    them hedging their bets that -- we don't have a problem

19    providing them.

20         *THE COURT:*  I think it would be helpful.  But I gather

21    the parties are not in a position to tell me when precisely

22    they might have them ready?

23         *MR. JARVIS:*  No, ma'am.  I've never had to do in a

24    criminal case proposed findings of fact and conclusions of law,

25    as to the defense.  Are you proposing to us -- for both of us

1    to provide them and you get to pick?

2            THE COURT:  If you don't want to provide them, that's

3    fine.

4            MR. JARVIS:  Okay.

5            THE COURT:  That is just fine.  You are welcome to.

6    It's not required.

7            MR. JARVIS:  Thank you, Judge.

8            THE COURT:  All right.  And I don't know what the

9    Government's preference is.  If you are going to provide them,

10   I would like them by tomorrow if at all possible.

11           MS. ZACK:  We will do our best, yes, Your Honor.

12           THE COURT:  All right.  Thank you.  Very good.

13               Anything further -- and I don't want to be

14   unreasonable, but if I can rule from the bench, I would like to

15   do so.  I don't want to make these lawyers come back in order

16   to do closing arguments and have -- and make findings from the

17   bench, nor do I -- but I can certainly rule in a written

18   opinion, which will take significantly longer, but I don't want

19   to do that either unless I absolutely have to.

20           MR. JARVIS:  Yes, ma'am.

21           MS. MINICK:  I do anticipate, Judge, that it will be a

22   good portion of tomorrow.  Did you say you had stuff tomorrow

23   afternoon?

24           THE COURT:  I have stuff, but I have -- I think that

25   we should have a significant amount of the afternoon available.

1              *MS. MINICK:*  Okay.

2              *THE COURT:*  So you'll have most of the day tomorrow,

3    with a few interruptions.

4              *MS. MINICK:*  Thank you, Judge.

5              *THE COURT:*  And Thursday morning if we need it, but I

6    don't -- it doesn't sound like it's going to be critical.  All

7    right.  All right.  Thank you very much.

8              *MR. JARVIS:*  Thank you, Judge.

9              *MS. ZACK:*  Thank you, Your Honor.

10        *(Pause.)*

11             *THE COURT:*  All right.  Thank you.  Go ahead.

12             *MS. MINICK:*  Thank you, Judge.  Kim Minick for the

13   defense.  Just a technical question.  There may be some

14   pictures that have -- we were provided I believe last week off

15   of Mr. Barry's camera that have not been admitted --

16   preadmitted or that have been addressed on our exhibit list

17   that we presented to the Court.  If those come up, how would

18   the Court like me to --

19             *THE COURT:*  Are you going to offer them --

20             *MS. MINICK:*  Yes.  Yes.  Okay.  Would you like me to

21   have them premarked?

22             *THE COURT:*  If you can, that would certainly make it,

23   I think, a little bit more efficient.

24             *MS. MINICK:*  I will try to do that, Judge, but I just

25   wanted to make sure it was still acceptable at that point, how

1   you want us to handle it.

2          THE COURT:  Sure.  No, we haven't closed the evidence.

3          MS. MINICK:  Okay.  Thank you.

4          THE COURT:  Thank you.

5      (Concluded at 3:37 p.m.)

6                              * * *

7   I certify that the foregoing is a correct transcript from the

8   record of proceedings in the above-entitled cause, to the best

9   of my ability.

10

11  /s/ *Kathy L. Metzger*                    *4-1-2015*
    Kathy L. Metzger                          Date
12  Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25