1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
2                  HOUSTON DIVISION

3  UNITED STATES OF AMERICA      .  CR. NO. H-12-691-2
                                 .  HOUSTON, TEXAS
4  VS.                           .
                                 .  APRIL 24, 2014
5  DAVID MORSE BARRY             .  8:30 A.M. to 1:15 P.M.

6

7                      DAY 4 of 5
                TRANSCRIPT of BENCH TRIAL
8         BEFORE THE HONORABLE LEE H. ROSENTHAL
                UNITED STATES DISTRICT JUDGE

9

10

   APPEARANCES:
11

12 FOR THE GOVERNMENT:              MS. SHERRI L. ZACK
                                   U.S. Attorney's Office
                                   1000 Louisiana
13                                 Suite 2300
                                   Houston, Texas   77002
14

15

   FOR THE DEFENDANT:              MR. ROBERT T. JARVIS
16                                 Robert T. Jarvis Law
                                     Firm, P.C.
17                                 123 W Houston
                                   Sherman, Texas   75090
18
                                   MS. KIMBERLY F. MINICK
19                                 Minick Law Firm, P.C.
                                   3340 Camp Bowie Blvd.
20                                 Suite 100
                                   Fort Worth, Texas   76107
21

22 THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
   CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
   COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
23 ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
   COPY AT THE OFFICIAL RATE.   General Order 94-15, United States
24 District Court, Southern District of Texas.

25 Proceedings recorded by mechanical stenography, transcript
   produced by computer-aided transcription.

APPEARANCES CONTINUED

ALSO PRESENT:                          MR. JEFFERY G. CHAPPELL


OFFICIAL COURT REPORTER:               MS. KATHY L. METZGER
                                       U.S. Courthouse
                                       515 Rusk
                                       Room 8004
                                       Houston, Texas  77002
                                       713-250-5208

1                                    INDEX

2                                                                PAGE

3    DEFENDANT'S WITNESS

4    David Morse Barry
        Cross-examination continued by Ms. Zack        671
5       Redirect Examination by Ms. Minick             706

6

7    GOVERNMENT'S REBUTTAL WITNESS

8    Jeffery G. Chappell
        Direct Examination by Ms. Zack                 725
9       Cross-examination by Mr. Jarvis                736
        Redirect Examination by Ms. Zack               744

10

11

12

13

14                              *  *  *

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2          *(Open court, Defendant present.)*

3          THE COURT:  Good morning.  Please seated.  I think

4     we're ready to resume.  Mr. Barry.

5          MS. ZACK:  Good morning.

6          MS. MINICK:  Judge, if I may, prior to us resuming

7     testimony, we would like to address the issues that we left off

8     with yesterday.

9          THE COURT:  All right.

10         MS. MINICK:  At this time, Judge, after reviewing what

11    we were given yesterday, after having time to speak with our

12    expert long distance, we are in need of more time to

13    effectively assist --

14         THE COURT:  How much more time do you need and for

15    what purpose?  Why don't you start with the for what purpose.

16    What holes are you missing?

17         MS. MINICK:  Well, here's our -- let me give you a

18    little bit of history, Judge.  On December 18th, 2013, we had a

19    meeting that's been referenced in the testimony with myself,

20    Mr. Jarvis, Mr. Barry, Mr. -- or Agent Chappell, excuse me,

21    Mr. Eastepp, Larry Eastepp, the defense counsel for Mr. Noonan,

22    all of us, at which point we were given the opportunity and

23    asked to view the computer and --

24         THE COURT:  The forensic image?

25         MS. MINICK:  That was our -- well, that was our

1    understanding.

2            THE COURT:  Exhibit 2?

3        MS. MINICK:  Yes.  We don't know that that's what it

4    was, but what we were shown was files that Agent Chappell

5    pulled up which were titled "Images of Interest."  And they

6    were separate folders, "David and the boys."  There was a file

7    where they said these specific images were found here.  These

8    specific images were found in the Messenger cache.  These

9    specific images were taken at Mr. Noonan's and suspected CP

10   location or they -- the unknowns we were shown as well.

11            At that time it was represented that those were

12   the images that they were relying on.  At a later --

13           THE COURT:  But that's way in advance of trial.

14           MS. MINICK:  Yes.

15           THE COURT:  And they're labeled "Images of Interest."

16   You knew at that time that there were more images, I gather?

17           MS. MINICK:  Correct.

18           THE COURT:  All right.

19           MS. MINICK:  But then when we got the exhibit list, it

20   was represented that Exhibit 3, Government's Exhibit 3

21   contained all of the child pornography, all of the images that

22   they intended to rely on.

23           THE COURT:  What did you think Exhibit 2 was?

24           MS. MINICK:  Well, we knew --

25           THE COURT:  It was an exhibit which was preadmitted

1   without objection.

2           MS. MINICK:  But, Your Honor, at the time we were --

3           THE COURT:  Well, what was your understanding of

4   Exhibit 2?

5           MS. MINICK:  It was just a forensic copy of the

6   computer.

7           THE COURT:  Everything?

8           MS. MINICK:  Yes.

9           THE COURT:  But it was an exhibit.  So it was

10  evidence.  The contents were all unobjected to admitted

11  evidence.

12          MS. MINICK:  But we had -- the information that we

13  were given is because we do not have any of the images that

14  correlate to the data, we're just simply given the data.  We

15  did take notes of the images, but we were never given the

16  correlating data to each of those.

17          THE COURT:  And now that you had it last night because

18  of the Government's admittedly delayed understanding of the

19  importance of these images and of the fact that they had been

20  previously disclosed to your client and Mr. Jarvis in the CPS

21  trial, you had a conversation with your expert last night.  So

22  what additional information did your expert inform you you

23  needed that would require additional time?

24          MS. MINICK:  Well, we -- he needs to be able to see,

25  as in 30 -- I believe it's Exhibit 30 where they were asked to

 1    create the other night to provide us the next morning, the EXIF
 2    data correlating to each of the photographs.
 3          *THE COURT:*  That EXIF data is now -- of the two
 4    photographs that have now been admitted, correct, 31 and 32?
 5          *MS. ZACK:*  Yes, Your Honor, 31 and 32.
 6          *MS. MINICK:*  And he needs to be able to look at that
 7    data.
 8          *THE COURT:*  Can you e-mail it to him?
 9          *MS. MINICK:*  Possibly, but I don't think that the data
10    that was -- and I'm assuming that -- yesterday they admitted 31
11    and 32.  There was a photograph and some EXIF data, I believe.
12          *THE COURT:*  Right.
13          *MS. MINICK:*  And I assume they're admitting those
14    together; is that correct?
15          *THE COURT:*  I believe so.
16          *MS. MINICK:*  Okay.
17          *THE COURT:*  And that was what you said you had not
18    previously had in the CPS trial, the combination of the two.
19    So I allowed you the time to consult with your expert and give
20    your expert that information.  I assume you've now done that.
21          *MS. MINICK:*  We have, Judge.  But now he has to run a
22    search to -- of the forensic data that he was given, of course,
23    do not include the images.  Now he needs to be able to go back
24    and look at those in correlation to the --
25          *THE COURT:*  That doesn't seem like it would take long.

1   That's two images.  So what would be the need for --

2         MS. MINICK:  Well, I guess then, Judge, our problem is

3   that it was represented to us that these were all the images

4   and --

5         THE COURT:  And that's why we have the additional

6   opportunity to consult with your expert.  But there's only two

7   images.  You've had the images before.

8         MS. MINICK:  If those are the only two images there

9   are.

10         THE COURT:  Well, the only two that the Government

11   intends to introduce at this point, right?

12         MS. ZACK:  They are the only two child pornography

13   images found in the my pics subfolder of favorites.  There are

14   images of Mr. Noonan naked.  There's images of Mr. Barry naked

15   that we don't have any intention of --

16         THE COURT:  But not with the children?

17         MS. ZACK:  -- of putting in, because they're not child

18   pornography and --

19         THE COURT:  All right.  So there you have additional

20   information limiting the likelihood of any further images being

21   introduced.  There are only two images.  You had them before.

22   Now you have them with the data.  So I'm perfectly happy to

23   have your expert do the additional work that you've described,

24   but that seems to me to be limited in both scope and time

25   required.  So and that's why I wanted to give you the

```
 1    opportunity to do that yesterday.  I'm happy to hear -- to let
 2    you take some time this morning if you need to further consult
 3    with your expert after he does that work.
 4              MS. MINICK:  Well, I guess part of it would be, Judge,
 5    yes, it would require us looking at those two images, but there
 6    are other images that we can now -- he wants to look at other
 7    images surrounding that that may give us --
 8              THE COURT:  That's fine.  He's got the time to do that
 9    now.  Does he have those images?
10              MS. MINICK:  No.
11              THE COURT:  Where is he?
12              MS. MINICK:  He's in Kentucky or Nashville.
13              THE COURT:  Can you send him those images so he can do
14    that work?
15              MS. MINICK:  The two images or the -- I mean, what it
16    would require, Judge --
17              THE COURT:  I'm not sure what else he wants to look
18    at.
19              MS. MINICK:  Well, I think what we would need to look
20    at is since we requested back at the end of March this exact
21    type of document that's in Government's Exhibit 30, we would
22    like the images that correlate to any of these photographs
23    surrounding --
24              THE COURT:  31 --
25              MS. MINICK:  -- in time the images that are on the
```

 1   folders.

 2           THE COURT:  All right.  Can you do that?

 3           MS. ZACK:  I have to redact it.  I cannot --

 4           THE COURT:  Can you redact it within a couple of hours

 5   or less and get it to them promptly, minutes?

 6           MS. ZACK:  Oh, we can redact it right now.  Then

 7   they'll have to --

 8           THE COURT:  Let's do that.  You can e-mail it to this

 9   morning.

10           MS. ZACK:  -- scan it and I send it to him.

11           THE COURT:  Yeah.

12           MS. ZACK:  Right.

13           THE COURT:  We'll have it for you to e-mail within

14   minutes.  So you can get it to your expert within minutes.  I

15   assume it won't take him much longer than a few minutes after

16   that to do his search.  And we can -- and I'll be happy to take

17   a break if you want to consult with him after he has that

18   opportunity.  All right?  We will certainly make that available

19   to you and your expert.

20           MS. MINICK:  I would just like to state for the

21   record, Judge, that based on the representation, we then -- and

22   those -- that Exhibit 3 did not contain No. 31 and 32.  Based

23   on the representation that No. 3 contained all of the child

24   pornography that they intended to rely on as part of our

25   notice, we then were here last week on 4-17 and Mr. Barry --

1   and Mr. Jarvis and I, with Mr. Stabe allowing us to look at --

2   since we understood that the disks that they have and there are

3   several of them in the exhibit list, the disks that they had

4   contained photographs and then they had selected certain

5   photographs from those disks to admit as separate images.  We

6   went to the U.S. Attorney's Office and looked at all of the

7   disks, so that we were to make sure we had seen all that they

8   were relying on.  Again, those pictures -- and we don't know if

9   there are other pictures that --

10          *THE COURT:*  You mean on 3 as opposed to 2?

11          *MS. MINICK:*  Yes.

12          *MS. ZACK:*  Can I respond --

13          *THE COURT:*  Or the other way around.

14          *MS. ZACK:*  -- to that, Your Honor?

15          *THE COURT:*  Yes.

16          *MS. ZACK:*  We did not intentionally mislead defense

17   about what we intended to show.  Mr. Stabe was here that day

18   because I was out of town.  The transcript that we got arrived

19   right before I left.

20          *THE COURT:*  You mean from the CPS trial?

21          *MS. ZACK:*  From the CPS trial.  It was after their

22   expert had come to our -- to HSI to look.  Their expert went on

23   April 4th -- April 3rd.  Sorry.  It was a Thursday, I believe.

24   April 3rd.  He came to HSI and had access to No. 2, to

25   Government's Exhibit No. 2.

1          *THE COURT:*  Which contained 31 and 32?

2          *MS. ZACK:*  Yes, it contains everything.  Absolutely

3   everything.  I mean, thousands of things that we haven't even

4   talked about and --

5          *THE COURT:*  Many of which are not child pornography?

6          *MS. ZACK:*  Correct, correct, absolutely.  And I left

7   on April 11th.  The transcript arrived either the 10th or the

8   13th, I'm not a hundred percent sure.  I just know that I

9   didn't review it before I left.  I did not return -- and

10  Mr. Stabe didn't have it.  It's in a -- it came in a box.  No

11  one opened the box until I returned on the 16th.  So April 17th

12  was the first time I had access to this transcript with the

13  pictures that are 31, 32.

14          Now, that all being said, I find this argument

15  that they're making about not knowing and all this somewhat

16  disingenuous.  They knew about this image back in 2012.  And it

17  sounds like, well, now that you found it and you're using it

18  against us, not fair.

19          *THE COURT:*  Well, I think it's that plus the

20  associated data which is being presented but --

21          *MS. MINICK:*  Yes, Your Honor.

22          *THE COURT:*  -- as I said, they did have notice of the

23  image itself.  Their client obviously knew it, Mr. Jarvis

24  obviously knew it, and now that the data is linked to it,

25  they've been given the opportunity to make sure that their

1   expert has the opportunity to review it and they've requested

2   some additional information.  You're making that available

3   promptly.  So you're going to have the opportunity to have your

4   expert look at that as well.  But I don't see -- since this can

5   be done very quickly and your expert is aware of the issues and

6   ready to make this additional inquiry and give you the results

7   of it, I think we can proceed.

8           MS. MINICK:  Judge, and I just want to say, I'm not

9   saying that they specifically did anything to misrepresent.

10   I'm saying that their representations at the time were not

11   complete or not accurate.

12           THE COURT:  Well, I'm not sure -- and I don't mean to

13   interrupt you, but I think now we're starting to get a little

14   repetitive.

15           MS. MINICK:  Well, but my other complaint would be

16   that they did have it at the beginning of the trial when we

17   started here on Monday and it was not provided to us then,

18   which they certainly could have done.

19           THE COURT:  I'm not excusing that on the part of the

20   U.S. Attorney's Office.  I think they should have.  It would

21   have limited the issue that we are now dealing with.

22           MS. ZACK:  We didn't run the report we're giving them

23   until Tuesday night.

24           THE COURT:  You know what, that is an explanation, but

25   I don't know if it's an excuse.

1          MS. ZACK:  Oh, no, no, I'm not saying it's an excuse,

2     but to say that we were sitting here with this picture with the

3     EXIF data on Monday morning, we were not.

4          THE COURT:  Well, actually you were, you just didn't

5     know you had it --

6          MS. ZACK:  Correct.

7          THE COURT:  -- because you hadn't looked at it.

8          MS. ZACK:  Correct.  Correct.  We were not prepared to

9     use it because we hadn't done anything with it yet, that is

10    correct.

11         THE COURT:  Again, explanation perhaps.

12         MS. ZACK:  Not an excuse, Your Honor.

13         THE COURT:  Not an excuse.  Certainly no one is

14    assuming that this was intentionally done and I'm not.

15         MS. ZACK:  Okay.

16         THE COURT:  I don't hear anybody accusing you of that,

17    but we do have the effect of the fact that it was not done

18    earlier.

19         MS. ZACK:  Yes, Your Honor.

20         THE COURT:  And that is what these steps are designed

21    to ameliorate.  I think we have now ameliorated it.  Again, the

22    existence of the pictures is not a surprise.  And I think that

23    with these additional steps that we've taken, we can proceed.

24    I would like those redacted images --

25         MS. ZACK:  It's done.

1          *THE COURT:*  -- promptly delivered by e-mail to defense

2     counsel so they can just as promptly deliver them by e-mail for

3     instantaneous receipt by their expert, who can rapidly transmit

4     back to them here in the courtroom the results of his

5     additional or her additional inquiry.

6          *MS. ZACK:*  Your Honor, we've redacted everything.

7     We're going to have it scanned and then --

8          *THE COURT:*  Let's go.  Good.

9          *MS. ZACK:*  And if we can -- what e-mail address do you

10    want it sent to?  Because I'm not using my thing, which

11    Mr. Jarvis is automatically in.

12         *MS. MINICK:*  Kim@minicklawfirm.com.

13         *THE COURT:*  Thank you.

14         *MS. MINICK:*  Minick is M-i-n, as in Nancy, i-c-k.

15         *MS. ZACK:*  Minick law firm all one word?

16         *MS. MINICK:*  Yes, dot com.

17         *MS. ZACK:*  Dot com.  Okay.  Here you go.

18         *THE COURT:*  All right.  We can avoid the questions

19    relating to 31 and 32 until they have an opportunity to consult

20    their expert.  But other questions relating to the case, I

21    think we can proceed with while we are waiting for the next

22    information to be available.

23         *MS. ZACK:*  And I believe I was almost done with that

24    area of inquiry anyhow.

25         *THE COURT:*  All right.

1          *MS. ZACK:*  Before we proceed, Your Honor, I provided

2    defense counsel and I'm providing the Court with our proposed

3    findings of facts and conclusions of law.  It also says "and

4    supporting memorandum of law."  There is no supporting

5    memorandum of law.  There is one case cite in there.

6          *THE COURT:*  All right.  Thank you.

7          *MS. ZACK:*  And I also e-mailed a copy to Ms. Eddins in

8    case there was editing that the Court wanted to make, if the

9    Court ultimately does find the Defendant guilty.

10         *THE COURT:*  Very good.  Thank you.

11         *MS. ZACK:*  Yes, Your Honor.

12         *THE COURT:*  All right.  This is helpful.  Thank you.

13         *MS. ZACK:*  Yes.

14         *THE COURT:*  And I'll be happy to hear any reaction to

15   this or dissent from any of the propositions, particularly the

16   description of the elements of the offenses from defense

17   counsel of course.

18              All right.  Mr. Barry, will you please retake the

19   stand, sir.

20         *THE WITNESS:*  Yes, ma'am.

21         *THE COURT:*  And, of course, you remain under oath.

22         *THE WITNESS:*  Yes, ma'am.

23         *THE COURT:*  I think we're ready.

24         *MS. ZACK:*  One second, Your Honor.  I just want to

25   find my starting place.  Here it is.

Barry - Cross by Ms. Zack

1                    **CROSS-EXAMINATION CONTINUED**

2    BY MS. ZACK:

3    Q.  Okay.  You've seen this picture, Mr. Barry?

4    A.  Yes, ma'am.

5    Q.  And you testified yesterday that 4P, Government's 4P, you

6    had never seen before, before the CPS trial or with Mr. Jarvis

7    when you met to discuss this case, correct?

8    A.  That's correct.

9    Q.  Okay.  And you said yesterday that you don't know who took

10   this picture or anything like that?

11   A.  That's correct.

12   Q.  Okay.  And this picture, the EXIF data in 6N, shows it was

13   taken on Mr. Noonan's camera?

14   A.  Okay.

15   Q.  You don't have any disagreement with that?

16   A.  No, ma'am.

17   Q.  Okay.  Do you recall giving a different answer as to who

18   took that picture?

19   A.  No, ma'am, I don't.

20   Q.  Okay.  Let me show you from the CPS trial on July 25th of

21   2012, and this was exhibit number, and I'll show it to you, 22.

22   You would agree, if you look at Exhibit 22, that's the same

23   picture, correct?

24   A.  Yes, ma'am.

25   Q.  Okay.

Barry - Cross by Ms. Zack

1              MS. MINICK:  Your Honor, I'm going to object to him

2    testifying regarding certain things that are not in evidence.

3    She's asking him to compare an exhibit that's not in evidence,

4    an image that's not in evidence against an image that is.

5              MS. ZACK:  He's saying he never saw this picture

6    before, before the CPS trial, and I just want to make sure

7    we're talking about the same image.

8              THE COURT:  I'll allow it just for that limited

9    purpose.  Thank you.

10   BY MS. ZACK:

11   Q.  Ms. Rush asked you --

12             MS. MINICK:  Could you please give us the --

13             MS. ZACK:  At page 92, line 10.

14             MS. MINICK:  On what day?

15             MS. ZACK:  Day 2, July 25th, 2012.

16   BY MS. ZACK:

17   Q.  Question -- oh, I'm sorry.  This was by Mr. Hale, the

18   guardian ad litem lawyer.  "Who took this picture?  This is

19   No. 22."

20                  Answer:  "I believe I did."

21                  You said that back on July 25th, 2012, correct?

22   A.  I don't recall.  But I also recall when Mr. Hale --

23   Q.  Well, it was a "yes" or "no" answer.

24   A.  I don't recall it, no, ma'am.

25   Q.  You don't recall saying it?

Barry - Cross by Ms. Zack

1   A.   No, ma'am.

2   Q.   Okay.  But you don't have any reason to believe that that

3   was written down wrong in this transcript, do you?

4   A.   I don't know.  I wasn't there when the transcript was

5   created.

6   Q.   Well, you've had an opportunity to review the transcript,

7   correct?

8   A.   My attorneys have, yes, ma'am.

9   Q.   Okay.  And back then, that's what was taken down, but for

10  what you're saying might be some kind of error?

11        MS. MINICK:  Judge, I'm sorry to interrupt.  May I see

12  the exhibit that she showed Mr. Barry to know what she's --

13        THE COURT:  Would you show to defense counsel, please.

14        MS. ZACK:  Absolutely.  Here.

15        MS. MINICK:  Thank you.

16  BY MS. ZACK:

17  Q.   Now, you also talked about how the pictures in your camera

18  were never put on your computer, correct?

19  A.   Yes, ma'am.

20  Q.   You said that you hadn't done that yet -- I believe this

21  was in the context of you were talking about the life books for

22  the children?

23  A.   That's correct.

24  Q.   Okay.  And that you had -- this was a camera you had just

25  gotten in December of 2010?

Barry - Cross by Ms. Zack

1   A.  Yes, ma'am.

2   Q.  And you had not yet started, I guess, downloading,

3   cataloging, doing whatever off your new camera?

4   A.  Yes, ma'am.

5   Q.  Okay.  So none of those pictures should be on your

6   computer, right?

7   A.  As far as I know of, yes, ma'am.

8   Q.  How would they get there?

9   A.  It would have had to have been taken with the San -- with

10  the disk taken out, put into the computer and transferred or by

11  using the share dock and connecting it to the computer and

12  transferring them that way.

13  Q.  Okay.  So the same way that the pictures from Mr. Noonan's

14  camera got on your computer would have been the same way your

15  pictures would have gotten on your computer?

16  A.  That's a possibility, yes.

17  Q.  Okay.  But that's not entirely correct, is it?  Because

18  let's look at 20H.  Until Mr. Stabe gets 20H back up there,

19  Mr. Barry, if I told you that picture 20H was a picture of you

20  painting naked from that series where you and the boys were

21  painting, would you have any reason -- there it is.  That's

22  you, right?

23  A.  That's correct.

24  Q.  And that was taken on your camera?

25  A.  Yes, ma'am.

Barry - Cross by Ms. Zack

1  Q.  And obviously you didn't take that picture?

2  A.  No, ma'am.

3  Q.  Okay.  Would it surprise you to know that that picture is

4  on your desktop?

5  A.  I didn't have a desktop at that time.

6  Q.  No, meaning on the desktop portion of your laptop, what's

7  called desktop?

8  A.  Oh, okay.  All right.  There you got terminology.  It may

9  not surprise me, no.

10  Q.  But you said you never put any of the pictures from your

11  camera onto your computer?

12  A.  Not that I recall.  I may have done this one, but right

13  offhand, I don't recall.  That was, again, four years ago

14  that -- I mean, most people can't remember what they did last

15  week, let alone what they did four years ago.

16  Q.  And let's talk about -- well, and do you know why you would

17  have put that on your desktop?

18  A.  I may have sent it to somebody about painting that day.  I

19  don't know.

20  Q.  May have sent it to Mr. Noonan?

21  A.  I could have, yes, ma'am.

22  Q.  Did you two exchange naked photos?

23  A.  No.

24  Q.  Of each other, other than the ones that you've said here

25  you were a willing participant in?

Barry - Cross by Ms. Zack

 1  A.  I don't even think we exchanged those.  If you're talking
 2  about via e-mail or what?
 3  Q.  E-mail, Instant Messenger chat?
 4  A.  I wouldn't -- if they were pictures that were taken with
 5  his, he would have already had them and wouldn't have e-mailed
 6  me those pictures.
 7  Q.  No, no, that wasn't my question.  Not the pictures of both
 8  of y'all.  You said you might have sent this to Mr. Noonan?
 9  A.  I didn't specifically say Mr. Noonan.  I said I may have
10  sent it to someone.
11  Q.  And I said "like Mr. Noonan," and you said, "yes."
12  A.  Well, correct.  But I don't know --
13  Q.  Could have been?  I'm not asking you definitively if you
14  did.
15  A.  Okay.
16  Q.  I'm asking you is one of the reasons it could have been on
17  your computer, because you wanted to send it to Mr. Noonan
18  because he was your buddy?
19  A.  Correct.
20  Q.  Okay.  And then I asked you if you exchanged naked photos
21  of each other, not the ones where you're together, and your
22  answer was, "How?"  And I said, "Either e-mail or Instant
23  Messenger chat."  And you said?
24  A.  Okay.  We did not send naked pics of each other during
25  those -- this may have just been one because of that, and he

Barry - Cross by Ms. Zack

1  may have said, you know, send it to me.

2  Q.  Now, you said that -- to Ms. Minick in the chats, that you

3  never sent naked pictures of the boys, correct?

4  A.  Not that I recall, no, ma'am.

5  Q.  Oh, because I thought yesterday it was, I would never have

6  sent naked pictures of my children?  Which is it, not that I

7  recall or I never did it?

8  A.  I don't remember doing -- sending naked pics to anybody of

9  my children.  That's what I'm saying.  No.

10  Q.  Okay.  But I don't remember sending them and I would never

11  do that are two different things.  Don't you agree?

12  A.  Okay.  Yes.  But I don't -- like I said, I don't remember

13  doing it, but I would have not have sent pictures to anybody.

14  I may have sent this one.

15  Q.  I'm not asking about this one.

16  A.  Yes.  But I don't --

17  Q.  Let's talk about 4B.  You recognize this picture, correct?

18  A.  Yes, ma'am.

19  Q.  And based on Government's 30, 4B was created on your

20  computer in the "David and the boys" subfolder D-O-R on 6-18 of

21  2010.  Are you with me?

22  A.  Yes, ma'am.

23  Q.  And that was one of the dates that you have said you were

24  in Houston, correct?

25  A.  That's correct.

Barry - Cross by Ms. Zack

1   Q.   And this was on your laptop.  Are you with me so far?

2   A.   Yes, ma'am.

3   Q.   Okay.   In September of 2010, this picture appears in your

4   Instant Messenger cache.  Okay?

5   A.   Okay.

6   Q.   How does it appear there as a thumbnail if you didn't send

7   it to somebody?

8   A.   I don't know, because I would not have sent that picture to

9   anybody because I didn't know it existed.

10  Q.   Then how does it get in your Instant Messenger cache?  I

11  mean, it had to have been opened up there for the thumbnail to

12  exist or placed in there to be sent to someone.  I mean, it had

13  to have been sent or received.  You agree with that, correct,

14  to be in the Instant Messenger cache?

15  A.   Yes.

16  Q.   Okay.  So either it was sent to you and you opened it and

17  it created the thumbnail or more likely, because you already

18  had the picture on your computer since June 18th, you sent it

19  to somebody?

20  A.   And, again, I don't know, because like I said, I wouldn't

21  have sent the picture.  So if it would have been on -- this

22  would have been from Mr. Noonan's camera and he was sending a

23  photo to me --

24  Q.   Why would he send you a photo if based on what you're

25  trying to make us believe, Mr. Noonan already put all this on

Barry - Cross by Ms. Zack

1  your computer and you had no knowledge?  That's what you want
2  us to believe?
3  A.  I don't know.  I really do not know because --
4  Q.  Then why --
5  A.  -- I didn't send the picture.
6         THE COURT:  One at a time.
7  BY MS. ZACK:
8  Q.  So the more logical answer, which is you were sending it to
9  some third party because it was on your computer, that's as far
10 as you're concerned not a possibility?
11 A.  I did not send this picture, no, ma'am.
12 Q.  Just like you didn't take 4N?
13 A.  4N?
14 Q.  The picture of the boys sleeping on the floor with one of
15 their genitals exposed.  You didn't do that either, you said?
16        MS. MINICK:  I believe that was 4P, Your Honor.
17        MS. ZACK:  No, this is 4B.
18        MS. MINICK:  4P.
19 BY MS. ZACK:
20 Q.  P, I'm sorry, 4P.  6N, 4P.  You didn't you take that
21 either?
22 A.  No, ma'am.  I didn't take pictures with Mr. Noonan's
23 cameras of my boys naked.  And at that time what I was saying
24 was is that Mr. Hale had also gotten a lot of the exhibits out
25 of order and it wasn't later until that they discovered, so

Barry - Cross by Ms. Zack

1  they never went back and did it.  He was holding -- just

2  holding up pictures saying, "Here, here."

3  Q.  Your lawyer would have cleared that up with you?

4  A.  I don't think he -- I don't remember the trial that day,

5  but I do recall Mr. Hale just holding up a bunch of them and

6  calling out numbers and saying, "Did you take that?"  "I

7  believe I did."  But I don't remember which exactly pictures it

8  was, because, again, that was in time past.

9  Q.  But if you said you didn't use Mr. Noonan's camera, what

10  would you have taken that on?

11  A.  I didn't -- but I didn't use Mr. Noonan's camera.

12  Q.  Then why would you have admitted to taking a picture with

13  it?

14  A.  I don't know.

15  Q.  Okay.  That must have just been a mistake on your part?

16  A.  It could --

17  Q.  It might have been?

18  A.  Yes, ma'am.

19  Q.  When we were closer in date and time to the incident itself

20  than we are today?

21  A.  That's correct.

22  Q.  Okay.  Let's talk about the chats.  Specifically chat 7C,

23  in line 6906 -- and you're talking to the Roxas person?

24  A.  Okay.

25  Q.  You asked -- well, yesterday you told Ms. Minick that the

Barry - Cross by Ms. Zack

1  picture that he was referencing had to have been the profile

2  picture, which you said was a JCPenney Christmas picture of you

3  and the boys?

4  A.  That's correct.

5  Q.  Okay.  And then you ask him in 6906, did he save it?

6  A.  Correct.

7  Q.  Why would you care if he saved a clothed picture of you and

8  your kids?  Because you claim this isn't about a naked picture.

9  Why would you care?

10  A.  Just asking a question.

11  Q.  Just asking a question.  That's your answer?  Because if

12  the picture was a naked picture, it would make sense that you

13  would be concerned as to why he would save a naked picture of

14  your children onto his computer.  That I get.  But a picture

15  that you put out there as your profile for the world to see or

16  at least anyone in True Nudist, all of a sudden you're

17  concerned someone is saving that?

18  A.  Whoa, whoa, whoa, wait a minute.  That pic was not on True

19  Nudist.

20  Q.  Okay.  Where was it?  Because this, I thought, was in the

21  context of you discussing the profile picture and how it was

22  like a profile picture on Facebook.

23  A.  Correct.

24  Q.  So what profile picture are you talking about now?

25  A.  This is a -- okay.  When you create MSN Instant

Barry - Cross by Ms. Zack

1  Messenger --

2  Q.  Uh-huh.

3  A.  -- you can put a profile pic so when you're having a

4  conversation with somebody --

5  Q.  They know who it is?

6  A.  -- they know who it is and they can see the picture.  So

7  what you're -- okay.  So what you're saying was on True Nudist

8  and it was carrying and that one, people can't see your profile

9  pic unless you're having a conversation with them on MSN.

10  Q.  Okay.  So is this the same picture that we're talking

11  about, the Christmas JCPenney picture?

12  A.  That's correct.

13  Q.  Okay.  That was your -- then I apologize.  That was your

14  MSN profile picture now that we're talking about?

15  A.  That's correct.

16  Q.  And everyone is clothed?

17  A.  Yes, ma'am.

18  Q.  And, again, I'm going to ask you, why would you care if

19  someone saved a clothed picture of you and your children from

20  your MSN profile?

21  A.  Probably because I didn't know them that well and that's

22  why I asked him.  Because I had closed the window on my side

23  and did not realize at that point that when I close mine, his

24  didn't close.  He had to close his own --

25  Q.  Okay.

Barry - Cross by Ms. Zack

1  A.  -- of displaying the profile picture, because it shows you

2  yours and theirs, one above the other.  And I just asked a

3  question, did you save that pic, because I had already closed

4  my window so that it wasn't showing the picture of myself and

5  the two boys.

6  Q.  And this is the same picture that you suggested to the

7  Court yesterday, this fully clothed picture demonstrated to

8  Roxas, whoever that is, that your children, as you said in line

9  6912, loved to be naked?  Does that make any sense to you,

10 Mr. Barry?

11 A.  Again, that's not the full conversation as we reviewed it,

12 so it could have been from previous comments that we had in

13 there.

14 Q.  Okay.  Let's say it's not the full conversation.  "As you

15 can see, my boys love to be naked," that statement alone seems

16 to reference an image.  How can you see that children love to

17 be naked if you're not showing someone a naked picture of

18 children?  Showing them a picture of children at the zoo would

19 not demonstrate that they loved to be naked, would it?

20 A.  I don't know.

21 Q.  Okay.  It makes more sense that he was looking at a naked

22 picture of your children, doesn't it?

23 A.  Not necessarily, no, ma'am.

24 Q.  And in the conversation with nudemac, 7E, on line 7453,

25 you're talking about being careful sending naked pics?

Barry - Cross by Ms. Zack

1  A.  I believe that was his statement, not mine.

2  Q.  But you're engaging in conversations about that, and then

3  you say, "You can see them live when you come to visit."  If

4  you hadn't sent him a naked picture, why would you reference

5  seeing them live, if he hadn't already seen them naked?

6  A.  Again, that's not the whole conversation.  So I don't know

7  what else, but we had made plans because he was coming to Texas

8  for business and we had planned on having a -- or going out to

9  dinner when he came into town.

10  Q.  Do you go out to dinner naked?

11  A.  No, ma'am.  But live doesn't necessarily mean naked either.

12  Just meeting the kids live, because I had previous

13  conversations in talking about the boys in soccer and the boys

14  playing, you know, learning how to ride bikes and taking them

15  to the park and teaching them how to roller skate.  So that

16  statement could just be you're going to meet the boys live and

17  you'll see what they're like.

18  Q.  So out of nowhere, this person that you're talking to says,

19  "You better be careful about sending naked pics"?

20  A.  Correct.

21  Q.  And then it's just your -- this is just someone that's

22  coming to have dinner and see the boys live, but it is nothing

23  to do with him seeing your boys naked or you sending naked

24  pics?  I just want to make sure we're clear on that.

25  A.  Yes, ma'am.

Barry - Cross by Ms. Zack

1  Q.  Okay.  7G, you told Ms. Minick you were talking about
2  teaching your boys about sex?
3  A.  Yes, ma'am.
4  Q.  And yet I reviewed 7G and I'll let you look at the whole
5  thing, if you need to look at it again, you never used the term
6  "sex," do you?
7  A.  Implied that that's -- that anything that comes along with
8  that is my job; and depending on the terminology I used, we
9  could have been talking about anything.  Again, that's not the
10  whole conversation.
11  Q.  Well --
12  A.  That's only an excerpt and so the speculation that's coming
13  across from yours is that I'm only talking about one thing in
14  particular when it's actually the whole array of the sex talk
15  that parents normally have with kids.
16  Q.  And when parents normally have the sex talk with kids, do
17  they say "wanking" and "jerking off" or do you think they
18  probably use the more technical terms because it's a subject
19  that you want to address in a more clinical way?
20  A.  When you're talking to kids, yes, you would probably use
21  that terminology, but that was just slang that people, you
22  know, when talking could use instead of, because when you
23  talk -- when you hear people talking about it, they don't
24  always use the term "masturbation" either.  You'll hear them
25  say "jerking off" or "jacking off" or "wanking" or whatever.

Barry - Cross by Ms. Zack

1  *Q.* But not usually in the context of when they're talking

2  about teaching that to children?  Wouldn't you agree that that

3  would be a little odd?

4  *A.* Don't know.  I've never been in that conversation with

5  anybody.  And my parents didn't talk to us about it.  So I

6  don't know what terminology even my parents would have used if

7  they would have had that conversation with us.

8  *Q.* So you're saying it would have been very natural for you to

9  turn to Mr. Peterson and say, "You know, we need to teach the

10  boys about jerking off"?

11  *A.* We need to teach the boys about sex and that's everything

12  and that would have been included.

13  *Q.* That's not my question.  You wouldn't have turned to

14  Mr. Peterson, would you, and have said, "We need to teach the

15  boys about jerking off," using the term "jerking off"?

16  *A.* I don't know what I would have used.  You're asking me to

17  speculate on a conversation that never existed, so.

18  *Q.* Well, because you never talked to him about that, right?

19  You just talked to all these people on the Internet about your

20  boys' penises?

21  *A.* Mr. -- no.

22  *Q.* And you talk a lot about having the boys see other men

23  naked, correct?  There are several different conversations.

24  One where you're excited about them seeing an uncut male, based

25  on XXXXXX's new situation, correct?

Barry - Cross by Ms. Zack

1   A.  No, that would have been based just on R.B., because he was
2   still uncut as well.
3   Q.  Okay.  But R.B. had been exposed to lots of naked men?
4   A.  They both have, but O.B. had already been circumcised,
5   where R.B. wasn't.  So seeing an adult male that was
6   uncircumcised would have been more in the line of R.B., not
7   O.B.
8   Q.  So this is now you've been practicing nudism.  You've been
9   going to Houston.  You went to Mr. Whittington's house.  You
10  went to Mr. Isaackson's house.  And I believe in one of the
11  chats you said, "They're not even phased by anybody being
12  naked"?
13  A.  They're not phased by anybody being naked, no, ma'am.
14  Q.  And you discussed your buddy coming over at Thanksgiving.
15  They saw someone naked then, too, correct?  That was in chat
16  7L?
17  A.  Yes, ma'am, I believe.
18  Q.  And -- I'm sorry?
19  A.  I said "I believe."  I've not seen 7L, so.
20  Q.  So they were exposed to a lot of naked men?
21  A.  Yes, ma'am.
22  Q.  And other than the -- Mr. Whittington's son and
23  Mr. Isaackson's kids, they were never around any other children
24  naked?
25  A.  No, ma'am.  Because there wasn't anybody in Wichita Falls

Barry - Cross by Ms. Zack

1   that was into that lifestyle that had kids.  That's why we were

2   also planning on going to one of the local resorts where there

3   were other children to expose them to families that had kids

4   that were into the same lifestyle as we were practicing.

5   Q.  But you never did that?

6   A.  No, ma'am, for a number of reasons.  Number one is that you

7   had to belong to what they call AANR, which is the American

8   Association of Nude Recreation, which --

9   Q.  It's my understanding that the first time you looked up the

10  resort rules on that site was after your children were taken

11  away from you by CPS the first time, based on your testimony at

12  the CPS trial.  Do you recall that?

13  A.  No, ma'am, because I looked up those Web sites on the

14  desktop which no longer existed that I used for my research

15  paper for school.

16  Q.  Back in 2008?

17  A.  No, ma'am.  I started that class in 2006.

18  Q.  Right.  That's what I'm saying.  Prior to --

19  A.  Oh.

20  Q.  -- January 1st -- or January 19th of 2008 -- was it 2008 or

21  2000 -- 2008, when you got that computer?

22  A.  That's correct.

23  Q.  Okay.  So you said that you looked this up back in 2006?

24  A.  Yes, ma'am.

25  Q.  Prior to getting the boys permanently, because that didn't

Barry - Cross by Ms. Zack

1  happen until April 27th of 2007, correct?

2  A.  Correct.

3  Q.  And you've testified and said that you did not tell CPS

4  that you were a nudist, correct?

5  A.  I wasn't a nudist at that time, no, ma'am.

6  Q.  You were just researching becoming a nudist?

7  A.  No, I was researching my paper that was dealing with single

8  parent -- or single fathers raising children, because --

9  Q.  And the rules for what to do at a nudist family resort came

10  up then?

11  A.  Well, I was looking at the -- when I read the -- or when I

12  was doing my research, I came across Dr. Okami's research that

13  dealt with raising nudist children, which was in my paper that

14  I wrote and I had also looked up resorts to see do they allow

15  single parents and consider a single dad with kids as a family

16  or do they discriminate.  Because the whole basis of my

17  research paper was discrimination against single fathers

18  raising children in all aspects of our society.

19  Q.  So you were not yet a nudist?

20  A.  No, ma'am.

21  Q.  You had not considered this lifestyle for your boys?

22  A.  Not at that point, no, ma'am.

23  Q.  Okay.  And then when you decide to become a nudist and to

24  introduce them to this lifestyle, you don't go to a resort.

25  You don't take them anywhere to see other naked children.  You

Barry - Cross by Ms. Zack

1   said that you didn't know you were going to the Isaacksons when

2   you came to Houston, which would have exposed them to other

3   children.  And so that first year, 2009, they're not exposed to

4   anyone naked other than you?

5   A.   That's correct.

6   Q.   Who they probably would have seen naked in the normal

7   course of parenting anyhow, because things happen, correct?

8   A.   Correct.

9   Q.   I mean, you know, you've got to go to the bathroom.  You've

10  got a little kid clinging to your leg.  It happens, right?

11  A.   Correct.

12  Q.   I mean, they follow you in there.  I mean, I have a

13  2-year-old.  He follows me everywhere.  It's hard to, you know,

14  get some privacy.  So chances are they saw you naked just in

15  the normal course of parenting?

16  A.   Correct.

17  Q.   Okay.  So now you decide we're going to do this.  This is

18  what these boys need to build their self-esteem.  And you don't

19  plan a trip to take them anywhere --

20          MS. MINICK:   Your Honor, I'm going to object to the

21  question -- or the lack of a question.  She's just simply --

22          THE COURT:   If you could break it down a little bit,

23  that would be helpful.

24  BY MS. ZACK:

25  Q.   When you first exposed them to this lifestyle, you don't

Barry - Cross by Ms. Zack

1  plan a trip to a nudist resort, correct?

2  A.  And --

3  Q.  It's a "yes" or "no" question, Mr. Barry.  Correct?

4  A.  Yes.

5  Q.  When you plan your trip to Houston to see Mr. Noonan, you

6  don't plan a trip to a nudist resort, do you, Mr. Barry?

7  A.  No, ma'am.

8  Q.  When you go back two weeks later to visit Mr. Noonan again,

9  you don't plan a trip to a nudist resort, do you?

10  A.  No, ma'am.

11  Q.  And between June and December when you go back to visit

12  Mr. Noonan for the third and final time, you don't plan a trip

13  to a nudist resort, do you?

14  A.  I don't think you would visit a nudist resort in December

15  when it's cold.

16  Q.  Between June and December, it's a six-month period.

17  A.  Okay.

18  Q.  You don't plan a trip or go with your children to a nudist

19  resort, correct?

20  A.  No, ma'am.

21  Q.  And when you get back from Mr. Noonan's, between January

22  and the execution of the search warrant, you don't plan a trip

23  to a nudist resort?

24  A.  Again, that was December, January, February when the

25  temperatures were below 30.  You wouldn't be outside running

Barry - Cross by Ms. Zack

1   around naked, no, ma'am.

2   Q.   So these resorts, none of them have indoor pools, indoor

3   gymnasiums, indoor movie theaters?   I mean, if you're telling

4   me you go there to explore the nudist lifestyle, how is the

5   fact that it's 50 or 60 degrees outside stop everyone from

6   sitting in a movie theater watching a movie naked?

7   A.   Because there's no movie theater on the resort site.   It

8   was camp grounds, outdoor pools, outdoor playgrounds,

9   campsites, RV sites.   They may have had a building inside for

10  activities, but not -- I mean, it's not a town.   They don't

11  have a movie theater or bowling alley, a restaurant, a Sonic

12  per se.   So why would you go to those camps, again, to be

13  outside naked in 50 or 30 degree weather.

14  Q.   And there's only nudist resorts in Texas, right?

15  A.   No, ma'am.

16  Q.   They happen to have them in places that are sunny and warm

17  in December and January, don't they?

18  A.   Yeah, and that takes money to do that, which if I wasn't in

19  school -- or if I was in school and not working, I wouldn't

20  have had the funds to take a vast trip like that to sunny

21  California or Florida to go just to a nude resort.

22  Q.   So it was -- now it's not we didn't go and all that.   Now

23  it was financial?

24  A.   That's what I was beginning to explain at the very

25  beginning, because to belong to or to go to Wildwood, to go to

Barry - Cross by Ms. Zack

1  Bluebonnet, you had to be a member of AANR, which is a
2  membership fee, an annual membership fee, and you had to have a
3  membership fee to the resorts in order to participate and go to
4  those resorts.  It wasn't just something they open to the
5  public and you say, well, let's go and go in and pay, you know,
6  $3 and, you know, walk in the door.  You had to fill out
7  membership paperwork.  You had to be -- have a background check
8  run.  You had to have the memberships to them, so.
9  Q.  So it sounds like the perfect place to expose your children
10  to other children in a safe environment where everyone has been
11  background checked.  Because you said, you know, you were very
12  careful about who you let them around?
13  A.  That's correct.
14  Q.  Okay.  So you were really careful about the people that you
15  met online that you then invited to your home, correct?
16  A.  May have invited, but they may never have showed up either,
17  which even Bryan, the one that I was talking to, the unknown,
18  said let's meet and that, he was never in the home with the
19  kids.
20  Q.  But you invited him?
21  A.  That's correct, I did.
22  Q.  Okay.  You invited several people in just a few chats that
23  we have?  Yes?
24  A.  I believe so, yes.
25  Q.  So what I'm taking away from what you're saying is, there

Barry - Cross by Ms. Zack

1  are no poor nudists, because you have to pay all these

2  membership fees?

3  A.  No, I'm not -- no.

4        MS. MINICK:  Your Honor, I'm going to object.  That's

5  argumentative.

6        THE COURT:  I'll sustain the objection.  But I do have

7  a question.  What is the amount of the membership fee, if you

8  recall?

9        THE WITNESS:  Off the top of my head, ma'am, I don't

10  recall.  But I know it was not, like, $25.  I think it was in

11  the hundreds.

12  BY MS. ZACK:

13  Q.  For AANR or for the resort?

14  A.  AANR.  And I don't know what the membership would have been

15  for the resorts.  Each one has their own.  And I know that

16  there's one that I looked at that I believe it was a $500 a

17  year membership fee.  And I thought, wow, if you're only going

18  to go once, that's kind of expensive.

19  Q.  But you never went?

20  A.  No, ma'am.

21  Q.  Okay.  Now let's talk about -- okay.  So if I told you that

22  at AANR, that the top level membership, the lifetime membership

23  was $128 a person today --

24  A.  Okay.  $128 a person times three is what, or times four?

25  Q.  Well, we'll put down $128 for a lifetime membership for

Barry - Cross by Ms. Zack

1   right now and we'll get back -- oh, I'm sorry, one-year

2   membership.  And we'll get back to the kids' part in a second.

3                    Let's talk about the Wii.  You said earlier that

4   the boys saw you excited -- sexually excited with an

5   erection -- I'm sorry, with an erection because you're claiming

6   it wasn't sexual, when you-all were naked playing Wii?

7   A.  Yes, ma'am.

8   Q.  And that that wasn't a big deal?

9   A.  Correct.

10  Q.  Okay.  And then in chat 7M, at line 30421, you said, "Have

11  seen me hard and leaking precum.  Always leak when hard."  So

12  they saw, as you're calling it, precum leaking out of your

13  penis while you're naked playing Wii?

14  A.  They would have seen it.  It wasn't something that I drew

15  their attention to, going, "You know, look at daddy."  They

16  would have seen it if they were looking.  But like I said, I

17  didn't say, Look at what's happening to daddy when we were

18  doing it.  It just would have been during the course of working

19  out on the Wii.

20  Q.  So it was better to be naked with an erection, with precum

21  leaking out of your penis, jumping around your living room in

22  front of your naked children than having on some underwear, in

23  your mind?  This was the course of action and the lifestyle you

24  were pursuing?

25  A.  Working out, I didn't think about that.  I mean, that's not

Barry - Cross by Ms. Zack

1   at the top of my head, as far as why I was working out on the

2   Wii.  It's just a natural course that happens in -- with

3   working out.

4   Q.  So you got hard when you worked out clothed?

5   A.  A couple of times, yes, ma'am.

6   Q.  Oh, just a couple of times?

7   A.  Well, because I didn't do that many exercises with working

8   out on the Wii clothed.

9   Q.  Oh, so it was only when you did Wii workouts that you got

10  an erection, not over the course of the --

11  A.  Well, that was the only exercising I did.  I didn't belong

12  to a gym or I didn't go to, you know, any kind of facility

13  where you did a workout.  I only did it at home on the Wii.

14  Q.  So out teaching your boys to ride bikes when you're running

15  behind them, pushing the bike, getting all sweaty and hot, you

16  would get erections then, too?

17  A.  I don't know.  I don't recall.

18  Q.  You only recall the ones when you were using the Wii naked

19  with your children?

20  A.  That was a different type of exercising than being behind

21  pushing the bike.

22  Q.  Right.  It has nothing to do with being sexually excited or

23  stimulated --

24  A.  No, ma'am, not at all.

25  Q.  -- by being naked with your children?

Barry - Cross by Ms. Zack

1    A.   No, ma'am.

2    Q.   And then you go and talk about it with a stranger online,

3    the fact that precum leaks out of your penis when you're hard?

4    A.   And, again, that wasn't, you know, the whole conversation.

5    So we could have been talking about other things previous to

6    that.

7    Q.   Right.  Where you were talking about --

8    A.   But the conversation you got there was taken out of context

9    from the whole conversation, which could have had different

10   connotations at the very beginning.

11   Q.   Right.  I believe that prior to this you were discussing

12   someone coming over and that it would be okay for them to be

13   naked but as long as they didn't get anything on your

14   furniture?

15   A.   I believe you took that whole conversation out of context.

16   If you reread it, you're realizing that that's wrong.

17        MS. MINICK:  I'm sorry to interrupt.  Can you

18   please --

19        MS. ZACK:  30408.

20        THE COURT:  Thank you.

21   BY MS. ZACK:

22   Q.   Which proceeds what we're talking about.

23        MS. MINICK:  Which chat is this, Ms. Zack?

24        MS. ZACK:  7M.

25        THE COURT:  M as in mother?

Barry - Cross by Ms. Zack

1          *MS. ZACK:*  M as in mother, yes, Your Honor.

2          *THE COURT:*  Thank you.

3     BY MS. ZACK:

4     Q.  Where the unknown person says to you, "Cool.  You're going

5     to teach them, about J-O?"

6               Your response:  "That I will do.  Want them to

7     know that it is normal and okay to do."

8               "That's cool."  Then he says, "I think that's a

9     more nurturing way to approach it."

10              Then you say, "We all had that guilty feeling

11    growing up."

12              "Yes, it is."

13              And then you go into, "Just don't get it on my

14    furniture.  You can do it any time anywhere in the house.

15    Don't care about that."

16              And his response is, laugh out loud, "awesome."

17              You're not talking about someone masturbating?

18    A.  No, ma'am, I was not.

19    Q.  Okay.  So if we perceive that from this chat, we're wrong?

20    A.  Yes, ma'am.  Because if you read the conversation once

21    again --

22    Q.  I did.

23    A.  -- the conversation -- can I finish?

24    Q.  Go ahead.

25              *THE COURT:*  Yes, please.

Barry - Cross by Ms. Zack

1   A.  All right.  Thank you.  The conversation was teaching my

2   boys about sex.  Every male child -- I shouldn't say male

3   child.  Every male in the United States and in the world

4   masturbates.  If they can say they don't, they're lying to

5   themselves and us.  Every male in the world masturbates.

6   Children will learn when they hit puberty, it's a natural thing

7   to masturbate.  Growing up, we felt guilty about it because we

8   were told that was wrong, that was a no-no, you don't do things

9   like that.

10          Now, being older you realize that that was a

11  stigma that the parents had during the '50s, '60s, and '70s as

12  the nuclear family, that they didn't talk about it.  I didn't

13  want my kids to have the same feeling.  And what I was coming

14  across was, that when they did it, I didn't care that they did

15  it.  I didn't want them to feel guilty about it.  I wanted them

16  to know that they had to use a towel or something and not get

17  it on my furniture.  That's the context of that conversation.

18  So your speculation of what you're saying is another man coming

19  over and jacking off and don't get it on my furniture is

20  totally wrong and bogus.

21  Q.  So you were telling him that it would be okay for your boys

22  to sit around and openly masturbate on the sofa as long as they

23  had a towel, because you don't want to get it on the furniture?

24  A.  It doesn't mean openly in front of me.  It could have been

25  when I was at work and they were watching a movie or whatever.

Barry - Cross by Ms. Zack

1   Q.  And that's --

2   A.  Because I know that I did that when my parents weren't

3   home.

4   Q.  And then from that conversation, I'm following your

5   meaning, you then -- he says, "Have they seen you do it

6   already"?  And you say, "No."

7   A.  You're right.

8   Q.  And then you say, "They've seen me hard and leaking precum.

9   Always leak when hard."  And then he says, "Have they said

10  anything about it?"  And you say, "No.  They're not interested

11  in it."

12  A.  Exactly.  Which means if they saw it, again, I didn't say,

13  "Look at daddy."  If they saw it, they didn't make mention of

14  it because it didn't phase them.  They had no interest in my

15  penis.

16  Q.  But you certainly had an interest in telling someone about

17  your penis and about the precum coming out of it?

18  A.  But that's to two adults talking, too.  That's not --

19  that's not child pornography.

20  Q.  Let's go back to the membership fee just so we're clear.

21  A.  Yes, ma'am.

22  Q.  Would you be surprised to know that you have to be over 18

23  to join AARN -- or NR -- wait, AANR?  Would that surprise you?

24  A.  No.

25  Q.  Okay.  So it would only be $128 or whatever it was back in

Barry - Cross by Ms. Zack

1  2009, because the kids can't be members?

2  A.  But you can have a family membership, yes, ma'am.  When I

3  was looking it up, there was a -- there was memberships for

4  couples and there were memberships for family.  They may have

5  changed it, I don't know, but at the time that I looked there

6  were different levels of membership, including couples and

7  family.

8  Q.  Okay.  And a couple's membership usually, like when you

9  join the gym, you would agree with me that if it's a hundred

10  and twenty-eight for one person, that it would have been a

11  hundred and -- 128 -- a hundred and fifty-six for two, except

12  that usually they make you some kind of deal.  So it -- I'm

13  sorry, 256.  It might be, like, 225 for a couple, right?

14  Because they're not going to charge you two full price?

15  A.  I don't know, because I never pursued going into it once I

16  saw the membership fees.

17  Q.  I'm just asking memberships in general.  Okay?  Let's talk

18  about memberships in general.  Usually if I'm going to join a

19  gym as a single person and it's a hundred dollars --

20  A.  Correct.

21  Q.  -- sometimes they have a couple's deal, which if let's say

22  Mr. Stabe and I joined, that would be a hundred dollars each,

23  correct?

24  A.  Okay.

25  Q.  Right?  But if Mr. Stabe and I joined as a couple, it might

Barry - Cross by Ms. Zack

1  only be a hundred and eighty dollars total instead of 200?

2  A.  I don't know, because I never bought a membership to a club

3  or a gym or anything else.  So I don't know if they offer a

4  discount.

5  Q.  Okay.

6  A.  Because that wasn't one of my avenues that I was interested

7  in.

8  Q.  And the resorts, do all the resorts require you to be a

9  member of AANR?

10  A.  A lot of them did, yes, ma'am.

11  Q.  And which ones were those?

12  A.  I off the top of my head, I couldn't tell you.  I mean,

13  without looking up the Web site, I could not tell you.  And

14  from the time that this happened until now, they could have

15  changed their policy for whatever reason.  I don't know because

16  I hadn't pursued the lifestyle since all this took place in

17  2011.  We're talking about, you know, that resorts had three

18  years to review policies, change them, rewrite them.  I don't

19  know, because I never went back and looked.

20  Q.  So you couldn't afford it, is what you're --

21  A.  No, ma'am, I could not afford it.

22  Q.  Okay.  And where would we find the other activities you

23  planned for the children to be around other naked children,

24  other than talking about it?

25  A.  Other than talking about it?  Nowhere.

Barry - Cross by Ms. Zack

1  Q.  Okay.  Now, yesterday you had told us that in reference to

2  picture 4B, the bath picture with the child's pelvis raised --

3  A.  Yes, ma'am.

4  Q.  -- that you said that that was a natural position for that

5  child because they always play in the bath?

6  A.  Correct.

7  Q.  Okay.  And then you said there's always toys in the bath,

8  correct?

9  A.  At our house, yes, ma'am.

10  Q.  Well, I don't believe that was the answer you gave.

11  A.  I know they had toys down there.  I don't know where they

12  were at in this picture.  I don't see them.  His brother could

13  have had them.

14  Q.  Listen for the question.

15  A.  Oh, yes, ma'am.

16  Q.  There's no toys in this picture?

17  A.  No, ma'am.

18  Q.  And yesterday you told me that there were toys in the other

19  picture where the boys aren't exposed.  Do you remember telling

20  me that?

21  A.  I believe -- no, I said was there picture -- was there toys

22  in there.  Because they had toys down there.

23  Q.  You didn't say that yesterday.

24  A.  Well, you asked me if there were toys in this one, but I

25  don't recall if there were toys in the other one.  I said that

Barry - Cross by Ms. Zack

1    there probably was toys in there, because I know they had toys

2    when they took a bath.

3    Q.  Okay.  You said that there were toys.

4    A.  Okay.  Then there were toys, but they may not have been in

5    the picture.

6    Q.  Oh, okay.  Because let's look at that picture.  That's 9I.

7    A.  I don't think that's it.

8    Q.  That's not 9I.  Where's the picture -- yes, that is 9I, but

9    that's not the -- I wrote it down wrong.  But the picture with

10   both of the boys in the tub.  We'll find that one.  But I just

11   want to --

12            MS. ZACK:  And, Your Honor, without violating Your

13   Honor's ruling that we don't talk about 31 and 32 --

14            THE COURT:  And by the way, just so the record is

15   clear, I assume that the information that defense counsel

16   requested this morning has been e-mailed to them and that they

17   have it?

18            MS. ZACK:  Yes, Your Honor.

19            MS. POUNCY:  Yes, ma'am.  And I provided them with a

20   CD as well, if they wish to have it, with the scanned items,

21   Your Honor.

22            THE COURT:  But the scan was also e-mailed to them,

23   correct?

24            MS. POUNCY:  Yes, ma'am.

25            THE COURT:  All right.  Good.  Thank you.

Barry - Redirect by Ms. Minick

1              *MS. MINICK:*  I'll check to see.

2    BY MS. ZACK:

3    Q.  9J.  I apologize, Mr. Barry.

4    A.  Yes, ma'am.

5    Q.  There's no bath toys in there?

6    A.  I don't see any, no, ma'am.

7    Q.  Okay.  And you say that doesn't show the whole tub?

8    A.  Correct.

9    Q.  Okay.

10             *MS. ZACK:*  Your Honor, if I could just reference the

11   other two images as far as that they show the entire tub?

12             *THE COURT:*  That's fine, for that limited purpose.

13   BY MS. ZACK:

14   Q.  The two images, 31 and 32, with Mr. Noonan and the boys

15   sitting in the tub, that shows the entire tub and you would

16   agree, would you not, that there's no bath toys in that picture

17   either, is there?

18   A.  That's correct.

19   Q.  Okay.

20             *MS. ZACK:*  May I have a moment, Your Honor?

21             *THE COURT:*  You may.

22             *MS. ZACK:*  Your Honor, we'll pass the witness.

23             *THE COURT:*  All right.

24             *MS. MINICK:*  Part of my cross -- or redirect, Your

25   Honor, obviously will be based on some of the information that

Barry - Redirect by Ms. Minick

1   I'll need to discuss with our expert.

2               *THE COURT:*  That's fine.

3                       **REDIRECT EXAMINATION**

4   BY MS. MINICK:

5   Q.  Mr. Barry, you were asked about nudist resorts and it was

6   suggested that that was not something you had really -- that

7   that was not an interest that you truly had for the children.

8   Is that your understanding?  Let me rephrase that.

9               You did research several nudist resorts, did you

10  not?

11  A.  Yes, ma'am, I did.

12  Q.  And what were those resorts?

13  A.  I had looked at ones that were considered family resorts in

14  the state of Texas and just in the state --

15  Q.  Specifically which one, please?

16  A.  Pardon me?

17  Q.  Specifically the name of the resort.

18  A.  Wildwood, Bluebonnet, and I believe Emerald Lake.

19  Q.  And when you go to Wildwood, is it Wildwood Naturist

20  Resort?

21  A.  I don't recall the full name.  I just knew it as Wildwood.

22  Q.  But on its Web site, it says "a family nudist club,"

23  correct?

24  A.  Correct.

25  Q.  And would it surprise you to learn that the single

Barry - Redirect by Ms. Minick

1   membership is $360 plus tax and a couple membership cost is

2   $700 plus tax?

3   A.  No, it wouldn't surprise me.

4   Q.  Was it your -- were there any additional fees, in terms of

5   grounds fees or RV hookup fees --

6   A.  Yes.

7   Q.  -- or cabin rental fees?

8   A.  Yes.  When -- if you were planning on going for more than

9   just what they called a day pass, if you were going to, you

10  know, spend like a Friday night and a Saturday night, you would

11  have camp site fees or RV hookup fees.  You would have what

12  they call a day pass fee for each one of the days, which gives

13  you access to the pool and to the clubhouse that were located

14  on each one of the resorts.

15  Q.  So do you know what particular activity -- you were asked

16  why you wouldn't visit these during the winter months or --

17  and, first of all, would the children be in school during the

18  school year?

19  A.  They would be.

20  Q.  Second of all, would -- what activities at the resort are

21  offered that involve or interest children?

22  A.  Well, they had playgrounds.  They had the volleyball.  They

23  had the swimming pool.  They had, you know, kind of like a game

24  area where kids could, you know, play.

25  Q.  And what the third nudist resort?  You said Wildwood,

Barry - Redirect by Ms. Minick

1   Bluebonnet, and what was the other?

2   A.   Emerald Lake.

3   Q.   Let me draw your attention to Government's Exhibit 7K.

4   What is the date of that conversation?

5   A.   1-24-2011.

6   Q.   And, again, this is prior to you being arrested, prior to

7   any search warrant being issued, prior to you knowing of any

8   sort of investigation?

9   A.   That's correct.

10   Q.   And who are you having this conversation with?

11   A.   It's unknown, but I believe, if I'm not mistaken, this was

12   with Andrew, which was the very first chat, 7A.  It's the same

13   person.  I think he was just using a different IM at the time

14   or may have been doing it from his phone.

15   Q.   And on line 30647, what are you discussing there?

16   A.   The nudist resort Wildwood, which is near Decatur, Texas.

17   Q.   What do you say specifically?

18   A.   "Want to try Wildwood up here in Decatur."

19   Q.   And what's your next comment on line 30648?

20   A.   "And then go to Lone Star."  And, again, that's not the

21   whole conversation, so I don't know what was stated previously

22   or afterwards.

23   Q.   You were asked about 20H, which was the picture of you

24   painting nude.

25   A.   Yes, ma'am.

Barry - Redirect by Ms. Minick

1   Q.  Do you recall that?

2   A.  Yes, ma'am.

3   Q.  And asked if it would surprise you if it's on your desktop.

4   Do you know if it's on your desktop?

5   A.  No, not offhand.

6   Q.  Do you know -- you were asked is it possible that you could

7   have sent that to Mr. Noonan.  Do you recall that?

8   A.  Yes, ma'am.

9   Q.  And you said, "It's possible"?

10  A.  That's correct, it's possible.

11  Q.  Do you know whether or not you did send it?

12  A.  To who, no, ma'am.

13  Q.  Do you know if you did send it?

14  A.  No, ma'am, not at all.

15  Q.  And if you sent a naked picture of yourself to another

16  adult, it's not illegal, is it?

17  A.  No.

18  Q.  And you are not told whether or not this 20H was actually

19  found on Mr. Noonan's computer, were you?

20  A.  No, ma'am, I wasn't told that.

21  Q.  Did you send --

22          MS. MINICK:  May I have just a second, Your Honor,

23  please?

24          THE COURT:  You may.

25  BY MS. MINICK:

Barry - Redirect by Ms. Minick

1   Q.  Do you recall when Ms. Zack asked you about the pictures on
2   your camera of the boys at Christmas?
3   A.  Yes, ma'am.
4   Q.  And asked you why they weren't naked in those pictures?  Do
5   you recall that question?
6   A.  Yes, ma'am.
7   Q.  And asked -- and then suggested that you first said, "Well,
8   it was Christmas" and then you later said, "Well, there are
9   other people there"?
10  A.  Correct.
11  Q.  And she asked you why there weren't any pictures of other
12  people there during Christmas, correct?  Do you recall that?
13  A.  Yes, ma'am, I do.
14          MS. MINICK:  Your Honor, I'm going to need just one
15  second, please.
16          THE COURT:  All right.  Would you please get your
17  client some water, if you have --
18          MS. MINICK:  Sure.
19          THE COURT:  -- some on the table.  Thank you.
20          THE WITNESS:  Thank you, sir.
21  BY MS. MINICK:
22  Q.  Mr. Barry, let me show you what's been marked as
23  exhibits -- Defense Exhibits 19 through 26.  I'll ask that you
24  take a look at those.
25          THE COURT:  These have not been previously admitted,

Barry - Redirect by Ms. Minick

1   have they?

2            MS. MINICK:  That's correct, Your Honor.

3            THE COURT:  Thank you.

4   BY MS. MINICK:

5   Q.  Did you get some water?

6   A.  Yes, ma'am.  Okay.

7   Q.  And what are those pictures of, Mr. Barry?

8   A.  Christmastime.

9   Q.  Okay.  And do they contain photographs of your boys?

10  A.  Yes, ma'am.

11  Q.  Are there other people in those pictures?

12  A.  My niece, my sister, and my parents.

13           MS. MINICK:  Your Honor, at this time we would offer

14  defense counsel -- or Defense Exhibits 19 through 26 and tender

15  them to the Government for inspection.

16           THE COURT:  Thank you.  Any objection?

17           MS. ZACK:  No, Your Honor.

18           THE COURT:  All right.  They're admitted.  Thank you.

19  BY MS. MINICK:

20  Q.  And who took those photographs, Mr. Barry?

21  A.  Probably myself or my sister.

22  Q.  And were those on your camera as well?

23  A.  I don't know.

24  Q.  Mr. Barry, yesterday Ms. Zack questioned you about

25  statements that you made at the CPS trial in July of 2012,

Barry - Redirect by Ms. Minick

1    correct?

2    A.   Correct.

3    Q.   And you were asked specifically about --

4              MS. MINICK:  One second, Your Honor.

5    BY MS. MINICK:

6    Q.   You were specifically asked to review page 90 and 91

7    regarding testimony of Exhibit 16.  Do you recall that, line 25

8    on page 90?

9    A.   Yes, ma'am.

10   Q.   And you were asked if that -- what computer that came off

11   of and you testified, "I believe it was on mine," is that

12   correct, on the next page, page 91, line 2 and 3?

13   A.   Yes, ma'am.

14   Q.   But when you look at the entire exchange, you were asked,

15   "Who took the Exhibit 16," and your response to that was what?

16   A.   "I believe Mr. Isaackson did."

17   Q.   And what picture does that response tell you that you're

18   referring to?

19   A.   That would have been the picture of the kids and Mr. Noonan

20   standing inside the pool at their barbecue.

21   Q.   And then immediately after that, "Whose computer did that

22   come off of," and you stated?

23   A.   "I believe it was mine."

24   Q.   So you're referring to that picture?

25   A.   Correct.

Barry - Redirect by Ms. Minick

1  Q.  Now, and when did you come to learn that information?

2  A.  During the execution of the search warrant, that was one of

3  the pictures that they showed me that was on my computer.

4  Q.  Okay.  So that's when you learned it was on your computer?

5  A.  Correct.

6  Q.  And it then goes on to question about Exhibit 17, who took

7  this picture, correct?

8  A.  Correct.

9  Q.  And it's your understanding that that was the -- what the

10  Government has offered as Exhibits 31 and 32, one of those?

11  A.  Correct.

12  Q.  You stated at that time, "I don't know who took that

13  picture"?

14  A.  That's correct.

15  Q.  Okay.  There's no question on here about where it was

16  located as far as your computer, correct?

17  A.  That's correct.

18  Q.  Mr. Barry, I believe you testified both on direct

19  examination and my questioning, as well as Ms. Zack's cross,

20  about not going to Houston specifically to get naked with Craig

21  and allow him access to your boys.  Do you recall that?

22  A.  Yes, ma'am, I do.

23  Q.  And even asked regarding what you did that first day,

24  correct?

25  A.  Correct.

Barry - Redirect by Ms. Minick

1   *Q.*  And I believe you testified that it wasn't until the second

2   day that that actually happened; is that correct?

3   *A.*  Correct, and that was when we went to the barbecue.

4   *Q.*  And that is what you testified to in the CPS trial as well,

5   is it not?

6              *MS. ZACK:*  Objection.  Leading.

7              *THE COURT:*  Sustained.

8   BY MS. MINICK:

9   *Q.*  Mr. Barry, you testified in the CPS trial; is that right?

10  *A.*  Yes, ma'am.

11  *Q.*  Is this a copy of your testimony from that trial?

12  *A.*  Yes, ma'am.

13             *MS. ZACK:*  Objection.

14             *THE COURT:*  Excuse me.  What is the predicate for

15  using a prior consistent statement?

16             *MS. MINICK:*  Because yesterday, Judge, it was

17  questioned that he went down to Houston with the specific

18  intent to get naked and was cross-examined about that he got

19  naked when they got down there and his prior consistent

20  statement, that it was not --

21             *THE COURT:*  But prior consistent statements ordinarily

22  are not admissible, so --

23             *MS. MINICK:*  After cross-examination, if it's -- if

24  the integrity is questioned.

25             *THE COURT:*  Well, but there has to be an intervening

1  motive to fabricate, as I understand it.

2           MS. MINICK:  Well --

3           THE COURT:  If that --

4           MS. MINICK:  -- I agree.  I think that --

5           THE COURT:  Is this optional completeness?

6           MS. MINICK:  It can go under that, too, Your Honor.

7           THE COURT:  It can't go under the first one, as best I

8  can tell, unless I'm misunderstanding where you're going.  Is

9  this testimony that was close to where the prior inconsistent

10 statement was taken in the proceeding, prior proceeding?

11          MS. MINICK:  I'm not sure I understand the Court, Your

12 Honor.  Is this statement he's -- that I'm getting ready to

13 have him testify to --

14          THE COURT:  Yes.

15          MS. MINICK:  -- is it close in time to the prior --

16          THE COURT:  Inconsistent statement that was relied on.

17          MS. MINICK:  I don't believe that she used a prior --

18          THE COURT:  All right.

19          MS. MINICK:  She questioned about --

20          THE COURT:  Right.

21          MS. MINICK:  -- the integrity of and at that point, I

22 do think that calls into question the sincerity of this

23 statement, at which point we would be allowed to rely on a

24 prior consistent statement.

25          THE COURT:  I'm not sure that's an adequate predicate.

1    What is the Government's position?

2            *MS. ZACK:*  Your Honor, she is attempting to use a

3    document that's not in evidence, that's hearsay, that is a

4    self-serving statement.

5            *THE COURT:*  Well, self-serving is not sufficient basis

6    for exclusion.

7            *MS. ZACK:*  No, no.  No, but for no purpose other than

8    I suggested he came here to get naked with Mr. -- came to

9    Houston to get naked with Mr. Noonan and his children and what

10   in the prior CPS trial -- I mean, I didn't impeach him with

11   anything, saying he did anything differently or he said his

12   purpose was different.

13           *THE COURT:*  I understand.  I understand.

14           *MS. ZACK:*  So using a prior consistent statement to

15   rebut some prior inconsistent statement might be okay, but

16   there was no prior inconsistent statement.

17           *MS. MINICK:*  Well, Your Honor, I'm not trying to rebut

18   a prior inconsistent statement.  He made a statement in direct.

19   She cross-examined him about it, implying that was not true.

20           *THE COURT:*  Right.

21           *MS. MINICK:*  And I then at this point have the

22   opportunity to show the prior consistent statement, showing

23   that it was not made up at the time that he was making the

24   statement here.

25           *MS. ZACK:*  So she's trying to demonstrate that he said

1   the same thing at two different times.

2          THE COURT:  Yeah, I'm not sure that that's a

3   sufficient basis.  Move on to a different area while I poke at

4   this further.

5          MS. MINICK:  Sure.

6          THE COURT:  And I'm happy to hear anything else you

7   want to add.

8          MS. MINICK:  Well, I believe that's the whole point of

9   the rules allowing a prior consistent statement.  It's not

10  admissible in my case on direct, but if it is questioned and

11  somehow showed that that was made up at the time of his

12  testimony now, then I am allowed to put it into evidence as a

13  prior consistent statement.

14         THE COURT:  I think under Tome, T-o-m-e, that it is --

15  that more is required.

16         MS. MINICK:  If I may --

17         THE COURT:  Let me -- again, I want to examine this a

18  little bit more.  So move on to a different area while I have

19  the opportunity to do that.  Go ahead.

20         MS. MINICK:  Judge, well, I believe at this point any

21  of my further questions, I'm going to need to consult our

22  computer expert prior to continuing.

23         THE COURT:  All right.  Why don't you go ahead and --

24  how long will you need to talk with him?

25         MS. MINICK:  I really can't tell you, Judge, because I

1    need to send him what we've received.

2              THE COURT:  I thought you had already done that.

3              MS. MINICK:  I haven't had a chance to verify that

4    I've gotten the e-mail.  I'm sorry.

5              THE COURT:  I thought that's why Mr. Jarvis had

6    stepped out of the room.

7              MS. MINICK:  I'm sorry, I didn't hear you.

8              THE COURT:  I thought that's why Mr. Jarvis had

9    stepped out of the room.

10             MS. MINICK:  No, Mr. Jarvis is not feeling very good

11   today.

12             THE COURT:  I'm sorry to hear that, Mr. Jarvis.  So I

13   would suggest that you go ahead and do that right away.  And I

14   take it you have no other questions pending your ability to

15   talk to your expert; is that correct?

16             MS. MINICK:  Yes, Your Honor, with the exception of

17   what you're looking at right now.

18             THE COURT:  All right.  Well, let's take a half-hour

19   break.  At the end of that, you can come back and tell me where

20   you are.  But send it promptly.

21             MS. MINICK:  Okay.  I will, Your Honor.

22             THE COURT:  All right.  Thank you.

23             MS. MINICK:  And I haven't had a chance to verify that

24   I've gotten it from them yet, but I'm doing that now.

25             THE COURT:  Thank you.  And you are excused for half

1   an hour.  In the meantime I'll be up here, but you may step

2   outside, if you would like.  And I would like you to send that

3   immediately, please.

4        *(Recess from 10:14 a.m. to 10:44 a.m.)*

5        *(Open court, Defendant present.)*

6             *THE COURT:*  All right.  Please be seated.

7                  A couple of things just to clarify the prior

8   ruling on the proposed admission of the prior consistent

9   statement from -- I just wanted to clarify that I don't

10  understand that this is being offered in any way to explain or

11  to disprove the making of an alleged prior inconsistent

12  statement.  Ms. Zack clarified that that was not the case, that

13  there was no effort to provide an impeachment -- to provide

14  impeachment by way of a prior inconsistent statement made by

15  Mr. Barry.  Rather this is a prior consistent statement offered

16  to show that Mr. Barry is saying the same thing today that he

17  said at another earlier occasion.  And as I understand the

18  hearsay rules, that is not a sufficient basis to allow it to

19  come in.

20            *MS. MINICK:*  May I respond, Judge?

21            *THE COURT:*  Yes.

22            *MS. MINICK:*  Mr. Barry -- well, she did cross-examine

23  him about the activities of the first day in regards to his

24  testimony of going down there and being naked.  That was the

25  point, were they naked the first day or the second day.  We're

 1  offering it under 801(d)(1)(B).

 2              THE COURT:  Right.  That's what I'm looking at.

 3          MS. MINICK:  Okay.  And so I guess I'm confused as to

 4  the Court's ruling.  We're offering it to rebut the express or

 5  implied charge that he was recently fabricating that --

 6          THE COURT:  There's no -- but I think the statement

 7  was that he said the same thing before that he did now.  And

 8  there's no intervening claim that he fabricated in between the

 9  two statements, unless I'm missing something.  What is it --

10          MS. MINICK:  It's my understanding that in her

11  cross-examine of him regarding this issue, that there was, that

12  she was trying to say that's not what your testimony was, that

13  that's not what his intent was.  He testified on direct and she

14  was cross-examining him about that and we're using this

15  consistent -- prior consistent statement to -- under that rule

16  to show that he's not just testifying to that today, as she

17  crossed him on.

18          MS. ZACK:  Your Honor, I don't believe I ever asked

19  Mr. Barry why he came to Houston.  We discussed the specific

20  dates that he came and that he had said at the previous trial

21  when he said he wasn't sure he remembered what date he came in

22  June, that at the previous trial he said June 17th or 18th.  I

23  didn't ask him the purpose of his trip.  And I don't -- I mean,

24  in general at some point I might have said, "So you came here

25  down here to get naked with Mr. Noonan and your children," but

1   that was not in reference to any prior statement he had ever

2   made at any time or anything at the trial.

3            The impeachment I used from the trial had to do

4   with dates, had to do with how the images got on his camera,

5   the fact that the picture that he claimed he had never seen was

6   taken with the small digital camera that we believe was his,

7   and I never discussed the purpose of his trip.  I know they

8   discussed with him that he came down here because he was

9   looking for a job and Mr. Noonan knew teachers and then the

10  second trip was the job fair and the third trip was just

11  because.  But I don't even recall the specific line of

12  questioning and I definitely didn't use anything from those

13  transcripts to suggest that he had made a different statement.

14       *MS. MINICK:*  No, Your Honor, that's not the point.

15  I'm not saying she said he said something different and we're

16  trying to show that he did.  He testified and in her cross is

17  where the express or implied assertion that it's fabricated in

18  his testimony in this trial.  I'm not saying that she used the

19  prior testimony.

20       *THE COURT:*  But if there was -- but if there was, it

21  was for a motive that existed at the time of the CPS testimony

22  as well.  Nothing has changed in that respect, and that's what

23  the rule is directed towards.  So I'm not going to allow it.  I

24  think it's still excluded under 801(b) -- (d)(1)(B).

25            All right.  So tell me where you are on your

1    examination now that we have clarified that.

2            MS. MINICK:  I e-mailed to Mr. Troy Asmus, our expert,

3    once the Court took the last break.  He was not in a position

4    to get to his computer or whatever he was doing in his job did

5    not allow him to access at that time.  It took until now.  We

6    just got notice that he is now available.

7            THE COURT:  Good.

8            MS. MINICK:  So we have not had a chance to -- he

9    hasn't -- he's looking at it now, and we haven't even had a

10   chance to talk to him about it.

11           THE COURT:  All right.  So I would suggest you take

12   that chance.  About how long do you think -- did he give you an

13   estimate as to how long it would take him to look at it since

14   there are relatively few pictures involved?

15           MS. MINICK:  Well, Judge, but you recall that we asked

16   for all of the --

17           THE COURT:  I understand it was the ones that are

18   nearby in date.

19           MS. MINICK:  Right.  And there's 34 pages of them,

20   which don't include the EXIF data.

21           THE COURT:  Just --

22           MS. MINICK:  I'm sorry?

23           THE COURT:  -- on the days right before and after?

24           MS. MINICK:  Yes, ma'am.

25           THE COURT:  All right.  That's not -- again, that's

```
 1    not a huge number considering most of them are not going to be
 2    pornography.  So tell me, given the number that you provided,
 3    how long you think it will take you to make the necessary
 4    inquiry -- for him to make the necessary inquiry and for you
 5    and he to speak?
 6             MS. MINICK:  I don't really know, Judge, because,
 7    again, we haven't even had a chance for him to look at it, for
 8    him to tell us, you know, what it is he needs to do.  So an
 9    hour maybe?  Maybe at that point we would know where we are, if
10    we're ready at that point or if we need additional time.
11             THE COURT:  Why don't you proceed -- let's check with
12    him in half an hour.  In the meantime continue with the witness
13    on other things that you're able to do, subject to your ability
14    to ask additional questions based on the information that
15    you're provided by your expert.
16             MS. MINICK:  This is the last matter, Judge, that I
17    intend to --
18             THE COURT:  So there's no other questions that you
19    have of this witness?
20             MS. MINICK:  No.
21             THE COURT:  All right.  Subject to that, Ms. Zack, do
22    you have additional questions of this witness?
23             MS. ZACK:  No, Your Honor.
24             THE COURT:  All right.  You may step down, sir.  Thank
25    you.
```

1              Did you have any additional witnesses that you

2    wanted to put on on behalf of the Defendant?

3              *MS. MINICK:*  No, Your Honor.

4              *THE COURT:*  Are you going to have rebuttal?

5              *MS. ZACK:*  Very briefly.  Based on what's already been

6    said, I don't know if what Mr. Noonan said -- I'm sorry,

7    Mr. Barry says about anything in redirect would require any

8    further explanation from my expert.  So I could --

9              *THE COURT:*  Why don't we put on the rebuttal that you

10   have now.  We'll do it out of order.

11             *MS. ZACK:*  Right.  Okay.

12             *THE COURT:*  Subject to, again, the ability of both

13   sides to raise these additional points after the defense expert

14   has had a chance to look at the additional information.

15             *MS. MINICK:*  But, Judge, in order for this time to be

16   utilized, if we're doing this while he's doing that, we need

17   the opportunity to talk to him now.

18             *THE COURT:*  You will, as soon as he's done the work.

19             *MS. MINICK:*  Well, he doesn't know what we need to do.

20             *THE COURT:*  Oh, well, then go talk to him.

21             *MS. MINICK:*  Okay.

22             *THE COURT:*  But I think only one of you needs to go do

23   that and the other one can stay here, unless that's a problem.

24   You've got two really good lawyers.

25             *MR. JARVIS:*  Thank you.

Chappell - Direct by Ms. Zack

1          THE COURT:  Let's do that.

2          MS. ZACK:  Your Honor, before Mr. Chappell retakes the

3    stand --

4          THE COURT:  Yes, ma'am.

5          MS. ZACK:  -- could I point out, in the document I

6    gave you, the proposed findings of fact, in No. 12, in the

7    findings of fact section, the year is wrong.  And I told

8    Mr. Jarvis, and they made their correction.  It should say

9    February 8th, 2011.

10         THE COURT:  Thank you.

11         MS. ZACK:  Are you ready for Mr. Chappell?

12         THE COURT:  I am.  Thank you.

13         MS. ZACK:  The United States calls Special Agent

14   Jeffery Chappell.

15         THE COURT:  You remain under oath, sir.

16         THE WITNESS:  Yes, ma'am.

17                    **DIRECT EXAMINATION**

18   BY MS. ZACK:

19   Q.  Special Agent Chappell, you were present during Mr. Barry's

20   testimony, correct?

21   A.  Yes, ma'am.

22   Q.  Okay.  And do you recall where I asked Mr. Barry about how

23   he showed pictures to his family members if it wasn't from his

24   computer?  Do you recall that line of questioning?

25   A.  Yes, ma'am.

Chappell - Direct by Ms. Zack

1  Q.  I believe we were talking about Kemah and those pictures?

2  A.  Yes, ma'am.

3  Q.  Okay.  And what do you recall Mr. Barry's answer being?

4  A.  That Mr. Noonan had a -- like a four-by-five printer and

5  that they were -- they had printed out some photographs and

6  that's what he took back with him to Wichita Falls.

7  Q.  And do you recall him specifically stating because -- so

8  R.B. could have them?

9  A.  Correct.

10  Q.  And when the search was conducted of Mr. Noonan's house,

11  what printers were found?

12  A.  I do not remember and did not find any printers within his

13  residence.

14  Q.  Okay.  What significance would a printer have had to you

15  investigating a child pornography case?

16  A.  Printers are significant to us in that, you know, we're

17  looking for obviously, besides possession, distribution, we're

18  also looking at production, and printers are commonly used for

19  production and printers themselves maintain data that we would

20  look at and analyze.

21  Q.  And that did not occur in this case?

22  A.  Correct.

23  Q.  Because there was no printer found?

24  A.  Correct.

25  Q.  Okay.  Let's talk about the Instant Messenger cache and the

Chappell - Direct by Ms. Zack

1  pictures in the Instant Messenger -- any picture in the Instant

2  Messenger cache.  Are you with me?

3  A.  Yes, ma'am.

4  Q.  Okay.  Mr. Barry indicated that he never saw the images

5  contained in Government's 4AA, BB, CC, DD, EE, FF, and GG.  You

6  heard that testimony?

7  A.  Yes, ma'am.

8  Q.  Okay.  And for the sake of the record, we've been calling

9  those the unknown child and unknown man series of pictures?

10 A.  Correct.

11 Q.  Okay.  Mr. Barry gave an explanation as to how they could

12 be in his Instant Messenger cache, but that he couldn't have

13 seen them.

14 A.  Yes, ma'am.

15 Q.  Did you agree with that explanation?

16 A.  No, ma'am.

17 Q.  Why not?

18 A.  The Instant Messenger program in question, MSN Messenger,

19 Mr. Barry had stated that when a -- during a conversation, a

20 chat conversation with another person, that if that person

21 sends you a file, that you receive a notification that you have

22 a file available, that this person tried to send you a file,

23 and you're allowed to accept it or not accept it.  That part is

24 correct.  MSN implemented that --

25 Q.  Let me stop you there.

Chappell - Direct by Ms. Zack

1   A.  Yes, ma'am.

2   Q.  So if someone sends you a notification -- or sends you

3   something, you get a notification?

4   A.  Correct.

5   Q.  Do you only get that notification if they're sending you a

6   graphic file?

7   A.  No, any file.  You can transfer any type of file --

8   Q.  Okay.

9   A.  -- via Instant Messenger.

10  Q.  Okay.  But it's not just a message?  It's not text?  It's

11  not my saying, "Hey, Jeff, how are you"?  You wouldn't get a

12  notification of that?

13  A.  No, ma'am.

14  Q.  I would have to send you a document that said, "Hey, Jeff

15  how are you" or --

16          MR. JARVIS:  We're going to have to object to leading.

17          THE COURT:  Sustained.  You don't need to lead.

18  BY MS. ZACK:

19  Q.  What happens when you send just a message that says, "Hi,

20  how are you"?

21  A.  Nothing.  You receive the message --

22  Q.  Okay.

23  A.  -- correct.

24  Q.  When would you get a notification?  What type of thing

25  would you be sending?

Chappell - Direct by Ms. Zack

1    A.   It's akin to an e-mail attachment.   You're attaching
2    something to the conversation --
3    Q.   Okay.
4    A.   -- and sending it to the person you're having the
5    conversation with.
6    Q.   So when you get a notification, what are your options?
7    A.   You can deny it or accept it or --
8    Q.   Okay.
9    A.   I'm sorry.   Or just completely get out of the conversation
10   and close it out completely, and it can be gone.
11   Q.   That's if you're engaged in the conversation?
12   A.   Correct.
13   Q.   Okay.   If you end that conversation and the notification,
14   you don't accept it, where does it go?
15   A.   It's gone.   That chat is -- again, as I was saying, it's
16   not directly saved by default to your computer as a chat.   So
17   when you close it out, for all intent and purposes, that chat's
18   gone, except for what we've run across, where you're able to
19   recover at least some partial instant messages through system
20   volume and other memory areas.
21   Q.   Okay.   When you get the notification, you said -- and this
22   is outside of the scenario you just described --
23   A.   Correct.
24   Q.   -- and you're not there, you come home and you look at your
25   computer, what are your options?

Chappell - Direct by Ms. Zack

1  *A.*  Accept or deny.

2  *Q.*  If you deny it, what happens?

3  *A.*  Then that file is not downloaded to your computer.  It

4  remains within the Microsoft server, or the person sending it

5  could be notified that it was denied, but it is not downloaded

6  to the recipient's computer.

7          *THE COURT:*  And that means it's not going to be in the

8  cache?

9          *THE WITNESS:*  That is correct.

10  BY MS. ZACK:

11  *Q.*  And what form would the attachment be in at that time?

12  *A.*  It's code.  Everything -- every graphic file, no matter the

13  type, is code.  It's not rendered.  It is strictly computer

14  language, computer code.

15  *Q.*  Okay.

16  *A.*  Any -- I'm sorry, yes, ma'am.

17  *Q.*  No, no.  So if I deny the notification, if I don't accept,

18  that code never turns into a visual image?

19  *A.*  The code's never downloaded to your computer.

20  *Q.*  Okay.  So if I accept, what happens?

21  *A.*  At that time Microsoft will download that file to your

22  computer, storing it into the Messenger cache folder.

23  *Q.*  And what happens to the code?  What does the code become at

24  that point?

25  *A.*  Then Messenger will use that code to render the visual

Chappell - Direct by Ms. Zack

1   image in the chat dialogue that you are having in that window.

2   Q.   In English, does that mean the picture comes up on your

3   screen?

4   A.   Exactly, yes, ma'am.

5   Q.   Okay.  So when this picture comes up on the screen --

6   A.   Yes, ma'am.

7   Q.   -- what does the computer do to recognize, hey, there's a

8   picture here?  Meaning what -- how does the computer note that?

9   A.   Well, the actual -- the MSN program, the chat program is

10  the one that's rendering that picture.

11  Q.   Okay.

12  A.   So it's reaching out -- when you accept it and it's

13  downloaded, that program reaches out to the Messenger cache

14  folder, reads the code and renders it into a visual image

15  within Windows Messenger in that chat dialogue where you're

16  having the chat, so you can see the picture.  So the recipient

17  can see what it is that they received.

18  Q.   And how does that translate to you finding a thumbnail in

19  the Instant Messenger cache?

20  A.   That means that that file was either received or sent and

21  it appeared in the Windows Messenger dialogue as a picture, a

22  viewable image.

23  Q.   Okay.

24          THE COURT:  May I ask a question?

25          THE WITNESS:  Yes, ma'am.

Chappell - Direct by Ms. Zack

1          MS. ZACK:  Sure.

2          THE COURT:  Is that true of the version of MSN that

3    would have been in use at the time that Mr. Barry was allegedly

4    sending or receiving the images at issue?

5          THE WITNESS:  Yes, ma'am.

6          THE COURT:  Has it -- for what period has this been

7    the way that MSN instant messaging programs have operated, to

8    your knowledge?

9          THE WITNESS:  I can't give you an exact year.  I do

10   know that towards the end of Windows XP and the beginning of

11   Vista, they implemented that due to problems with viruses,

12   spam, bots, and so they implemented that as a safeguard to

13   where you had to accept it as -- in case it was a virus or spam

14   or something else.

15   BY MS. ZACK:

16   Q.  What was Mr. Barry's operating system?

17   A.  Windows Vista.

18   Q.  So this is the version that would have been compatible and

19   running with his Vista operating system?

20   A.  Correct, yes, ma'am.

21   Q.  And the images, the thumbnails forensically lead you to

22   believe what?

23   A.  That those images were rendered as visible.  In other

24   words, the user could see them and see what they were on the

25   computer desktop in the dialogue box --

Chappell - Direct by Ms. Zack

1    Q.  Okay.

2    A.  -- at the very least.

3    Q.  And those weren't the only -- the unknowns weren't the only

4    images of naked children in the Instant Messenger cache,

5    correct?

6    A.  Correct.

7    Q.  There were other images that --

8          MR. JARVIS:  Object to leading.

9    BY MS. ZACK:

10   Q.  What other images were in the Instant Messenger cache?

11   A.  There was also an image of one of the Barry children, I

12   believe it's 4B.  One of the ones is 4B, where he's in the bath

13   tab with his legs up on the edge and he's thrusting his groin

14   area up into the air.

15   Q.  And to the best of your recollection, when in time did it

16   occur in the Instant Messenger cache versus when it was created

17   on the computer?

18   A.  The file itself was created on the computer in -- on

19   June 18th of 2010.  It was created within the Instant Messenger

20   cache -- or Messenger cache on September 16th, I believe, of

21   2010.

22   Q.  Okay.  And what does that demonstrate to you forensically?

23   A.  Again, that the Instant Messenger program was used to send

24   or receive that file, based on the fact that it was within --

25   on the computer in a user created -- or user controlled folder

Chappell - Direct by Ms. Zack

1    in June and then appeared in the Messenger cache in September,
2    that same image, that leads me to believe that that was a sent
3    message by the user of Mr. Barry's computer.
4                THE COURT:  May I ask one other question here?
5                THE WITNESS:  Yes, ma'am.
6                THE COURT:  Is there any evidence that Mr. Barry was
7    using the prior version or a prior version of MSN that did not
8    have this protection against viruses?
9                THE WITNESS:  No, ma'am.
10                THE COURT:  Okay.  Is there any evidence that he was,
11   in fact, using the later version?
12                THE WITNESS:  Yes, ma'am, because that's installed on
13   there currently.
14                THE COURT:  All right.  And when you say
15   "currently" --
16                THE WITNESS:  As of the time that I received the
17   computer to work on it, yes, ma'am.
18                THE COURT:  All right.  Thank you.
19   BY MS. ZACK:
20   Q.  And is that evidenced by the forensic image, Government's
21   No. 2?
22   A.  Correct.
23   Q.  That information is contained in there?
24   A.  Correct.
25   Q.  Okay.  Let's talk about Government's Exhibit 20H.

Chappell - Direct by Ms. Zack

1            *MS. ZACK:*  Oh, excuse me.  Can you switch it from the

2    ELMO to the -- thank you.

3    BY MS. ZACK:

4    *Q.*  Okay.  This is 20H, correct?

5    *A.*  Yes, ma'am.

6    *Q.*  And as presented in 20H, where did this come from?

7    *A.*  Mr. Barry's Kodak camera.

8    *Q.*  Okay.  Where else did you find this image?

9    *A.*  I happened to find the same image located on the desktop of

10   the Dell laptop belonging to Mr. Barry.

11   *Q.*  What does that mean?

12   *A.*  The desktop is the area displayed on the screen when you're

13   using the computer, where your icons are, your start button,

14   everything else.  This is a file that has been saved to that

15   location.

16   *Q.*  You had to open up a file to see it?

17   *A.*  You have to -- it's the file, yes.  I had to open it up to

18   see it, yes, ma'am.

19   *Q.*  How does it look on the desktop?  What does it say?

20   *A.*  It depends on the view that he had it set to.  It could be

21   an icon that indicates it's a picture and had the file name on

22   it.  It could be an actual thumbnail of the picture itself,

23   that it's just a smaller version of the picture, so you see

24   what it is.

25   *Q.*  Okay.  Do you recall which way it was?

Chappell - Cross by Mr. Jarvis

1  A.  No, ma'am.  My software doesn't -- it renders it

2  differently, so I automatically see it as a picture.

3  Q.  Okay.  So how does an image get to somebody's desktop?

4  A.  It would have to be saved there by the user.

5  Q.  And how would something from a camera get to a desktop?

6  A.  It would have to be transferred from the camera to the

7  desktop by the user.

8          MS. ZACK:  May I have a moment, Your Honor?

9          THE COURT:  Certainly.

10          MS. ZACK:  Pass the witness, Your Honor.

11          THE COURT:  Mr. Jarvis?

12          MR. JARVIS:  Yes, ma'am.

13          THE COURT:  Go ahead, please.

14          MR. JARVIS:  Yes, ma'am.  Thank you.

15                    **CROSS-EXAMINATION**

16  BY MR. JARVIS:

17  Q.  Agent Chappell, I want to talk a little bit about the Vista

18  situation and the old computer program.  You said Mr. Barry had

19  Windows Vista back in 2010?

20  A.  He would have had it in 2010.  It was installed in -- I

21  have the date.  I think I have the date here.  I think it was

22  2008.  January of 2008 was when it was installed on that

23  laptop.

24  Q.  Okay.  And isn't one of the things that Vista did to

25  correct these problems that they were having with the viruses

Chappell - Cross by Mr. Jarvis

1   and those things, is they would send you -- give you the
2   opportunity to put on a patch to correct that problem?
3   A.  It's called service updates, yes, sir, service packs.
4   Q.  Right.
5   A.  Correct.
6   Q.  Service patch, p-a-t-c-h, or pack, p-a-c-k?
7   A.  P-a-c-k.
8   Q.  Okay.  Were you aware that they also had patches that they
9   would let you -- just for that specific problem, to correct
10  that?
11  A.  Yes, sir.  They -- routinely the standard user, they call
12  them updates.  They are basically patches, yes, sir.  I see
13  what you're saying, yeah.
14  Q.  Okay.  And did you see evidence of that on Mr. Barry's
15  computer?
16  A.  Yes, sir.
17  Q.  Okay.  So if he got that, that would correct that problem
18  and then the pictures wouldn't automatically show up back in
19  2010, would they?
20  A.  Excuse me?
21  Q.  If he got the patch and that corrected that problem, those
22  pictures would not automatically show up at that point, because
23  it corrected that one little problem, correct?
24  A.  What problem are you referring to, sir?
25  Q.  The one you said about the viruses, the reason why they had

Chappell - Cross by Mr. Jarvis

1  to change everything.

2  A.  No, sir.  No, sir.  That's -- I think you're

3  misunderstanding what I'm trying to say.  The early -- earlier

4  incantations of instant messaging programs, even Mr. Barry said

5  this, allowed for users as they're talking, it's basically an

6  open window.  So if I'm talking to you and I send you a

7  picture, it automatically popped up on your screen.  You had no

8  control whether it did or didn't.  These were early versions of

9  Yahoo Messenger, MSN, all of them.

10          What started happening is a lot of the spammers,

11  the hackers and everything started using this to send viruses,

12  bots and malware to other people's computers, especially in the

13  chat rooms.  So what they all did is they added features to

14  their MSN from the program itself, not necessarily a patch, but

15  an update to the program or when you installed a newer version

16  of the program and it gave you user control over what was sent

17  to your computer or what you accepted to be downloaded into

18  your computer.

19  Q.  Okay.  Now, if -- can those messages -- but that wasn't a

20  part of Windows Vista, was it?

21  A.  No, sir.  It's part of the MSN Messenger program, not Vista

22  itself.  That was MSN Live and the instant messaging software.

23  Q.  But MSN Live didn't come on board until 2011, 2012.  So

24  Mr. Barry's computer in 2010 wouldn't have that yet and

25  wouldn't be able to correct that problem, correct?

Chappell - Cross by Mr. Jarvis

1   A.  No, but it would have had the version -- the version at
2   2010, 2011 that he did have, did have that.  They started doing
3   that I remember earlier versions as far back as 2005, 2006 with
4   that implementation on it.
5   Q.  So when you forensically looked at the computer, where does
6   it show and what does it say that he had the version that would
7   allow you to either accept or decline?
8   A.  He had Windows Live version on his Dell laptop.  I've
9   got -- I have evidence -- there's proprietary evidence relating
10  to Windows Live on his desktop -- I mean, on his laptop.
11  Q.  What about the messages, what would they do if they were
12  sent while the computer -- the person is offline?
13  A.  The same.  You would get a notification once you logged
14  back on that the person was sending you a file and you were
15  still either allowed to download it -- to allow it or not allow
16  it.
17  Q.  But you can accept or decline at that point?
18  A.  Correct.  Yes, sir.
19  Q.  Okay.  And you talked about the printer issue at
20  Mr. Noonan's.  You said that when y'all did the search warrant,
21  y'all didn't find a printer.  Printers are very important to
22  you, right?
23  A.  Yes, sir.
24  Q.  Do you recall the testimony that they had a -- Mr. Noonan
25  had an extra bed there during the Christmas season?

Chappell - Cross by Mr. Jarvis

1   A.   Yes, sir.

2   Q.   Because of family members coming in?

3   A.   Correct.

4   Q.   Okay.  But it wasn't there when you were there?

5   A.   The bed?

6   Q.   Yeah.

7   A.   Yes, sir, the bed was there during the search warrant.

8   Q.   Okay.  But Mr. Barry had three printers at his house and

9   nobody took those printers, did they?

10  A.   I can't answer to why the HSI Dallas office would or would

11  not have taken a printer.  I wasn't there during that search

12  warrant.

13  Q.   Well, I understand, but if your testimony as an HSI expert

14  on computers, that you -- and I'm assuming you're trained just

15  like the Dallas guys are, that printers are very important,

16  especially in production, you would think that part of the

17  protocol would be everybody takes printers, right?

18  A.   It is part of the training and it is part of what we're

19  instructed to do, but I can't answer as to why they would or

20  wouldn't do it.  I know that for me, I take printers when I do

21  my warrants.

22  Q.   I understand, but you just said part of the training is

23  you're supposed to take printers if you believe that there's

24  any, any outside chance of production, right?

25           MS. ZACK:  Objection.  Asked and answered.

Chappell - Cross by Mr. Jarvis

1           *THE COURT:*  Overruled.

2    BY MR. JARVIS:

3    *Q.*  Isn't that correct?

4    *A.*  Correct.

5    *Q.*  And so one of the explanations of why they didn't take any

6    printers is because when they looked at these pictures, they

7    didn't believe it was child pornography, correct?

8           *MS. ZACK:*  Objection.  It calls for speculation.  It

9    calls for --

10          *THE COURT:*  You can reask the question a different

11   way.  The way it is framed I think is -- I'll sustain the

12   objection.

13   BY MR. JARVIS:

14   *Q.*  As an expert in computer forensics and child pornography on

15   computers, when y'all go to a suspected place with a search

16   warrant, the first -- one of the first things you do is run a

17   quick search of the suspected computer, right?

18   *A.*  No, sir.  That is not a standard protocol in all search

19   warrants.  That is a technique that is used and can be used but

20   it is not by any means a set policy that that's what you have

21   to do.

22   *Q.*  But that was done at Mr. Barry's house in Wichita Falls?

23   *A.*  It's my understanding it was, yes.

24   *Q.*  Okay.  And so they set up a secondary -- one of their --

25   the HSI brings their computer to put it over to their computer

Chappell - Cross by Mr. Jarvis

1  and then they review it, correct?

2  A.  However they did it, but, yes, sir, it's my understanding.

3  Q.  That's the normal way of doing it, right?

4  A.  It's one way, yes, sir.

5  Q.  Okay.  And so once they review it, they can make a decision

6  to arrest somebody, ask questions about it, or whatever else

7  they find that they want to talk about, right?

8  A.  Correct.

9  Q.  And Mr. Barry wasn't arrested for possession of child

10 pornography on that day, was he?

11 A.  No, sir.

12 Q.  And he has never been arrested for possession in Wichita

13 Falls by the Northern District, has he?

14 A.  No, sir.

15 Q.  And that could be one of the reasons why they didn't take

16 the printers, right?

17         MS. ZACK:  Objection.  He's asking him to speculate on

18 a -- charges being brought that he can't answer that question.

19         THE COURT:  I'll sustain the objection.

20 BY MR. JARVIS:

21 Q.  When you were talking about Government's Exhibit 20H, the

22 picture of Mr. Barry painting --

23 A.  Yes, sir.

24 Q.  -- okay, you said it was from his camera and it appeared on

25 his laptop in the desktop portion, saved to that location,

Chappell - Cross by Mr. Jarvis

1    right?

2    A.   Correct.

3    Q.   But there's not any significance to that, is there, other

4    than he kept a picture of himself on his computer?

5    A.   I believe it indicates that the picture which was on the

6    camera, that the testimony I heard Mr. Barry stated, that he

7    had not downloaded any of those pictures to his computer, shows

8    that at least one picture was downloaded to his computer from

9    the camera, which he stated he hadn't downloaded any.

10   Q.   But it doesn't have anything to do with child pornography,

11   right?

12   A.   No, sir, it's not a child pornographic image, no, sir.

13   Q.   Okay.   And neither were the other pictures of the boys

14   painting, correct?

15   A.   Of the boys painting?

16   Q.   Yes, sir.

17   A.   Not all of them, no, sir.   Not all of those pictures, no,

18   sir, they were not child pornography.

19   Q.   But I recall your testimony the other day, you said, no,

20   none of those are child pornography?

21   A.   Correct.   You are correct.

22   Q.   All right.

23            MR. JARVIS:   We'll pass the witness, Judge.

24            MS. ZACK:   Just one question.

25            THE COURT:   Sure.

1                        **REDIRECT EXAMINATION**

2    BY MS. ZACK:

3    *Q.* What, if any, scenario would allow for a declined

4    notification to create a thumbnail image in Instant Messenger

5    cache or Messenger cache?

6    *A.* I'm not aware of any that would.

7              *MS. ZACK:* No further questions, Your Honor.

8              *THE COURT:* All right. Anything further?

9              *MR. JARVIS:* Subject to the information we get from

10   our expert --

11             *THE COURT:* Sure.

12             *MR. JARVIS:* -- no other questions, Judge.

13             *THE COURT:* All right. You may step down, sir. Thank

14   you very much.

15             *THE WITNESS:* Thank you, ma'am.

16             *THE COURT:* Do you want, Mr. Jarvis, to check on that

17   and give us a report on estimated timing?

18             *MR. JARVIS:* Yes, ma'am, if I could be excused.

19             *THE COURT:* We'll just wait here for you.

20             *MR. JARVIS:* Yes, ma'am.

21        *(Brief break.)*

22             *MS. MINICK:* Judge, I just got off the phone with our

23   expert and in order to do what we need to be done not only with

24   this -- these two pictures, but because they came from a file

25   folder that was not -- let me give the Court a little bit of

 1    background as far as what he told me in terms of what was

 2    presented to him.  In this file that they sent us today,

 3    there's over 2.6 million files and folders.  There is almost

 4    400,000 --

 5              THE COURT:  I see a lot of shaking heads on the other

 6    side.

 7              MS. MINICK:  Well, I would like to finish.

 8              THE COURT:  Go ahead.

 9              MS. MINICK:  There are almost 400,000 graphic files

10    that can contain pictures, thumbnails.  When --

11              THE COURT:  How many images are there?

12              MS. MINICK:  Well, those are -- I'm not sure about

13    that.  That's contained in the graphic number.

14              THE COURT:  Well --

15              MS. MINICK:  But --

16              THE COURT:  -- I'm not sure that we're expressing the

17    same measurements, but I'll inquire as to that.  Go ahead.

18              MS. MINICK:  In the information that was given by

19    Agent Chappell to our expert, he was given -- we provided the

20    sanitized report that it was provided to us to our expert.  And

21    Agent Chappell provided the unsanitized FTK report to our

22    expert.  In there it designated certain files and folders

23    that --

24              THE COURT:  Exhibit 3?

25              MS. MINICK:  I'm sorry?

1           THE COURT:  Is that Exhibit 3?

2           MS. MINICK:  Yes, ma'am.

3           THE COURT:  All right.

4           MS. MINICK:  And the FTK report -- may I finish,

5  please?

6           MS. ZACK:  Okay.  But I think you're traveling under a

7  misconception.  Three was never given to their expert.

8           THE COURT:  Well, is that a reference to Exhibit 3?

9           MS. ZACK:  It can't be, because three was never given

10 to their expert.

11          THE COURT:  All right.  Thank you.

12          MS. MINICK:  Well, the FTK report designates certain

13 folders, David and the boys, Dor, Craig Houston, those

14 particular things in the FTK report that's given to him and

15 represented to him that these are the folders containing the

16 images that are relevant to their evidence against our client,

17 in such, giving him direction as to all of the evidence they

18 intend to use, and that's what he then uses to go specifically

19 to Exhibit No. 2, the forensic image to ferret out those

20 particular folders in all these files.  And that's why I was

21 giving the Court the number of files and folders.

22          THE COURT:  All right.

23          MS. MINICK:  Based on that information from the FTK

24 report, he then makes those extractions from the forensic image

25 of the computer of the hard drive.

1           THE COURT:  And when does he do that?

2           MS. MINICK:  He did that during an eight-hour process.

3           THE COURT:  Right, when he was here.  All right.

4           MS. MINICK:  Correct.  And the owner favorites, my

5    pics, that these exhibits came from, as well as a number of

6    other pictures that are related to exhibits already in

7    evidence, was not in the FTK report he was provided or the FTK

8    report we were provided.  So both Mr. Jarvis and I and the

9    expert relied on --

10          THE COURT:  What does he need to do?

11          MS. MINICK:  He needs access to the forensic image

12   again.

13          THE COURT:  How quickly can he get here?

14          MS. MINICK:  He is sending me his schedule right now.

15          THE COURT:  He needs to be here tomorrow and then we

16   will recess until Monday and we'll resume on Monday.

17          MS. MINICK:  Yes, Your Honor.

18          THE COURT:  Okay.  If there's any way that -- if

19   there's a reason that that cannot be accomplished, tell me

20   promptly.  Why don't you go check with him now and come right

21   back.  If he can get here tomorrow, then he'll have time to do

22   that and he can then be prepared on Monday.

23          MS. MINICK:  Okay.  Thank you, Judge.  I'll be right

24   back.

25          THE COURT:  That will be great.  Thank you.

1          So, Mr. Jarvis, I wanted to ask one question and

2  I obviously need you here to do it.

3          MR. JARVIS:  Yes, ma'am.

4          THE COURT:  Is there any way that some of the

5  logistical difficulties might be eased by, for example,

6  electronically transmitting the folder my faves or my pics,

7  favorites from which 31 and 32 were -- on which 31 and 32 we

8  are told were located, is there any way to e-mail the forensic

9  e-mail of that to your expert so that he could review it where

10  he is?

11          MS. ZACK:  Judge, there's -- the first problem is, it

12  can't be sent electronically, it's too big.

13          THE COURT:  Can it be sent in parts?  Often you break

14  up very large chunks of data and send them sequentially.

15          MS. ZACK:  The other issue is we could not send him an

16  untouched version because there's child pornography in there.

17  That is why they have to come here and look at it.

18          THE COURT:  Even under a court order that would

19  require that this be done in order to facilitate the ends of

20  justice?

21          MS. ZACK:  The only thing we could do would be to send

22  it to the closest HSI location.  Because under Adam Walsh, we

23  cannot release that to a third party.

24          THE COURT:  I understand.  You're not releasing it to

25  a third party.  You are operating under a court order that

```
 1    would require the transmission of it.  And it can be stitched
 2    up with whatever bells and whistles are necessary to ensure
 3    that it not be --
 4              MS. ZACK:  An expert's never allowed to remove that
 5    from a government facility.
 6              THE COURT:  I understand that that is the normal
 7    operating procedure, but we're -- we have a time crunch here
 8    that we're trying to minimize.  Is there any way in which that
 9    could be done and as an alternative, what is the closest HSI
10    facility to the expert's location so that he could view it
11    there?
12              MS. ZACK:  If we're told where the expert is --
13              THE COURT:  I heard North Carolina.  Could you be more
14    precise?
15              MS. ZACK:  I heard Kentucky.
16              MR. JARVIS:  I can't tell you off the top of my head,
17    Judge.
18              THE COURT:  Go find out.
19              MR. JARVIS:  Yes, ma'am.
20              THE COURT:  All right.  That would be helpful.
21              And one other question that -- to crank in, an
22    alternative would be to create a CD or an external hard drive
23    for the folder or folders from the forensic image and FedEx
24    that to the nearest HSI office to the expert and he could go
25    there tomorrow and look at it there.
```

1          *MS. ZACK:*  And can we clarify, Your Honor, what they

2    want?  Do they want the entire forensic image or just the

3    favorites folder?

4          *MR. JARVIS:*  I think a better suggestion, and I agree

5    with her, why don't we let the two computer guys talk and see

6    what they could come up with.  They could probably figure out

7    better than all of us telling them how to do their business.

8    That's what I normally do, is let the computer guys talk and --

9          *THE COURT:*  That would be fine with me.

10         *MR. JARVIS:*  If Mr. Chappell will be -- he's --

11         *MS. ZACK:*  Yeah.

12         *THE COURT:*  I assume counsel are invited as well.

13         *MR. JARVIS:*  Oh, right.

14         *THE COURT:*  But just to discuss the logistics

15   obviously.

16         *MS. ZACK:*  Yes.

17         *MR. JARVIS:*  Yes.

18         *THE COURT:*  But that would be -- but we've now

19   identified at least two possibilities.  One is -- that don't

20   raise the sensitivity of e-mailing it to a third party, that

21   is, the expert, and that is, to either e-mail part which is

22   just this folder, favorites, my pics, or more, either by e-mail

23   or by overnight mailing a CD or other external drive that would

24   contain the information to the nearest HSI office to the

25   expert.

1                      And have you located the city that he is closest

2   to?

3              MS. MINICK:  I've got him on the phone, if the Court

4   wants me to ask him.

5              MR. JARVIS:  Can we break for a few minutes --

6              THE COURT:  Sure.

7              MR. JARVIS:  -- and let's see if we can work this out

8   amongst ourselves?

9              THE COURT:  That would be great.

10             MS. MINICK:  The only issue, Judge, and that's much

11  better, because he has a medical appointment at the VA in the

12  morning, so that would be helpful, but he does say that come

13  Monday, he is traveling to Helena, Montana, for the state of

14  Montana to do a forensic examination for a trial the following

15  week for them, but he did say we could be available

16  telephonically, if that --

17             THE COURT:  Well, I think the most important thing is

18  what he's going to tell you.

19             MR. JARVIS:  Yes.

20             THE COURT:  And if we need to call him as a witness,

21  that raises other logistical issues, but the primary question

22  right now is getting him the additional information that you've

23  suggested he may need.  So why don't you look at that.  I'm

24  going to -- it's now a quarter to 12:00.  We will resume at

25  12:45.  Does that work?

1           *MS. MINICK:*  Yes, Your Honor.

2           *THE COURT:*  Or 1:00 o'clock.  You can then tell me

3    where you are --

4           *MR. JARVIS:*  Yes.

5           *THE COURT:*  -- in some detail, because that will give

6    you enough time to work out these logistics, figure out really

7    what it is he needs.  There may be a better way even if he asks

8    questions of Agent Chappell and Agent Chappell gets the

9    information, I don't know what those sensitivities are in terms

10   of your revealing the questions that he is asking you or vice

11   versa.  So because I don't know, I'm going to stop talking and

12   let you confer.  And we will resume --

13          *MS. ZACK:*  At 1:00?

14          *THE COURT:*  -- at 1:00 o'clock.  It gives you plenty

15   of time to both work this out, I hope, and get something to

16   eat.  All right?

17          *MS. ZACK:*  Yes, ma'am.

18          *MS. MINICK:*  Thank you, Judge.

19          *THE COURT:*  Thank you very much.  And if you want to

20   use the phone here so that Mr. Barry can listen to some of

21   this, I think that we can arrange that as well.

22          *MS. MINICK:*  I've got a speakerphone if we need to,

23   Judge.

24          *THE COURT:*  That's fine.  That's even better.

25          *MS. MINICK:*  Thank you though.

1          THE COURT:  All right.  I'm going to leave the court

2    courtroom to you all.

3          MS. ZACK:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5      (Lunch recess from 11:51 to 1:00 p.m.)

6      (Open court, Defendant present.)

7          THE COURT:  All right.  What were we able to work out?

8          MS. ZACK:  Your Honor, Special Agent Chappell went to

9    make a copy of the forensic image.  He spoke to their expert,

10   and he asked for the entire image.  He is placing it on a hard

11   drive and it's my understanding it's going to be FedExed to --

12   and he's going to confirm with Raleigh, that they have the

13   ability to have a place for their expert to go, but Raleigh

14   seemed to be the likely place and it's close to their guy and

15   seems to work.  So that is what is in the process of being done

16   right now.  He left immediately after we broke.

17         THE COURT:  Good.  All right.  So it will be shipped

18   overnight, correct?

19         MS. ZACK:  That's my understanding, yes, Your Honor.

20         THE COURT:  And specified for morning delivery,

21   correct?

22         MS. ZACK:  Yes.  I will call and make sure that that's

23   specified as soon as --

24         THE COURT:  Better do that.

25         MS. ZACK:  -- I --

1       THE COURT:  And then will we resume on Monday, is that

2   the plan?

3       MS. MINICK:  Well, Judge, obviously at this point we

4   don't know what he will find, if anything, if we need him to

5   testify or not until after he's done his evaluation.

6       THE COURT:  When is his Montana event?

7       MS. MINICK:  Monday.

8       THE COURT:  Monday?

9       MS. MINICK:  Yes, ma'am.

10      THE COURT:  Well, there's one other alternative.

11      MS. MINICK:  And then he is supposed to go -- that is

12  in preparation for a trial the following week in Helena,

13  Montana.

14      THE COURT:  Okay.  No, that's fine.  One alternative,

15  we would have to move some things around, but -- obviously if

16  he doesn't need to testify and you weren't planning on having

17  him testify originally, if he doesn't need to testify, then we

18  can certainly resume on Monday.  If he needed to be here, then

19  I can give you some time on Wednesday morning.

20      MS. MINICK:  The 1st, Your Honor?

21      THE COURT:  The 30th.

22      MS. ZACK:  Oh, sorry.  Okay.

23      MS. MINICK:  I don't recall exactly -- it's my

24  recollection, Judge, that he said he was going to be there all

25  week, but I don't know that for sure, but I can -- I'll find

1   that out.

2          *THE COURT:*  Well, he's clearly going to be there the

3   next week, based on what you said.

4          *MS. MINICK:*  Yes, ma'am.

5          *THE COURT:*  So we could do it Wednesday or we could do

6   it on -- I could give you some time on that Thursday as well.

7   But we need to finish this next week.  It's a brief recess to

8   allow you to be in a position to respond to the Exhibits 31 and

9   32 and I'm glad to be able to make that available to you, but I

10  don't believe that we should extend it beyond next week or that

11  there's any need demonstrated to do that at all.

12         *MS. MINICK:*  Well, the only -- and I don't know that

13  there is either, Judge.  However, they are providing the

14  forensic image and his intent is to do a complete evaluation of

15  the favorites, my pics folder that was not provided to either

16  one of us or designated as part of the evidence.  So it's

17  more -- for the record, it's more --

18         *THE COURT:*  Provided but not designated.

19         *MS. ZACK:*  There's 74 images in that folder.

20         *THE COURT:*  That's not that -- that should not take

21  that long from what I understand the work requires.

22         *MR. JARVIS:*  How would you like for us to communicate

23  as soon as we know?

24         *THE COURT:*  E-mail Ms. Eddins.

25         *MR. JARVIS:*  Okay.

1           THE COURT:  But by default, our presumption will be

2    that you'll be here at 9:00 o'clock on Monday morning.  Only in

3    the event that that needs to be moved either to Wednesday at

4    8:00 a.m. or Thursday at 8:30 will that change.

5           MR. JARVIS:  Judge, if I could make a suggestion --

6           THE COURT:  Yes, sir.

7           MR. JARVIS:  -- and I don't know how long it takes

8    computer guys to do what they do, but if we don't hear from him

9    by 5:00 o'clock tomorrow and he has --

10           THE COURT:  You'll hear from him.

11           MR. JARVIS:  Excuse me?

12           THE COURT:  One way or the other, you're going to hear

13    from him by 5:00 o'clock tomorrow, I assume.

14           MR. JARVIS:  So if he's not finished, then the answer,

15    we need to e-mail Ms. Eddins and say it will be Wednesday or

16    Thursday?

17           THE COURT:  It will be Wednesday.

18           MR. JARVIS:  Wednesday.

19           THE COURT:  That's right.

20           MR. JARVIS:  All right.  Just make sure I --

21           THE COURT:  It will be Wednesday unless there's a need

22    for him to testify and he can't be here on Wednesday, in which

23    event it will be Thursday.

24           MR. JARVIS:  Yes, ma'am.  Okay.

25           THE COURT:  All Right.

1          MR. JARVIS:  All right.

2          THE COURT:  Is there anything else we need to do

3    today?

4          MS. ZACK:  Nothing from the United States, Your Honor.

5          MR. JARVIS:  I don't think so, Judge.

6          THE COURT:  All right.  Thank you.

7          MS. MINICK:  Thank you, Judge.

8       (Concluded at 1:15 p.m.)

9                              * * *

10   I certify that the foregoing is a correct transcript from the

11   record of proceedings in the above-entitled cause, to the best

12   of my ability.

13

14   /s/ _Kathy L. Metzger_____        _4-15-2015____
     Kathy L. Metzger                          Date
15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25