```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   UNITED STATES OF AMERICA        .  CR. NO. H-12-691-2
                                     .  HOUSTON, TEXAS
 4   VS.                             .
                                     .  MAY 1, 2014
 5   DAVID MORSE BARRY               .  8:45 A.M. to 1:30 P.M.

 6

 7                            DAY 5 of 5
                       TRANSCRIPT of BENCH TRIAL
 8            BEFORE THE HONORABLE LEE H. ROSENTHAL
                    UNITED STATES DISTRICT JUDGE
 9


10   APPEARANCES:

11
     FOR THE GOVERNMENT:            MS. SHERRI L. ZACK
12                                  MR. ROBERT STABE
                                    U.S. Attorney's Office
13                                  1000 Louisiana
                                    Suite 2300
14                                  Houston, Texas   77002

15
     FOR THE DEFENDANT:             MR. ROBERT T. JARVIS
16                                  Robert T. Jarvis Law
                                      Firm, P.C.
17                                  123 W Houston
                                    Sherman, Texas   75090
18
                                    MS. KIMBERLY F. MINICK
19                                  Minick Law Firm, P.C.
                                    3340 Camp Bowie Blvd.
20                                  Suite 100
                                    Fort Worth, Texas   76107
21
     THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
22   CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
     COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
23   ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
     COPY AT THE OFFICIAL RATE.   General Order 94-15, United States
24   District Court, Southern District of Texas.

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

APPEARANCES CONTINUED

ALSO PRESENT:                    MR. JEFFERY G. CHAPPELL


OFFICIAL COURT REPORTER:         MS. KATHY L. METZGER
                                 U.S. Courthouse
                                 515 Rusk
                                 Room 8004
                                 Houston, Texas  77002
                                 713-250-5208

1                                    <u>INDEX</u>

2                                                                        PAGE

3    <u>DEFENDANT'S WITNESS</u>

4    David Morse Barry
        Redirect Examination continued by Ms. Minick        761
5       Recross-examination by Ms. Zack                      767
        Further Redirect Examination by Ms. Minick           775
6

7
     DEFENDANT RESTS                                          776
8

9
     <u>GOVERNMENT'S REBUTTAL WITNESS</u>
10
     Jeffery G. Chappell
11      Direct Examination by Ms. Zack                       776
        Cross-examination by Mr. Jarvis                      782
12

13   <u>CLOSING ARGUMENTS</u>

14
     By Ms. Zack                                             788
15   By Mr. Jarvis                                           813
     By Ms. Zack                                             839
16

17

18

19

20                                  *  *  *

21

22

23

24

25

Barry - Redirect by Ms. Minick

1        *(Open court, Defendant present.)*

2                    THE COURT:  Are we ready?

3                MS. MINICK:  We are, Your Honor.

4              THE COURT:  All right.  Where are we with respect to

5    the additional testimony that you were considering presenting

6    on behalf of Mr. Barry?

7                MS. MINICK:  Judge, just for the record, our expert

8    had a medical procedure on Friday and then went to North

9    Carolina.  He had a couple of hours.  Ms. Eddins e-mailed us

10   and told us she needed to know by 3:00.  So at 3:00 we did not

11   know exactly -- you know, he had not had enough time to look at

12   everything and then speak to us.  Since that time we've talked

13   to him and had an opportunity for him to evaluate stuff, and we

14   are not calling him.  So the only thing we have left is I

15   believe we broke with Mr. Barry, and I just have some finish-up

16   questions for him.

17              THE COURT:  That's fine.  Mr. Barry, if you will take

18   the stand.  You remain under oath, sir.

19                THE DEFENDANT:  Yes, ma'am.

20                MS. MINICK:  May I proceed, Your Honor?

21                THE COURT:  You may.

22                MS. MINICK:  Thank you.

23                     **REDIRECT EXAMINATION CONTINUED**

24   BY MS. MINICK:

25   Q.  Mr. Barry, did Mr. Noonan ever have access or use your

Barry - Redirect by Ms. Minick

1   computer that you know of?

2   A.  Yes, ma'am, on more than one occasion.

3   Q.  Okay.  And why was that?

4   A.  When I was in Houston, the laptop that they seized from

5   him, the University of Texas, actually belonged to Jeff.  So if

6   Jeff was on doing work or checking his e-mails, Craig would ask

7   if he could borrow mine and he would be on it.

8   Q.  Did -- during the time that you were in Houston, did Craig

9   ever take naked pictures or pictures of you and the boys while

10  naked?

11  A.  No, ma'am, not at all.

12  Q.  Did Craig ever ask you to take pictures of the boys while

13  you were at home in Wichita Falls?

14  A.  No, he never asked me that question.

15  Q.  Did Mr. Noonan ever ask you to send him pictures of the

16  boys?

17  A.  Absolutely not.

18  Q.  Did Mr. Noonan ever -- or let me ask this:  Did he have any

19  kind of apparatus that he used with his camera?

20  A.  Yes, ma'am.  He had one of the little bitty flexible

21  tripods that the legs weren't standard solid legs.  They were

22  kind of like an octopus.  They could be bent or shaped around

23  to whatever position was needed.

24  Q.  And so how big are we talking?

25  A.  Probably about maybe if you held the legs closed, probably

Barry - Redirect by Ms. Minick

1   8, 9 inches, but when it was spread out, it lowered it down.

2   Q.  Mr. Barry, I'm going to show you what's been marked by --

3   previously marked as exhibit -- Government's Exhibit 31 and 32.

4   A.  Yes, ma'am.

5   Q.  And did you take those photographs?

6   A.  No, ma'am, I did not.

7   Q.  Do you know who took the photographs?

8   A.  I have no idea who took those photos.

9   Q.  Did -- were you ever aware of -- well, strike that.

10              How large is the bathroom depicted in these

11  photographs?

12  A.  How large is the --

13          THE COURT:  Do you have an exhibit number?

14          MS. MINICK:  I'm sorry.  Yes.  Still Exhibit No. 31

15  and 32.

16          THE COURT:  All right.  Thank you.

17  A.  The bathtub was from the front wall to there was a wall

18  where the showerhead came on and on the other side of that was

19  the toilet and then across from that was the sink, which was a

20  double sink, and then it had a wall which had a built-in

21  bookcase inside the wall and then a small space, which was the

22  water heater and then the door going out.  But there was

23  probably 3 feet between wall to bathtub, somewhere in that

24  vicinity.

25          MS. MINICK:  And, Judge, I'll show you 31 and 32.

Barry - Redirect by Ms. Minick

1   These are our copies but just so you'll know which pictures I

2   was referring to.

3        *THE COURT:*  Yeah.   Thank you.   All right.

4   BY MS. MINICK:

5   *Q.*  Mr. Barry, so you said from wall to bathtub is

6   approximately 3 feet?

7   *A.*  Two to 3 feet, yes, ma'am.

8   *Q.*  So, would it be fair to say the width of this table?

9   *A.*  Maybe -- no, it's probably less than that.   It was probably

10  less than that.   Maybe more like 2 feet then.

11  *Q.*  Could it have been possible -- you described the bookcase.

12  *A.*  Yes, ma'am.

13  *Q.*  Is it directly opposite the bathtub?

14  *A.*  Yes, ma'am, it is.

15  *Q.*  Did you yourself ever take photographs of the boys

16  unclothed?

17  *A.*  I did.   There's a couple of different occasions.   One when

18  we were doing the Wii workout and then another one when they

19  were painting their rooms.

20  *Q.*  And the Wii workout, where was that?

21  *A.*  That was taken in our living room in Wichita Falls.

22  *Q.*  Let me show you what's been marked as Defense Exhibit 27

23  and 28.   I ask you to take a look at those.

24  *A.*  Yeah, that was our workout, because they had their step up

25  and down and they were putting the weights on their arms.

Barry - Redirect by Ms. Minick

1   Q.  And those weights were part of the workout?

2   A.  Yeah, it was part of the workout.

3   Q.  And you took these photographs; is that correct?

4   A.  I believe so, yes.

5   Q.  Do you know with what camera?

6   A.  No, ma'am, I don't.

7   Q.  Do you know when they were taken?

8   A.  I believe they were taken in either November or December of

9   2010, because I know these were done just before they executed

10  the search warrant on our house in February.

11          MS. MINICK:  Your Honor, at this time we would --

12  BY MS. MINICK:

13  Q.  Well, let me ask you this:  Do they -- this is a copy of

14  those photographs, is it not?

15  A.  Yes, ma'am.

16  Q.  All right.  Is it an accurate copy of the photograph that

17  you took?

18  A.  I believe so, yes.

19          MS. MINICK:  Your Honor, at this time we would offer

20  Defense Exhibits 27 and 28 and offer them to the Government

21  counsel.

22          MS. ZACK:  No objection, Your Honor.

23          THE COURT:  All right.  They're admitted.

24          MS. MINICK:  I'll take these back, Your Honor.

25          THE COURT:  You may.

Barry - Redirect by Ms. Minick

1   BY MS. MINICK:

2   Q.  Mr. Barry, was there ever a time that you took

3   photographs -- y'all are hanging out during the day in the

4   living room, bedroom, wherever, that you took photographs with

5   Mr. Noonan and the boys clothed?

6   A.  Yes, ma'am, on a number of occasions.

7   Q.  Let me show you Defense Exhibit No. 29.  Do you recognize

8   that?

9   A.  I sure do.

10  Q.  Is that -- this is a copy, is it not?

11  A.  Yes, it is.

12  Q.  All right.  But is it an accurate copy of a photograph that

13  you believe was taken?

14  A.  Yes, I do.

15  Q.  And who's in the photograph?

16  A.  Myself, Mr. Noonan, and my oldest, R.B.

17  Q.  All right.  And do you know who took this photograph?

18  A.  Yeah.  My youngest did, O.B.

19          MS. MINICK:  Your Honor, at this time I would offer

20  Defense Exhibit 29.

21          THE COURT:  Any objection?

22          MS. ZACK:  No.

23          THE COURT:  It's admitted.

24          MS. MINICK:  I'll pass the witness, Your Honor.

25          THE COURT:  All right.  Redirect -- or recross, sorry?

Barry - Recross by Ms. Zack

1          *MS. ZACK:*  Yes, Your Honor.

2                      **RECROSS-EXAMINATION**

3     BY MS. ZACK:

4     *Q.*  Mr. Barry, the pictures, Defense Exhibits 27 and 28, you

5     took those pictures, correct?

6     *A.*  Yes, ma'am, I believe so.

7     *Q.*  Okay.  And those pictures were found on your computer in

8     the same place as Government's Exhibit 31 and 32.  You're aware

9     of that, correct?

10    *A.*  No, ma'am, I wasn't aware of that, no.

11    *Q.*  You didn't discuss that with your counsel?

12    *A.*  No.

13    *Q.*  Well, where do you think those pictures came from?

14    *A.*  I don't know where they came from.

15    *Q.*  Didn't you just say you took them?

16    *A.*  I did.  I don't remember what camera and I don't remember

17    if I put them on my computer or not.  You're talking four years

18    ago.  I don't remember, I really don't.

19    *Q.*  Okay.  But you had an opportunity to review the information

20    we provided to your counsel?

21    *A.*  I looked at it, yes, ma'am.

22    *Q.*  Okay.  And in that same group of pictures is 31 and 32 --

23    I'm sorry, yeah, Government's 31 and 32.

24          *MS. MINICK:*  Your Honor, could she show him what

25    exhibit she's referring so that he would know --

Barry - Recross by Ms. Zack

1          *MS. ZACK:*  It's not an exhibit.  It's the information

2   we provided to you for your expert that you said were the ones

3   that you just pulled out, those pictures that you just showed

4   him.

5          *MS. MINICK:*  Actually I was wanting him to know what

6   you're asking him if we showed him.

7          *THE COURT:*  Show him the pictures if you have them.

8          *MS. ZACK:*  Yes, absolutely.

9          *THE COURT:*  That would be great.  Thank you.

10  BY MS. ZACK:

11  *Q.*  This is what you looked at, correct, and it was image, I

12  believe, 20 -- there you go, 29.

13  *A.*  Okay.

14  *Q.*  And -- wait, I wrote it down.  And 57.  Okay.  So this is

15  29.

16  *A.*  Yes, ma'am.

17  *Q.*  The boys doing the Wii?

18  *A.*  Okay.

19  *Q.*  And 57?

20  *A.*  Okay.

21  *Q.*  Those are the two images you just told counsel you took,

22  correct?

23  *A.*  Yes, ma'am.

24  *Q.*  Okay.  Now, the item that I'm looking at is what was given

25  to your counsel and this is the items that we were talking

Barry - Recross by Ms. Zack

1    about back before we took the break so that the expert could

2    have a chance to review everything and Items 6 and 7 are

3    Government's 31 and 32.

4    A.   Okay.

5    Q.   You're following me?

6    A.   Yes, ma'am.

7    Q.   Okay.  All of this was found in the same place on your

8    computer.

9    A.   Okay.

10        MS. MINICK:  I'm going to object, Your Honor.  Is that

11   a question?

12        MS. ZACK:  No, I'm getting to the question.

13   BY MS. MINICK:

14   Q.   All of this was found on your computer, in the same folder,

15   and you're saying you have no idea how it got in that location?

16   A.   That's a default setting that's on the computer.  That's

17   where it goes.  When you do a copy or when you do anything from

18   one item to another, it has a default and then you can change

19   it from there.

20   Q.   You're telling this Court that the "my pics" folder in your

21   favorites is a default?

22   A.   But that's not my favorites.  Those are standard folders

23   that are on the Windows operating system.  So where it comes

24   up, if it comes up with a jpeg, it automatically defaults to

25   the picture photo album underneath favorites.  It doesn't mean

Barry - Recross by Ms. Zack

1  that I set it up.  That's what comes with Windows.

2  I never accessed them after -- if they were on my

3  computer, I never accessed them.  Actually I never looked at

4  them.  I had no reason to.

5  Q.  So when all of those pictures have the same access date of

6  February 6th, which would only happen if you moved the entire

7  contents of that folder at one time, you have no knowledge of

8  that?

9  A.  On February 6th?

10  Q.  Of 2011.

11  A.  I would not have moved it, no, ma'am, because I was in the

12  middle of studying for my first day at the job at the hospital.

13  Q.  I just want to be clear --

14  A.  Yes, ma'am.

15  Q.  -- you're saying that you have no knowledge of that, a date

16  that you were in Wichita Falls, correct?

17  A.  Correct.

18  Q.  Mr. Noonan was not there?

19  A.  No, ma'am.

20  Q.  Okay.  I just want to make sure we're clear on that.

21  Now, let's talk about 31 and 32, the tub pictures

22  of Mr. Noonan with your children.

23  A.  Yes, ma'am.

24  Q.  You're claiming you have no knowledge when that was taken,

25  correct?

Barry - Recross by Ms. Zack

1   A.   No, ma'am, I don't.

2   Q.   You would agree it was at Mr. Noonan's house?

3   A.   Yes, ma'am.

4         MS. ZACK:   Can you put up 21F, please?

5   BY MS. ZACK:

6   Q.   That's the bathroom, correct?

7   A.   Yes, ma'am.

8   Q.   Okay.   And you're suggesting to the Court that Government's

9   Exhibit 31 and 32 -- and I want you to look carefully at the

10  angle of these pictures, Mr. Barry -- that those pictures were

11  taken with a tripod --

12  A.   That's not the entire bathroom.

13  Q.   -- based on this counter?   I understand that.   Because

14  you're saying that it was to the left of that in some bookcase?

15  A.   Yes, ma'am.

16  Q.   Okay.

17        MS. ZACK:   Can you put up the picture that shows the

18  bathtub empty with the shower curtain, which is Government's

19  Exhibit No. 21e.

20  BY MS. ZACK:

21  Q.   Okay.   When we're looking at this photograph, the door is

22  to the right, correct?

23  A.   That's correct.

24  Q.   Okay.   Look at these pictures again, 31 and 32.

25  A.   All right.

Barry - Recross by Ms. Zack

1    *Q.*  Based on the angle of these pictures, it would be

2    impossible for them to have been taken from the bookcase with

3    the tripod at the height you're suggesting?

4    *A.*  I have no idea.

5    *Q.*  Well, does that make sense to you?  Look at where -- the

6    pictures look like they were taken from sitting on the --

7    *A.*  No, ma'am, those are different angles.  Those are totally

8    different angles.

9    *Q.*  Well, both these pictures are at totally different angles,

10   are they not?

11   *A.*  Yes, they are.

12   *Q.*  Okay.  And they were taken 40 seconds apart, according to

13   the EXIF data.  Okay?  Are you with me?

14   *A.*  Okay.

15   *Q.*  So you're suggesting that these were taken with a timer on

16   a tripod 40 seconds apart, except that there's nowhere in this

17   bathroom from which that tripod could have been standing or

18   placed to get this angle?

19   *A.*  That tripod could also wrap around and hold onto things.

20   *Q.*  Such as what?

21         *MS. ZACK:*  Can you put 21E back up, please?

22   *A.*  Well, I don't know.  Alls I'm saying is that I did not take

23   the pictures.  I was not in the bathroom when those pictures

24   were taken.  That's what I'm telling you.

25   BY MS. ZACK:

Barry - Recross by Ms. Zack

1   *Q.*  Where were you?

2   *A.*  Probably fixing dinner.

3   *Q.*  And so there would have been no one else in the house that

4   could have taken these pictures?

5   *A.*  No, Jeff was in --

6         *MS. MINICK:*  Your Honor, I'm going to object.  He just

7   testified that he doesn't know -- he wasn't there, he didn't

8   take the picture, and he doesn't know.

9         *THE COURT:*  He can answer the question.  You can

10  answer the question.  Overruled.

11  *A.*  No, Jeff was in the house as well.

12  BY MS. ZACK:

13  *Q.*  So now you're suggesting that Jeff took the pictures?

14  *A.*  No, I'm not suggesting anything.  I just said Jeff was in

15  the house, too.  I was in cooking dinner.  If I was -- when

16  they were normally in -- when the kids were normally in taking

17  a bath was normally during the time that I was fixing dinner

18  for all of us when he got home from work.  That's when the kids

19  would take a bath.  I would get them ready and then we would

20  eat dinner and then we would relax for the evening and watch a

21  movie before it was time for them to go to bed.

22  *Q.*  So what you're telling the Court is you really have no

23  explanation for why a picture of Mr. Noonan with your sons

24  naked in a bathtub was taken from a height that appears to be

25  of an adult looking down on that tub?  You have no absolutely

Barry - Recross by Ms. Zack

1  no idea how that happened?

2  A.  No, ma'am, because I know I didn't take them.

3  Q.  So you've said repeatedly.

4          MS. MINICK:  Your Honor, objection.

5          THE COURT:  Sustained.

6  BY MS. ZACK:

7  Q.  Mr. Noonan in Exhibit 29, Defense Exhibit 29 --

8          MS. ZACK:  Do you have a copy of that somewhere?

9  Where is the one you --

10          MS. MINICK:  The Judge has it.

11          MS. ZACK:  Oh, okay.  I don't need to see it.

12          THE COURT:  All right.

13  BY MS. ZACK:

14  Q.  But in that picture you can't tell if Mr. Noonan is wearing

15  clothes, can you?

16  A.  I recall that picture, yes, ma'am, and he was wearing

17  shorts.

18  Q.  That's not what I asked you.  In that picture you can't

19  tell if Mr. Noonan is wearing clothes?

20  A.  No, ma'am.

21  Q.  Okay.  So, once again, it's just your word that he was

22  wearing clothes?

23  A.  Well, if I recall the picture, yes, ma'am, because we were

24  all clothed.  He had on a pair of shorts.

25  Q.  So you say.

Barry - Further Redirect by Ms. Minick

1    *MS. ZACK:*  I have nothing further, Your Honor.

2                 **FURTHER REDIRECT EXAMINATION**

3    BY MS. MINICK:

4    *Q.*  Mr. Barry, looking at 21E -- the picture of the bathtub,

5    correct?

6    *A.*  Yes, ma'am.

7    *Q.*  Where in relation to this is the cabinet?

8    *A.*  About where that picture is taken from, because it's right

9    there across from the bathtub.  There was also a hook up there

10   on the wall where he would hang his towel.

11   *Q.*  All right.

12        *MS. MINICK:*  And would you please pull up 21F.

13   BY MS. MINICK:

14   *Q.*  So in looking at 21F, which is a picture of the sink, if

15   you're looking directly at it, where is the cabinet in relation

16   to the sink?

17   *A.*  When you're looking at it, you're -- it's off to the left

18   of the sink.

19   *Q.*  You were asked, Mr. Barry, about access dates, that if all

20   these -- I believe the Government's attorney asked you about

21   access dates and if they were all at one time or another.  Did

22   you have any virus software on your computer?

23   *A.*  Yes, ma'am, I did.

24   *Q.*  Did you have any other kind of software that would run in

25   the background on your computer, if you know?

Chappell - Direct by Ms. Zack

1    A.  The only thing that I ran in the background was my -- if I

2    was doing a backup of my system while I was still working on my

3    computer, it would run in the background.

4    Q.  So based on your experience, if virus software accessed

5    files, that would have changed the access date, would it not?

6    A.  Yes, ma'am, that would.

7              MS. MINICK:  I don't have anything further, Your

8    Honor.

9              THE COURT:  All right.  Anything more?

10             MS. ZACK:  Not of this witness, Your Honor.  But we

11   reserve the right to call for rebuttal, so.

12             THE COURT:  I understand.  Very good.

13             MS. MINICK:  The Defendant rests, Your Honor.

14             MS. ZACK:  Your Honor, the United States would call

15   Special Agent Jeffery Chappell.

16             THE COURT:  All right.  You may step down, sir.  Thank

17   you.

18                  You remain under oath as well, sir.

19             THE WITNESS:  Yes, ma'am.

20             MS. ZACK:  May I proceed, Your Honor?

21             THE COURT:  You may.

22             MS. ZACK:  Thank you.

23                          **DIRECT EXAMINATION**

24   BY MS. ZACK:

25   Q.  Special Agent Chappell, you've seen Defense Exhibit 27 and

Chappell - Direct by Ms. Zack

1  28, the Wii pictures, correct?

2  A.  Yes, ma'am.

3  Q.  Where did those come from?

4  A.  The -- I believe the transcripts -- oh, you mean on his

5  computer?

6  Q.  Yes.

7  A.  They came from a folder called "my pics," which was located

8  on Mr. Barry's computer within his user account under the main

9  folder called "favorites."

10  Q.  Is that a default location for that folder?

11  A.  For the my pics folder?

12  Q.  Yes.

13  A.  No, ma'am, it is not.

14  Q.  Can you explain that to the Court, please?

15  A.  The favorites, there are several -- when you install

16  Windows Vista in this case and you create your user account,

17  the operating system creates several default folders,

18  documents, photographs, videos.  Favorites is one of them.

19  Favorites is a place where URL or Web addresses are stored to

20  be used by Internet Explorer mainly.  Because it is a folder,

21  other things can be placed in there.

22  Q.  Where does the my pics folder reside by default when you

23  install Vista?

24  A.  My pics is not a default folder.  That name is not a

25  default name for a folder.

Chappell - Direct by Ms. Zack

1   *Q.*  So that folder has to be created by the user?

2   *A.*  Correct.

3   *Q.*  Okay.  And in this particular case there was a folder

4   called my pics within the favorites that contained Government's

5   Exhibit 31, 32, as well as Defense 27 and 28; is that correct?

6   *A.*  Yes, ma'am.

7   *Q.*  And I believe Mr. Barry just testified that the reason that

8   all of those pictures have the same access date is because

9   while he was very busy studying on the 26th, he ran -- or on

10  the 6th of February, he ran some antivirus software?

11  *A.*  Correct.

12  *Q.*  And that the anti -- what does antivirus software do to

13  access dates?

14  *A.*  On a Windows XP machine, server 2003, other operating

15  systems, it can affect the access date as the virus scan goes

16  through and actually scans the file.  It can change the dates

17  on there.  On Windows -- I'm sorry.

18  *Q.*  What about on Vista?

19  *A.*  Windows Vista, it will not -- the access date is -- and in

20  Mr. Barry's computer, it is turned off by default.  The access

21  date is not affected by literally accessing the file.

22  *Q.*  So what can you tell us forensically about why all of the

23  images in the my pics folder contained within the favorites

24  have the same access date?  What do you believe forensically

25  occurred?

Chappell - Direct by Ms. Zack

1   A.   Based on they all having the same access date of

2   February 6th, yet their created dates are all different, I

3   believe that all these files were moved, moved in mass from an

4   external drive that had a different type of file system than

5   what Mr. Barry had on his computer.

6   Q.   And when would that have occurred?

7   A.   February 6th.

8   Q.   And why do you believe it came from an external system?

9   A.   Specifically FAT 32 is a file system that is used -- is

10  very popular when using flash drives, thumb drives, external

11  hard drives, because it views with different systems, like an

12  Apple Mac or a PC, a Windows based PC.

13            The -- Mr. Barry's laptop had Windows Vista

14  installed which uses NTFS, a different type of file system.  It

15  can happen and regularly does when you move files from a FAT 32

16  file system to a Windows NTFS system, the attributes for that

17  file stick, stay.  In this case it created dates.

18  Q.   Okay.

19  A.   But that move is recorded by the Windows NTFS system.

20  Q.   And that's the access date?

21  A.   And it populates the access date with that move, which is

22  February 6th.  To corroborate that, I went and looked at the

23  master file table on Mr. Barry's computer.  That is a listing

24  of all the files on his computer and it keeps track of where

25  they are and other information and stuff.  The record date on

Chappell - Direct by Ms. Zack

1  the master file table is when that -- or the record date is
2  when a particular file is created.  In this case all of those
3  files within the my pics folder within the favorites that were
4  accessed -- or listed as accessed on February 6th were created
5  in the MFT on February 6th.
6  Q.  And why would somebody want those pictures -- what would be
7  the purpose of putting them in the favorites as opposed to on
8  the desktop or in some other location, like where all the other
9  child pornography images that have been entered into
10 evidence -- like the ones that are in "David and the boys" and
11 "Craig Houston" and all of that, that was in a completely
12 different place on the computer, correct?
13 A.  Correct.
14 Q.  What is the advantage or what can be gained by having
15 something in the favorites?
16 A.  For use with a Web browser.  In this particular case
17 Internet Explorer is the easier one.  If that is synced with
18 Mozilla Firefox or with Google Chrome or whatever Web browser,
19 easier access to those items within that folder.
20 Q.  And when you say "easier access," the items that we
21 discussed in the "Craig Houston" and the "David and the boys"
22 file, would those have been remotely accessible to Mr. Barry
23 from some other computer?
24 A.  No, ma'am, not on the settings I found.
25 Q.  Okay.  And what about these images?

Chappell - Direct by Ms. Zack

1   *A.* No, ma'am.  What I mean by easier is instead of having to

2   drill down to them and attach them to an e-mail or something,

3   you simply had to click on favorites within the Web browser and

4   those folders and stuff would appear right there.

5   *Q.* Okay.  That's what you mean, easier access for the user

6   viewing them on that computer?

7   *A.* Correct.

8   *Q.* Or to send them, would that work?

9   *A.* Correct.

10  *Q.* Okay.  And when you executed the search warrant at

11  Mr. Noonan's house, how many tripods were seized?

12  *A.* None.

13  *Q.* And what would be the significance of a tripod in your

14  investigation for production of child pornography?

15  *A.* It would be significant because it relates to how this was

16  done.  At the very least if we had seen a tripod, it would have

17  at the very least been photographed, so we acknowledge its

18  existence.

19  *Q.* But you never found one or saw one?

20  *A.* No, ma'am.  No, ma'am.

21          *MS. ZACK:* Pass the witness.

22          *THE COURT:* Anything further?

23          *MR. JARVIS:* Just a few questions, Judge.

24                      **CROSS-EXAMINATION**

25  BY MR. JARVIS:

Chappell - Cross by Mr. Jarvis

1  Q.  Agent Chappell, my understanding from your earlier

2  testimony last week is that the modified and access dates don't

3  count anymore.  I mean, you're very clear that the only thing

4  that counts now under -- with Vista is the created date,

5  correct?  That's what you said last week.

6  A.  That's not totally correct.  It doesn't count for accessing

7  the -- as it relates to accessing a photograph, it doesn't

8  record that.  That's what I testified to.  It's not that the

9  access date doesn't matter, because there are times when

10 Windows Vista will affect the access date, but not by looking

11 at it, not by a user opening up the picture.  It won't change

12 the dates then at all.

13 Q.  Well, you didn't say that there was an exception last week.

14 For today you've got an exception to your testimony, that it

15 doesn't count?

16      MS. ZACK:  Your Honor, I'm going to object as

17 argumentative.

18      THE COURT:  I'll sustain the objection.

19 BY MR. JARVIS:

20 Q.  Well, you just testified that one of the advantages or

21 potential advantages is that when you put everything in the

22 favorites, you can click on favorites and it all appears,

23 correct?

24 A.  Correct.

25 Q.  And when you say all the -- and there's 76 pictures in the

Chappell - Cross by Mr. Jarvis

1  favorites?

2  A.  In the my pics folder.

3  Q.  Okay.  There are 76 pictures and they would all appear.

4  Would they appear, like, one at a time or 76 thumbnails?

5  A.  Depending on how it's set up, when you click on the

6  favorites, let's say, through Internet Explorer, it's going to

7  show the folders in an individual unsorted -- what's typically

8  called unsorted URLs or unsorted Web addresses, that will pop

9  up.  I don't know what setting was set up for clicking on the

10 folder.  If it would open up a Windows Explorer window and then

11 show the files or if it actually would populate that drop-down

12 list from favorites on Internet Explorer.

13 Q.  Okay.  So it can be a default setting then?  You just

14 doesn't know how it would bring it back up?

15 A.  Right.  Yes, the default setting for the view typically is

16 the drop-down menu.  You see the folders that are within the

17 favorites folder, the subfolders, and then any unsorted URLs

18 that are just within the root of the folder typically pop up in

19 a drop-down.  There are settings to when you click on a folder

20 that it will open up the Windows Explorer and show the contents

21 of the file that way, or when you clicked on the folder, it

22 would populate the drop-down box with the contents of the

23 folder.

24 Q.  And you also testified that it would be easier to send them

25 from that favorites, correct?

1  *A.* It can be, yes, sir.

2  *Q.* Okay. But you didn't see any evidence of any of these

3  being sent, did you?

4  *A.* No, sir.

5  *Q.* So forensically that means they weren't sent, if you didn't

6  find any evidence of it, correct?

7  *A.* No, sir. It just means I didn't have evidence that they

8  were sent. It doesn't mean that they hadn't been sent. I just

9  didn't have any evidence that they were.

10  *Q.* Okay. And does that statement apply to all of your

11  testimony about your forensic evaluation of the computers and

12  the cameras?

13       *THE COURT:* Can you use the mike, please, sir?

14       *MR. JARVIS:* I just have a sore throat, Judge.

15       *THE COURT:* That's why the mike will help you.

16  BY MR. JARVIS:

17  *Q.* And does that statement apply to all of your testing, just

18  because I didn't find it didn't mean it didn't happen?

19       *MS. ZACK:* I'm going to object to the question.

20       *THE COURT:* I'll allow him to answer it if he can.

21  *A.* In certain circumstances, yes, sir, that is correct.

22  BY MR. JARVIS:

23  *Q.* Okay. So for the trier of fact, your testing -- and I

24  don't mean to say it's incomplete or be derogatory towards what

25  you can do, but the reality is you're testing, using the

Chappell - Cross by Mr. Jarvis

1   techniques that you've been trained on, isn't complete or

2   completely accurate because you can't always get the data, can

3   you?

4   A.  I wouldn't necessarily agree with that statement, only

5   partially.  Yes, we don't always get all of the data, because

6   if the data is not there, we can't recover it.  Particularly

7   when it comes to Web-based material, e-mails, Internet,

8   Internet chat and so forth, the evidence just may not reside on

9   the computer and therefore there's no way I can recover it.

10  But that doesn't mean that because I can't recover it that it

11  didn't happen.  There's other stuff that we can look at, which

12  in this case that's what we've done.

13  Q.  But you don't have any evidence that any of these pictures

14  in favorites were sent to anybody?

15  A.  In the my pics folder, no, sir, I do not.

16  Q.  And in the Messenger cache, we've already gone over those,

17  right?

18  A.  Correct.

19  Q.  And those are not all the same pictures, are they?

20  A.  No, sir.

21       THE COURT:  Hold on.

22       MR. JARVIS:  I'm sorry.

23       THE COURT:  What's the objection?

24       MS. ZACK:  Outside the scope of this limited

25  testimony.

1              THE COURT:  Overruled.

2              MR. JARVIS:  That's all of the questions that I have,

3    Judge.  Thank you.

4              THE COURT:  All right.  Did you have any follow-up?

5              MS. ZACK:  No, Your Honor.

6              THE COURT:  All right.  You may step down, sir.  Thank

7    you.

8              THE WITNESS:  Thank you, Judge.

9              THE COURT:  Does that conclude the Government's

10   rebuttal?

11             MS. ZACK:  Yes, Your Honor.

12             THE COURT:  Do both sides rest and close?

13             MR. JARVIS:  Yes, ma'am.

14             MS. ZACK:  Yes, Your Honor.

15             THE COURT:  All right.  What's the most efficient way

16   to proceed?  Do you want a brief break before we do closing?

17             MS. ZACK:  I would, Your Honor.

18             THE COURT:  All right.

19             MR. JARVIS:  I would too, Judge.

20             THE COURT:  Do you want 30 minutes to pull your

21   thoughts together?

22             MR. JARVIS:  That would be perfect.

23             THE COURT:  Or is 15 adequate?

24             MS. ZACK:  I'm okay with 15, but I'm not going to

25   object to their wanting 30.

```
 1            THE COURT:  Well, let's see.  It's about 20 till
 2   10:00.  Why don't we resume at 10:00.
 3            MR. JARVIS:  Yes, ma'am.
 4            THE COURT:  All right.  Thank you.
 5            MS. ZACK:  Excuse me, Your Honor.  Is there going to
 6   be a limit on time for closing or --
 7            THE COURT:  Why don't you take -- is 30 minutes each
 8   enough?
 9            MR. JARVIS:  It should be.
10            THE COURT:  All right.  That will be fine.  Thank you.
11            MS. ZACK:  Thank you.
12      (Recess from 9:40 a.m. to 10:00 a.m.)
13      (Open court, Defendant present.)
14            THE COURT:  Are we ready?
15            MS. ZACK:  Yes, Your Honor.
16            THE COURT:  All right.  I think we're ready to
17   proceed.
18            MS. ZACK:  Yes, Your Honor.  This is the most updated,
19   before we start, version of the Government's proposed findings
20   of facts and conclusions of law --
21            THE COURT:  Very good.
22            MS. ZACK:  -- that take into account the testimony
23   today.
24            THE COURT:  All right.
25            MS. ZACK:  Here's a copy for y'all.  I want to make
```

1   sure I give you the right one.  This is it.

2                    May I proceed, Your Honor?

3          *THE COURT:*  Yes, please.

4          *MS. ZACK:*  Your Honor, last week this trial started

5   with the presentation of the Government's case and we believe

6   that the evidence has shown that we have proven all of the

7   elements of Counts 1 and 2, which is conspiracy to produce

8   child pornography and Counts 6 and 7, which is the production

9   of child pornography by a parent or legal guardian.

10                   I think it's undisputed that the Defendant, David

11  Morse Barry, adopted R.B. and O.B. on April 27th of 2007 and

12  that given R.B.'s date of birth of September 10th, 2003, and

13  O.B.'s date of birth of October 5th, 2004, that they were in

14  fact minors, they still are, and were at the time of the

15  charges -- or the time frame listed in the indictment and that

16  the Defendant was and is still, in fact, the parent or legal

17  guardian of those children as it relates to Counts 6 and 7.

18                   The other undisputed fact is that the Defendant,

19  David Barry, traveled to Houston three different times.  The

20  Defendant, by his own admission, traveled here first in June of

21  2010 -- actually the first date was May 31st of 2010 for

22  approximately four or five days, into the beginning of June,

23  and then June 17th and 18th of 2010, and then between Christmas

24  and New Year's of 2010 going into 2011.  So sometime after

25  December 25th up until and potentially including January 2nd.

1            The images that were found on the computers were
2    the result of two different search warrants.  One executed in
3    Wichita Falls on February 7th of 2011, and one executed here in
4    Houston on February 8th of 2007.  The first one being at
5    Mr. Barry's house, the second one being at Mr. Noonan's house.
6            The importance of the dates of travel as to
7    Mr. Barry comes into play when we discuss what was found on
8    Mr. Barry's computer.  And we know that images involving the
9    children with their naked genitals exposed with either
10   Mr. Barry, Mr. Noonan, by themselves were created on the
11   computer not only during the dates when Mr. Barry was in
12   Houston, but on dates when he wasn't in Houston.  And why is
13   this important?  This is important because Mr. Barry claims
14   that he put none of these images on his computer and was
15   completely oblivious to their existence on his computer.
16           Besides the 6-13 creation date -- and when
17   questioned about that, Mr. Barry then all of a sudden wasn't so
18   sure when he came to Houston, yet it's been demonstrated by
19   impeachment, that he gave testimony in 2012 at the CPS trial,
20   that he came on the 17th or 18th.  So it would be impossible
21   for him to have been here on the 13th when some of those images
22   were created in the "Craig H" or "Craig Houston" and the "David
23   and the boys" file on his computer.
24           The other issue that leads to recognition that
25   Mr. Barry had to know about these images is the Internet chats,

1   which discuss many things.  And we'll get to some of the other

2   things in a minute.  But when it comes to the pictures, he

3   discusses that do you see the pictures of my boys and he

4   demonstrates by way of chat that they are naked in some of

5   these pictures.  And he further discusses that he understands

6   that it's illegal to send them, that these pictures are just

7   for whoever he is sending it to, as if somehow that negates its

8   illegality and that they're for their personal enjoyment.

9             The chats go on certainly to demonstrate that

10  Mr. Barry is a person who has a sexual interest in children and

11  is chatting with like minded individuals.  But why is it

12  important that he knows of the illegality?  Because the

13  elements of the conspiracy charge require that we prove that he

14  knew of the unlawful purpose of what he was doing.  And we

15  believe that this clearly demonstrates that he knew of this

16  unlawful purpose.

17            We also have to demonstrate that two or more

18  persons, directly or indirectly, reached an agreement to

19  produce this child pornography.  And I believe through the

20  items found on Mr. Noonan's computer, through the items found

21  on Mr. Barry's computer, and the fact that a lot of these

22  images are exactly the same and that both Mr. Noonan and

23  Mr. Barry and often both of them appear together in the

24  pictures with the children definitely demonstrates an indirect

25  agreement.

1         There was no written contract.  There was no

2   obvious, hey, let's get together and make child pornography

3   statement between these parties, but I believe that the

4   evidence shows that this was definitely an activity that both

5   of them engaged in willingly, often, and with the each other's

6   knowledge and consent.

7         Further, Mr. Barry indicated that the pictures

8   got on his computer because he downloaded them from

9   Mr. Noonan's camera.  And while he denied that, here he was

10  impeached with the testimony he gave at the CPS trial two years

11  earlier, wherein he said he took the scan disk out of

12  Mr. Noonan's camera and downloaded them onto his computer.

13        Further, Mr. Barry took several images.  And one

14  of those images is Government's Exhibit 4p.  Government's

15  Exhibit 4p is a picture of the Barry children asleep at

16  Mr. Noonan's residence, where one of the children is exposed

17  and their genitals are exposed and their legs are spread and

18  clearly that is the focus of the picture.  When asked in court

19  who took that picture, Mr. Barry denied any knowledge of that

20  picture, said he had never seen it before the CPS trial or any

21  of that, but at that CPS trial admitted he took that picture,

22  with Mr. Noonan's camera, because we know this picture based on

23  the EXIF data that's in evidence came from Mr. Noonan's camera.

24        Further evidence of the conspiracy, Your

25  Honor, is the picture of Mr. Barry and Mr. Noonan naked in

1   Mr. Noonan's bed.  And whatever that means in and of itself is
2   not the issue, though I believe it demonstrates that they had
3   an intimate relationship.  There is a hand, a Barry child's
4   hand in one of these pictures, holding Mr. Barry's camera, the
5   Kodak camera that is in evidence that is Government's Exhibit
6   26.  And Mr. Barry testified that that picture was taken with
7   Mr. Noonan's camera, which is Government's Exhibit 8 and it was
8   taken with a timer.  And then there's the exact same picture
9   that Mr. Barry has on Mr. Barry's camera, the camera that
10  appears in Mr. Noonan's picture.

11          So to say that he didn't know what was going on
12  and pictures weren't being readily taken in front of him and in
13  front of Mr. Noonan is implausible.  Your Honor has seen the
14  pictures from the search, Government's Exhibit 21.  This house
15  was not a mansion.  This was a modest home.  This was a
16  three-bedroom home, only which two of the bedrooms were being
17  used and one was by Mr. Noonan's roommate.  It's an open floor
18  plan.  This is not a house where something can be going on in
19  one room and people don't know about it in the next or where
20  they are.  And the only time that Mr. Barry claims to have been
21  out of the presence of his children was when he spent 45
22  minutes going on a job interview and said that Mr. Noonan and
23  the children were at the park.

24          So based on that, if we take that at face value,
25  then Mr. Noonan created all of these images, which by the way

1  the dates and the computer evidence forensically does not

2  support at all, in this 45-minute window and then put it on

3  Mr. Barry's computer, all without him knowing.

4          Let's talk about the images themselves, because

5  in order for the Government to prove the conspiracy charge and

6  the production of child pornography charge, the Government has

7  to demonstrate that the images are, in fact, child pornography.

8       *THE COURT:*  And are you going to identify specifically

9  by number the pictures that you believe are child pornography?

10       *MS. ZACK:*  Yes, Your Honor.

11       *THE COURT:*  That would be very helpful.

12       *MS. ZACK:*  Yes.  We can start with 4p, which the

13  United States has on the monitor right now and --

14       *THE COURT:*  And would you as you go through identify,

15  just so our record is clear because of the way the case is

16  indicted, which child is in which picture.

17       *MS. ZACK:*  Well, Your Honor, the way --

18       *THE COURT:*  And some of them are both.

19       *MS. ZACK:*  Right, some of them are both.  And to be

20  honest with you, we know that there are different children.  I

21  can't tell them apart in some of the images.  And we didn't

22  indict by image.

23       *THE COURT:*  That's true.

24       *MS. ZACK:*  So we know that they're in both, but I

25  can't delineate between the two because I would be just

1    guessing as to which -- I mean, obviously this is both of the

2    children.  But it's child pornography because they're both in

3    it, but one of them is exposed.

4              So in going to Government's Exhibit 4, which

5    contains the selected images from Mr. Barry's computer, we

6    believe that 4a is child pornography, 4b is child pornography,

7    4c is child pornography, 4d is child pornography, 4e is child

8    pornography, 4f is child pornography, 4g, 4h --

9         *THE COURT:*  Did you mean to skip 4g or include it?

10        *MS. ZACK:*  No, no, include it.

11        *THE COURT:*  All right.

12        *MS. ZACK:*  4h, 4i, 4j, 4k, 4l, 4m --

13        *THE COURT:*  M?

14        *MS. ZACK:*  M, as in Mary.  I apologize, Your Honor.

15        *THE COURT:*  All right.

16        *MS. ZACK:*  4n, 4p, 4r, 4s --

17        *THE COURT:*  S?

18        *MS. ZACK:*  S, as in Sam.

19        *THE COURT:*  Right.

20        *MS. ZACK:*  4t, 4u, 4v, 4w, 4x, 4y.  Your Honor, there

21   are images contained in 4aa, bb, cc, dd, and ee and ff that the

22   United States believes are child pornography but were not

23   produced by Mr. Barry or Mr. Noonan but are the subject of the

24   414 and 404 motion and have been --

25        *THE COURT:*  With the unknown children?

1          MS. ZACK:  Correct, the unknowns, yes.  But going back
2     to the images that --
3          THE COURT:  Which images?
4          MS. ZACK:  The 4a through z, the ones that we have
5     delineated as child pornography --
6          THE COURT:  With the -- that you are alleging were
7     produced by Mr. Barry and/or Mr. Noonan?
8          MS. ZACK:  Correct.  And we would add to that, Your
9     Honor, Government's Exhibit 31 and 32, as well as the images
10    contained in Government's Exhibit 9 are from Mr. Noonan's
11    camera and we believe that 9b, 9d, 9e, 9f, 9g, 9i, 9k are child
12    pornography.  There were images, Your Honor, found in
13    Mr. Barry's Messenger cache contained in Government's Exhibit
14    17 and we believe that 17 -- and some of these are duplicates,
15    Your Honor, but I'm going to list them anyhow, because they
16    were found in a different place.  17a, 17b, 17c --
17         THE COURT:  17a, b, c?
18         MS. ZACK:  Yes.  D -- 17d, 17e, 17f, 17g, 17h.
19         THE COURT:  Where were the Exhibits 4a through y
20    found?
21         MS. ZACK:  Mr. Barry's computer.
22         THE COURT:  Where on the computer?
23         MS. ZACK:  Oh, those, Your Honor, were in the Craig
24    Houston or David and the boys folders that contained the
25    subfolders Craig H and others and I believe D-O-R and new

1  folder.

2          THE COURT:  I'm sorry.  Say the last two again.

3          MS. ZACK:  D-O-R and new folder was the subfolders of

4  David and the boys.

5          THE COURT:  31 and 32 where were they found?

6          MS. ZACK:  31 and 32, Your Honor, were found on

7  Mr. Barry's computer in the my pics folder contained within

8  favorites.

9          THE COURT:  Okay.

10         MS. ZACK:  And within 17 as well as, Your Honor, are,

11  again, the unknowns that we believe are child pornography but

12  were not produced by Mr. Barry or Mr. Noonan.

13         THE COURT:  And which ones of the 17a through h are

14  the unknowns?

15         MS. ZACK:  They are 17n through t.

16         THE COURT:  Got it.  And in the -- of 17a through h,

17  which ones were also in the 4 series?

18         MS. ZACK:  Okay.  I believe everything found in 17,

19  Your Honor, because that was the Instant Messenger cache, all

20  of those are in 4.

21         THE COURT:  All of the 17s were in 4?

22         MS. ZACK:  Correct.  Because 17 is the Instant

23  Messenger cache for Mr. Barry's computer.  It just demonstrates

24  they were in different places.

25         THE COURT:  Got it.

1           MS. ZACK:  And that can be -- the Instant Messenger
2  cache ones are also contained in Government's Exhibit 30.
3           THE COURT:  3-0?
4           MS. ZACK:  3-0.  Which shows the creation date within
5  the Instant Messenger cache.  And those dates, while some
6  correspond to Mr. Barry's trip to Houston, they are dates in
7  there, specifically in September and November of 2010, that
8  demonstrate that somebody did something with those images when
9  Mr. Barry was not in Houston.
10          THE COURT:  And which of the images have creation
11 dates that do not correspond to the Houston trips?
12          MS. ZACK:  The images that have creation dates that do
13 not correspond to Houston specifically are 4d of Government's
14 Exhibit 30 -- and let me explain just so the record is clear,
15 Your Honor.  Government's Exhibit 30 is an examination of
16 images that have already been identified in Government's
17 Exhibit 4 and some in 17.  So I'm going to refer to their --
18 the picture number, but it's 30 -- it would be 30 and I guess
19 it would be sub 4d.  Does that make sense to Your Honor?  It's
20 Government's Exhibit 30 referring to Government's Exhibit 4d,
21 which demonstrates that the image in 4d --
22          THE COURT:  Yes.  No, I understand.  I think I
23 understand.
24          MS. ZACK:  -- right, was created --
25          THE COURT:  Right.

1          MS. ZACK:  -- in either David and the boys or Craig H

2     on 6-13 of 2010, a date when Mr. Barry was not in Houston.

3               Also, image 4g was created in the Craig Houston

4     file -- oh, I'm sorry.  Wrong one.  That's the wrong date.

5     That was the date he was in Houston.  4t was created on 6-13.

6          THE COURT:  4t?

7          MS. ZACK:  4t as in --

8          THE COURT:  Tom?

9          MS. ZACK:  -- Tom.  4u was also created on 6-13.

10         THE COURT:  And 4d, when was that created?

11         MS. ZACK:  6-13, Your Honor, I believe.

12         THE COURT:  Got it.  Thank you.

13         MS. ZACK:  Yes.  Then the images 4bb -- I'm sorry, aa,

14    bb, cc, dd, ee, and ff, which are the unknowns, were created on

15    11-20 of 2010 and December 18th respectfully.  And there's --

16    the other images, Your Honor, that we would like to draw the

17    Court's attention to is Exhibit 20.  Exhibit 20 come from

18    Mr. Barry's camera, and those contain the painting pictures of

19    the boys and Mr. Barry as well as the -- some family Christmas

20    type images.

21         THE COURT:  Are you contending that these are child

22    pornography?

23         MS. ZACK:  No, Your Honor, no, not those.

24         THE COURT:  Okay.

25         MS. ZACK:  The only pictures that we're contending are

1  child pornography that were taken with Mr. Barry's camera are

2  Government's Exhibit 31 and 32.  And we know that from the EXIF

3  data contained in them, that they were produced on the Kodak

4  camera.

5         THE COURT:  And do we know the dates of those

6  pictures?

7         MS. ZACK:  We only know that they were moved to the

8  favorites folder on February 6th.  They were created in the my

9  pics of the favorites folder on February 6th, and I believe the

10 date that they were taken --

11        THE COURT:  That's 20 --

12        MS. ZACK:  No, that's 31 and 32.

13        THE COURT:  I'm sorry.  What year?

14        MS. ZACK:  Oh, sorry.  2010 -- 2011.

15        THE COURT:  Thank you.

16        MS. ZACK:  They were taken on it appears to be

17 January 2nd at Mr. Noonan's house, from the EXIF data and the

18 comparison to the search photographs.

19        THE COURT:  Right.

20        MS. ZACK:  Okay.  So now knowing what the Government

21 believes are the child pornography images, I would like to

22 discuss with the Court that we believe that these depict

23 sexually explicit conduct as defined by Title 18, United States

24 Code, Section 2(a) which defines sexually explicit conduct as

25 meaning actual or simulated sexual intercourse, including

1    genital to genital, oral to genital, anal to genital, and some

2    other things that don't apply in this case, between persons of

3    the same or opposite sex, potentially masturbation and

4    lascivious exhibition of the genitals or pubic area of any

5    person.

6              So I'm going to break this down even further,

7    Your Honor, and I just want to talk first about the images that

8    the Government believes show simulated sexual intercourse.

9              So going back to Government's Exhibit 4, I

10   believe that 4d shows one of the children's heads in the

11   genital area of Mr. Noonan.  4f shows one of the children

12   pressed up against the genital area of Mr. Noonan, the child's

13   buttocks up against the genital area of Mr. Noonan, with the

14   child's penis and genitals exposed.  4n shows Mr. Noonan's face

15   in the pubic or genital region of one of the children.  4g

16   shows Mr. Noonan's arm around an unclothed Barry child and

17   Mr. Noonan is lying down, as is the child, and the child is

18   being spooned, for lack of a better term, by Mr. Noonan,

19   wherein the child's buttocks are aligned with Mr. Noonan's

20   genitals and neither is clothed.  And while 4s does not depict

21   a sex act, it does show Mr. Noonan's hand cupping the buttock

22   of one of the Barry children naked in Mr. Noonan's bed with

23   Mr. Noonan's genitals exposed.

24              Government's Exhibit 31 shows Mr. Noonan's

25   hand -- hands in the genital area or touching the genitals of

1  one of the Barry children who -- in the tub, whose buttocks are

2  aligned or pressed up against Mr. Noonan's genitals.  And

3  Government Exhibit 32 is a similar image, where the child is

4  further leaning back against Mr. Noonan, naked in the tub, but

5  this time the child's own hands are on his genitals as opposed

6  to Mr. Noonan's hands.

7          The other images, Your Honor, all of the other

8  mentioned images, I would suggest are lewd and lascivious.  And

9  then we have to get into, well, what is lewd and lascivious

10 exhibition of the genitals or pubic area of any person.  And I

11 believe in order to do that, we have to consider the *Dost*

12 factors.  And the *Dost* factors are not an exhaustive list, but

13 they are things that should be considered when making the

14 determination as to whether something is lewd or lascivious.

15         So one should consider the focal point of the

16 visual depiction, whether it's on the minor's genitalia or

17 pubic area, and I believe that many of the images, that is the

18 sole focal point.  Specifically looking at Government's Exhibit

19 4b, which is also contained in Government's Exhibit 17.

20 Government's Exhibit 4b, there's no other purpose or focus of

21 this picture than this child's genitals, whether the setting of

22 the depiction is such as to make it sexually suggestive as --

23         THE COURT:  I'm sorry.  What was the number?

24         MS. ZACK:  This is 4b.

25         THE COURT:  Thank you.

1              MS. ZACK:  And it's also contained, Your Honor, in

2    17b.  The setting of the depiction is such to make it appear to

3    be sexually suggestive -- that is, in a place or a pose

4    suggested with sexual activity.  And I would suggest to the

5    Court that bedrooms, bathrooms, places where people commonly

6    get naked are associated and can be associated with sexual

7    activity.  And then we talk about is it sexually suggestive.

8    This child's legs are splayed apart and his feet are up on the

9    edge of the tub so that he can lift his pelvic region out of

10   the tub to expose his genitals.  There is no other purpose for

11   this picture.

12              Whether the child is fully or partially nude.

13   These children are nude in all of the pictures that the

14   Government has suggested are child pornography.  Whether it

15   suggests a sexual coyness or willingness to engage in sexual

16   activity.  I would suggest that these children are very much

17   aware of their nudity and very much aware that it's pleasing

18   the person who's taking the picture that they are nude.

19              The depiction appears to have been designed to

20   elicit a sexual response in the viewer.  Again, in just looking

21   at this picture alone, what other purpose exists for this

22   picture other than to arouse someone that has a sexual interest

23   in children?

24              And the reason we know that is there is another

25   picture contained in -- and I will have the number for the

 1   Court in a minute -- that shows both the children in the bath

 2   with soapsuds, happy playing, and that could be considered a

 3   picture that does not -- or a picture that is not designed to

 4   elicit a sexual response in the viewer and that it's a bath

 5   picture of children that probably you would be hard pressed to

 6   find a parent who doesn't have that type of picture.  And we

 7   know that there -- it's Government's Exhibit 9j, which is not

 8   child pornography, and the Government never suggested that it

 9   would be.

10          Whether the depiction portrays the minor as a

11   sexual object.  Well, we have the pictures where the child's

12   buttocks are backed up into Mr. Noonan.  We have the child's

13   head in Mr. Noonan's genital area.  We have Mr. Noonan's head

14   in the child's genital area.  We have Mr. Noonan with his hand

15   cupped around the child's buttocks.  And not each one of these

16   factors, not all of these factors are going to apply to every

17   picture, and they don't have to.  But there is no reason for a

18   picture of Mr. Noonan with two children that are not his, are

19   not related to him in a bathtub with his hands in the child's

20   genitals but for to arouse the sexual interest or to elicit a

21   sexual response in the viewer.

22          *THE COURT:*  What's the number of this picture?

23          *MS. ZACK:*  31 and 32.

24          *THE COURT:*  Thank you.  I just wanted to be sure I

25   have it right.  All right.  Go ahead, please.

 1          MS. ZACK:  Number three in the *Dost* factors is whether
 2   the child is depicted in an unnatural pose or inappropriate
 3   attire considering the age of the child.  I would suggest to
 4   the Court that it's inappropriate for these children at this
 5   age to be naked with adults other than in a setting such as
 6   they were taking a shower but the adult not being naked, the
 7   children being naked and an adult may be to help them out or
 8   something or to escort them into the bathroom.  Why Mr. Noonan
 9   is in a bath with two children that are old enough to wash
10   themselves, it's inexplainable other than he has a sexual
11   interest in children.
12              And while we're on these two images, Your Honor,
13   I would like to point out that if Your Honor looks at
14   Government's Exhibit 21e, I believe, and I will verify that,
15   the bathroom of Mr. -- I'm sorry, 21f, the bathroom of
16   Mr. Noonan's house, if Mr. Barry is to be believed and there is
17   some bookcase that is not photographed in this picture off to
18   the left of the sink, if the Court were to look at the angle
19   that the pictures in 31 and 32 are taken, it's impossible that
20   the pictures were taken from that bookcase on the tripod, by
21   the way, that was never found during the search.  And the angle
22   of the pictures suggest that it's an adult standing in the
23   middle to back portion of the bathroom -- and by back portion I
24   mean the portion furthest away from the door, so closer to the
25   spigot in the tub, taking the picture looking down at

1   Mr. Noonan, who's obviously looking up at someone or something

2   smiling, as are the children.  And I would suggest to the Court

3   that if you compare those two photographs, Government's Exhibit

4   31 and 32, to the bathroom pictures in Government's Exhibits

5   21d, e, and f, there's no other conclusion that can be come to

6   than those pictures were taken by a human being.

7              The other argument about the camera and the

8   timer, the EXIF data from these two photos, 31 and 32, show

9   they were taken 40 seconds apart.  So if we are to believe that

10  the timer took them, that means somebody had to get out of that

11  tub twice to set that timer and to take that picture, and they

12  are not both taken from the exact same angle, so then the

13  camera would have been moved as well.

14             But going back to the *Dost* factors.  I believe

15  that not only are we to look at each of these factors and apply

16  them where they demonstrate the lewd and lascivious nature of

17  the images, we have to look at the totality of the images

18  themselves.  Where they were taken, by whom were they taken,

19  under what circumstances were they taken, and what do we know

20  about the individuals taking them.  And that leads me to the

21  404 and 414 evidence, the chats and the unknown child.

22             Mr. Barry through his chats demonstrated that he

23  has a sexual interest in children.  We do not believe these

24  pictures were an accident.  We don't believe that they were a

25  mistake.  We believe they certainly demonstrate a pattern of

1  activity.  Every time he went there, pictures were taken.

2         THE COURT:  Is it also your contention that they show

3  that Mr. Barry was aware of Mr. Noonan's sexual interest in

4  children?

5         MS. ZACK:  Yes.  But we are not suggesting that

6  Mr. Barry knew of --

7         THE COURT:  You're not suggesting that there's

8  evidence to the contrary?

9         MS. ZACK:  Right.

10        THE COURT:  Or that there's any evidence that

11  Mr. Barry knew that Mr. Noonan had an established history --

12        MS. ZACK:  Right.

13        THE COURT:  -- of a sexual interest in or predatory

14  relationship with children.  I'm not suggesting that.  My

15  question to you is whether it is your position on behalf of the

16  Government that the pictures and the chat -- chats with

17  Mr. Noonan show that Mr. Barry and Mr. Noonan had a shared

18  interest -- sexual interest in children and that Mr. Barry was

19  aware of Mr. Noonan's interest?

20        MS. ZACK:  Yes, Your Honor.  And I believe that the

21  things that demonstrate that are, as Your Honor pointed out,

22  the pictures themselves, the chats, the fact that there are

23  pictures of Mr. Barry, Mr. Noonan, and the children together

24  naked, which is Government's Exhibit 4a and that photograph of

25  all four of them naked with Mr. Noonan's arms wrapped around

1   one of the Barry children certainly demonstrates that this

2   is -- and Mr. Barry's arm around Mr. Noonan, certainly

3   demonstrates that this is more than just a vacation photograph.

4           There is -- there are also pictures that have

5   been introduced into evidence, specifically Government's

6   Exhibit 4v and 4w, which are pictures of Mr. Noonan, the Barry

7   children, and a third child believed to have been the son of a

8   friend of Mr. Noonan's.  They've been referred to as the

9   Isaacksons, at the Isaacksons' residence, backyard, inside a

10  pool.  And even Mr. Barry testified that they went there and

11  that he was present at this activity.

12          There are pictures that were -- there's a picture

13  taken New Year's with Mr. Barry, Mr. Noonan, the children, and

14  a third male naked at Mr. Noonan's home.  There are the

15  pictures that were taken at Mr. Whittington's residence.  There

16  was a common theme, Your Honor, and that was get naked and get

17  naked with these kids and document it.  And this went on every

18  time Mr. Barry went to Houston.

19          What's interesting is that the pictures when not

20  in Houston, other than the painting pictures and the two Wii

21  pictures, don't demonstrate the nudist lifestyle that Mr. Barry

22  is putting up as his excuse for why these pictures exist.

23  Mr. Peterson's testimony at the detention hearing suggested

24  that he barely dabbled in nudism and that was not his thing.

25  And I believe it's incredibly telling that there isn't one nude

```
 1   picture of Mr. Peterson, Mr. Barry's life partner of 20 years
 2   in any of these.   There is not one picture of Mr. Peterson, the
 3   other by default parent of these children, though he has no
 4   legal status, but they lived as a family, nude with these
 5   children.
 6                 Mr. Barry told the Court that Mr. Peterson
 7   doesn't know of the nude pictures of Mr. Barry and Mr. Noonan,
 8   but Mr. Barry somehow still insists that they're just friends.
 9   And I believe Your Honor asked him, "Well, why did you take
10   this picture?"   And he said, "Well, I just wanted to have it."
11   And that picture shows Mr. Barry's arm around Mr. Noonan and
12   Mr. Noonan's hand on Mr. Barry's thigh, naked, sitting --
13              THE COURT:  But not this picture that's --
14              MS. ZACK:  No, no, the picture that Your Honor
15   inquired --
16              THE COURT:  Yeah.  Right.
17              MS. ZACK:  -- about which --
18              THE COURT:  What's the exhibit number of that?
19              MS. ZACK:  That exhibit is -- I will find the number
20   for you.
21              THE COURT:  I don't believe it's --
22              MS. ZACK:  It's in two different places.  It's on
23   Mr. Barry's camera, 9a, I think.  Let me double-check that.
24   Yes, 9 -- 9a is the one that was taken with Mr. Noonan's
25   camera.  And then the one taken with Mr. Barry's camera is 20a.
```

1    And they are taken -- 20c is actually a better version of that.

2    So 9a and 20c.

3                    And not only do I believe that this demonstrates

4    that they have an interest in each other, but that they were

5    fully aware, based on 9a, with the picture -- in the pictures

6    of the Kodak camera of Mr. Barry, that they were fully aware of

7    what was going on and that this was part of what they did when

8    Mr. Barry traveled to Houston.

9            *THE COURT:*  And where on the -- where on Mr. Barry's

10   computer were these photos -- images found?

11           *MS. ZACK:*  They were found on Mr. Barry's camera and

12   Mr. Noonan's camera.

13           *THE COURT:*  Not on the Barry computer; is that

14   correct?

15           *MS. ZACK:*  I will double-check that.  But I don't

16   believe so.  No, I don't believe they were found on the

17   computer.

18           *THE COURT:*  Okay.

19           *MS. ZACK:*  So going back to the lewd and lascivious

20   nature of these images, I believe further that it's supported

21   not only by the *Dost* factors but by the other factors that I

22   mentioned briefly before we got into the last examination of

23   the Barry, Noonan nude picture.  The chats with other gentlemen

24   demonstrate that Mr. Barry has a sexual interest in children.

25   The fact that there are unknown -- an unknown child in two

1   different places on Mr. Barry's computer, the Instant Messenger

2   cache -- well, actually in the Instant Messenger cache of his

3   computer on a date when he is not in Houston.  And the fact

4   that it's in the Instant Messenger cache demonstrates that it

5   was sent, received, or both.  And the way the times lay out on

6   that, it appears that there was some type of chat going on on

7   November 20th of 2010, that that chat was over -- in the first

8   part of the afternoon, around 4:30 in the afternoon, because

9   one of them was at 4:30.  That would be 4bb.  That 4ee was at

10  4:43.  And 4ff was at 4:26.  So all three of those appear to

11  have been part of one chat episode on that date.

12           Then on the same day but later in the evening,

13  4aa appears at 6:50 and 4dd is at 7:00 p.m., roughly.  And then

14  on December -- then on December 18th you have the image in 4cc

15  at 2:30 in the afternoon.  And those appear to be times when

16  Mr. Barry obviously was home on the computer chatting, but

17  where Mr. Peterson would have been at work.

18           The other thing that I believe demonstrates that

19  Mr. Barry has a sexual interest in children is the testimony

20  that was admitted of R.B.  Specifically that portion of the

21  testimony where he said on several different occasions

22  Mr. Barry took him into Mr. Barry's bedroom or he was already

23  in Mr. Barry's bedroom and they were lying down and Mr. Barry

24  played with his penis.  And I believe there were attempts to

25  explain that away as some type as hygiene or checking

1  because --

2          *THE COURT:*  I think it was the application of an

3  ointment.

4          *MS. ZACK:*  No, no, that's O.B.

5          *THE COURT:*  That's O.B.

6          *MS. ZACK:*  This is R.B.

7          *THE COURT:*  Got it.  Thank you for the clarification.

8          *MS. ZACK:*  And that R.B. -- Mr. Barry tried to say

9  that R.B. was complaining of the same symptoms --

10         *THE COURT:*  Right.

11         *MS. ZACK:*  -- as O.B.  But R.B. never mentioned that

12  in the interview.  R.B. was never treated.  We have no records

13  to suggest that R.B. was ever treated or examined at a doctor

14  for that same condition that caused O.B. to have to be

15  circumcised.  And specifically R.B. delineated between when he

16  is in the shower and Mr. Barry helps him clean his penis and

17  the events in the bedroom where he played with his penis.  And

18  I believe that if R.B. had been in pain and had been looking to

19  find out if he had the same thing that his brother had, it

20  would not have been called playing with his penis, nor would he

21  have said that Mr. Barry asked him to touch his, if it were

22  really for a medical purpose or a pain related inquiry.

23          So in taking all of those things together and

24  adding in the *Dost* factors, I believe that it's very apparent,

25  Your Honor, that these images are, in fact, child pornography.

1   And we can -- we believe we have demonstrated from the cameras,

2   from the computers, from the way the items were on the

3   computers, from the images themselves and the chats and other

4   evidence that has been presented demonstrate that this was a

5   conspiracy between Mr. Barry and Mr. Noonan to produce these

6   images.  We know that the items were placed on both computers.

7   We know that both cameras have images.  We know that the

8   children depicted in these images are minors, R.B. and O.B.,

9   and we know that the cameras and computers were produced in

10  Thailand and China, certainly not within the United States or

11  within the Southern District of Texas, thus meeting the

12  interstate nexus requirement for both Counts 1, 2 and 6 and 7.

13  And I believe, Your Honor, in examining the evidence as a

14  whole, the only conclusion that the Court can come to based on

15  the facts and based on the laws applicable to those facts is

16  that the Defendant is guilty as charged as to all four counts.

17  Thank you.

18            *THE COURT:*  All right.  Thank you.

19            *MS. ZACK:*  Thank you.

20            *THE COURT:*  I actually have a call that I need to take

21  now.  This took a little longer than I thought, which is fine.

22  So we can do this in -- I expect I'll be done in about 30

23  minutes.  So at 11:30?

24            *MR. JARVIS:*  That will be great.

25            *THE COURT:*  Do you think you will be done in 30

1  minutes?

2          MR. JARVIS:  It will be close, Judge, yeah.

3          THE COURT:  Well, we'll probably take a lunch break

4  then in between, because I've got a lunch meeting that I need

5  to attend to and I apologize for this being so broken up, but I

6  didn't think we would be in court in this case today and it's

7  fine that we are, but we just need to accommodate the schedule.

8  So we'll resume in about 30 minutes.  All right?

9          MR. JARVIS:  Thank you, Judge.

10         THE COURT:  Thank you.

11     (Recess from 11:02 a.m. to 11:30 a.m.)

12     (Open court, Defendant present.)

13         THE COURT:  All right.  I think we're ready.  Go

14 ahead, please.  Go ahead.

15         MR. JARVIS:  Thank you, Judge.

16             As I see, the two main issues, are the individual

17 pictures child pornography and did David Barry knowingly

18 participate in the production.  Those are the two main issues.

19 But the first thing I want to point out and if you look at the

20 Government's case, they're essentially arguing the absence of

21 evidence and the assumptions they make based upon the absence

22 of evidence is evidence.  In my opinion, that's not evidence

23 beyond a reasonable doubt.  That's an assumption or a guess

24 based upon what they don't have.

25             So let's look at the child pornography.  Everyone

agrees that mere nudity is not enough.  It's not sufficient to
be child pornography.  It's got to be a lascivious exhibition
of the genitals, which has got to have some sexual intent to go
along with it.  Because we all have a First Amendment right to
be naked, as bizarre as that sounds and I certainly don't
practice that and I don't think anybody else except Mr. Barry
in the past has ever practiced that, but you still have the
right to do that and that's why it's got to be more than just
mere nudity.

          And we understand that nudism as a lifestyle may
not be a statutory defense, but it explains in a reasonable
noncriminal way why there's naked pictures of his boys and
other people and of himself and that these are not for sexual
gratification.  And the Government says that, well, he's
pretending to be a nudist.  Well, their own evidence shows that
he really is -- or really was a nudist.  Looking at
Government's Exhibit 9b, there's a picture of both the boys,
one of them at the sink washing dishes, doing normal, regular
things that normal people do.  They just don't have any clothes
on.

          Then you look at Government's Exhibit 6u, which
is the backyard barbecue and, again, almost the same picture,
6t.  These are at a backyard barbecue with other nudists.
There was no contradiction of that.

          And then you have the painting pictures, which

1   they now are saying are not child pornography.  That's

2   Government's Exhibit 20e, one of the little boys painting;

3   Government Exhibit 20f, both the boys paintings in the nude;

4   again, 20g, both the boys painting in the nude; and then

5   Mr. Barry himself, 20h.  Obviously one of the boys took that

6   picture.  That shows regular activities of regular people, just

7   they happen to be naked.

8           And then some of the pictures down at

9   Mr. Noonan's house.  You have 4i, they're doing the Wii game,

10  him and one of the boys.  Again 4 -- no, this is 4i.  The other

11  one must have been 4j.  There's another picture of them,

12  Mr. Noonan and one of the boys doing exercises.

13          And then Defense Exhibit 27, these were taken at

14  Mr. Barry's house sometime late fall.  And here are pictures of

15  the two boys naked doing their Wii exercises -- or playing the

16  Wii game, just like Mr. Barry testified.  And in this one,

17  Defense Exhibit 28, they're not even looking at the camera.

18  There's no suggestive poses of anything.  But this is an

19  exhibit showing their nudist lifestyle.

20          In addition to that, the Government's own expert

21  testified that Mr. Barry on his computer went to go see or look

22  up truenudism.com 500 times in a six-month period.  And yet

23  there was not any queries or anybody looking for any child

24  pornography on the computer when they did a word search.

25          The Government introduced Mark Peterson's

1   testimony, and in there he says David Barry was a nudist and

2   that he dabbled in it.

3            And the other thing is, looking at the chats,

4   almost every one of the chats talked about being a nudist and

5   being naked.  They didn't talk about sex with children or how

6   much they want to have sex with children.  They talked about

7   being naked.  Now, again, I'm not saying that the nudism

8   lifestyle is normal.  It's not.  I think it's crazy, but it's

9   not illegal to be just naked.

10            Then we look at child pornography and the

11   definition of child pornography.  It's one of the few crimes

12   that is a very, very gray area.  There's not a list of elements

13   that the Government has to prove beyond a reasonable doubt.

14   It's all hugely subjective.  And we know that because the

15   Northern District had these pictures for five months or so.

16   They never prosecuted Mr. Barry for possessing child

17   pornography.  They had the first look at it.  Wichita Falls

18   Police Department was there during the search warrant.  They

19   could have filed state charges of possessing of child

20   pornography, but they've never done that in three and a half

21   years.

22            So if there's a split of opinion within the law

23   enforcement community, how can it be so easy to say down here

24   in the Southern District that these are child pornography

25   pictures beyond a reasonable doubt when other federal and state

 1   law enforcement agencies have not chosen to do so.

 2          *MS. ZACK:*  Your Honor, I'm going to object.  That

 3   assumes facts not in evidence as to why other agencies did not

 4   prosecute Mr. Barry.

 5          *THE COURT:*  I agree that we cannot make any conclusion

 6   based on the information we have about why other agencies made

 7   whatever prosecutorial decisions that they did or didn't.  Go

 8   ahead.

 9          *MR. JARVIS:*  When you look at the *Dost* factors, you

10   know, the focal point of the pictures is the genitalia, sexual

11   suggestive setting, unnatural pose for a 6-year-old child,

12   whether they're nude or in some kind of sexual costumes, it

13   suggests sexual coyness or willingness to engage in sex and

14   then for me the most important, the picture was intended or

15   designed to elicit a sexual response from the viewer.  And what

16   evidence did they bring you of that, other than just the

17   pictures?

18             Looking at, for example, 4a, here's a picture,

19   what I've been calling the portrait pictures, where they're all

20   four or five people inside the picture sitting still as if it

21   was a family picture.  There's no real posing in any of these

22   other pictures except for these.  The other pictures are all

23   just random acts of the children.  There's not any sitting on

24   the beach with the sunset and the -- like we've seen in other

25   cases, where the child is bent leaning backwards to expose a

1   part of their body to the camera.  We don't have any of these.

2   These are not to type of child pornography pictures the cases

3   have talked about.

4                Now, the Government says, Well, gosh, we can show

5   intent.  But the intent, I believe, must occur at the time the

6   pictures are taken.  You can't have intent to create child

7   pornography two years later or three years later or even ten

8   minutes later.  Because the intent has to occur when the

9   picture is taken.  Because they have to -- the picture has to

10  be intended to be child pornography at the time.  If it's not

11  intended to be at the time and some other person looks at it

12  and decides they get sexual gratification out of it, that

13  doesn't mean it was produced with intent.

14               It's just like in one of the dissents of one of

15  the cases that says, Well, gosh, if some pervert likes -- gets

16  turned on by clown pictures, that doesn't mean clown pictures

17  are automatically child pornography.  That's his own personal

18  deal.

19               These pictures were not intended to be child

20  pornography.  And there's been no evidence brought forth saying

21  that at the time that the pictures were taken, they were

22  supposed to be child pornography.  Now, if it was really child

23  pornography, these pictures all were child pornography, why did

24  it take two and a half years to indict him?  They've had access

25  to him.  He's supposedly producing child pornography of his own

1  children, horrible, but why did it take two and a half years to

2  indict him then?

3      MS. ZACK:  Objection.  The process of the Government

4  or how or when something is indicted is not a comment on the

5  evidence and shouldn't be seen as such.  I mean, there are many

6  reasons why things take as long as they do and I don't think

7  that that should be consideration as to whether or not the

8  Government has proven the elements beyond a reasonable doubt.

9      THE COURT:  All right.  I will decide on the relevance

10 of it and take the appropriate consideration of it, if any.

11     MR. JARVIS:  Another question I have is, if this was

12 intended to be child pornography at the time, why in the world

13 would the adults let their faces be in each and every one of

14 these pictures, or Mr. Noonan's and on occasion Mr. Barry when

15 they are portrait pictures?  Why would they leave evidence that

16 they were the ones participating in it?  Most child pornography

17 that I've seen in the past doesn't have the adult's face in it,

18 because they don't want to be in a child porn picture.  But

19 here almost every single one of them, you can clearly identify

20 who the adult is.  That doesn't make any sense, because it

21 wasn't intended at the time to be child pornography.

22         If it was really child pornography, all these

23 pictures, and David Barry knew and intended for it to be child

24 pornography, why wouldn't he have taken more pictures of his

25 boys from June when he got back home to Wichita Falls to

1   December, whatever date it was he went back to Houston?  The
2   Government's theory is he knew the pictures were being taken in
3   June, one of those two first times he went down there and he
4   knew they were child pornography.  Well, if he wants child
5   pornography, he's got five months every day alone with these
6   kids naked and yet the only picture we see is the picture with
7   the boys exercising on the Wii.  Why isn't there thousands of
8   pictures of these boys naked at home if he was creating child
9   pornography?  Its because in his mind, he wasn't creating child
10  pornography.  He was taking pictures or Mr. Noonan was taking
11  pictures at a vacation time, when they went to Houston for a
12  vacation.  It doesn't make any sense.  If he's a child
13  pornographer, he's got the actors right here all day for months
14  and there's not a single one them, Judge, not a single one,
15  except the two boys exercising.

16              If these were really child pornography, why isn't
17  there actual touching?  Why isn't there, in my opinion, really
18  some simulated sex in any of these pictures?  The pictures that
19  they use to say that there's simulated sex, 4d, the picture of
20  Craig Noonan sitting on the bed with one of the Barry boys
21  upside down.  His mouth is two inches away from the boy's
22  penis.  His mouth isn't open as if he's about to do something,
23  perform oral sex.  They said it's child pornography because the
24  child's head is in his lap.  The back of his head is in his
25  lap.  That's not simulated sex.  How easy could it have been

for Mr. Noonan if he wanted to have child pornography to flip
that kid over?  Now he's got simulated sex.  But he doesn't.
Because he's just horsing around with the kid.

Here's another one that they said is simulated
sex, 4f, in the shower, as I call these series of pictures.
Where's the simulated sex?  You don't see any erect penises.
You don't see anything saying that the boy is about to be
penetrated.  It's just one guy grabbing the kid.  That picture
could have easily been what I call real simulated sex.  The
boy's legs aren't even spread out as if he was about to be
penetrated.  There's no simulated sex in any of these, Judge.
There's no erect penis in any of these.  There's no sexual
content in any of these.

And then the Government relies on 6f, what I call
the Superman picture.  Where one of the boys is holding up a
picture of somebody in a Superman outfit, which I believe is
Craig Noonan, but there wasn't any testimony on that, and
because his elbow is near the scrotum of Mr. Noonan, they're
claiming that's simulated sex.  Why isn't it really simulated
sex?  Why didn't the picture taker say or Mr. Noonan say, "Grab
my penis"?  Because it wasn't a sexual picture.  This picture
was probably taken by his brother, because you can tell by the
angle, as the vast majority of these Saturday morning and
shower pictures were, taken by the other boy, because they were
goofing off on Saturday morning.  If this was a sexually

1    explicit picture, why isn't Mr. Noonan's penis erect?  It's

2    not, because the boy never touched it.  Never even thought

3    about touching it.  There's no evidence of sex.

4              And then the other one the Government relies on

5    is 4hh.  And there's a series of these pictures and we'll look

6    at each one of them.  But 4hh has got the boy playing around in

7    Mr. Noonan's lap and his toe is near Mr. Noonan's penis.

8    Surely if this was going to be simulated sex and Mr. Noonan was

9    creating something to elicit a sexual response from the viewer,

10   there would have been something else other than the foot near

11   his penis.  It's not.  It's a boy running -- rolling around on

12   a guy on a couch.

13             Look at 4ii.  This is where Mr. Noonan has one of

14   the -- the same boy, his feet up to his nose, probably smelling

15   it and the other kids are laughing.  Where is the simulated sex

16   in that picture?  It's not any.  There's not any in any of

17   these pictures.

18             And then the other one that I think they were

19   relying on is 4h.  Now, this one the foot is actually looks

20   like it's -- or the ankle area touching the penis.  If it was

21   sexual stimulation, why isn't Mr. Noonan's penis erect?  It's

22   just another picture in the series that looks like one of the

23   brothers took.  There's no sexual intent in any of that.

24             And then the 4q, which is the spooning picture,

25   they've actually said during closing arguments, what I wrote

1  down, that this was not child pornography because you can't see
2  any genitalia.  So without any sexual intent, there's no child
3  pornography intended at the time the picture was created by
4  anybody, whoever took the picture.  Now, I think we can tell
5  the majority of these pictures were taken by either one of the
6  of boys or a timer.  And, of course, we know there's a timer,
7  because we've got pictures of 4m, for example, where if you
8  look at the boy in the front, it looks like he just jumped into
9  the bed after he hit the timer.  We know there's timers because
10 they're on the camera and because there's pictures of all four
11 of them in a portrait.  And, of course, we have the 9a, the
12 picture of Mr. Noonan and Mr. Barry either handing or getting a
13 camera.  So we know there are two cameras.  But they both have
14 timers.

15         So isn't that enough right there to say Mr. Barry
16 didn't know or they can't prove beyond a reasonable doubt that
17 he knew the pictures were taken, because we can tell from the
18 angle that the majority of them are taken by one of the
19 children and there's no evidence that he directed the children
20 or that other pictures that are taken by a timer.  That's not
21 proof beyond a reasonable doubt.

22         Now, the Government's definition of child
23 pornography is so broad, Judge, that looking back at 9a again,
24 that they declared that this was child pornography because it
25 appeared that one of the arms of one of the boys was in the

1    picture.  And yet there's no erect penises.  There's no sexual

2    stimulation or simulation.  There's nothing sexual about this

3    picture at all.  It's two naked guys sitting on a bed.  So

4    where's the child pornography?  I suggest the Government's

5    definition is so broad, it includes everything.  And that's not

6    the law.

7                 The other thing I wanted to point out to the

8    Court, Special Agent Chappell never interviewed the boys.  So

9    he can't say what an unnatural pose is for them.  None of these

10   pictures are unnatural as far as the picture taker, the

11   photographer saying, no, no, no, move back a little bit to the

12   left so I can get a better shot at the genitalia.  These are

13   almost all action shots.  There's no posing going on.  And

14   because he never talked to the boys, there's no evidence and

15   the burden of prove is on them to bring you some, that anybody

16   ever told them to pose in any form or fashion.  And without

17   that, where's the production?  We're going to cover that in a

18   second.  But these are all random pictures that look like any

19   6-year-old boy could be doing, except they don't have clothes

20   on.  Why?  Because they're nudists, which isn't illegal.

21   Surely they could have done something more than that.

22                 Oh, and the other argument on the simulated sex,

23   the Government argued and I think Agent Chappell talked about,

24   well, they are standing next to a naked man.  I don't believe

25   that that's the definition of sexual simulation, Judge.  Merely

1  being naked standing next to another naked person isn't

2  simulating any type of sex.  It's just two naked people

3  standing there, which isn't illegal.

4           Now, the Government says that the R.B. outcry

5  provides that intent.  Well, let's look at that.  First of all,

6  you've got to believe beyond a reasonable doubt, that he,

7  Mr. Barry touched R.B. with some sexual intent.  Mr. Barry

8  discussed that, explained why.  It's a rational explanation.

9  Because one of the children had that problem, the other boy

10 came to him and said he was hurting and so Mr. Barry checked it

11 out.  It happened maybe three or four times.

12          But the weird part is when CPS took the children

13 February 7th, 2011, and they had both boys for 17 months, they

14 were in counseling every week.  They were with a foster parent.

15 They had a CPS worker.  They had a counsel worker.  They had

16 tons of people helping them out.  There was not a single outcry

17 during that period of time from any one of the boys saying they

18 had ever been sexually abused by anybody, Mr. Noonan or

19 Mr. Barry.

20          So why in the world would Mr. Barry after being

21 indicted in Tarrant County, getting released on bond, knowing

22 he's under investigation by the feds, then begin to start

23 sexually assaulting one of the children?  That doesn't make any

24 sense.  It doesn't make any sense at all.  What makes more

25 sense is, is that he was actually checking to make sure that

1  the boy didn't have the same problem as his brother did.  But

2  even if you believe that, how does an event that happened three

3  years later show intent when the pictures were taken?  Because

4  you can't go back and go, well, he must have intended it that

5  way back there three years ago because he did something today.

6        That's why all the cases talk about previous

7  actions of sexual molestation.  That's what they're looking

8  for, a pattern to show when he took the pictures, he had sexual

9  intent.  Well, this isn't a pattern.  It doesn't fit.  It

10  doesn't shed any light on that.

11        Now, let's talk about production a little bit.

12  Producing means, quote, "producing, directing, manufacturing,

13  issuing, publishing, or advertising."  There's nothing in there

14  about transporting a child within the state to a place where

15  someone else was taking naked pictures, because the Government

16  has to prove beyond a reasonable doubt that Mr. Barry knew it

17  was child pornography at the time the pictures were taken.  If

18  in June when the pictures were supposedly taken, the vast

19  majority of them were taken in June, one of those two dates, if

20  Mr. Barry didn't think that they were child pornography then,

21  didn't intend them to be child pornography, if he actually (A)

22  even knew about them, how can bringing them back in December

23  show intent to create child pornography?  It doesn't make any

24  sense that the mere fact that he brought them back to Houston

25  in December to revisit Mr. Noonan means he brought them back

with intent to create more child pornography if there wasn't
any intent in the beginning.

Now, the only evidence you had about producing is
from Special Agent Chappell.  And I asked him on every single
picture, Do you have any evidence that David Barry knew this
specific picture was taken?  No, we do not.  Do you have any
evidence that David Barry gave permission for his boys to be in
the picture or to take the picture?  No, we do not.  Do you
have any evidence that David Barry conspired with Craig Noonan
to produce these pictures or to produce child pornography?  No,
we do not.  Do you have any evidence that David Barry was even
in the room when the pictures were taken?  No, we do not.

They have absolutely no direct evidence of any of
that, which are the essential elements.  What they've got is
assumptions and guesses and it could have been, should have
been, so therefore it has to be.  But that's not beyond a
reasonable doubt.

Now, what they're saying is, gosh, all these
pictures are on his computer.  Okay.  What does that show?  I
have a pen in my pocket.  If the pen's not illegal, the fact
that it's in my pocket doesn't mean I'm possessing an illegal
item.  If there was no intent when the pictures were taken, the
fact that they ended up on his computer somehow, some way --
which they still don't figure out how.  They've got two or
three theories or could have beens.  But the fact that the

1   pictures are actually on the computer doesn't help show
2   anything about the intent of the pictures to be child
3   pornography when they were taken.  It doesn't shed any light on
4   intent.  But that's all they've got.

5           There are only -- I think I counted them
6   correctly, three pictures taken in -- after June.  The two with
7   the boys that I've already showed you with the Wii exercises,
8   our exhibits, I think, 27 and 28, and then 4a, which is the
9   picture of all four of them together.  And the Government
10  already said that that's not child pornography.  So it doesn't
11  appear to me, and maybe I missed it, that there were any more,
12  quote, "child pornography pictures" taken after June.  Why not?
13  If the intent and purpose of coming to Houston after the
14  pictures get on his computer, even if you believe that they're
15  child pornography, if the intent was to create more, come to
16  Houston and create more, why didn't they?  They didn't.  They
17  didn't have any more pictures.

18          Now, the Government's going to talk a little bit
19  and they mentioned the chats earlier.  But I want you to look
20  at the chats.  Read them again.  Because you'll find there's
21  not a single thing in any of those chats about the pictures
22  that were taken at Craig Noonan's house, not a single one.  Why
23  not?  If the intent of those pictures when they took them was
24  to create child pornography, why aren't they talking about
25  them?  They only have one chat from Craig Noonan to David

Barry, and all they talk about is maybe moving in together.
They don't talk about -- there's nothing in there saying, You
know, I really enjoyed those pics, Dave.  Can you send me some
more because I'm getting excited about them, or I'm tired of
these pics, Dave, can you make some more and send them to me so
I can have more fun with them?  There's no -- nothing like that
in any of those chats.

There's none of the chats talk about how someone
would be sexually stimulated by any of the pictures.  When he's
talking to others about R.B. taking pictures and they'll be fun
pictures, the next line doesn't say, Gosh, send me some,
because that turns me on.  There's nothing like that, Judge.
There's nothing in those chats that talk about how those
pictures or any of the pictures of the boys are sexually
stimulating.  There's none of the chats that discuss David
Barry wanting to or had molested the boys sexually.  Nothing
like that in there.  In fact, he talks about protecting them
and making sure him and Uncle Craig, there's enough adults
around to make sure that nothing happens to the boys at the New
Year's Eve party.  Now, I don't think that's appropriate
either, but there's nothing in there talking about sex with the
boys.  There's no chats about anything other than being a
nudism -- being a nudist, and that's not illegal.

Why if these pictures were all child pornography
and the Government knew that there was another picture of

1   unknowns and they knew at the time or at least of the detention

2   hearing, why didn't they investigate the Isaacksons?   It

3   doesn't make sense to me.   Obviously Craig Noonan is there with

4   another boy in the backyard with the Barry boys, same picture.

5   The problem is, it's just standing around naked.   There's no

6   sexual stimulation in that picture or those pictures either.

7            There's no evidence that the boys were ever told

8   to be in a picture or to take a picture.   No evidence

9   whatsoever.   Now, they're going to say, Well, gosh, you can

10  assume that because he was there in the house.   Well, assuming

11  he's there in the house isn't the same as proof beyond a

12  reasonable doubt.   They brought you nothing.   It's a zero.

13  They want you to guess and say, Well, he had to know because he

14  brought them to Houston.   But you can't do that.

15        *THE COURT:*   Well, I can rely on circumstantial

16  evidence, can't I?

17        *MR. JARVIS:*   You can.   But what's the circumstances?

18  That he was in the house?   There's no circumstances he intended

19  to produce child pornography, because if he wanted to produce

20  child pornography, like one of the cases, why don't we see any

21  of these pictures being sent to a child pornography Web site to

22  be used by other people with the intent for sexual

23  gratification.   There's no evidence of that.   There's no

24  evidence of anything like that.   They don't have any evidence

25  that at the time the pictures were taken they were intended to

1  be anything more than family vacation pictures.  So they're

2  asking you to assume, based on the lack of evidence, which

3  isn't proof beyond a reasonable doubt.

4              Now, if the timer was used by the child without

5  direction of Mr. Barry, how can he be held responsible for

6  production or production with his children, if he wasn't in

7  the room, didn't know about it, didn't approve it, and there's

8  no even halfway evidence of an agreement between him and

9  Mr. Noonan?  There's nothing.

10             Then I know they're going to talk about Mr. Barry

11  and all his lies and all these things that were confusing and

12  he can't remember and he's lying about this and lying about

13  that.  But remember the parts that you heard about Mr. Barry's

14  conversation four or five days after the search warrant in

15  Wichita Falls.  He voluntarily went down and talked to

16  Detective Jones, without a lawyer, and went and told him --

17  answered all his questions for about an hour, told him the same

18  story that he told the Court.  He met Craig on True Nudist.

19  They're both nudists.  They started talking.  They got up --

20         MS. ZACK:  Objection, Your Honor.  Assumes facts not

21  in evidence.  That statement is not part of the exhibits or the

22  evidence.

23         THE COURT:  Response?

24         MR. JARVIS:  Mr. Barry testified to it, Judge.

25         THE COURT:  All right.  I'll certainly allow the

1    evidence as to what was in Mr. Barry's testimony, the argument.

2    Go ahead.

3        MR. JARVIS:  And don't you know if there had been some

4    conflict or he had left something out, they would have brought

5    you that tape and said, No, no, no, that's wrong.  He's lying

6    to you again, Judge.  They've got that tape.  They didn't bring

7    that to you to say there's a conflict, because there isn't one.

8    Four days after the search warrant, before he knew anything,

9    before he talked to a lawyer, he told this same story about

10   meeting Craig and being a nudist and was shocked that Craig

11   turned out to be such a bad guy, but he said the exact same

12   things.  He talked about O.B. and the circumcision.  He talked

13   about how all that happened.  So it's a consistent story from

14   three and a half years ago, that he didn't know, couldn't know,

15   didn't think it was, because that wasn't the intent.

16            The other thing that I thought was interesting,

17   is why aren't there pictures of just David and the boys at

18   Craig Noonan's?  You know, there's no picture that I saw with

19   just Mr. Barry and his boys naked.  It was always Craig Noonan

20   either in the picture or around the picture.  So why isn't

21   there pictures?  Because they're not pictures of David Barry

22   and the boys.  He's not doing anything sexual with them,

23   because he has no sexual intent.  It's all Craig Noonan's ideas

24   and thoughts, which Mr. Barry can't be held responsible for

25   without some evidence of an agreement that he knew they were

1    child pornography.  And they have no evidence of that.

2                   Now, the Government's case doesn't show any

3    intent on the part of David Barry to produce child pornography.

4    The fact that they're on his computer, however they got there,

5    whenever they got there.  And they make a big point of some of

6    the pictures being on there on a date that he says he might not

7    have been in Houston or wasn't in Houston and the Wichita Falls

8    trial or this trial, but if you look at their exhibit list --

9    and I know I've got the old one, but there are in 4, for

10   example, 4c, f, h, i, j, are all created supposedly 6-18-2010

11   and then they're in the Craig Houston file.  But then 4d, the

12   one where Noonan is holding one of the children upside down,

13   that's created on 6-13 and it's in the same file folder.  So

14   maybe he was in Houston on 6-13.  It's only two days before.

15                   Then you go the rest of them, 4k, l, m are 6-18.

16   O, p, q, r, s are all 6-18.  But then you go to t, u, they're

17   6-13, and they're in the Craig Houston file.  So, Mr. Barry may

18   have had his dates wrong.  It was four years ago.  It was twice

19   in June.  Whether it was the first week and the second or the

20   first week and the third, it really doesn't matter.  But yet

21   they're saying he's a liar because of that, and their own

22   pictures, creation dates say that may not be true.

23                   The Government wants to focus on these bathtub

24   pictures, such as 6a.  That's the bathtub picture.  Well, if

25   you look at -- you've got a little boy in a bathtub, and I

1    can't tell -- well, I guess I didn't look, but 25a is both
2    little boys presumably in the same bathtub at the same time as
3    6a.  And they've both got the little bubbles on their chins
4    just like all our kids did when we're taking pictures of them
5    in the bathtub.  So who's to say that one of the boys got out
6    to take the picture of his brother and his brother climbed up
7    like a little monkey to show off.  The Government can't say any
8    adult took that picture or any adult knew that picture was
9    being taken.  They have no evidence of that.  They say, Well,
10   gosh, it was on his computer, so he must have known.  Well, the
11   fact that it's on his computer a month later doesn't mean
12   anything about who took the picture and what was intended at
13   the time.  They just don't have the evidence.
14              Then they want to talk about the picture of
15   Noonan, which is 31 and 32 with the boys.  If you look at 32,
16   it appears to me that the water is still in that picture.  And
17   then you look at 31, the water is moving in that picture, it
18   looks like to me.  So who's to say that he didn't use a timer
19   and jumped in.  He only had to jump in or actually jump out one
20   time to take two pictures.
21        MS. ZACK:  Objection, Your Honor.  That's a
22   mischaracterization of the evidence.  The EXIF data
23   demonstrates they were taken 40 seconds apart.
24        THE COURT:  Your objection is noted.
25        MR. JARVIS:  Well, I would think 40 seconds would be

1    plenty of time to get out, hit timer again and if you hit the

2    camera again where it says "timer," you can move it in such a

3    slight way as to get a slightly different angle on the second

4    picture from the first picture.  But, again, they don't have

5    any evidence that Mr. Barry knew about that picture at the time

6    it was taken, wanted it to be child pornography at the time it

7    was taken, or did anything with it, because those pictures,

8    these, quote, "child pornography pictures," they don't show

9    that they were sent to anybody.

10              Then in Government's Exhibit 30, Mr. Chappell, I

11   thought last week -- and I'm not a computer guy, so I don't

12   understand all of this stuff, but I thought he made it real

13   clear to me when I was asking these questions, that the

14   modified date and access date don't mean anything anymore,

15   because Vista has shut them down or somebody shut them down and

16   they don't mean anything.  And yet today we get, Well, it could

17   mean something.

18              But if you look at all these pictures in

19   Government's Exhibit 30, which is basically all of 4, and all

20   the created and access dates are the same on every single

21   picture.  So if we're to believe his testimony today that

22   sometimes the access date means something, if these were

23   intended to be child pornography and Mr. Barry knew they were

24   child pornography, wanted to have them to be child pornography,

25   why isn't he looking at them over and over again, like perverts

1    do?  Every single one of these have the access date the exact
2    same date they were taken, as if they were never seen again
3    from the date they were created on the computer.  That doesn't
4    make any sense.  Every single picture, Judge, has the same
5    date.  So either the access date doesn't mean anything or it
6    does.  And if it does, why isn't David Barry looking at these
7    child pornography pictures that he spent so much time creating?
8                And then they want to make a big deal about these
9    unknown pictures, the 4aa, bb, cc.  And they look at these
10   pictures like 4dd, a picture of the unknown boy and the unknown
11   man.  Again, no erect penises, no sexual stimulation or
12   simulation, nothing other than naked people.  And what's
13   interesting to me, in looking at 4ee, they're even outside
14   playing around.  All of these pictures are supposedly created
15   12 -- excuse me, 11-20-2010, except the one of the boy on the
16   bicycle.  According to their records, it was -- this is 4cc --
17   it was created 12-18-2010.  Well, how does that happen?  How
18   does one out of seven pictures get created almost a month
19   later?  It's the same boy.  Do they send it to him twice?  It
20   doesn't show that.  They can't tell that.  That doesn't make
21   any sense.  So I'm not sure about all of this created and
22   modified and access information.  But we know Mr. Barry didn't
23   take these pictures and we know he didn't produce them.  So
24   they're really not relevant as to whether or not the pictures
25   that he's charged with at the time are child pornography.

1            Basically we've got all of this bad stuff and he

2    just -- it looks bad.  He's doing bad things.  We've got

3    pictures of him and naked men touching each other.  Uh.  But

4    there's no sexual activity going on in any of these pictures,

5    Judge.  And you heard the uncontroverted evidence from

6    Mr. Barry and you know the Government had all of the

7    information because they had the transcript, that he loved

8    these boys.  He took them in when they were 1 and 2 basically.

9    They couldn't walk.  They couldn't talk.  They couldn't do

10   anything.  And he spent an enormous amount of time being a good

11   parent to them at that time.  He even learned how to talk in

12   sign language so he could teach one of the boys how to talk.

13   That's extraordinary steps.  Why if the master plan of David

14   Barry was to go adopt two little boys so he could sexually

15   molest them, why in the world would he teach them how to talk

16   and send them to school so they could tell everybody?  That

17   doesn't make any sense.  He put them in special classes.  He

18   did everything.  The Government's own expert testified, the

19   boys are doing good in school.  They're making straight As.

20   There's no problems with the boys.  So where is the master plan

21   of creating child pornography.  He was a good dad.  He just

22   made a horrible decision to become a nudist and include his

23   boys in that.

24            And you heard him testify.  You saw him.  He

25   realizes that he made a horrible decision.  And he knows he's

1  never going to see the boys again.  They're going to terminate

2  his rights.  He's going to voluntarily give up his rights.

3  Those boys are not going to be at risk anymore from David

4  Barry, if they ever were.  And one jury already found that they

5  weren't.  But he's already going to give up on the boys, and

6  that's as much punishment as you can do to a dad.  They don't

7  have any evidence that he did anything other than be naked.

8  He's lost his boys.  He's been in jail since June.  He doesn't

9  have a job.  He doesn't have any money.  Mr. Peterson is not

10  here to support him, so he's probably lost that relationship

11  too.  He made a horrible mistake by doing this, but that

12  mistake is not a crime.  It certainly wasn't proven beyond a

13  reasonable doubt that he intended to create child pornography

14  and intended to commit a crime.  I mean, his being naive and

15  trusting Craig Noonan shouldn't be a crime.  And based on all

16  the evidence, all the real evidence, not the assumptions from

17  the lack of evidence, the Government hasn't proved their case

18  beyond a reasonable doubt at all and we would ask the Court to

19  find him not guilty.  Thank you.

20            *THE COURT:*  Thank you, sir.  We'll finish after our

21  lunch break.  I've got that commitment I mentioned.  So about

22  1:15, does that work?

23            *MS. ZACK:*  Yes, Your Honor.

24            *MR. JARVIS:*  Yes, ma'am.

25            *THE COURT:*  All right.  Thank you.

1          *(Lunch recess from 12:15 p.m. to 1:15 p.m.)*

2          *(Open court, Defendant present.)*

3               *THE COURT:*  All right.  I think we're ready to

4     proceed.  Go ahead, Ms. Zack.

5               *MS. ZACK:*  Thank you, Your Honor.  I think that there

6     are some certain things that the Court needs to consider that

7     are slightly different than what was suggested by Mr. Jarvis.

8     The United States does not have to prove that Mr. Barry, as the

9     taker of an image, was sexually aroused by the image.  That's

10    not what the *Dost* factors say.  They say whether the depiction

11    appears to have been designed to elicit a sexual response in

12    the viewer, not the taker.  There are plenty of child

13    pornographers who have absolutely no sexual interest in

14    children, who know it's illegal, who take pictures, and who

15    profit off of it.  And I'm not saying that that's what

16    Mr. Barry did here.  But there's nothing in the law that says

17    Mr. Barry has to be sexually aroused by the pictures.  While I

18    believe that there's evidence that he is sexually aroused by

19    children, there doesn't have to be.

20               And the suggestion that just because he went

21    there doesn't demonstrate that he was part of the conspiracy, I

22    believe that the more likely story, Your Honor, is that

23    Mr. Barry was in love with Mr. Noonan and would do anything

24    that Mr. Noonan wanted him to do, including make his children

25    available for Mr. Noonan to look at, for Mr. Noonan to

1   photograph, photograph the three of them together, the tub

2   pictures specifically, Mr. Barry did, because that's what

3   Mr. Noonan wanted.  And Mr. Barry, by his own admission, was in

4   a relationship that was failing.  He was potentially moving to

5   Houston.  He was looking for jobs in Houston.  And the

6   explanation about the picture of he and Mr. Noonan in the bed

7   with their arms around each other and wanting it just because,

8   doesn't make sense.

9          The fact that Mr. Barry didn't distribute these

10  images to a child pornography Web site is not an element.

11  There are many cases where the girlfriend of the pedophile

12  takes pictures of her child and supplies them to her boyfriend,

13  child pornography pictures, and she is not sexually aroused by

14  them but she does this because if she doesn't, she's going to

15  lose her boyfriend.  And she goes to prison just like he does,

16  because she produced child pornography.  There does not have to

17  be any distribution in order for this to have been a crime with

18  which Mr. Barry can be convicted of.  And child pornographers

19  come in all shapes and sizes and have different motivations and

20  different reasons for doing what they did.

21         And it seems to stretch the boundaries of logic

22  to suggest that Mr. Noonan for some unknown reason, because

23  there's no explanation for this, put all these images on

24  Mr. Barry's computer and put them in two separate places and

25  put them in -- well, actually three separate places, the

1    favorites, subfolder my pics, the Craig Houston, and David and
2    the boys files that were all in one area, and then in the
3    Instant Messenger cache.  I mean, that doesn't make any sense.
4    And defense counsel suggests that the Government's evidence is
5    all assumptions.  I don't believe the exhibits we put into
6    evidence are assumptions.  I believe they demonstrate that
7    Mr. Barry colluded with Mr. Noonan and conspired with
8    Mr. Noonan to take these images and to make these children
9    available.
10                Child pornography does not have to be a
11   professional photo shoot.  He talks about poses.  That
12   doesn't -- it doesn't apply to every picture.  It doesn't apply
13   to every instance.  Are their child pornography images where
14   young children are posed in certain ways in order to elicit a
15   sexual response in the viewer?  Yes.  But that's not a
16   requirement.  And these pictures were taken for -- or with the
17   knowledge of Mr. Barry and by Mr. Barry, some of them.  So to
18   say he was unaware, it doesn't make any sense.  And by his own
19   admission, he was only gone for 45 minutes.  If what they're
20   suggesting is correct, then every time Mr. Barry went to the
21   bathroom, Mr. Noonan whipped out the camera and started taking
22   pictures.  Every time Mr. Barry was asleep, Mr. Noonan whipped
23   out the camera and was taking pictures.  And then secretly
24   Mr. Noonan took Mr. Barry's computer and loaded this all on
25   there for no logical reason and now all of a sudden Mr. Barry,

1    the naive nudist, is sitting before this Court saying, I didn't

2    know.  It wasn't my intention.  It's not my fault.  I would

3    never do this.

4              The more logical thing, Your Honor, is he was in

5    love with Mr. Noonan; he started to explore his own sexual

6    interest in children, which is demonstrated by the chats; his

7    behavior escalated; he had the pictures from June from both

8    different occasions; then in November, he's chatting with

9    somebody and he gets the unknown pictures.  Then they go back

10   in December and he takes more pictures, specifically

11   Government's Exhibit 31 and 32, which are the bathtub pictures

12   dated January 2nd of 2011, and then there's more chats about

13   masturbation, about other people masturbating with children,

14   about how little boys like their penises touched.

15             And the argument about R.B. and him touching R.B.

16   and why would he do that after he got the children back, and my

17   response to that would be because he believed he had gotten

18   away with it.  He was home free.  He got the kids back.  He

19   hadn't been charged federally with anything.  He had

20   disassociated himself with Mr. Noonan.  And who was going to do

21   or say anything at this point?  He got the kids back.  But that

22   doesn't matter.  Because even if you take out of the equation

23   the touching of R.B., even if he only allowed these pictures to

24   be taken for Mr. Noonan's sexual gratification, it's still

25   production of child pornography.  He still conspired to do it,

1    and he's still guilty.   Thank you.

2             THE COURT:  All right.   Thank you very much.   I have

3    the proposed findings and conclusions.   Do you have any

4    anything specific you wanted to bring to my attention with

5    respect to those on behalf of the Defendant?

6             MR. JARVIS:  I haven't been able to review the new one

7    all the way through yet, Judge.   But I think the specific

8    pictures, exhibits should be listed and the analysis that the

9    Court would run through to decide whether or not they're child

10   pornography should be for each and every picture.   That would

11   be my general objection.   I have some other objections

12   because --

13            THE COURT:  Do you have authority that supports that

14   requirement?

15            MR. JARVIS:  Not case law that says that is required,

16   but in the cases I've reviewed, there were -- each picture --

17   granted, there weren't as many pictures as these, but in the

18   cases that I reviewed, each picture had an analysis by them.

19   That's my understanding.   Because otherwise like on page 7,

20   No. 9, many of the images admitted into evidence meet the

21   federal definition.   Well, I don't think many, while it's not

22   statutorily required that they pick a number, once they've

23   announced to the Court which ones they are relying on for a

24   conviction, I think the Court has an obligation to say yes or

25   no on each picture.   Because otherwise it's just a general

1   verdict and there's not any findings of fact and conclusions of

2   law.

3          THE COURT:  Did you want to respond?

4          MS. ZACK:  Yes, Your Honor.  Typically when one reads

5   the decisions based on jury trial verdicts or even based on

6   pleas, they're not --

7          THE COURT:  No, I know, but he's talking about

8   findings and conclusions, specifically when those are

9   requested.  Focus on those cases.

10          MS. ZACK:  I have not reviewed any where it's based on

11   that, other than there is a -- and I don't have the cite in

12   front of me, but I can furnish it to the Court.  There was a

13   case, I believe it was out of the Northern District of Georgia.

14   It involved a series of videos.  It was call the *Azov Films*

15   case.  That's what they referred to it as.  That was not the

16   defendant's name, but the videos were wrestling videos of boys

17   out of Europe.  There was no sex in them.  There was no sexual

18   positions.  There was no anything.  It was boys wrestling

19   naked, covered in whipped cream, covered in oil, in what

20   appears to be a kiddy pool in someone's kitchen and they were

21   produced mostly in Romania.  And in this decision the judge

22   referred to several of the videos by their title and found that

23   they were child pornography, and that was based on a nonjury

24   trial.  And I can get that cite to the Court shortly.

25          THE COURT:  All right.  Thank you.  That would be

1    helpful.  Provide it to the other side as well.

2            MS. ZACK:  Yes, Your Honor.

3            THE COURT:  And any other similar cases would, of

4    course, be helpful to consider.  Very good.  Anything further

5    you want me to consider as I work on these findings and

6    conclusions?

7            MS. ZACK:  Nothing further to consider, Your Honor.

8    But we have the original notebook that we will be submitting.

9            THE COURT:  If you would hand them to my law clerk,

10   please, Mr. Thompson.

11           MS. ZACK:  Yes.

12           THE COURT:  Thank you.

13           MS. ZACK:  And this contains all of the images and

14   the -- that we talked about, all the exhibits we talked about,

15   as well as DVDs of the items that were put in to evidence.  As

16   far as the laptops, Your Honor, and the hard drives and the

17   cameras, does the Court want to retain those at this time?

18           THE COURT:  Yes.  Yes.  All right.  Anything further?

19           MR. JARVIS:  No, ma'am.  Thank you.

20           THE COURT:  Thank you very much.

21           MS. ZACK:  And, Your Honor --

22           THE COURT:  You're all excused.

23           MS. ZACK:  -- we'll send the e-mail to Ms. Eddins and

24   cc defense counsel with that cite.

25           THE COURT:  Yes, please.  Thank you.  And any others

1  that are going to be helpful.  Thank you.  I'll be up here for

2  a moment.  Thank you.  But you are free to leave.

3         MR. JARVIS:  Judge, if I could ask a question

4  procedurally?

5         THE COURT:  Sure.

6         MR. JARVIS:  I'm assuming you're going to send us a

7  written order and we won't have the privilege of coming back?

8         THE COURT:  You won't have the requirement of coming

9  back, that's true.

10        MR. JARVIS:  No, I've been here enough.  Thank you.

11 I've enjoyed it.

12        THE COURT:  Thank you very much.  I hope you feel

13 better.

14        MR. JARVIS:  Yes, ma'am.

15    (Concluded at 1:30 p.m.)

16                              * * *

17 I certify that the foregoing is a correct transcript from the

18 record of proceedings in the above-entitled cause, to the best

19 of my ability.

20

21 /s/ _Kathy L. Metzger_____          ___4-18-2015___

   Kathy L. Metzger                      Date

22 Official Court Reporter

23

24

25